IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| DIAMOND CONSORTIUM, INC. D/B/A | § | |
| THE DIAMOND DOCTOR | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. |
| | § | |
| | § | |
| BRIAN MANOOKIAN | § | |
| | § | |
| | § | |
| Defendant. | § | |

## THE DIAMOND DOCTOR'S ORIGINAL COMPLAINT

Plaintiff Diamond Consortium, Inc. d/b/a The Diamond Doctor files this Original

Complaint complaining of Defendant Brian Manookian and respectfully shows the Court the

following:

### I. PARTIES

1.      Diamond Consortium, Inc. d/b/a The Diamond Doctor ("The Diamond Doctor")

is a Texas corporation with its principal place of business located at 8127 Preston Road, Dallas,

Texas 75225.

2.      Brian Manookian is a natural person and resident of the state of Tennessee. His

address is 133 Trail East Drive, Hendersonville, Tennessee, or alternatively, 112 West End

Close, Nashville, Tennessee.

### II. JURISDICTION AND VENUE

3.      The Court has jurisdiction over non-resident Brian Manookian because

Manookian purposefully availed himself of the privileges and benefits of conducting business in

Texas by committing torts and other illegal acts, which are the subject matter of this suit, in

whole or in part in Texas. This Court further has jurisdiction over Manookian pursuant to 18 U.S.C. 1964 (c).

4.      Venue is proper in this Court as it is in this District that at least part of the acts, omissions, and injuries giving rise to The Diamond Doctor's claims occurred. Venue is further proper pursuant to 18 U.S.C. § 1965.

### III.  EXECUTIVE SUMMARY OF THE LAWSUIT

5.       This is a case about a cunning shakedown operation to extort millions of dollars from a long-time, well-respected Dallas area businessman. The main perpetrator of the shakedown operation is a lawyer and convicted criminal named Brian Manookian. Manookian and his firm Cummings Manookian selectively target and systematically attack prominent, successful retail jewelers around the country as "fraudsters" perpetrating "scams" accusing them—without any evidence—of selling poor quality diamonds at inflated prices.

6.      Manookian utilize slickly produced internet websites with videos featuring Manookian himself and social media campaigns plastered with the victim's trademarks and logos. The targeted jeweler (in this case, The Diamond Doctor) naturally contacts Manookian directly or indirectly and demands a stop to the disparaging and harassing campaigns. Manookian personally responds and negotiates with the potential extortion victim. Manookian quickly gets to the point: the victim has the choice of retaining Manookian and his firm as outside counsel at a cost of millions of dollars or face further intimidation, unsubstantiated allegations, and harassment. This is no choice at all.

7.      Rather than give into the demands of an extortionist and convicted criminal, The Diamond Doctor has decided to expose Manookian and his thinly veiled, yet sophisticated

scheme of extortion and shakedowns. The Diamond Doctor brings claims for violations of RICO

and other federal and state causes of action against Manookian.

## IV.  FACTUAL BACKGROUND

A.      The People and Entities Involved.

1.      <u>The Diamond Doctor</u>. The Diamond Doctor is a Dallas-based wholesaler of

diamonds, gemstones, and other jewelry. The Diamond Doctor attracts customers from Dallas-

Fort Worth and the surrounding suburbs including Plano, Texas. The Diamond Doctor has

earned and enjoys a reputation in the community for selling high-quality jewelry at fair prices.

*a.      Who is David Blank?* The Diamond Doctor's owner is David Blank, a

native of South Africa. In South Africa, Blank built a successful jewelry business only to have it

ruined when Blank and an employee became victims of a violent robbery. Blank's employee was

murdered at the hands of the robbers, and Blank decided to leave his homeland seek a new life in

another country.

Blank came to America and became a proud naturalized citizen of the United States. In

America, Blank started over in the jewelry business. He worked as an entry-level salesman for a

diamond wholesaler. Eventually, he was able to start another business and founded The Diamond

Doctor.

*b.      Philanthropy.*  The Diamond Doctor is a regular contributor to MD

Anderson Cancer Center, St. Jude's Children's Hospital, the Suicide Crisis Prevention Center,

American Heart Association, the Jewish Federation, and many other charities benefitting the

underprivileged and other causes.

*c.      The Diamond Doctor Mark.* The Diamond Doctor is the owner of the

well-known and federally protected trademark "The Diamond Doctor" (The "Diamond Doctor

Mark") used in connection with its Dallas-based jewelry store and related goods/services. The Diamond Doctor has extensively used and advertised The Diamond Doctor Mark. The Diamond Doctor Mark has come to indicate to the relevant trade and consumers, goods, and services that have its source of origin in, or are connected with, The Diamond Doctor. In fact, The Diamond Doctor is an official sponsor of the Dallas Cowboys.

The Diamond Doctor devotes significant resources every year on marketing and advertising The Diamond Doctor Mark on the Internet, television, radio, and in print.  As a result of those efforts and as a result of The Diamond Doctor's extensive and continued use of The Diamond Doctor Mark, The Diamond Doctor Mark has become well-known to consumers in Dallas, Texas, and the surrounding area as a designation that identifies and distinguishes the quality goods/services The Diamond Doctor offers.

2.      <u>Manookian</u>. Defendant Manookian is a Nashville, Tennessee based lawyer and the main perpetrator of the illegal scheme to extort The Diamond Doctor.

