**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **THE DIAMOND CONSORTIUM, INC. D/B/A THE DIAMOND DOCTOR, and DAVID BLANK** | § § § § | |
| *Plaintiffs*, | § § | |
| vs. | § § | |
| **BRIAN MANOOKIAN, BRIAN CUMMINGS, CUMMINGS MANOOKIAN, PLC, MARK HAMMERVOLD, and HAMMERVOLD, PLC** | § § § § § | **Civil Action No. 4:16-CV-94** |

## PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT

Plaintiffs The Diamond Consortium, Inc. d/b/a The Diamond Doctor and David Blank (collectively, "Plaintiffs") file this Consolidated Amended Complaint[1], complaining of Defendants Brian Manookian, Brian Cummings, Cummings Manookian, PLC, Mark Hammervold, and Hammervold, PLC, and respectfully shows the Court the following:

### I.     PARTIES

1.      Diamond Consortium, Inc. d/b/a The Diamond Doctor ("The Diamond Doctor") is a Texas limited liability company with its principal place of business located at 8127 Preston Road, Dallas, Texas 75225.

2.      David Blank ("Blank") is a natural person and resident of the State of Texas.

3.      Brian Manookian ("Manookian") is a natural person and resident of the state of Tennessee. Manookian has appeared and may be served through counsel of record.

---

[1] On June 29, 2016, this action was consolidated with 4:16-cv-382, *The Diamond Consortium LLC v. Manookian, et al.,* which was transferred from the United States District Court for the Northern District of Texas, Dallas Division, by Order dated June 8, 2016.

**PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**

4.      Brian Cummings ("Cummings") is a natural person and resident of the State of Tennessee. Cummings has appeared and may be served through counsel of record.

5.      Cummings Manookian, PLC ("Cummings Manookian") is a Tennessee professional limited liability company in the business of the practice of law and has its principal place of business in Davidson, County, Tennessee. Cummings Manookian has appeared and may be served through counsel of record.

6.      Mark Hammervold ("Hammervold") is a natural person and resident of the State of Illinois. Hammervold has appeared and may be served through counsel of record.

7.      Hammervold, PLC ("Hammervold PLC") is a Tennessee professional limited liability company in the business of the practice of law and has its principal place of business in Davidson, County, Tennessee.  Hammervold PLC has appeared and may be served through counsel of record.

## II.      JURISDICTION AND VENUE

8.      The Court has jurisdiction over non-residents Manookian, Cummings, and Hammervold because each one of these individuals purposefully availed himself of the privileges and benefits of conducting business in Texas by committing torts and other illegal acts, which are the subject matter of this suit, in whole or in part in Texas. The Court has jurisdiction over non-resident Cummings Manookian, PLC because Cummings Manookian by and through its agents, Manookian and Cummings, purposefully availed itself of the privileges and benefits of conducting business in Texas by committing torts and other illegal acts, which are the subject matter of this suit, in whole or in part in Texas. The court has jurisdiction over non-resident Hammervold PLC, because Hammervold PLC, by and through its agent, Hammervold, purposefully availed itself of

the privileges and benefits of conducting business in Texas by committing torts and other illegal acts, which are the subject matter of this lawsuit, in whole or in part in Texas.

9.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1694(a). The Court also has subject matter jurisdiction pursuant to 18 U.S.C. § 1332 because the parties are completely diverse and the amount controversy exceeds $75,000.

10.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the acts, omissions, and injuries giving rise to Plaintiffs' claims occurred within the Eastern District of Texas, Sherman Division. Venue is further proper pursuant to 18 U.S.C. § 1965 because Defendants' transact affairs in this District.

### III. BACKGROUND FACTS

**A.**      **The People and Entities Involved.**

11.      The Diamond Doctor. The Diamond Doctor is a Dallas-based wholesaler and retailer of diamonds, gemstones, and other jewelry. The Diamond Doctor attracts customers from Dallas and the surrounding suburbs. The Diamond Doctor has earned and enjoys a reputation in the community for selling high-quality jewelry at fair prices.

12.      David Blank. David Blank owns The Diamond Doctor. In his native South Africa, Blank built a successful jewelry business before immigrating to the United States and becoming a proud, naturalized citizen. In the U.S., Blank started over in the jewelry business and worked as an entry-level salesman for a diamond wholesaler. He was eventually able to start another business and founded The Diamond Doctor in 2002.

13.      Manookian. Defendant Manookian is a Nashville, Tennessee, based lawyer and the main perpetrator of an illegal scheme to extort Plaintiffs.

14.    <u>Cummings Manookian</u>. Cummings Manookian, PLC is a two-person law firm in Nashville, Tennessee. Upon information and belief, Manookian and Cummings are partners in Cummings Manookian. Cummings Manookian is the instrument through which Manookian perpetrates his scheme.

15.    <u>Brian Cummings</u>. Cummings is an attorney who participated in the targeting of at least one victim in the nationwide extortion scheme Manookian operates.

16.    <u>Boaz Ramon</u>[2]. Ramon is the owner of Genesis Diamonds. On or around January 17, 2012, Manookian filed suit *pro se* against Genesis Diamonds and Ramon individually for allegedly selling him an over-graded diamond. (Ex. 4). Then, on or around July 22, 2015, Manookian filed suit against Genesis Diamonds and Ramon for the same claims. (Ex. 5). On or around August 18, 2012, while working with the Nashville law firm of Levine, Orr & Geracioti, Cummings brought suit against Genesis Diamonds alleging it sold over-graded diamond cufflinks. (Ex. 6). Now, Genesis Diamonds is actually a client of Cummings Manookian in other litigation. (Ex. 7).

17.    Ramon has participated in Manookian's attempts to extort retail jewelers in Washington, DC, Philadelphia, South Florida, and Atlanta by encouraging the victims to negotiate with Manookian in order to avoid the harassment campaigns. Ramon warns the victims before Manookian's harassment campaigns commence and advises them to contact Manookian directly in order to avoid being targeted.

18.    <u>Mark Hammervold and Hammervold, PLC</u>. Hammervold is a lawyer and solo practitioner in Nashville with the law firm of Hammervold, PLC and former colleague of

---

[2] Ramon is not currently named as a Defendant in this lawsuit.

Manookian's when they worked together at the Gideon Cooper & Essary law firm. Manookian solicits clients to sue the targeted jewelers and then refers the cases to Hammervold and his law firm to prosecute so Manookian thereby avoids an appearance of a conflict when he enters into "engagement agreements" with the targeted jewelers. Hammervold of Hammervold, PLC is the lead attorney in two pending consumer suits against a Manookian victim in Washington, D.C., and has sent The Diamond Doctor four notice letters pursuant to the Texas Deceptive Trade Practices Act. Hammervold and his law firm are currently representing Manookian in pending litigation in Tennessee state court over ownership interests in a gun armory operated by Manookian and other individuals. (App. 95 – App. 136.)  Hammervold has also acted as co-counsel with Manookian in at least two federal lawsuits filed in the Middle District of Tennessee.

**B.      How Retail Diamonds Are Graded.**

19.      As part of this scheme at the center of this lawsuit, Manookian uses allegations about the different grading systems used in the retail diamond industry to ensnare victims in his extortion scheme. Thus, a cursory understanding of the different methods of diamond grading is helpful.

20.      <u>There Is No Agreed-Upon Industry Standard</u>. It is critical to understand that there is no universally agreed-upon—much less legally binding or mandated—grading standard for diamonds. Diamond traders and jewelers **_may_** perceive specific grading entities as being more stringent, exacting, or consistent than others. Accordingly, diamonds possessing such a certification from a laboratory considered more stringent or exacting **_may_** command a higher retail price or appraised value than a diamond from a laboratory viewed as less stringent or exacting. There are over a dozen laboratories which grade diamonds, including the Gemological Institute of America ("GIA"), EGL Platinum ("EGL"), the American Gem Society, and the International

Gemological Institute. Evaluations from the same laboratory of the same diamond could vary as could evaluations from different laboratories.

21.     GIA. The GIA is perhaps best known for developing a widely used grading system for diamonds, which employs what is commonly known as the "4Cs": cut, color, clarity, and carat weight. From those characteristics, a report with an overall "grade" of the diamond is generated. Some in the jewelry industry perceive a certification from the GIA as a relatively more credible evaluation of a diamond's overall quality and, thus, capable of playing a larger role in its monetary value. Regardless of GIA's perceived credibility, GIA certifications of the same diamond may differ significantly. In fact, GIA itself has come under scrutiny and attack for alleged bribery for falsified certifications.

22.     EGL. In addition to the GIA, there are several other diamond grading labs, the most well-known being the EGL-USA and EGL-International. Much like the GIA, these labs grade diamonds and gemstones and issue grading reports. However, EGL-USA and EGL-International are typically afforded less weight than reports issued by the GIA, primarily because they use slightly different grading scales than the GIA.

23.     The Diamond Doctor's Policy of Full Disclosure. The Diamond Doctor has had, and continues to maintain, a consistent policy of disclosing to its clients the potential for significant differences between grading and certifications from one laboratory to another. Simply put, The Diamond Doctor makes its clients aware that a certification from one lab may be perceived as being more reliable than a certification from another. These disclosures include the potential for higher appraised values for diamonds with particular certifications and the resulting retail pricing disparities.

24.     The Diamond Doctor purposefully sets out to explain these differences to each of its customers. The Diamond Doctor always prices diamonds according to the type of certification it possesses because of the possibility of perceived discrepancies in the reliability of the respective certifications. The Diamond Doctor has never represented, for instance, that a diamond certified at one laboratory is the same as a diamond certified through another. Finally, The Diamond Doctor's customers enjoy the ability to receive a full money back guarantee during their lifetime or to trade a previously purchased diamonding for a diamond of equal price.