On February 9, 2015, Manookian was charged in federal court with three counts of mail fraud, one count of violating the federal Food Drug and Cosmetic Act (FDCA), and conspiring to commit violations of the FDCA. (App. 1-App. 18.) Two of Manookian's family members, Edward and Karen Manookian, were also charged with the mail fraud and conspiracy to commit FDCA violations in the same indictment. (*Id.*) On March 11, 2015, Manookian pled guilty to violating the FDCA and is currently serving one year of probation. (App. 19-36.) Manookian is under house-arrest as part of his plea agreement. (App. 34.) Manookian has used (and may continue to use) the alias Brian Manning. (App. 2.)

3.      <u>Cummings Manookian</u>. Defendant Cummings Manookian is a two-person law firm in Nashville, Tennessee. Upon information and belief, Manookian and Brian Cummings are

partners in Cummings Manookian. Cummings Manookian participates in and benefits from the nationwide scheme of extortion Manookian perpetrates.

1.      Brian Cummings. Cummings participated in the targeting of at least one victim in the nationwide extortion scheme Manookian operate.

2.      Boaz Ramon. Ramon is the owner of Genesis Diamonds. In May 2014, Genesis Diamonds was the subject of local television news reports for selling over-graded diamonds. *See* http://www.wsmv.com/story/25435522/questions-about-the-quality-of-diamonds-at-nashvilles-best-known-jeweler. Upon information and belief, Ramon was one of Manookian' first victims and is now actually a client of Manookian in other litigation. Ramon has participated in at least three of Manookian' attempts to extort retail jewelers in the Washington, DC, Philadelphia, and Florida.

**B.      How Retail Diamonds Are Graded.**

Manookian uses these allegations about the different grading systems used in the retail diamond industry to ensnare victims in his extortion scheme. So, a cursory understanding of the different methods of diamond grading is helpful for this case.

1.      GIA. The Gemological Institute of America ("GIA") is a nonprofit gem research institute. The GIA is widely considered to be the world's leading authority on diamonds, other stones, and pearls. The GIA provides resources for people seeking a career and/or credentials in gemology or retail jewelry. The GIA is perhaps best known for developing a widely used grading system for diamonds which employs what is commonly known as the "4Cs": cut, color, clarity, and carat weight. From those characteristics, a report with an overall "grade" for the diamond is generated. In short, a GIA certification is regarded as the most credible evaluation of a diamond's overall quality and, thus, plays a large role in its monetary value.

2.      <u>The other methods</u>. There are various other methods for grading diamonds. For example, one such other method is provided through an entity called EGL International ("EGL"). Unlike the GIA, EGL is a for-profit enterprise based in Israel.  It has become widely known in the industry that grading from EGL is not as nearly reliable as a certification from the GIA.

3.      <u>The Diamond Doctor's policy of full disclosure</u>. The Diamond Doctor has had and continues to maintain a consistent policy of disclosing to its clients the significant differences between grading and certification from, on the one hand, GIA and, on the other hand, non-GIA entities like EGL. Simply put, The Diamond Doctor makes its clients aware of the superiority of a GIA certification as opposed to those of other non-GIA entities. These disclosures from The Diamond Doctor include the potential for higher appraised values for GIA certified diamonds and the resulting retail pricing disparities between GIA and non-GIA/EGL certified diamonds.

So, The Diamond Doctor prices each diamond according to its specific type of certification. In other words, The Diamond Doctor always sells non-GIA/EGL certified diamonds for significantly less than a GIA-certified diamond because of the discrepancy in the reliability of the respective certifications. Lastly, the Diamond Doctor offers refunds to any customer dissatisfied with his/her purchase.

**C.      The Extortion Scheme.**

Manookian has seized on this alleged flaw in the retail diamond industry and targeted jewelers across the country in a complex scheme to extort millions of dollars from its victims.

1.      <u>Targeting The Diamond Doctor</u>. In October 2015, Manookian set his sights on The Diamond Doctor with a systematic campaign on the internet and social media culminating in the attempted extortion.

a.      *Harassing websites*. In or around October 2015, Manookian created two websites, www.diamonddoctorlawsuit.com and www.diamonddoctorclassaction.com, utilizing The Diamond Doctor Mark and photos of The Diamond Doctor's location to launch broadsides that The Diamond Doctor has "cheated" and "ripped off" its customers through the sale of non-GIA certified diamonds. (App. 37-App. 44.)

b.      *Social media*. Manookian increased the pressure through Facebook. First, on or around November 5, 2015, Manookian posted messages on the newsfeed of The Diamond Doctor's Facebook page calling The Diamond Doctor a "scam" and making accusations about cheating customers. (Ex. App. 45.) At about the same time, Manookian then went a step further and targeted The Diamond Doctor's employees with Facebook messages. (App. 46.) "Do you work here? Ask David Blank if you could be personally liable for the fraudulent [sale of diamonds] . . ." (*Id.*)

c.      *Direct contact*. The Diamond Doctor's owner, Blank, eventually contacted Manookian about the websites and Facebook postings and messages. Manookian claimed to have 10-20 clients ready to sue The Diamond Doctor for selling them over-graded diamonds. However, Manookian told Blank that he would take down the website and cease attacks on Facebook if The Diamond Doctor "engaged" Cummings Manookian as its outside legal counsel. In order to tempt The Diamond Doctor into substantive negotiations and eventual retention of Cummings Manookian, Manookian agreed to a temporary halt in the publicity attacks. Manookian also claimed he would delay the start of a television, radio, and billboard campaign as long as The Diamond Doctor was negotiating.