**C.**     **Manookian's Extortion Scheme Against The Diamond Doctor and Blank.**

25.     Defendant Manookian is the central figure in a nationwide, sophisticated, multi-pronged shakedown operation. Manookian and his law firm, Cummings Manookian, have selectively targeted and systematically attacked prominent, successful retail jewelers in Washington, DC; Philadelphia, Pennsylvania; Atlanta, Georgia; San Francisco, California; and St. Petersburg, Florida, as well as The Diamond Doctor. As in this case, Manookian's extortion scheme was executed through the use of internet, social media, and door hanger smear campaigns, all of which attack reputable businessmen as criminals and "fraudsters."

26.     As detailed below, Manookian has taken what amounts to differences of opinion over how separate, independent entities grade diamonds, and contrived a legal dispute the sole goal of which is to extort millions of dollars from its victims.

27.     Manookian's scheme is both devious and unethical, and his purpose is to harass and intimidate the jewelers into believing their businesses are in jeopardy by way of threatening mass amounts of (largely imaginary) diamond "over-grading" claims, which Manookian is quick to threaten but never gets around to filing. The jewelers, in turn, are then encouraged through a third party, a former Manookian target and now client of the Cummings Manookian law firm, Boaz

Ramon ("Ramon"), to buy peace by "engaging" Cummings Manookian as their lawyers and paying millions of dollars in "fees" that are in reality protection money to end the harassment.

28.     As set forth below, Manookian used others, including Ramon and Defendant Hammervold, to promote and perpetrate his extortion scheme across the jewelry industry.

29.     In the fall of 2015, Defendants set their sights on Blank and the Diamond Doctor as the next victims of their extortion scheme.

30.     Without any warning or notification, beginning in October 2015, Manookian established two websites, www.diamonddoctorlawsuit.com and www.diamonddoctorclassaction.com, falsely accusing The Diamond Doctor of having committed "diamond fraud" and "cheat[ing]" customers through the sale of "overgraded" diamonds. The websites contained pictures of The Diamond Doctor's physical location and trademarks. Another website, diamonddoctorfraud.com, accused The Diamond Doctor and Blank of "crimes."

31.     Manookian placed messages in The Diamond Doctor's Facebook newsfeed, such as, "Is Diamond Doctor a scam?" Manookian's Facebook posts targeted The Diamond Doctor's employees, asking "Do you work here? Ask David Blank if you could be personally liable for the fraudulent sale [of diamonds]?" Manookian also posted false and misleading YouTube videos with the titles "Diamond Doctor Scam: 3 Reasons Why Diamond Doctor Are Frauds," "Diamond Doctor Lawsuit: Take Action from Diamond Doctor's Fraud," "Diamond Doctor: David Blank Diamond Fraud," "The Diamond Doctor Lawsuit: The Ultimate Scam," "Diamond Doctor Found Guilty," and others.  (Exs. 14-16, 25-42, 59)

32.     Manookian also distributed fliers and door hangers around The Diamond Doctor's location and Blank's residential neighborhood with false statements such as, "Diamond Doctor has been ripping off unsuspecting customers with . . . overgraded diamonds."

33.     Manookian's campaign was and is completely false. The Diamond Doctor's business is not a "scam." The Diamond Doctor and Blank do not commit "fraud" or sell "overgraded diamonds." They are not "guilty" of any "crimes." With the exception of the counterclaims he has now asserted in this lawsuit, Manookian has not brought a single independent lawsuit—much less a class action—against The Diamond Doctor.

34.     During this same time period, Blank learned about other jewelers around the country who had suffered from Manookian's harassment. From his discussions with his friends and colleagues in the industry, Blank learned that several of Manookian's victims had escaped the onslaught of harassing propaganda by "hiring" Cummings Manookian as their own lawyers. The convoluted logic of the arrangement was explained to Blank as follows:  the victim jeweler gains freedom from Manookian's campaign because Cummings Manookian is conflicted out of representing any prospective plaintiffs that may be found. In exchange for this "legal counsel," the victim is required to pay Cummings Manookian an exorbitant sum of money as a monthly retainer to the firm for several years. Additionally, should the victim decide it no longer wishes to employ Cummings Manookian's services, the payoff amount and monthly retainers continue to be due by the victims, in direct violation of the Tennessee Rules of Professional Conduct and the Texas Disciplinary Rules of Professional Conduct.

35.     The Diamond Doctor, through Blank, initially responded with a written demand to Manookian, requesting that he halt his harassing campaign. (Ex. 59 ¶7).  When that did not work, The Diamond Doctor – through prior counsel – filed suit in Texas state court seeking to enjoin Manookian's actions based on trademark infringement and disparagement. *See Id.* The state court denied the request for injunction, and surprisingly, Manookian's campaign continued. *See Id.* It

was not until after the first state court proceeding had been nonsuited that the full scope of

Manookian's scheme was ultimately revealed to Blank. *See* Exhibit __.

**D.      Other Jeweler Victims of Manookian's Extortion Scheme.**

*Solomon Brothers:*

        36.     Blank was in communication with other jewelers around the country whom

Manookian had targeted. Specifically, Blank spoke with Howard Solomon of Solomon Brothers

in Atlanta, Georgia. Howard Solomon told Blank that someone in the jewelry business, Boaz

Ramon of Nashville, had contacted his brother and partner, Anthony Solomon, about a smear

campaign Manookian was about to commence against Solomon Brothers. In a later conversation,

Ramon advised Anthony's brother, Howard Solomon, that Solomon Brothers needed to contact

Manookian directly, engage Cummings Manookian, and pay it a monthly retainer. According to

Ramon, Solomon Brothers needed to "get Manookian on [Solomon Brothers'] side." Ramon said

that hiring Cummings Manookian and paying the money would stop any attacks from beginning.

Shortly thereafter, Solomon discovered a website of similar propaganda to Manookian's The

Diamond Doctor websites, with an address of www.solomonbrotherslawsuit.com.

        37.     At that point, Howard Solomon told Blank he approached Manookian and agreed

to pay Cummings Manookian $20,000 a month for a period of five years, totaling $1.2 million.

Solomon even e-mailed Blank a copy of the "Consulting/Engagement Agreement" he entered with

Manookian. (Ex. 19). Manookian's harassment of Solomon Brothers stopped as a result of Howard

Solomon's payment of the protection money.

*Mervis Diamond Importers:*

        38.     Blank also had several discussions about Manookian with Ronald Mervis

("Mervis") of Mervis Diamond Importers in Washington, D.C. Mervis also had similar

conversations with Ramon who, as detailed below, also contacted him to warn of Manookian's pending attacks on his business. On September 18, 2015, Ramon e-mailed Mervis about Manookian. (Ex. 57). Ramon told Mervis that Manookian's victims can "avoid [a lawsuit] if they would call [Manookian] before." *See Id.* The same day Ramon again warned Mervis, "the earlier [j]ewelers . . . reach out to him the less damage they have." *See Id.* On October 2, 2015, Ramon wrote again under the subject "[d]on't miss the boat," and again admonished Mervis: "I think they [Manookian] are going to file lawsuits and a web site in your area next week." (Ex. 58). Ramon concluded: "If you can avoid it before it will be great for you." *See Id.*

39.     When Mervis ultimately refused to give in to Manookian's demands, Manookian promised "an avalanche of claims over the next year" and no further settlement offers "ever . . . [j]ust lawsuits." (Ex. 49). Then, Cummings Manookian's law partner, interjected with copy to Mervis's lawyers: "Brian—Let's also restart our previous Internet campaign [against Mervis] in earnest tomorrow." *See Id.*  Manookian then distributed brochures in Maryland, the District of Columbia, and Virginia identical to the ones Diamond Doctor was subjected to. (Ex. 50).

40.     Manookian's response to Mervis's refusal to settle the bogus claims is telling. Rather than just advancing his clients' claims through litigation or publicity, Manookian threatened to continue the barrage of disparaging comments on the internet and to start distributing fliers. In other words, Manookian's proposed deal was pay-up or face continued negative publicity. The claims of his supposed clients, whom he should have been advocating for first and foremost, were not part of the proposed *quid pro quo*. **As was later confirmed by Manookian to Blank during The Diamond Doctor shakedown, the purported avalanche of aggrieved plaintiffs Cummings Manookian claimed to have waiting in throngs would receive absolutely zero dollars out of the arrangement Manookian had devised.**

*Golden Nugget:*

41.     Ramon again played a central role in Manookian's targeting another jewelry store called the Golden Nugget. As with Mervis Diamond Importers and Solomon Brothers before, Ramon personally contacted Asaf Herskovitz, whose family owns the Golden Nugget, prior to the commencement of Manookian's attacks. On August 12, 2015, Ramon called Herskovitz and informed him that Cummings Manookian was planning to start a negative publicity campaign, which would include a website designed to instigate litigation against Golden Nugget. Ramon told Herskovitz that his business would "go through hell" and advised that Herskovitz should reach out to Cummings Manookian directly and to "fire your attorney and hire him [Manookian] as your attorney." In a subsequent e-mail and phone call on or around August 18, 2015, Ramon again told Herskovitz to contact Cummings Manookian about the upcoming harassment campaign. On September 16, 2015, someone using the e-mail address michaelgold@gmail.com sent Herskovitz an e-mail with the subject "lawsuit" and a link to an active website www.goldennuggetjewelry.com. (Ex. 22). The website was live and very similar to the one employed against The Diamond Doctor and other victims.

42.     In a phone conversation on or around October 9, 2015, **Ramon admitted to Herskovitz that Manookian's scheme amounted to "extortion and blackmail,"** but Golden Nugget "needed to pay" to avoid it. Ramon added that refusal to pay would result in Manookian and his firm ruining Golden Nugget's reputation. According to Ramon, this could be avoided if Golden Nugget paid Cummings Manookian.