Manookian proposed that The Diamond Doctor pay Cummings Manookian $25,000 a month over a 10 year period for an aggregate fee of $3,000,000. Importantly, if The Diamond

Doctor terminated the engagement for any reason, it would still owe Cummings Manookian the

full $3,000,000. Furthermore, Manookian portrayed the proposed relationship as one between a

client and its attorney. However, when The Diamond Doctor asked about legal representation in

a potential lawsuit, Manookian explained he was not interested in performing actual legal work

for The Diamond Doctor.

Manookian's only interest was in collecting the $3 million payoff. In other words,

Manookian's attacks would only end in return for the $3 million payment. Interestingly,

Manookian confessed that the 10-20 clients who had purportedly retained Cummings Manookian

to sue The Diamond Doctor would not get any of the $3 million. All of the money would go to

Cummings Manookian.

On November 12, 2015, Blank and Manookian discussed the proposed agreement in a

recorded phone conversation:

| | |
|---|---|
| Blank: | Just to be on the same page, we get this agreement in place, we get funds, you'll agree never to up this campaign ever again? |
| Manookian: | Correct. I would not be able to. As your lawyer, I would effectively be conflicted out from doing that ever. If you want to spell that out in an agreement, I have never done that before, but we can. |
| Blank: | Brian, it's $3,000,000. I would like to. |
| Manookian: | No, I understand. It is a belt and suspenders approach, and I totally understand it. |
| Blank: | I fully understand that you can put it up [i.e., re-start the website and Facebook campaign against Diamond Doctor] at any time if make any missteps or anything like that. Clearly, I am at your mercy. |

d.  *Engagement agreement.* After these initial conversations with, Manookian

emailed a proposed "Consulting/Engagement Agreement" (the "Manookian Agreement"). (App.

47-App. 52.) Cleverly, the Manookian Agreement was a version another jeweler supposedly executed with critical information concerning the payment terms and length redacted. (*Id.*) This served two purposes. First, the ostensible acceptance by another jeweler portrayed the Manookian Agreement as part of a legitimate transaction as opposed to what it really was—the coup de grace in Manookian's extortion scheme. Second, the redacted payment terms in the Manookian Agreement leave the victim without any written documentation of the key element of the scheme aside from Manookian's own verbal threats and activation and re-activation of the website and social media attacks. Nonetheless, Manookian did leave one critical term un-redacted—The Diamond Doctor's obligation to pay the full amount (*i.e.*, $3,000,000) to Manookian even if it terminates the Manookian Agreement. (App. 52.)

   *e.*  *Renewed harassment.* The Diamond Doctor would not submit to Manookian's extortion and execute the Manookian Agreement. When Manookian realized The Diamond Doctor would not pay, they re-activated the websites. (App. 37-App. 44.) In or around January 26, 2015, Manookian created his own Facebook page rather than just posting on The Diamond Doctor's own newsfeed in Facebook. (App. 53-App. 54.)  On January 19, 20, 21, and 25, they posted videos on YouTube. (App. 55-App. 68.) Upon information and belief, on January 12, 2016, Manookian posted on www.ripoffreport.com that The Diamond Doctor had committed "heinous crimes." (App. 69-App. 72.) Finally, Manookian even distributed fliers in and around The Diamond Doctor's location and Blank's own residential neighborhood in Dallas. (App. 73-App. 74.)

   2.  <u>Other victims</u>. Manookian have attacked other retail jewelers across the country in eerily similar fashion.

a.      *Mervis Diamond Importers (Maryland, Virginia, and District of Columbia).*

i.      <u>Media campaign</u>. Manookian targeted Mervis Diamond Importers ("Mervis") in a similar fashion as The Diamond Doctor. They established a website. (App. 75-App. 78.) Mervis then corresponded directly with Manookian in an attempt to end the harassment. In an email December 10, 2015, Manookian threatened Mervis with the distribution of "tens of thousands of the attached brochures, as well as door hangers, scheduled to begin being distributed in DC, Maryland, and Northern Virginia beginning this weekend" unless Mervis reached a settlement with two supposedly aggrieved former customers of Mervis. (App. 88.)

ii.      <u>Coerced settlement.</u> Manookian proposed settlement amounts exponentially larger than any damages (assuming the claims had merit—which they did not). Nonetheless, Mervis considered paying in order to stop the publicity.  "The amounts you're claiming, $200,000 and $100,000 . . . respectively are excessive and they have no foundation. However, we are inclined to accept as a business decision, even though we deny any wrongdoing, if this ends the continuous string of negative publicity." (App. 87.)

Sensing a possible payoff, Manookian agreed to cease the attacks. "At your request . . . our firm has paused all Mervis-related advertising and suspended its related website." (App. 86.) When Mervis eventually refused to give in, Manookian promised "an avalanche of claims over the next year" and no further settlement offers "ever . . . [j]ust lawsuits." (App. 79-App. 80.) Then, Brian Cummings, Manookian's law partner, interjects and states with copy to Mervis's lawyers: "Brian—Let's also restart our previous Internet campaign [against Mervis] in earnest

tomorrow." (App. 79.)  Manookian then distributed brochures in Maryland, the District of

Columbia, and Virginia identical to the ones Diamond Doctor experienced. (App. 90.)