43.     When Ramon could not scare Herskovitz into contacting Manookian, the campaign of harassment began. On November 18, 2015, Manookian posted a message on a Golden Nugget employee's personal Facebook page, asking "[d]o you work here? Ask if you are selling over

graded Golden Nugget Jeweler diamonds." (Ex. 51). Similar Facebook postings continued throughout the holiday shopping season. *See Id.*

*International Diamond Center:*

44.     Ramon also forewarned International Diamond Center ("IDC") about pending attacks from Manookian. Ramon text-messaged his former employee currently working for IDC "[i]f you need help with it, let me know." The message provided a link to Manookian's website targeting IDC located at www.internationaldiamondcenterlawsuit.com. (Ex. 53). Manookian also established a Facebook page linking to the website and to commentary and text indicating the existence of lawsuits against IDC which do not exist. (Ex. 54). Finally, as with The Diamond Doctor, Manookian posted a story on a website called "Ripoff Report" claiming that IDC defrauded its customers. (Ex. 55).

45.     There is no explanation for how or why Ramon would know what tactics Manookian was going to unleash against all of these jewelers unless he was coordinating with Manookian. Upon information and belief, Ramon has bargained with Manookian to take part in the extortion scheme by convincing fellow jewelers to pay Manookian's demands in return for some benefit—perhaps a part of any proceeds from the extortion, free representation in Ramon's previously mentioned lawsuit, or something else.

**E.     Manookian Negotiates to Represent The Diamond Doctor.**

46.     Fearing he had no alternative to stop Manookian's potentially business-crippling propaganda campaign and watching his sales decrease as a result of the scheme, Blank listened to the input and advice he received from Howard Solomon, Mervis, and other victims of this extortion scheme and considered what to do next.  Blank believed the barrage of negative publicity would cause irreparable harm to The Diamond Doctor's reputation and ability to survive as a business.

Blank contacted Manookian directly and asked if The Diamond Doctor could engage Cummings Manookian to act as its legal counsel. In Blank's mind, paying Cummings Manookian millions of dollars was the last resort effort to preserve Blank's good reputation.

47.    Blank firmly believed his business was in jeopardy due to the ongoing negative publicity attacks perpetrated by Manookian. He had no other option than to do what his friend, Solomon, had done: directly negotiate with Manookian to retain Cummings Manookian. In Blank's mind, paying Cummings Manookian millions of dollars would be worth preserving his well-earned good reputation and multi-million-dollar business. The alternative was a destroyed business reputation and successful business he had built himself from nothing.

48.    Consequently, as orchestrated by Manookian, Blank called Manookian and broached the subject of retaining Cummings Manookian as his new outside counsel through monthly retainers. Manookian stated Blank would need to pay $5 million—not to compensate his supposed clients with claims—but instead to end the negative publicity campaign. Blank informed Manookian that he could not afford $5 million, and he asked Manookian what percentage of this purported settlement arrangement he was getting as the plaintiffs' attorney. **Manookian informed Blank that no plaintiffs were to be paid and that all monies would be kept by Cummings Manookian.** Since Blank could not afford $5 million, Manookian stated that he would have to consider Blank's offer to engage Cummings Manookian further after consulting with his partner Cummings.

49.    After these initial conversations, however, Manookian reversed course and claimed he was not interested in The Diamond Doctor engaging Cummings Manookian.

50.    Because Blank continued to believe this was his only way out, he asked Manookian on multiple occasions to reconsider.

51.     Finally, Manookian, sensing that he had Blank irretrievably hooked, re-engaged and discussed terms of $25,000 monthly retainer payments over ten years for an aggregate fee of $3 million.

52.     Manookian portrayed the proposed relationship as one between a client and its attorney. However, when The Diamond Doctor asked about legal representation in two unrelated matters, Manookian explained he was not interested in representing The Diamond Doctor for those purposes. Manookian's only interest was in collecting the $3 million payoff, not in providing actual legal counsel. In other words, Manookian's attacks would only end in return for the $3 million payment. Manookian represented that any purported prospective clients in discussions with Cummings Manookian to sue The Diamond Doctor would not get any of the $3 million or be able to retain Cummings Manookian because of the "conflict" that would exist between them and the firm.

**F.      A Fiduciary Relationship Was Created Between Cummings Manookian and The Diamond Doctor/Blank.**

53.     After several days of negotiations and conferring with his partner, Cummings, Manookian stated that he and Cummings Manookian would represent The Diamond Doctor "in disputes arising between [The Diamond Doctor] and customers, disputes between [The Diamond Doctor] and vendors, and disputes between [The Diamond Doctor] and competitors." (Ex. 59 ¶11). Manookian further stated that he could also represent The Diamond Doctor in employment issues, "whether it's enforcing non-competes against competitors, or just dealing with issues that tend to arise with employees." (Ex. 59 ¶13).  Manookian also stated that part of his duties as The Diamond Doctor's lawyer would be "reputation management" to undo the damage from Manookian's very own negative Facebook campaign. *See Id.*

54.     When asked about his representation related to disputes between The Diamond Doctor and current customers who might have issues, Manookian stated that he and Cummings Manookian would represent The Diamond Doctor, "[a]s long as I haven't signed an engagement agreement with them, then there's no issue there, I can do that." (Ex. 59 ¶14).

55.     Manookian also provided Blank with a plan for how he would proceed as counsel for The Diamond Doctor if another law firm established a website similar to that which Manookian and Cummings Manookian had to solicit clients related to the sale of EGL-certified diamonds:

> …primarily, if it was a firm that we had some type of mutual firm relationship through, Lieff Cabraser, or other firms that we deal with, which it generally is, the plaintiff's bar is not particularly large, we see each other, the same firms pop up over and over. Now again, that does not account for, if some crazy solo practitioner decided he wants to do that, but we can handle that as well. But, if you're talking about large firm seeking class action-type status, that's something we've handled pretty effectively in the past.

(Ex. 59 ¶15). Manookian went on to state that he has "not had anyone file a lawsuit against any of my clients and I now represent twenty or twenty-five stores, total, who deal pretty heavily in disputed diamonds, and it's not because there's a lack of people who are upset about it." (Ex. 59 ¶16).

56.     Manookian explained further, providing an example of the work he has performed for one such client in the past, Ramon:

> ….Boaz sold a lot of EGL diamonds in Nashville for quiet a while, and the level of consciousness about it is pretty high. So he, not infrequently, gets contacted by somebody who wants to sue him, or who wants to come to some type of settlement arrangement. I handle all of those, and have done so very successfully, and almost exclusively by extending credit to those customers, so that there's really no net payment by Boaz. We, we do it just like if it was my business, and I don't want to be out-of-pocket anything, and so, I can't recall if Boaz hasn't paid cash to anyone, where I've handled something for him. That's not to say that he won't, at some point if somebody's incredibly aggressive or unreasonable, and we elect to take care of that one case rather than have another lawsuit filed.
> …

> And that would be really bad for him, but for the most part, we've been able to handle all of them, and we handle them from a business perspective.
> …
> My job is to make sure he's not out of pocket anything.

(Ex. 59 ¶17).

57.     Manookian further advised if The Diamond Doctor changed its practices related to the sales of EGL-certified diamonds, customers would be unable to file lawsuits at some point in the future because of "statute of limitations issues." (Ex. 59 ¶18). Specifically, Manookian explained,

> …let's say I had one client on the east coast who dumped these things left and right for years, and years, and years, the real issue is staving off liability while they wait for the statute of limitations period to expire. Because at that point it doesn't – they can't file the lawsuits anyways, and so, from a negotiating standpoint, if someone came to you today, and said, 'here's a diamond you sold me fifteen years ago, it's not what you said it was, I want you to do X, Y, and Z or I'm going to file a lawsuit," it gives me a lot of bargaining power to say, "listen, David wants you to be happy, and that's the most important thing, but I'm a lawyer here, so I can tell you, you don't have a lawsuit. There is no ability to file because of the statute of limitations and because of that, you're not really entitled to anything. He's going to do the right thing because that's the kind of man he is." But it takes the wind out of their sails when they realize, well they can't file anyway. It makes them a lot easier to negotiate with, and there are a lot of way to do that even when there isn't a statute of limitations issue. But, if there's a cut-off date at which EGL stones weren't sold, or you've put in place some pretty robust practices, you can say, "alright, on this date in 2025, there's not going to be anyone with a live claim against me on these issues."
>
> …
>
> I would need to know more about your practices for me to be able to say, "here's the date on the calendar," and after that, you're not going to have to worry about any of these from a legal standpoint. People might get mad and write letters to the editor, or that type of thing, but nobody will even have the ability to file a lawsuit, which again, makes it a lot easier to negotiate.

*See Id.*

58.     Blank also inquired about and received legal advice from Manookian related to trying to stop unfair competition from another competitor. (Ex. 59 ¶19). Blank informed

Manookian that an attorney sent a letter on The Diamond Doctor's behalf to a competitor, who

advertises on Google as the "Diamond Doctor Dallas," to which Manookian responded,

> [y]ou can have that taken down almost immediately because he's a competitor. The reason you can't get me to take it down is because I'm not in the same business as you, as a competitor, you can make that happen in about an hour, just by calling Google. He's violating Google's terms of service, and one, I suspect you may already be a Google advertiser, which is going to make it more effective anyways, but Google will pull that right away.
>
> …
>
> It's not effective to deal with that guy, we've done that many times over. You need to go to Google directly, let them know that you hold the trademark, you show them the application for it, and then you take screenshots where they're using your trademark name to compete against you. They'll not only get pulled, but Google will blacklist that ad-words account, which can be a real pain in the ass for them, so that if they do it again, you keep letting them know and it will really prevent them from doing it on a go-forward basis.

(Ex. 59 ¶19).