Manookian's response to Mervis' refusal to settle the bogus claims is telling. Rather than

just advancing his clients' claims through litigation (eventually suits were filed) or publicity,

Manookian threatened to continue the barrage of disparaging comments on the internet and start

distributing fliers. In other words, Manookian's proposed deal was pay-up or face continued

negative publicity. The present claims of his clients, whom they should have been advocating for

first and foremost, were not part of the proposed *quid pro quo*. Presumably, the clients would get

nothing. The same was true in Manookian's campaign against The Diamond Doctor.

iii.     <u>Co-conspirator</u>. Manookian's targeting of Mervis is significant

because it also introduces Ramon as part of the extortion scheme. As described above, upon

information and belief, Ramon was one of Manookian's first targets. However, now he is

actually a client of Manookian in a separate lawsuit against another jewelry retailer.  (App. 91-

App. 108.)

Ramon is important in this case because he corresponded with Mervis via email on

September 18, 2015, to warn him about Manookian. (Ex. V.) Ramon tells Mervis that

Manookian's victims can "avoid [a lawsuit] if they would call [Manookian] before." (App. 110.)

The same day he again warns "the earlier [j]ewelers . . . reach out to him the less damage they

have." (App. 109.) On October 2, 2015, Ramon writes again under the subject "Don't miss the

boat." (App. 112.) He again admonishes Mervis "I think they [Manookian] are going to file

lawsuits and a web site in your area next week." (App. 112.) He concludes: "If you can avoid it

before it will be great for you." (*Id.*)

There is no explanation for how or why Ramon would know what tactics Manookian was going to unleash against Mervis unless he was coordinating with them. Upon information and belief, Ramon has bargained with Manookian to take part in the extortion scheme by convincing fellow jewelers to pay Manookian's demands in return for some benefit—perhaps free representation in Ramon's previously mentioned lawsuit.

       *b.*     *Golden Nugget Jewelry (Philadelphia, Pennsylvania).* Ramon played a central role in the targeting of Golden Nugget Jewelry ("Golden Nugget"). On August 12, 2015, Ramon contacted Golden Nugget's owner. In a subsequent phone call, Ramon revealed that Manookian—whom Golden Nugget's owner had never heard of—was planning a negative media campaign against Golden Nugget. Ramon warned that Manookian promised Golden Nugget would "go through hell" unless they agreed to hire and pay them. Later in August 2015, Ramon again warned Golden Nugget to contact Manookian as soon as possible.

On September 16, 2015, an unknown sender from the email address michaelgold@gmail.com emailed Golden Nugget with a link to a website www.goldennuggetlawsuit.com. (App. 113.) The website is again identical to the one Manookian used for the other victims except for the name of the victim. (App. 114-App. 117.) Golden Nugget demanded Manookian take down the website, but they refused.

On October 9, 2015, Ramon agreed in a phone conversation that Manookian' scheme was "extortion" and "blackmail." Ramon explained Manookian targeted Golden Nugget because it was successful and, thus, "needed to pay." Ramon said that Manookian would ruin Golden Nugget's reputation if they did not give in. On November 10, 2015, Ramon texted Golden Nugget's owner with the message "Class action is very serious" alluding to Manookian's supposed plans to file a class action against Golden Nugget. (App. 118.)

On November 18, 2015, Manookian posted a message on a Golden Nugget employee's personal Facebook page. "Do you work here? Ask if you are selling over graded Golden Nugget Jeweler diamonds." (App. 119.) Facebook postings continued throughout the holiday shopping season. (App. 120.)

        *c.*     *International Diamond Center (St. Petersburg, Florida).* Ramon also forewarned International Diamond Center ("IDC") about pending attacks from Manookian. Ramon text messaged a former employee of his currently working for IDC "If you need help with it, let me know." The message provided a link to Manookian's website targeting IDC www.internationaldiamondcenterlawsuit.com. (App. 121-App. 124.) Manookian also established a Facebook page linking to the website. (App. 125-App. 128.) The Facebook page also links to commentary and text meant to indicate links to lawsuits against IDC which actually do not exist. (App. 128.) One correctly notes how misleading Manookian is being: "[T]here is no formal lawsuit against IDC." (*Id.*) Ramon also contacted IDC and encouraged them to pay Manookian. Finally, just like with The Diamond Doctor, Manookian posted a story on a website called "Ripoff Report" claiming that IDC defrauded its customers. (App. 129-App. 132.)

        *d.*     *Padis Jewelry (San Francisco, California).* The last known victim of Manookian is Padis Jewelry ("Padis") in California. Manookian set up a website accusing Padis of fraud identical to the ones previously discussed. (App. 133-App. 136.)

## V.  CAUSES OF ACTION

**A.**    **Violations of Racketeer Influenced Corrupt Organizations Act (18 U.S.C. § 1962(c)).**

The Diamond Doctor re-alleges and incorporates herein by reference each and every foregoing paragraph of this complaint as if fully set forth below.

1.      <u>RICO Persons</u>. At all relevant times, The Diamond Doctor is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c). At all relevant times, Manookian was a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

2.      <u>The RICO Enterprise</u>. Cummings Manookian is a law firm formed and operating, upon information and belief, under the laws of the state of Tennessee. Cummings Manookian's ostensible purpose is to represent clients in civil lawsuits. In reality, Cummings Manookian is much more. Cummings Manookian, as The Diamond Doctor has alleged and described in the foregoing paragraphs of this complaint, is an ongoing enterprise engaging in illegal acts. Cummings Manookian participates in the commission of extortion and other illegal acts through a sophisticated, systematic scheme of targeting retail jewelers across the country through a barrage of false, misleading, and harassing publicity on the internet, social media, and distributed fliers in the geographic locations of its victims.