59.     Blank also provided Manookian with details related to an on-going dispute, which

The Diamond Doctor was having with one of its vendors. (Ex. 59 ¶20). Blank asked if Manookian

and Cummings Manookian would represent him in this matter, and Manookian declined, stating,

"No, I won't. I will only represent you on the matters that are listed in the contract." *See Id.*

60.     Manookian even explained to Blank what happens in the event of a lawsuit, since

Manookian, Cummings, and Cummings Manookian are not attorneys licensed in the State of

Texas:

> [we] have a provision in the consulting agreement that says, if there is a live lawsuit, and somebody actually files, you pay for local counsel, and so, that's on you. Most of the time you're going to have an insurance policy that covers that anyways, but local counsel is usually very cheap. It sounds like your brother-in-law could do it. All we do is file a motion that says, so-and-so is serving as local counsel, we're out of Tennessee, we have a lot of expertise in this area that's going to benefit our claim and the court for us to be involved, and we get admitted *pro hac vice.*

(Ex. 59 ¶21).

61.     Manookian specifically informed Blank that if he agreed to represent The Diamond Doctor, he would be "conflicted out, period, from anything adverse to you."  (Ex. 59 ¶22).  In another conversation with Blank, Manookian confirmed that he could not put the negative advertising campaign back online, stating, "as your lawyer that's effectively conflicted out from doing that, ever" and "once we've entered this agreement, I'm professionally barred from doing that." *See Id.* He later stated that "[o]nce someone becomes your client, you can't do things that are adverse to them, like put up an ad campaign.  I can't do that once that happens, and so, it is absolutely no problem to make that explicit in an agreement, that's fine."  *See Id.*

62.     During the ongoing negotiations to formally engage Cummings Manookian as legal counsel, Manookian threatened Blank that if no agreement is reached, "the ads and the things" would go back up.  (Ex. 59 ¶23).

63.     Cummings Manookian was so intent on becoming engaged as counsel in order to receive the retainer payoff from The Diamond Doctor that Manookian actually contacted his own bank to set up a guarantee of the repayment of the retainer.  ("… I'm paying my own bank to ensure your payments, and I'm going to have to do that out of what you pay me per month, but I'm going to bare the expense because I don't want you to have to go through your loan committee or try to secure something against real property or things like that"). (Ex. 59 ¶24).

64.     **On or about November 13, 2015, Manookian agreed to represent The Diamond Doctor, at which time he and his partner "agree[d] in principle to be retained by [The Diamond Doctor]" for $25,000.00 per month for 120 months, totaling $3 million.**  (Ex. 59 ¶25).  Manookian indicated that all that was left was to finalize the terms of the engagement and forwarded Blank a draft engagement agreement.  (Ex. 59 ¶28).

65.     Not until Manookian had driven the payoff price up to a sufficient level for his interest did Manookian finally agree that Cummings Manookian could, in fact, act as The Diamond Doctor's counsel.

**G.      The Diamond Doctor/Blank Shared Confidential Information with Manookian Based on Manookian's Misrepresentations about their legal relationship.**

66.     During their negotiations related to Manookian's and Cumming Manookian's representation of The Diamond Doctor, Blank provided Manookian with confidential information. (Ex. 59 ¶25).  Specifically, they discussed what Blank could afford to pay as a retainer.  *See Id.* Originally, Blank offered to pay $25,000.00 per month for eight (8) years, totaling $2.5 million. *See Id.* On or about November 6, 2015, after consulting with his partner, Manookian informed Blank that they would only accept $25,000.00 per month for ten (10) years.  Blank informed Manookian that he could afford to pay $25,000.00 per month for 120 months as a retainer/settlement, totaling $3 million.  *See Id.*  This information provided Manookian with confidential financial information that Blank would not have provided otherwise.  *See Id.*

67.     Moreover, Blank provided Manookian with information related to his business dealings.  *See Id.*  Specifically, he informed Manookian of how he pays his suppliers, to which Manookian responded, "Okay, no, I understand, I mean those are the types of unique things about your business that I wouldn't be privy to." (Ex. 59 ¶26).

68.     Blank also provided Manookian with specific details related to ongoing legal disputes he had with The Diamond Doctor's vendors, disputes he may have with current customers related to sales of EGL diamonds, and the dispute he had with a competitor who was engaged in unfair competition with The Diamond Doctor.  (Ex. 59 ¶20).

69.     Manookian's agreement to represent The Diamond Doctor was clearly a misrepresentation as he could not represent The Diamond Doctor because he represented plaintiffs

who planned to assert claims against The Diamond Doctor.  Manookian stated that if he "agreed to represent [The Diamond Doctor], [he] would be giving up the right to pursue claims on behalf of other individuals against his company." (Ex. 59 ¶27).  However, in a later correspondence, The Diamond Doctor discovered that Manookian admitted that Cummings Manookian "had already invested a significant amount of time and resources investigating and confirming those claims" of the other individuals against The Diamond Doctor.  (Ex. 59 ¶35).

70.     Blank was shocked by the terms insisted upon by Cummings Manookian in their Draft Consulting/Engagement Agreement.  (Ex. 59 ¶29).  Blank would have been required to pay the full amount owed for the entire term even if he fired them the day after signing.  *See Id.*  The agreement effectively allowed Cummings Manookian to be paid even if they performed no services.  *See Id.*

71.     The total amount to pay was discussed back and forth and a final "Consulting/Engagement Agreement" was ultimately sent by Manookian to Blank for his execution. However, before signing the self-serving "Consulting/Engagement Agreement" with Cummings Manookian, Blank decided that he should not allow The Diamond Doctor to be victimized in this fashion.

72.     Rather than give into the demands of an extortionist, The Diamond Doctor decided to expose Manookian and his thinly veiled, albeit sophisticated, scheme of extortion and shakedowns.

73.     Blank felt these insisted upon terms were more akin to extortion than to the rightful engagement of legal counsel. (Ex. 59 ¶31).   Further, the "engagement" of legal counsel who had initiated a wrongful and false campaign against The Diamond Doctor did not sit well with Blank, and he chose not to sign the proposed agreement prepared by Cummings Manookian.  *See Id.*

74.     Though the firm had not been formally engaged as legal counsel via the proposed Consulting/Engagement Agreement, Blank and The Diamond Doctor shared significant confidential information with Manookian and Cummings Manookian under the belief that the firm and Manookian would ultimately be the attorneys for The Diamond Doctor. (Ex. 59 ¶30).  Because this relationship had extended as far as it did under the auspices of attorney/client relations, Blank and The Diamond Doctor anticipated that Manookian and Cummings Manookian would determine that it was ethically and legally improper for them to take up the campaign against Blank and The Diamond Doctor again.  *See id.*

**H.     Failed Negotiations Lead to More Improper Acts by Defendants.**

75.     Unfortunately, the campaign started up again and became far more prolific and vitriolic.  Manookian and Cummings Manookian were just getting started.  (Ex. 59 ¶33).  On January 12, 2016, Manookian posted on www.ripoffreport.com that The Diamond Doctor had committed "heinous crimes." *See Id.*

76.     On or around January 26, 2016, Manookian created a Facebook page entitled "Diamond Doctor Scam" (now entitled "Diamond Doctor Fraud") rather than just posting on The Diamond Doctor's own newsfeed in Facebook.  (Ex. 59 ¶34).   On that page, and through paid Facebook advertisements, Manookian personally attacks Blank and improperly appropriates his name and likeness.  *See Id.*  Some of Manookian's Facebook posts feature a photograph of Blank branded with the word "FRAUD," while others accuse Blank and The Diamond Doctor of being "fraudsters," "scam[ming]" and "misleading" their customers, and "steal[ing] [customers] cash." *See Id.*

77.     On January 19, 20, 21, 25, 26, February 24, March 3, 7, and 9, 2016, Manookian posted videos on YouTube featuring pictures of The Diamond Doctor's logo, showroom, and

building exterior, and including a link to Manookian and Blank's recorded telephone conversations about the engagement of Cummings Manookian as The Diamond Doctor's outside legal counsel. (Ex. 59 ¶36).  The websites and other propaganda further accuse The Diamond Doctor of "fraud," "scams," "crimes," "intentional overgrading," "misrepresentations," "rip[ping] off the masses," and being found "guilty of trying to bribe a lawyer." *See Id*.

78.     On March 4, 2016, Manookian unsuccessfully tried to buy advertising time on a popular Dallas radio station 1310 AM.  (Ex. 59 ¶37).

79.     On March 10, 2016, upon information and belief, Manookian contacted Blank personally via e-mail. (Ex. 59 ¶38).   The e-mail came from the address haha@youareafraud.com. *See Id*.  In a clumsy attempt to mask the identity of the sender, the name associated with the address was "Bachendorf," another prominent retail jeweler and competitor of The Diamond Doctor.  *See Id*.  The e-mail contained a link to a new website www.diamonddoctorfraud.com.  *See Id*. The website purports to have the "Truth About The Diamond Doctor Fraud Case" and The Diamond Doctor's "crimes" and "wrongdoing."  *See Id*.  It again makes the accusation The Diamond Doctor has been "supplying customers with fake certificates" and "Found Guilty of Trying to Bribe a Lawyer." *See Id*. There is a link and transcript of Blank and Manookian's phone conversations. *See Id*.

80.     Manookian distributed defamatory fliers in and around The Diamond Doctor's location and Blank's own residential neighborhood in Dallas in December 2015 and again in January 2016. (Ex. 59 ¶44).  These fliers attacked The Diamond Doctor, falsely accusing it of having "scam[med]," "cheated," and "taken advantage of" its customers.  (Ex. 59 ¶¶39-40).  In April 2016, Manookian distributed additional fliers in Blank's neighborhood and in the neighborhoods of The Diamond Doctor's clients.  (Ex. 59 ¶40).