For the express purposes of this complaint, Cummings Manookian has targeted and continues to target The Diamond Doctor with all of the aforementioned acts including, without limitation, 1) establishing false, misleading, and harassing internet websites www.diamonddoctorlawsuit.com and www.diamonddoctorclassaction.com, 2) posting false, misleading, and harassing messages and videos on Facebook, YouTube, and Ripoff Report against The Diamond Doctor and its employees, and 3) distributing false, misleading, and harassing fliers in and around The Diamond Doctor's physical location in Dallas, Texas. Cummings Manookian has engaged in this campaign against The Diamond Doctor for the express purpose of extorting $3 million from The Diamond Doctor as described in detail above.

Cummings Manookian is necessary to Manookian's illegal acts as described herein. Specifically, Manookian can portray his illegal acts (including, without limitation, the illegal acts

of Cummings Manookian) as nothing more than a law firm soliciting clients. However, Cummings Manookian is a corrupt organization operated and managed through a pattern of racketeering activity as described more fully herein and including the extortion of victims like The Diamond Doctor who have not committed the wrongdoing of which they are accused. Finally, Manookian individually is separate and distinct from the enterprise as described herein through the commission of illegal acts.

3.      Association in Fact Enterprise. Cummings Manookian and Ramon are members of an association in fact enterprise. Cummings Manookian and Ramon have defined roles. As described in detail above, Cummings Manookian has targeted and continues to target The Diamond Doctor and other victims across the country by 1) establishing false, misleading, and harassing internet websites www.diamonddoctorlawsuit.com and www.diamonddoctorclassaction.com, 2) posting false, misleading, and harassing messages and videos on Facebook, YouTube, and Ripoff Report, and 3) distributing false, misleading, and harassing fliers in and around The Diamond Doctor's physical location in Dallas, Texas. Cummings Manookian has engaged in this campaign against The Diamond Doctor for the express purpose of extorting $3 million from The Diamond Doctor as described in detail above.

Ramon's role in the association in fact enterprise is different but no less important. As described in detail above, Ramon worked in concert with Cummings Manookian by warning victims like Mervis and Golden Nugget of the impending internet, social media, and flier campaigns.  Ramon, then, encouraged Mervis and Golden Nugget to give into Manookian's demands and pay them. Ramon and Cummings Manookian have operated and, upon information and belief, continue to operate in the fashion as described in detail above.

Finally, Manookian operates and manages the association in fact described above through a pattern of racketeering activity.

4.      <u>Predicate acts</u>. Manookian has engaged in a pattern of racketeering activity. Manookian conducted or participated, directly or indirectly, in the conduct, management, or operation of Cummings Manookian as an enterprise as described above through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c). The Diamond Doctor has suffered and continues to suffer harm as a result of each of these predicate acts detailed below in the form of costs associated with hiring various professionals to respond to the systematic and targeted campaign of negative publicity.

a.      *Extortion in violation of Hobbs Act 18 U.S.C. § 1951*. At all times relevant to this Complaint, The Diamond Doctor was engaged in interstate commerce and in an industry that affects interstate commerce. As described in detail above, Manookian has engaged in a systematic scheme of targeting retail jewelers across the country through a barrage of false, misleading, and harassing publicity on the internet, social media, and distributed fliers in the geographic locations of its victims. For the express purposes of this complaint, Manookian has targeted and continues to target The Diamond Doctor with all of the aforementioned acts including, without limitation 1) establishing false, misleading, and harassing internet websites www.diamonddoctorlawsuit.com and www.diamonddoctorclassaction.com, 2) posting false, misleading, and harassing messages and videos on Facebook, YouTube, and Ripoff Report, and 3) distributing false, misleading, and harassing fliers in and around The Diamond Doctor's physical location in Dallas, Texas. Manookian has engaged in this campaign against The Diamond Doctor for the express purpose of extorting $3 million from The Diamond Doctor as described herein.

Manookian's actions as described above are designed to induce the fear in The Diamond Doctor and its employees that Manookian will, among other things continue to 1) maintain false, misleading, and harassing internet websites www.diamonddoctorlawsuit.com and www.diamonddoctorclassaction.com, 2) post false, misleading, and harassing messages and videos on Facebook, YouTube, and Ripoff Report, and 3) distribute false, misleading, and harassing fliers in and around The Diamond Doctor's physical location in Dallas, Texas, unless and until The Diamond Doctor "retains" Cummings Manookian as its outside counsel for no apparent benefit other than to halt the negative publicity campaign of intimidating and harassing falsehoods. Manookian's actions as described herein have created a reasonable fear of harm on the part of The Diamond Doctor including, without limitation, the fear of economic loss and damage to its hard-earned reputation.

Manookian has, thus, unlawfully obstructed, delayed, and affected—and attempted to obstruct, delay, and affect—commerce as that term is defined in 18 U.S.C. § 1951, and the movement of articles and commodities in such commerce, by extortion, as that term is defined in § 1951 to the extent that Manookian attempted to induce The Diamond Doctor to relinquish property (i.e., $25,000 per month for 10 years or $3 million) through the wrongful and illegal use of actual and threatened fear of economic and reputational harm.

b. *Mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341, 1343*. As described in detail above, Manookian has engaged in a systematic scheme of targeting The Diamond Doctor through a barrage of false, misleading, and harassing publicity on the internet, social media, and distributed fliers in The Diamond Doctor's geographic location. Manookian has engaged in this campaign against The Diamond Doctor for the express purpose of extorting $3 million from The Diamond Doctor as described in more detail above.