81.     The fliers, likely distributed by a professional company, reached as many as 30,000 people in those areas.  They personally attached Blank and improperly appropriated his name and likeness. *See id*. The April 2016 flier brands a photograph of Blank with the word "FRAUD" and accuses him and The Diamond Doctor of "scam[ming]" their customers.  *See Id*. The fliers also suggest that the read visit www.diamonddoctorlawsuit.com, where Defendants again improperly appropriate Blank's likeness and label him a "FRAUD." (Ex. 59 ¶39).

82.     Most recently, yet another of Manookian and Cummings Manookian's Facebook entries dated April 17, 2016 linked to a confusingly written but nevertheless defamatory website written against The Diamond Doctor.  (Ex. 59 ¶41).  This most recent website referred to some sort of a "ruby fraud" purportedly carried out by The Diamond Doctor. *See Id.*

83.     Needless to say, Manookian's efforts amount to nothing more than a vicious smear campaign.  The Diamond Doctor and Blank are not fraudsters or criminals.  (Ex. 59 ¶42).  They do not over grade diamonds, bribe individuals, or scam their customers.  *See Id*.  They have not been found "guilty" of anything and there is no "fraud case" against them.  *See Id*.

84.     The impact of Manookian's smear campaign against The Diamond Doctor has undoubtedly harmed its business. (Ex. 59 ¶43).  Members of the public have seen Manookian's allegations of "fraud" and are taking them seriously.  *See Id*. A listener to the above-mentioned radio station, 1310 AM, contacted four hosts of its various radio shows, commenting that the listeners "can't listen to [D]iamond [D]octor [advertising] spots without thinking of fraud charges he's facing." (Ex. 59 ¶44).

85.     Furthermore, The Diamond Doctor knows of several customers it has lost because of Manookian's smear campaign.  One potential customer stated she decided not to even consider a purchase of a $50,000 diamond from The Diamond Doctor despite her own sister's

recommendation. (Ex. 59 ¶45).  The potential customer's decision was due to doubts about The Diamond Doctor's business practices after hearing about the negative publicity Defendants are responsible for generating.  *See Id.*

86.    Additionally, Blank has been personally injured by the defamatory campaign and the wrongful use of his name and likeness by the Defendants in their purported efforts to gain additional clients.  (Ex. 59 ¶46).   Defendants' defamatory actions and wrongful use of his name and likeness has been personally damaging, upsetting, and disruptive to Blank's life and livelihood. *See id.* Blank has often been confronted by friends, neighbors, and customers about the lies being spread about him in his community. (Ex. 59 ¶47).

87.    Blank worries that he is being wrongly judged as a "fraud" by everyone he converses with and he knows that any internet search of his business will yield results that consist of lies and defamatory characterizations of himself and the business he has worked so hard to grow. *See id.* Blank also worries about his personal safety as well as the personal safety of his family, his employees, and their families. (Ex. 59 ¶48).  Defendants' efforts have not stopped or slowed, rather they continue to build as they publish new online entries and distribute fliers in neighborhoods that are not only defamatory, but also breach the fiduciary duty Defendants owe to The Diamond Doctor not to act against its interest related to these purported allegations. (Ex. 59 ¶49).

88.    On November 12, 2015, Manookian tried to seal the deal with Blank in a recorded telephone conversation:

> Blank:        Just to be on the same page, we get this agreement
>               in place, we get funds, and then you'll agree never
>               to use this campaign ever again?
>
> Manookian:    Correct. I wouldn't be able to. As your lawyer, I
>               would effectively be conflicted out from doing that

|  | ever. But if you want to put that specifically in an agreement, I have never done that before, but we can. |
|---|---|
| Blank: | Brian, it's $3,000,000. I would like to. |
| Manookian: | No, I understand. It is a belt and suspenders approach, and I totally understand it. I can't do that anyway, but anything you want to spell out in there that's absolutely fine with me. That's the reason we circulate a draft. You say "I'd like this in there as well" and we say "that's fine and we'll insert it." |
| Blank: | Ok. And in the meantime you will not put up this campaign until we have worked through this. I fully understand that you can put it up [i.e., re-start the website and Facebook campaign against Diamond Doctor] at any time if [I] make any missteps or anything like that. Clearly, I am at your mercy… |
| Blank: | …Your backstop is really you can just put the campaign up and we're back at square one… |
| Manookian: | …But I can't do that once we have entered into this agreement. I'm professionally barred from doing that. |

89.     After this call, Manookian e-mailed a proposed "Consulting/Engagement Agreement" (the "Manookian Agreement") to Blank. (Ex. 24.) Consistent with Manookian's devious extortion scheme, the Manookian Agreement was a version another jeweler (upon information and belief, Solomon Brothers) supposedly executed with critical information concerning the payment terms and term length redacted. *See Id.* This served two purposes: (1) the ostensible acceptance by another jeweler portrayed the Manookian Agreement as part of a legitimate transaction as opposed to what it really was—the coup de grace of Manookian's extortion scheme; and (2) the redacted payment terms in the Manookian Agreement left the victim without any written documentation of the key element of the scheme aside from Manookian's own verbal threats and activation and re-activation of the website and social media attacks. Nonetheless,

Manookian did leave one critical term un-redacted—The Diamond Doctor's obligation to pay the full amount (*i.e.*, $3,000,000) to Manookian even if it terminated the Manookian Agreement. *See Id.*

## IV. CAUSES OF ACTION

### A.   Violations of Racketeer Influenced Corrupt Organizations Act (18 U.S.C. § 1962(c)) – Manookian (All Defendants)

The Diamond Doctor re-alleges and incorporates herein by reference each and every foregoing paragraph of this complaint as if fully set forth below.

90.     RICO Persons. At all relevant times, The Diamond Doctor is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c). At all relevant times, Manookian was a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

91.     The RICO Enterprise. Cummings Manookian is a law firm formed and operating, upon information and belief, under the laws of the state of Tennessee. Cummings Manookian's ostensible purpose is to represent clients in civil lawsuits. In reality, Cummings Manookian is much more. Cummings Manookian, as The Diamond Doctor has alleged and described in the foregoing paragraphs of this complaint, is an ongoing enterprise engaging in illegal acts. Cummings Manookian participates in the commission of extortion and other illegal acts through a sophisticated, systematic scheme of targeting retail jewelers across the country through a barrage of false, misleading, and harassing publicity on the internet, social media, and through the distribution of fliers in the geographic locations of its victims.

92.     For the express purposes of this complaint, Cummings Manookian has targeted and continues to target The Diamond Doctor with all of the aforementioned acts including, without limitation, 1) establishing false, misleading, and harassing internet websites www.diamonddoctorlawsuit.com  and  www.diamonddoctorclassaction.com, 2) posting false,

misleading, and harassing messages and videos on Facebook, YouTube, and Ripoff Report against The Diamond Doctor and its employees, 3) sending a false, misleading, and harassing email directly to Blank (after the commencement of this litigation) under the name "Bachendorf" another Dallas area jeweler, and 4) distributing false, misleading, and harassing fliers in and around The Diamond Doctor's physical location in Dallas, Texas. Cummings Manookian has engaged in this campaign against The Diamond Doctor for the express purpose of extorting $3 million from The Diamond Doctor as described in detail above.

93.     Cummings Manookian is necessary to Manookian's illegal acts as described herein. Specifically, Manookian can portray his illegal acts (including, without limitation, the illegal acts of Cummings Manookian) as nothing more than a law firm soliciting clients. However, Cummings Manookian is a corrupt organization operated and managed through a pattern of racketeering activity as described more fully herein and including the extortion of victims like The Diamond Doctor who have not committed the wrongdoing of which they are accused. Finally, Manookian individually is separate and distinct from the enterprise as described herein through the commission of his illegal acts. Likewise, Mark Hammervold and Hammervold, PLC are necessary to Manookian's illegal acts as described herein because Manookian solicits clients to sue the targeted jewelers and then refers those cases to Hammervold and/or Hammervold, PLC to prosecute, thereby avoiding the appearance of a conflict when Manookian subsequently enters into "engagement agreements" to represent the targeted jewelers as part of his extortion scheme.

94.     As for continuity, the pattern of racketeering activity satisfies either an open-ended or closed-ended standard. Under the open-ended standard, Manookian's racketeering activity has been continuous through a pattern of ongoing conduct in his ordinary course of business. As pleaded above, Manookian has regularly used Cummings Manookian to intimidate, extort, or

attempt to extort multiple jewelers across the United States. Manookian is still using Cummings Manookian to collect and attempt to collect extortion payments, and therefore, poses a significant threat of continuing to do so in the future. Under the close-ended standard, Manookian's pattern of racketeering activity suffices. Upon information and belief, the pattern of racketeering activity began after Manookian first sued Ramon in 2012 and continues through today.

95.     <u>Association in Fact Enterprise</u>. Cummings Manookian, Ramon, Cummings, Manookian, Hammervold, and Hammervold, PLC are members of an association-in-fact enterprise. Cummings Manookian, Ramon, Cummings, Manookian, Hammervold, and Hammervold, PLC each have defined roles, but together they function as a unit with a common purpose: extorting millions from their victims. As described in detail above, Cummings Manookian has targeted and continues to target The Diamond Doctor and other victims across the country by: 1) establishing false, misleading, and harassing internet websites www.diamonddoctorlawsuit.com, www.diamonddoctorclassaction.com, and www.diamonddoctorfraud.com; 2) posting false, misleading, and harassing messages and videos on Facebook, YouTube, and Ripoff Report; 3) transmitting false, misleading, and harassing email under the address haha@youareafraud.com and trying to portray that it was from another Dallas jeweler; and 4) distributing false, misleading, and harassing fliers in and around The Diamond Doctor's physical location in Dallas, Texas. Cummings Manookian has engaged in this campaign against The Diamond Doctor for the express purpose of extorting $3 million from The Diamond Doctor, as described in detail above.