In furtherance of this scheme, and as described above, Manookian transmitted, or caused to be transmitted, by means of wire communication in interstate commerce, writings, signs, pictures, and sounds, and also caused matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier without limitation the following:

    i.    Websites, www.diamonddoctorlawsuit.com and www.diamonddoctorclassaction.com, incorporating false, misleading, and harassing statements regarding The Diamond Doctor and its business;

    ii.    Postings and messages on the internet website Facebook incorporating false, misleading, and harassing statements regarding The Diamond Doctor and its business some of which were directed at The Diamond Doctor's employees threatening them with personal liability for no reason other than to harass and intimidate them and The Diamond Doctor;

    iii.    Posting false, misleading, and harassing messages on the internet website Ripoff Report;

    iv.    Posting videos on the internet website YouTube incorporating false, misleading, and harassing statements regarding The Diamond Doctor;

    v.    Transmission through the mail system, other interstate carrier, or electronic mail of fliers for distribution containing false and

> misleading statements in and around The Diamond Doctor's geographic location in Dallas, Texas; and

vi.   The transmission through electronic mail of the Manookian Agreement and other communications concerning the Manookian Agreement for the express purpose of inducing The Diamond Doctor to execute it and pay Manookian $3 million.

Manookian participated in the scheme or artifice knowingly, willfully, and with specific intent to generate fear on the part of The Diamond Doctor such that The Diamond Doctor would execute the Manookian Agreement and pay Manookian $3 million.

Upon information and belief, persons who have seen the internet websites, the Facebook, YouTube, and Ripoff Report postings, messages, and videos, and the fliers distributed in Dallas, Texas, have relied on their false and misleading contents to the harm and detriment of The Diamond Doctor.

c.   *Travel Act in violation of 18 U.S.C. § 1952.* As described in detail above, Manookian have engaged in a systematic scheme of targeting The Diamond Doctor through a barrage of false, misleading, and harassing publicity on the internet, social media, and distributed fliers in The Diamond Doctor's geographic location. Cummings Manookian has engaged in this campaign against The Diamond Doctor for the express purpose of extorting $3 million from The Diamond Doctor. In furtherance of this scheme, and as described above, Manookian transmitted, or caused to be transmitted, by travel, mail, or any other facility in interstate commerce  in the furtherance of unlawful activity or promote, manage, establish, carry on, facilitate the promotion, management, establishment, or carrying on of any unlawful activity through the following without limitation:

i.      Websites, www.diamonddoctorlawsuit.com and www.diamonddoctorclassaction.com, incorporating false, misleading, and harassing statements regarding The Diamond Doctor and its business;

ii.     Postings and messages on the internet website Facebook incorporating false, misleading, and harassing statements regarding The Diamond Doctor and its business some of which were directed at The Diamond Doctor's employees threatening them with personal liability for no reason other than to harass and intimidate them and The Diamond Doctor;

iii.    Posting false, misleading, and harassing messages on the internet website Ripoff Report;

iv.    Posting videos on the internet website YouTube incorporating false, misleading, and harassing statements regarding The Diamond Doctor;

v.     Transmission through the mail system, other interstate carrier, or electronic mail of fliers for distribution containing false and misleading statements in and around The Diamond Doctor's geographic location in Dallas, Texas; and

vi.    The transmission through electronic mail of the Manookian Agreement and other communications concerning the Manookian Agreement for the express purpose of inducing The Diamond Doctor to execute it and pay Manookian $3 million.

Manookian participated in the scheme or artifice knowingly, willfully, and with specific intent to generate fear on the part of The Diamond Doctor such that The Diamond Doctor would execute the Manookian Agreement and pay Manookian $3 million.

Upon information and belief, persons who have seen the internet websites, the Facebook, YouTube, and Ripoff Report postings, messages, and videos, and the fliers distributed in Dallas, Texas, have relied on their false and misleading contents to the harm and detriment of The Diamond Doctor.

d.      *Texas Penal Code.* Manookian has violated the Texas Penal Code § 31.03 through his wrongful and illegal attempts to extort The Diamond Doctor and coerce The Diamond Doctor into executing the Manookian Agreement and pay Manookian $3 million which rightfully belongs to The Diamond Doctor. Manookian's actions constitute coercion and generate fear on the part of The Diamond Doctor through his campaign of false, misleading, and harassing publicity as described in detail above constitutes violations of the Texas Penal Code.

e.      *Tenn. Code Ann. § 39-14-112.* Manookian has violated the applicable Tennessee statute through his wrongful and illegal attempts to extort The Diamond Doctor and coerce The Diamond Doctor into executing the Manookian Agreement and pay Manookian $3 million which rightfully belongs to The Diamond Doctor. Manookian's actions constitute coercion and generate fear on the part of The Diamond Doctor through his campaign of false, misleading, and harassing publicity as described in detail above constitutes violations of Tennessee law.

The Diamond Doctor has suffered injury in its business and property due to the violations of 18 U.S.C. § 1962 as detailed herein and above and, thus, seek recovery of threefold its damages, cost of suit, and reasonable attorneys' fees. Specifically, The Diamond Doctor has

suffered and continues to suffer harm as a result of each of the aforementioned predicate acts in the form of costs associated with hiring professionals to respond to the systematic and targeted campaign of negative publicity.