96.     Ramon's role in the association in fact enterprise is different but no less important. As described in detail above, Ramon worked in concert with Cummings Manookian by warning victims like Mervis, Golden Nugget, IDC, and Solomon Brothers of the impending internet, social

media, and flier campaigns. Ramon, then, encouraged these victims to give into Manookian's demands and pay them. Ramon is aware of the other members' roles in this scheme. Ramon and Cummings Manookian have operated and, upon information and belief, continue to operate in the fashion as described in detail above.

97.     Hammervold's role in the association in fact enterprise involves prosecuting claims against the targeted jewelers on behalf of clients Manookian solicits, so Manookian can avoid an appearance of conflict when he subsequently enters into "engagement agreements" to represent the targeted jewelers.

98.     Manookian operates and manages the association in fact described above through a pattern of racketeering activity.

99.     Predicate acts. Manookian has engaged in a pattern of racketeering activity. Manookian conducted or participated, directly or indirectly, in the conduct, management, or operation of Cummings Manookian as an enterprise as described above through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c). The Diamond Doctor has suffered and continues to suffer harm as a result of each of these predicate acts detailed below in the form of costs associated with hiring various professionals to respond to the systematic and targeted campaign of negative publicity.

100.     Extortion in violation of Hobbs Act 18 U.S.C. § 1951. At all times relevant to this Complaint, The Diamond Doctor was engaged in interstate commerce and in an industry that affects interstate commerce. As described in detail above, Manookian has engaged in a systematic scheme of targeting retail jewelers across the country through a barrage of false, misleading, and harassing publicity on the internet, social media, and distributed fliers in the geographic locations of its victims. For the express purposes of this complaint, Manookian has targeted and continues

to target The Diamond Doctor with all of the aforementioned acts including, without limitation: 1) establishing false, misleading, and harassing internet websites www.diamonddoctorlawsuit.com, www.diamonddoctorclassaction.com, and www.diamonddoctorfraud.com; 2) posting false, misleading, and harassing messages and videos on Facebook, YouTube, and Ripoff Report; 3) transmitting a false, misleading, and harassing email under the address haha@youareafraud.com and trying to portray it is from another Dallas jeweler; and 4) distributing false, misleading, and harassing fliers in and around The Diamond Doctor's physical location in Dallas, Texas. Manookian has engaged in this campaign against The Diamond Doctor for the express purpose of extorting $3 million from The Diamond Doctor as described herein.

101.    Manookian's actions as described above are designed to induce the fear in The Diamond Doctor and its employees that Manookian will, among other things continue to: 1) maintain false, misleading, and harassing internet websites www.diamonddoctorlawsuit.com, www.diamonddoctorclassaction.com, and www.diamonddoctorfraud.com; 2) post false, misleading, and harassing messages and videos on Facebook, YouTube, and Ripoff Report;, 3) transmit of false, misleading, and harassing emails under the address haha@youareafraud.com and portray they are from another Dallas jeweler; and 4) distribute false, misleading, and harassing fliers in and around The Diamond Doctor's physical location in Dallas, Texas, unless and until The Diamond Doctor "retains" Cummings Manookian as its outside counsel for no apparent benefit other than to halt the negative publicity campaign of intimidating and harassing falsehoods. Manookian's actions as described herein have created a reasonable fear of harm on the part of The Diamond Doctor including, without limitation, the fear of economic loss and damage to its hard-earned reputation (above and beyond the harm it has suffered already as described herein).

102.     Manookian has, thus, unlawfully obstructed, delayed, and affected—and attempted to obstruct, delay, and affect—commerce as that term is defined in 18 U.S.C. § 1951, and the movement of articles and commodities in such commerce, by extortion, as that term is defined in § 1951 to the extent that Manookian attempted to obtain The Diamond Doctor's property (i.e., $25,000 per month for 10 years or $3 million), with its consent, induced by the wrongful and illegal use of actual and threatened fear of economic and reputational harm.

103.     Mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341, 1343. As described in detail above, Manookian has engaged in an attempt to defraud through a systematic scheme of targeting The Diamond Doctor through a barrage of false, misleading, and harassing publicity on the internet, social media, e-mail, and fliers in The Diamond Doctor's geographic location. Manookian has engaged in this campaign against The Diamond Doctor for the express purpose of extorting $3 million from The Diamond Doctor as described in more detail above.

104.     In furtherance of this fraudulent scheme, and as described above, Manookian transmitted, or caused to be transmitted, by means of wire communication in interstate commerce, writings, signs, pictures, and sounds, and also caused matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier without limitation the following:

> i.     Websites, www.diamonddoctorlawsuit.com, www.diamonddoctorclassaction.com, and www.diamonddoctorfraud.com incorporating false, misleading, and harassing statements regarding The Diamond Doctor and its business;

ii.      Postings and messages on the internet website Facebook incorporating false, misleading, and harassing statements regarding The Diamond Doctor and its business some of which were directed at The Diamond Doctor's employees threatening them with personal liability for no reason other than to harass and intimidate them and The Diamond Doctor;

iii.      Transmitting a false, misleading, and harassing email message designed to portray it as coming from another Dallas-based jeweler and competitor of The Diamond Doctor;

iv.      Posting false, misleading, and harassing messages on the internet website Ripoff Report;

v.      Posting videos on the internet website YouTube incorporating false, misleading, and harassing statements regarding The Diamond Doctor;

vi.      Transmitting through the U.S. mail system, other interstate carrier, or electronic mail of fliers for distribution containing false and misleading statements in and around The Diamond Doctor's geographic location in Dallas, Texas; and

vii.      Transmitting through electronic mail of the Manookian Agreement and other communications concerning the Manookian Agreement for the express purpose of inducing The Diamond Doctor to execute it and pay Manookian $3 million.

105.    Manookian participated in the fraudulent scheme or artifice knowingly, willfully, and with specific intent to generate fear on the part of The Diamond Doctor such that The Diamond Doctor would execute the Manookian Agreement and pay Manookian $3 million.

106.    Upon information and belief, persons who have seen the internet websites, e-mails, Facebook, YouTube, and Ripoff Report postings, messages, and videos, and the fliers distributed in Dallas, Texas, have relied on their false and misleading contents to the harm and detriment of The Diamond Doctor.

107.    <u>Travel Act in violation of 18 U.S.C. § 1952</u>. As described in detail above, Manookian has engaged in an unlawful activity in the form of a systematic scheme of targeting The Diamond Doctor through a barrage of false, misleading, and harassing publicity on the internet, social media, and fliers distributed in The Diamond Doctor's geographic location. Cummings Manookian has engaged in this campaign against The Diamond Doctor for the express purpose of extorting $3 million from The Diamond Doctor. In furtherance of this unlawful activity scheme, and as described above, Manookian transmitted, or caused to be transmitted, by travel, mail, or any other facility in interstate commerce in the furtherance of unlawful activity or promote, manage, establish, carry on, facilitate the promotion, management, establishment, or carrying on of any unlawful activity through the following without limitation:

    i.    Websites, www.diamonddoctorlawsuit.com,

www.diamonddoctorclassaction.com,  and

www.diamonddoctorfraud.com incorporating false, misleading,

and harassing statements regarding The Diamond Doctor and its

business;

ii.     Postings and messages on the internet website Facebook incorporating false, misleading, and harassing statements regarding The Diamond Doctor and its business some of which were directed at The Diamond Doctor's employees threatening them with personal liability for no reason other than to harass and intimidate them and The Diamond Doctor;

viii.    Transmitting a false, misleading, and harassing email message designed to portray it as coming from another Dallas-based jeweler and competitor of The Diamond Doctor;

iii.    Posting false, misleading, and harassing messages on the internet website Ripoff Report;

iv.     Posting videos on the internet website YouTube incorporating false, misleading, and harassing statements regarding The Diamond Doctor;

v.      Transmitting through the U.S. mail system, other interstate carrier, or electronic mail of fliers for distribution containing false and misleading statements in and around The Diamond Doctor's geographic location in Dallas, Texas; and

vi.     Transmitting through electronic mail of the Manookian Agreement and other communications concerning the Manookian Agreement for the express purpose of inducing The Diamond Doctor to execute it and pay Manookian $3 million.

108.    Manookian participated in the unlawful activity scheme or artifice knowingly, willfully, and with specific intent to generate fear on the part of The Diamond Doctor such that The Diamond Doctor would execute the Manookian Agreement and pay Manookian $3 million.

109.    Upon information and belief, persons who have seen the internet websites, e-mail, Facebook, YouTube, and Ripoff Report postings, messages, and videos, and the fliers distributed in Dallas, Texas, have relied on their false and misleading contents to the harm and detriment of The Diamond Doctor.

110.    <u>Tenn. Code Ann. § 39-14-112</u>. Manookian has violated the applicable Tennessee statute through his wrongful and illegal attempts to use coercion upon The Diamond Doctor with the intent to obtain its property via executing the Manookian Agreement and paying Manookian $3 million which rightfully belongs to The Diamond Doctor. Manookian's actions constitute extortion through his coercion and generating fear on the part of The Diamond Doctor through Manookian's campaign of false, misleading, and harassing publicity as described in detail above constitutes violations of Tennessee law.

111.    The Diamond Doctor has suffered injury in its business and property due to the violations of 18 U.S.C. § 1962 as detailed herein and above and, thus, seek recovery of threefold its damages, cost of suit, and reasonable attorneys' fees. Specifically, The Diamond Doctor has suffered and continues to suffer harm as a result of each of the aforementioned predicate acts in the form of: a) costs associated with hiring professionals (specifically multiple public relations firms) to respond to the systematic and targeted campaign of negative publicity currently amounting to $123,000; b) loss of business reputation, value, and goodwill; and c) lost profits.