**B.      False Designation of Fact 15 U.S.C. § 1125(a).**

Manookian's use of The Diamond Doctor Mark constitutes a false description and representation of fact, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and is likely to cause confusion or mistake or to deceive the public as to the nature, characteristics or qualities of The Diamond Doctor's products or services or association of Manookian with The Diamond Doctor, to the damage of The Diamond Doctor.

Manookian's unauthorized use of The Diamond Doctor Mark has had, and unless restrained will continue to have, the consequent result of causing The Diamond Doctor to lose the value of its very valuable trademark (i.e., The Diamond Doctor Mark), to damage its integrity, and to lose control over its goodwill and reputation, for which The Diamond Doctor has no adequate remedy at law.

Manookian's conduct has caused, and if not enjoined will continue to cause, irreparable damage to The Diamond Doctor, its marks, and its business reputation and goodwill, for which monetary relief will not be fully compensable.  Accordingly, The Diamond Doctor has no adequate remedy at law and is entitled to injunctive relief against Manookian from engaging in further such unlawful conduct.

The Diamond Doctor further is entitled to recover from Manookian all gains, profits, and advantages obtained as a result of the unlawful conduct alleged herein, in an amount to be determined at trial.

### C.        Common Law Trademark Infringement and Unfair Competition

Manookian's unauthorized use of The Diamond Doctor Mark constitutes common law trademark infringement and unfair competition, in violation of the common and statutory law of Texas. Manookian's conduct has caused, and if not enjoined will continue to cause, irreparable damage to The Diamond Doctor and to its business reputation and goodwill, for which monetary relief will not be fully compensable. Accordingly, The Diamond Doctor has no adequate remedy at law and is entitled to injunctive relief against Manookian from engaging in further such unlawful conduct. The Diamond Doctor further is entitled to recover from Manookian all gains, profits, and advantages obtained as a result of the unlawful conduct alleged herein, in an amount to be determined at trial.

### D.        Injury to Business Reputation and Trademark

Manookian's unauthorized use of The Diamond Doctor Mark in Texas and elsewhere, as set out hereinabove, has injured, and, unless enjoined, is likely to continue to injure, The Diamond Doctor's business reputation and good will, and has diluted, and, unless enjoined, is likely to continue to dilute, the distinctive quality of The Diamond Doctor Mark.

Pursuant to Tex. Bus. & Com. Code Ann. § 16.103, The Diamond Doctor is therefore entitled to have Manookian's aforementioned unauthorized uses of The Diamond Doctor Mark enjoined to prevent further injury to The Diamond Doctor's business reputation and goodwill, and to prevent further dilution of The Diamond Doctor Mark.

### E.        Business Disparagement

As described in detail above, Manookian's systematic scheme of targeting The Diamond Doctor through a barrage of false, misleading, and harassing negative publicity on the internet, social media, and distributed fliers in The Diamond Doctor's geographic location contain

disparaging words concerning The Diamond Doctor's economic interests. The content of this publicity on internet websites www.diamonddoctorlawsuit.com and www.diamonddoctorclassaction.com, social media websites Facebook, YouTube, and Ripoff Report and hard copy fliers are false and published with malice. Manookian made and continue to make these publications without privilege, and the same have caused special damages.

**F.    Request for Injunctive Relief**

The nature and magnitude of Manookian's conduct demonstrates the likelihood that The Diamond Doctor will succeed on the merits with respect to the causes of action set forth hereinabove.  The potential recovery of monetary damages will not redress the non-economic harm and injury that will be sustained by The Diamond Doctor as a result of the use of The Diamond Doctor Mark. The Diamond Doctor has no adequate remedy at law and will suffer irreparable harm in the event Manookian's wrongful conduct is not enjoined.  Accordingly, The Diamond Doctor seeks the following injunctive relief:

1.    <u>Application for preliminary injunction</u>

In order to preserve the status quo, and the property and rights of The Diamond Doctor during the pendency of this action, Manookian should be cited to appear and show cause why it should not be preliminarily restrained from engaging in the conduct described hereinabove.

Specifically, The Diamond Doctor seeks a preliminary injunction pursuant to 15 U.S.C. § 1116 (a) restraining Manookian from:

i.    Using The Diamond Doctor Mark, in whole or in part, or any confusingly similar designation, as a trademark, service mark or trade name to market, advertise, promote, advance, or identify his

scheme of extortion on websites, social media, and fliers as described above;

ii.    Using The Diamond Doctor Mark, in whole or in part, or any confusingly similar designation, as a trademark, service mark or trade name to market, advertise, promote, or identify any products or services on websites, social media, and fliers to the extent not produced or authorized by The Diamond Doctor, including in connection with Manookian's business operations;

iii.    Using The Diamond Doctor Mark, in whole or in part, or any confusingly similar designation, or purchasing The Diamond Doctor Mark, in whole or in part, or any confusingly similar designation, in connection with keywords comprised, in whole or in part, of The Diamond Doctor Mark; and

iv.    Causing a likelihood of confusion or misunderstanding as to Manookian's affiliation, connection, or association with The Diamond Doctor or any of its goods/services.

Such limitations will prevent the likelihood of confusion, injury to business reputation/trademark, or dilution of the distinctiveness of The Diamond Doctor Mark and its symbols or other forms of advertisements.