**B.      Business Disparagement (Manookian and Cummings Manookian)**

112.    As described in detail above, Manookian and Cummings Manookian's systematic scheme of targeting The Diamond Doctor through a barrage of false, misleading, and harassing negative publicity on the internet, social media, and distributed fliers in The Diamond Doctor's geographic location contain disparaging words concerning The Diamond Doctor's economic interests. The content of this publicity on internet websites www.diamonddoctorlawsuit.com and www.diamonddoctorclassaction.com, social media websites Facebook, YouTube, and Ripoff Report, and hard copy fliers are false and published with malice. Manookian and Cummings Manookian made and continue to make these publications without privilege, and the same have caused special damages in the form of: a) costs associated with hiring professionals (specifically multiple public relations firms) to respond to the systematic and targeted campaign of negative publicity currently amounting to $123,000; b) loss of business reputation, value, and goodwill; and c) lost profits.

## C.    Tortious Interference with Prospective Business Relations (Manookian and Cummings Manookian)

113.    Manookian and Cummings Manookian's false and malicious public attacks against The Diamond Doctor have tortiously interfered with The Diamond Doctor's prospective business relationships.  Indeed, there is a reasonable probability that The Diamond Doctor would have entered into a business relationship with at least one customer but for Manookian and Cummings Manookian's false attack campaign as described in detail herein.  Moreover, Manookian and Cummings Manookian's conduct is independently tortious and unlawful, in that their public statements about The Diamond Doctor are false and defamatory and were made in furtherance of an unlawful civil conspiracy as described herein.

114.    In addition, Manookian's pattern of conduct as described herein demonstrates that he embarked on his attack campaign with a conscious desire to prevent The Diamond Doctor from

entering into business relationships with prospective customers and/or with knowledge that interference with The Diamond Doctor's prospective business relationships was certain or substantially certain to occur. Finally, The Diamond Doctor has suffered actual harm as a result of Manookian's tortious interference in the form of at least one lost customer and lost profits.

**D.**     **Defamation – (Manookian and Cummings Manookian)**

115.     Manookian and Cummings Manookian have also defamed The Diamond Doctor by publishing multiple false statements about The Diamond Doctor and its owner in various public forums, including YouTube and Facebook.  For instance, Manookian and Cummings Manookian have falsely stated that The Diamond Doctor "trie[d] to bribe a lawyer," that The Diamond Doctor's owner "has been found bribing a lawyer for millions," and that The Diamond Doctor's owner has been "found guilty of trying to bribe a lawyer." Manookian and Cummings Manookian made these false statements with knowledge that they were false, with reckless disregard for their truth or falsity, or, at minimum, negligently. Moreover, because these statements falsely accuse The Diamond Doctor of committing a crime, they are defamatory *per se*.  The Diamond Doctor has suffered substantial economic and non-economic harm as a result of Manookian and Cummings Manookian's false statements, including harm to its reputation and goodwill.

**E.**     **Civil Conspiracy – (All Defendants)**

116.     The extortion scheme and false attack campaign perpetrated by Manookian, Cummings, Ramon, Hammervold, Hammervold, PLC and other yet to be identified, unnamed persons, constitutes a civil conspiracy under Texas law.  Specifically, Manookian, Cummings, Ramon, Hammervold, Hammervold, PLC and others yet to be identified, unnamed persons have agreed and conspired to smear the business names and ownership of various jewelry retailers

across the country including, without limitation, The Diamond Doctor, and extort millions of dollars from them.

117.    As set forth above, these conspirators have committed one or more unlawful acts in furtherance of their unlawful objectives, and The Diamond Doctor has suffered substantial damages as a proximate result of their actions.

**F.     Breach of Fiduciary Duty (Manookian, Cummings, Cummings Manookian)**

118.    Plaintiffs incorporate the preceding paragraphs as if fully reproduced herein.

119.    Plaintiffs had a fiduciary relationship with each of the Defendants.  An attorney-client fiduciary duty arose from the discussions and communications between Plaintiffs and Defendants.

120.    Defendants breached their fiduciary duty to Plaintiffs.  Specifically, Defendants failed to preserve client confidences, deal honestly with the clients, avoid impermissible conflicting interests, and not employ advantages arising from the attorney-client relationship in a manner adverse to the clients.

121.    Defendants' breach resulted in injury to Plaintiffs and benefit to Defendants.  As a result of Defendants' actions, Plaintiffs have suffered actual and consequential damages.

122.    Plaintiffs' injuries resulted from Defendants' malice or actual fraud, which entitles Plaintiffs to exemplary damages under Tex. Civ. Prac. & Rem. Code § 41.003(a).

**G.     Fraud (Manookian, Cummings, Cummings Manookian)**

123.    Plaintiffs incorporate the preceding paragraphs as if fully reproduced herein.

124.    Defendants made material representations to Plaintiffs that they knew were false when they made them and they made the representations with the intent that Plaintiffs would act upon the representations.  Specifically, Defendants represented that they had the intention of being

retained by Plaintiffs and to act as Plaintiffs' attorneys.  In fact, they were legally and ethically prohibited from doing so due to their detailed investigation and accumulation of confidential information from potential adverse parties to The Diamond Doctor, as represented to the Tennessee Bar.

125.    Plaintiffs did act in reliance on the misrepresentations, thereby incurring injury. Plaintiffs engaged in several discussions with Defendants in reliance on Defendants' representation that they were negotiating to act as attorneys for Plaintiffs.  As a result, Plaintiffs disclosed confidential information to Defendants that would have not been otherwise disclosed.

126.    Defendants also perpetrated fraud by omission in that Defendants concealed and/or failed to disclose one or more material facts within their knowledge, knowing Plaintiffs were ignorant of the facts and did not have an equal opportunity to discover the truth.  Specifically, Defendants withheld the fact that they were legally and ethically prohibited from being engaged as legal counsel by The Diamond Doctor in relation to the campaign.  Defendants' nondisclosure was intended to induce Plaintiffs to take action, i.e. giving confidential information to Defendants and paying the retainer, by concealing or failing to disclose these material facts.  Plaintiffs suffer injury as a result of acting without knowledge of the undisclosed material fact(s).

127.    As a result of Defendants' fraud, Plaintiffs have suffered actual and consequential damages.

128.    Plaintiffs' injuries resulted from Defendants' actual fraud, gross negligence, or malice, which entitles Plaintiffs to exemplary damages under Tex. Civ. Prac. & Rem. Code § 41.003(a).

## H.  Barratry (Manookian, Cummings, Cummings Manookian)

129.    Plaintiffs incorporate the preceding paragraphs as if fully reproduced herein.

130.    Defendants are liable for prohibited barratry under Tex. Gov't Code § 82.0651 because Defendants' conduct violated Rule 7.03 of the Texas Disciplinary Rules of Professional Conduct.

131.    Defendants' conduct violated Rule 7.03 of the Texas Disciplinary Rules because their solicitation of Plaintiffs' business was in-person, telephonic, and electronic contact which involved coercion, duress, fraud, overreaching, intimidation, undue influence, and/or harassment.

132.    Defendants' prohibited conduct resulted in actual damages to Plaintiffs.

133.    Plaintiffs are entitled to recover a penalty in the amount of $10,000 under Tex. Gov't Code § 82.0651(d)(1).

134.    Plaintiffs are further entitled to actual damages caused by the prohibited conduct, including consequential damages. Tex Gov't Code § 82.0651(d)(2).

135.    Plaintiffs are also entitled to recover their reasonable and necessary attorney fees. Tex Gov't Code § 82.0651(d)(3).

## I.    Appropriation of Name and Likeness (Manookian and Cummings Manookian)

136.    Plaintiffs incorporate the preceding paragraphs as if fully reproduced herein.

137.    Defendants Manookian, Cummings, and Cummings Manookian have repeatedly and prolifically appropriated Blank's name and/or likeness for the value associated with it without license or other authorization of Blank.

138.    Blank can be identified from the publications.  One publication features a photo of Blank with the word "Fraud" plastered over it and identifies Blank by name.  The photo of Blank with the word "Fraud" stamped in red in front of him has been scattered all over the Dallas area, including Highland Park, University Park, Preston Hollow, far north Dallas, and all the way to

Lakewood.   Additionally, this unauthorized likeness has been published countless times by Manookian, Cummings, and Cummings Manookian online, including on Facebook, for months.

139.     Manookian, Cummings, and Cummings Manookian's wrongful acts caused injury to Blank and benefit or advantage to Manookian, Cummings, and Cummings Manookian.

140.     Each and every one of Manookian, Cummings, and Cummings Manookian's wrongful uses of Blank's name and/or likeness caused injury to Blank, which resulted in actual and nominal damages.

141.     Blank's injuries resulted from Manookian, Cummings, and Cummings Manookian's malice, which entitles Blank to exemplary damages under Tex. Civ. Prac. & Rem. Code § 41.003(a)(2).

**J.      Libel (Manookian and Cummings Manookian)**

142.     Plaintiffs incorporate the preceding paragraphs as if fully reproduced herein.

143.     Defendants Manookian, Cummings, and Cummings Manookian published several false statements made as assertions of fact about Blank and The Diamond Doctor.  Such false assertions of fact include, but are not limited to, stating that Blank and The Diamond Doctor intentionally misrepresent the quality of the diamonds they sell to their customers.  Manookian, Cummings, and Cummings Manookian also published false statements asserting as fact that Blank and The Diamond Doctor have engaged in and have been convicted of the crime of bribery. Manookian, Cummings, and Cummings Manookian's statements refer to Plaintiffs by name.

144.     Manookian, Cummings, and Cummings Manookian's statements are libel *per se* as defined by Tex. Civ. Prac. & Rem. Code § 73.001.  Manookian, Cummings, and Cummings Manookian's statements injured Plaintiffs' reputation and exposed Plaintiffs to public hatred,

contempt, ridicule, and/or financial injury.  Manookian, Cummings, and Cummings Manookian's statements impeached Plaintiffs' honesty, integrity, virtue, and/or reputation.