Pursuant to 15 U.S.C. § 1116(a), The Diamond Doctor further requests the Court to command Manookian to file with the Court and serve on The Diamond Doctor, within thirty (30) days after the service of such injunction, a report in writing under oath setting forth in detail the manner and form in which Manookian have complied with the injunction.

**THE DIAMOND DOCTOR'S ORIGINAL COMPLAINT**    **25**

2.     Application for permanent injunction

Consistent with the relief The Diamond Doctor seeks in connection with its Application for Preliminary Injunction, The Diamond Doctor ultimately requests that upon final trial of this cause a permanent injunction be issued, pursuant to 15 U.S.C. § 1116 (a) restraining Manookian from:

i.     Using The Diamond Doctor Mark, in whole or in part, or any confusingly similar designation, as a trademark, service mark or trade name to market, advertise, promote, advance, or identify his scheme of extortion on websites, social media, and fliers as described above;

ii.    Using The Diamond Doctor Mark, in whole or in part, or any confusingly similar designation, as a trademark, service mark, or trade name to market, advertise, promote, or identify any products or services on websites, social media, and fliers to the extent not produced or authorized by The Diamond Doctor, including in connection with Manookian's business operations;

iii.   Using The Diamond Doctor Mark, in whole or in part, or any confusingly similar designation, or purchasing The Diamond Doctor Mark, in whole or in part, or any confusingly similar designation, in connection with keywords comprised, in whole or in part, of The Diamond Doctor Mark; and

iv.    Causing a likelihood of confusion or misunderstanding as to Manookian's affiliation, connection, or association with The Diamond Doctor or any of its goods/services.

Such limitations will prevent the likelihood of confusion, injury to business reputation/trademark, or dilution of the distinctiveness of The Diamond Doctor Mark and its symbols or other forms of advertisements.

Pursuant to 15 U.S.C. § 1116(a), The Diamond Doctor further requests the Court to command Manookian to file with the Court and serve on The Diamond Doctor, within thirty (30) days after the service of such injunction, a report in writing under oath setting forth in detail the manner and form in which Manookian have complied with the injunction.

## VI.  PRAYER FOR RELIEF

Plaintiff The Diamond Consortium, Inc. d/b/a The Diamond Doctor prays that this Court:

1.      Enter judgment in favor of The Diamond Doctor and against Manookian on all of The Diamond Doctor's claims and award The Diamond Doctor trebled actual and economic damages due to Manookian' willful conduct as described herein and exemplary and punitive damages;

2.      Temporarily and, upon conclusion of trial on the permits, permanently enjoin and refrain Manookian, his partners, affiliates, subsidiaries, officers, directors, agents, servants, employees, attorneys, and all persons acting for, with, by, through and under it, from:

i.      Using The Diamond Doctor Mark, in whole or in part, or any confusingly similar designation, as a trademark, service mark or trade name to market, advertise, promote, advance, or identify his scheme of extortion on websites, social media, and fliers as more fully described above;

ii.     Using The Diamond Doctor Mark, in whole or in part, or any confusingly similar designation, as a trademark, service mark or

trade name to market, advertise, promote, or identify any products or services on websites, social media, and fliers to the extent not produced or authorized by The Diamond Doctor, including in connection with Manookian's business operations;

iii.   Using The Diamond Doctor Mark, in whole or in part, or any confusingly similar designation, or purchasing The Diamond Doctor Mark, in whole or in part, or any confusingly similar designation, in connection with keywords or other terms comprised, in whole or in part, of The Diamond Doctor Mark; and

iv.   Causing a likelihood of confusion or misunderstanding as to Manookian's affiliation, connection, or association with The Diamond Doctor or any of its goods/services;

3.   Require Manookian to account for and pay over to The Diamond Doctor Manookian's profits and all damages The Diamond Doctor suffered;

4.   Award The Diamond Doctor its attorney's fees, costs, and all other expenses due to the exceptional nature of this case pursuant to 15 U.S.C. § 1117; and

5.   Award The Diamond Doctor such other and further relief that this Court deems just and proper.

Pursuant to Fed. R. Civ. P. R. 38, The Diamond Doctor demands a trial by jury for all issues triable by jury.

Respectfully submitted,

**GARDERE WYNNE SEWELL LLP**

By:    /s/ *Peter L. Loh*
              Peter L. Loh
              State Bar No. 24036982
              Luke Wohlford
              State Bar No. 24070871
              ploh@gardere.com
              lwohlford@gardere.com
              State Bar No.
              Stephen Higdon
              State Bar No. 24087719
              shigdon@gardere.com
              1601 Elm Street, Suite 3000
              Dallas, Texas 75201
              Telephone:    (214) 999-3000
              Facsimile:    (214) 999-4667

              **OF COUNSEL:**

              Braden M. Wayne (*pro hac vice
              forthcoming*)
              State Bar. No. 24075247
              bwayne@settlepou.com
              SettlePou
              3333 Lee Parkway
              Eighth Floor
              Dallas, Texas 75219

           **ATTORNEYS FOR PLAINTIFF
DIAMOND CONSORTIUM, INC. D/B/A
THE DIAMOND DOCTOR**

## CERTIFICATE OF SERVICE

The undersigned certifies that on February 3, 2016, he served the foregoing Original Complaint on all counsel of record via the Court's ECF system.

              /s/ *Peter L. Loh*
              Peter L. Loh