145.    Manookian, Cummings, and Cummings Manookian's statements were false.

146.    Manookian, Cummings, and Cummings Manookian were negligent or acting with actual malice in determining whether the statements were true.

147.    Manookian, Cummings, and Cummings Manookian's false statements were defamatory *per se*, which entitles Plaintiffs to a presumption of general damages.

148.    Manookian, Cummings, and Cummings Manookian's false statements directly and proximately caused injuries to Plaintiffs, which resulted in special damages.

149.    Plaintiffs' injuries resulted from Manookian, Cummings, and Cummings Manookian's malice, which entitles Plaintiffs to exemplary damages under Tex. Civ. Prac. & Rem. Code § 41.003(a)(2).

## V.  INJUNCTIVE RELIEF

150.    Plaintiffs incorporate the preceding paragraphs as if fully reproduced herein.

151.    The harm to Plaintiffs described in this Complaint is a direct and proximate result of Defendants' acts.  The nature and magnitude of Defendants' conduct demonstrates the likelihood that Plaintiffs will succeed on the merits with respect to the causes of action set forth hereinabove.  The potential recovery of monetary damages will not redress the non-economic harm and injury that will be sustained by Plaintiffs as a result of Defendants' breach of fiduciary duty via the wrongful publications and the unlawful appropriation of Blank's name and/or likeness. Plaintiffs have no adequate remedy at law and will suffer imminent and irreparable harm in the event that Defendants' wrongful conduct is not enjoined.  The injury that Plaintiffs face outweighs any injury that would be sustained by Defendants as a result of this injunctive relief, and the

injunctive relief will not adversely affect public policy or the public interest.  Prior to issuance of the injunction requests, Plaintiffs are ready, willing, and able to execute a bond payable to the Defendants, or to provide other security in such sum as this Court deems proper for such costs and damages, if any, as may be incurred or suffered by any party found to be wrongfully enjoined or restrained as follows:.

     i.     Plaintiffs request injunctive relief enjoining Defendants from the following:

     1. Keeping any online publications, websites, advertisements and/or other publicly viewable information related to David Blank and/or The Diamond Doctor in a publicly viewable location or site on the internet, including but not limited to, keeping the websites and social media comments referenced hereinabove viewable to the public;

     2. Making and publishing, either directly or by innuendo, the statements and representations set forth on the websites, advertisements, and flyers referenced hereinabove;

     3. Making and publishing, either directly or by innuendo, the statements or representations as to any act or practices of either of the Plaintiffs;

     4. Making and publishing, either directly or by innuendo, any statements to Plaintiffs' current, former, or prospective customers regarding the reputation, business, or business practices of either of the Plaintiffs; and

     5. Wrongfully appropriating David Blank's name and likeness, or the publication or other inclusion of David Blank's name or image in association with Facebook advertisements, YouTube advertisements, www.diamonddoctorlawsuit.com, www.dallasdiamonddoctorclassaction.com, whether on those venues or any other website or internet venue.

6. In order to preserve the status quo, Defendants should be cited to appear and show cause why they should not be preliminarily restrained from engaging in the conduct described hereinabove.

ii.    Temporary Injunction

7. Plaintiffs ask the Court to set its application for temporary injunction for hearing and, after the hearing, to issue a temporary injunction against Defendants.

8. Plaintiffs have joined all indispensable parties pursuant to Tex. R. Civ. P. 39.

iii.    Permanent Injunction

9. Plaintiffs ask the Court to set its request for a permanent injunction for a full trial on the merits and, after trial, to issue a permanent injunction against Defendants.

## VI. DAMAGES

152.    Defendants' egregiously wrongful conduct resulted in and proximately caused injuries to Plaintiffs.  Plaintiffs seek damages allowed in the State of Texas in an amount within the jurisdictional limits of the Court.  Plaintiffs have suffered damages as follows:

1. Actual damages;

2. Special monetary damages, including compensatory and consequential damages;

3. Prejudgment and post-judgment interest;

4. Reasonable and necessary attorney fees; and

5. Exemplary damages as determined by a jury.

## VII.  ATTORNEYS FEES

153.   Plaintiffs have retained the law firms of STECKLER GRESHAM COCHRAN, JOHNSTON TOBEY BARUCH, P.C., SANDERS, O'HANLON, MONTLEY, YOUNG & GALLARDO, PLLC, SETTLEPOU, and FEE, SMITH, SHARP & VITULLO, LLP to represent them in this action and have agreed to pay the firms reasonable and necessary attorney fees.  Plaintiffs seek recovery of their reasonable and necessary attorney fees, expenses, and costs, pursuant to applicable Texas law.  All conditions precedent to Plaintiffs' recovery of attorney fees have occurred or have been waived.

## VIII. DEMAND FOR JURY TRIAL

154.   Plaintiffs demand a jury trial and tender payment of the jury fee with this Complaint.

## IX. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs The Diamond Consortium, Inc. d/b/a The Diamond Doctor and David Blank respectfully pray that this Court:

155.   Enter judgment in favor of The Diamond Doctor and against Manookian, Hammervold of Hammervold, PLC and all other named Defendants on all of The Diamond Doctor's claims and award The Diamond Doctor trebled actual and economic damages due to Manookian and Hammervold of Hammervold, PLC's willful conduct as described herein and exemplary and punitive damages;

156.   Issue a temporary restraining order enjoining Defendants Brian Manookian, Brian Cummings, and Cummings Manookian, PLC from:

1. Keeping any online publications, websites, advertisements and/or other publicly viewable information related to David Blank and/or The Diamond Doctor in a

publicly viewable location or site on the internet, including but not limited to keeping the websites and social media comments referenced hereinabove viewable to the public;

2. Making and publishing, either directly or by innuendo, the statements and representations set forth on the websites, advertisements, and fliers referenced hereinabove;

3. Making and publishing, either directly or by innuendo, the statements or representations as to any act or practices of either of the Plaintiffs;

4. Making and publishing, either directly or by innuendo, any statements to Plaintiffs' current, former, or prospective customers regarding the reputation, business, or business practices of either of the Plaintiffs; and

5. Wrongfully appropriating David Blank's name and likeness, or the publication or other inclusion of David Blank's name or image in association with any advertisements, including but not limited to online advertisements such as Facebook advertisements, YouTube advertisements, www.diamonddoctorlawsuit.com, www.dallasdiamonddoctorclassaction.com, whether on those venues or any other website or internet venue.

157.    Set a date for a temporary injunction hearing no later than fourteen (14) days after the hearing on issuance of a temporary restraining order, and, at such time, issue a temporary injunction enjoining Defendants from the same acts listed above, and upon final trial, enter a permanent injunction.

158.    Plaintiffs further pray that Defendants be cited to appear and answer, and on final trial, that Plaintiffs have judgment against Defendants for the following:

1. Actual, consequential, and incidental damages;

2. Attorney fees and costs allowed by law;

3.   Exemplary damages as allowed by law;

4.   Prejudgment and post-judgment interest at the highest rate allowed by law; and

5.   Cost of suit.

159.   Award The Diamond Doctor such other and further relief that this Court deems just and proper.

160.

## X.  PRAYER FOR RELIEF

Plaintiff The Diamond Consortium, Inc. d/b/a The Diamond Doctor prays that this Court:

161.   Enter judgment in favor of The Diamond Doctor and against Manookian, Hammervold of Hammervold, PLC and all other named Defendants on all of The Diamond Doctor's claims and award The Diamond Doctor trebled actual and economic damages due to Manookian and Hammervold of Hammervold, PLC's willful conduct as described herein and exemplary and punitive damages; and

162.   Award The Diamond Doctor such other and further relief that this Court deems just and proper. Pursuant to Fed. R. Civ. P. R. 38, The Diamond Doctor demands a trial by jury for all issues triable by jury.

Respectfully submitted,

**STECKLER GRESHAM COCHRAN**

*/s/ Bruce W. Steckler*
Bruce W. Steckler
Texas Bar No. 00785039
Stuart Cochran
Texas Bar No. 24027936
Stefani S. Eisenstat
Texas Bar No. 00788417
12720 Hillcrest Road – Suite 1045

Dallas, TX  75230
Telephone:  972-387-4040
Facsimile:  972-387-4041
bruce@stecklerlaw.com
stuart@stecklerlaw.com
stefani@stecklerlaw.com


**JOHNSTON TOBEY BARUCH, P.C**.
Randy Johnston
State Bar No. 10834400
3308 Oak Grove Avenue
Dallas, TX 75204
Telephone:  214-741-6260
Facsimile:  214-741-6248
randy@jtlaw.com


**SANDERS, O'HANLON, MOTLEY, YOUNG, & GALLARDO, PLLC**
Roger Sanders
State Bar No. 17604700
111 S. Travis Street
Sherman, TX 75090
Telephone:  903-892-9133
Facsimile:  903-892-4302
rsanders@somlaw.net


**SETTLEPOU**
Braden M. Wayne
State Bar No. 24075247
3333 Lee Parkway, Eighth Floor
Dallas, TX 75219
Telephone:  214-520-3300
Facsimile:  214-526-4145
bwayne@settlepou.com


**FEE, SMITH, SHARP & VITULLO, LLP**
Howard J. Klatsky
State Bar No. 00786024
Three Galleria Tower
13155 Noel Road, Suite 1000
Dallas, TX 75240-5019
Telephone: 972-934-9100

Facsimile:  972-934-9200
hklatsky@feesmith.com

**ATTORNEYS FOR PLAINTIFFS DIAMOND
CONSORTIUM, INC. D/B/A THE DIAMOND
DOCTOR, AND DAVID BLANK**

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 26, 2016, he served the foregoing Amended Consolidated Complaint on all counsel of record via the Court's ECF system.

*/s/ Bruce W. Steckler*
Bruce W. Steckler