1

```
1              UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF TEXAS
2                    SHERMAN DIVISION

3
     DIAMOND CONSORTIUM,        |  DOCKET NO. 4:16CV94
4    INC., ET AL                |
                                |  JULY 12, 2017
5                               |
     VS.                        |
6                               |  1:45 P.M.
                                |
7    BRIAN MANOOKIAN, ET AL     |  PLANO, TEXAS

8    -----------------------------------------------------

9           VOLUME 1 OF 1, PAGES 1 THROUGH 167

10          REPORTER'S TRANSCRIPT OF MOTION HEARING

11      BEFORE THE HONORABLE KIMBERLY C. PRIEST JOHNSON
               UNITED STATES MAGISTRATE JUDGE
12
     -----------------------------------------------------
13

14   APPEARANCES:

15   FOR THE PLAINTIFFS:    BRUCE WILLIAM STECKLER
                            LAURA KIRSTINE ROGERS
16                          STECKLER GRESHAM COCHRAN
                            12720 HILLCREST ROAD, SUITE 1045
17                          DALLAS, TEXAS 75230

18                          COYT RANDAL JOHNSTON
                            COYT RANDAL JOHNSTON, JR.
19                          JOHNSTON & TOBEY
                            3308 OAK GROVE AVENUE
20                          DALLAS, TEXAS 75204

21                          HOWARD JAY KLATSKY
                            FEE SMITH SHARP & VITULLO
22                          THREE GALLERIA TOWER
                            13155 NOEL ROAD, SUITE 1000
23                          DALLAS, TEXAS 75240

24                          ROGER D. SANDERS
                            SANDERS O'HANLON MOTLEY & YOUNG
25                          111 S. TRAVIS STREET
                            SHERMAN, TEXAS 75090
```

```
 1  FOR THE DEFENDANTS:      CHRISTOPHER JOHN SCHWEGMANN
                             ANDRES CORREA
 2                           LYNN TILLOTSON PINKER & COX
                             2100 ROSS AVENUE
 3                           SUITE 2700
                             DALLAS, TEXAS 75201
 4

 5

 6  COURT REPORTER:         TONYA B. JACKSON, RPR-CRR
                            FEDERAL OFFICIAL REPORTER
 7                          300 WILLOW, SUITE 239
                            BEAUMONT, TEXAS  77701
 8

 9

10

11     PROCEEDINGS REPORTED BY ELECTRONIC SOUND RECORDING;
             TRANSCRIPT PRODUCED BY COURT REPORTER.
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

INDEX

| | PAGE |
|---|---|
| OPENING STATEMENT BY MR. JOHNSTON | 6 |
| OPENING STATEMENT BY MR. SCHWEGMANN | 11 |
| DIRECT EXAMINATION OF BRUCE STECKLER | 20 |
| CROSS-EXAMINATION OF BRUCE STECKLER | 70 |
| REDIRECT EXAMINATION OF BRUCE STECKLER | 83 |
| RECROSS-EXAMINATION OF BRUCE STECKLER | 87 |
| DIRECT EXAMINATION OF BRIAN MANOOKIAN | 88 |
| CROSS-EXAMINATION OF BRIAN MANOOKIAN | 154 |

INDEX OF EXHIBITS

| | |
|---|---|
| EXHIBIT 1 | 37 |
| EXHIBIT 2 | 42 |
| EXHIBIT 3 | 43 |
| EXHIBITS 4 AND 5 | 49 |
| EXHIBIT 6 | 56 |
| EXHIBIT 7 | 57 |
| EXHIBIT 8 | 58 |
| EXHIBIT 9 | 59 |
| EXHIBIT 10 | 62 |

4

```
 1   EXHIBIT 11                                    65

 2   EXHIBIT 9                                     69

 3   EXHIBIT 11                                    69

 4   EXHIBIT 12                                   114

 5   EXHIBIT 12                                   119

 6   EXHIBIT 13                                   119

 7   EXHIBIT 14                                   125

 8   EXHIBIT 15                                   134

 9   EXHIBIT 16                                   157

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Motion Hearing 7-12-2017

5

1          (OPEN COURT, ALL PARTIES PRESENT.)

2          THE COURT:  All right.  Good afternoon.  We're

3   here in the matter of 4:16CV94, *Diamond Consortium, Inc.,*

4   *et al v. Brian Manookian, et al.*

06:40AM  5          Can we have appearances for the record,

6   please?

7          (Indiscernible.)

8          THE COURT:  Good afternoon.

9          MR. SCHWEGMANN:  Good afternoon, your Honor,

06:40AM 10   Chris Schwegmann and Andres Correa for the defendants.

11          MR. JOHNSTON:  We have other counsel for the

12   plaintiffs, so that the record is complete, your Honor.

13          THE COURT:  Yes.  Thank you.

14          You can go ahead.

06:41AM 15          MR. STECKLER:  Bruce Steckler and Kirstine

16   Rogers for the plaintiffs.

17          MR. SANDERS:  And local counsel Roger Sanders.

18          THE COURT:  All right.  We're here today on

19   Plaintiffs' Emergency Motion to Show Cause (contempt and

06:41AM 20   sanctions).  I have read all of the briefing in this

21   case.  However, because this case has been going on for a

22   while and I am new to the case, I wanted to hear argument

23   from counsel.  So, I do have some questions; but I'm

24   going to hear from counsel first.  And if you don't

06:42AM 25   answer questions, then I -- I may interrupt you and I may

6

1  wait until you're finished to ask them so...

2          Counsel.

3          MR. JOHNSTON:  Your Honor, (indiscernible) the

4  presentation of evidence as well and we are prepared to

06:42AM  5  introduce evidence, but I do have an opening that I think

6  explains why we are here today.  And candidly, it is

7  because there has been conduct by attorneys licensed in

8  the state of Tennessee and aided in part, hopefully

9  unknowingly, by officers of this court that have been

06:42AM  10  publicly harassing and ridiculing our client Mr. Blank,

11  that have made a mockery of this court's protective order

12  and the discovery rules and the general judicial process.

13  And there are four things that I would point out to the

14  court that we would hope to accomplish today.

06:43AM  15          One of them is to demonstrate to the court

16  three websites maintained by an organization we refer to

17  as shorthand as "DISF," Diamond Integrity Standards fund.

18  That is what we refer to as the "Victim Fund website,"

19  the "Sales Tax Fraud website," and the "Sue David Blank

06:43AM  20  website" established respectfully May 10 of this year,

21  June 19 of this year, and July 7 of this year, as far as

22  we know.

23          THE COURT:  What is the third one?

24          MR. JOHNSTON:  The *suedavidblank.com* website

06:43AM  25  established just a few days ago.  Or at least it came to

1    our attention on July the 7.

2            THE COURT:  Okay.

3            MR. JOHNSTON:  One of the things we intend to

4    demonstrate for the court is the connection between DISF

06:44AM  5    and Mr. Manookian; and we believe it's candidly an alter

6    ego of him, a device being used to mock this court and

7    ridicule the plaintiff.  And the evidence will include

8    evidence that he is the registered agent and incorporator

9    of it.  He says in his declaration he is not on the board

06:44AM 10    of directors but does not tell us who is.  The website

11    templates cross-reference his law firm back and forth;

12    and if you click on the admin site for the DISF websites,

13    it says that the administrator of those websites is the

14    Cummings Manookian law firm.

06:44AM 15            The third point is -- well, the third point is

16    the misuse of customer information and discovery abuse

17    and shockingly incredible questions that remain

18    unanswered with regard to the customer list of the

19    Diamond Doctor.  The defendants have demanded that

06:45AM 20    information from day 1, have filed motions to compel.

21    They have repeatedly in pleadings to this court said that

22    every customer is a witness and then we find that they

23    have this information already and it is disclosed on all

24    three of those websites in various forms -- sometimes

06:45AM 25    full names with full phone numbers and addresses and the

dollar amounts even of the diamond purchases;

sometimes -- and I will tell the court these websites

have been changed over time.  We make a complaint, and a

name may be -- the last name may be removed and then an

06:45AM  initial put up or partial phone numbers put up, websites

taken down and then reappear at a pace that candidly we

have trouble keeping track of.

       But we now know that they had this information

all the time and demanded that we produce it and sought

06:46AM  sanctions for our not producing it, even though we got a

court order protecting us from producing it.  They

refused to produce it to us, when we had discovery

requests out for them.  At no time did they ever indicate

to us they already had these customer lists.

06:46AM        And then lastly, what I would call the "calls

and e-mails sections" of our relief -- or of our

complaints and then our relief.  The defendant

Mr. Manookian has admitted to 175 robo-calls to customers

even though it didn't get that information from us.  He

06:47AM  has admitted that every customer is a witness, and he

denies that he has made robo-calls to witnesses.  He says

these people were carefully selected, but we don't know

how.  He says they couldn't possibly be a witness or a

juror, but he said every customer is a witness.

06:47AM        We also have e-mails to media seeking to

Motion Hearing 7-12-2017

9

06:47AM

1  publicize these derogatory websites about -- and they're

2  really incredibly distasteful and designed specifically

3  to harass and not educate, and we'll demonstrate that to

4  the court.

5          And then lastly, we have Mr. Manookian

6  admitting to violating the court's order by personally

7  calling three customers.  We think there are more than

8  that.

9          I will tell the court one of the accusations

06:47AM  10  we made in our motion we will withdraw and will submit no

11  evidence in support of, and that was our claim that

12  Mr. Manookian called Mr. Blank's mother.  His mother does

13  not want to testify.  We are dropping that allegation.

14  She candidly has some deteriorating mental faculties

06:48AM  15  anyway; and, so, we don't intend to introduce evidence on

16  that.

17          In the end we think that we'll demonstrate

18  that there has been significant unjustified interference

19  with the judicial process of this court and with the

06:48AM  20  rights of our clients to a fair trial; and we'll at that

21  time then discuss the relief we want, your Honor.

22          THE COURT:  All right.  One question.  With

23  regards to who owns the client information of your

24  client, does your client own that information?  I know

06:49AM  25  there was some allegations made in defendants' response

Motion Hearing 7-12-2017

10

1 that another entity owns that information.  Can you

2 address that?

3          MR. JOHNSTON:  That's accurate, your Honor.

4 The Diamond Doctor sold its assets to Diamonds Direct,

06:49AM  5 and that includes the customer list.  Mr. Blank is under

6 a covenant and obligation in that sales agreement to

7 continue to protect that information.  In fact, we have

8 communicated with them asking them if they are the source

9 of the customer list going to Mr. Manookian.  Somewhat

06:49AM  10 coincidentally, Mr. Manookian is an attorney for Diamonds

11 Direct.  Diamonds Direct has mandated that we keep that

12 information secret and not let it out; and, yet, their

13 own lawyer, through this website, has let it out.

14          So, the specific ownership of the customer

06:50AM  15 list is not Mr. Blank anymore, although he has a lot of

16 that information in his head.  He has access to that

17 information.  He continues to be a consultant.  I'm not

18 sure if he's an employee or independent consultant of

19 Diamonds Direct pursuant to that sales agreement.

06:50AM  20          Is that an adequate answer, your Honor?

21          THE COURT:  It is, I think, for now.  I don't

22 completely understand Mr. Manookian's representation of

23 Diamond Direct but --

24          MR. JOHNSTON:  Nor do we, your Honor.

06:50AM  25          THE COURT:  Okay.  All right.

Motion Hearing 7-12-2017

11

1        MR. JOHNSTON:  Thank you, your Honor.

2        MR. SCHWEGMANN:  Good afternoon, your Honor.

3   My name is Chris Schwegmann.  I'm here for the

4   defendants.

06:51AM  5        I'm not sure where to start.  I don't believe

6   this was the right time, place, or even parties for the

7   court to hear some of the issues before it; but let me

8   start by saying we believe from our perspective this is

9   just part of Mr. Blank and the Diamond Doctor's

06:51AM 10  continuing efforts to suppress truthful information being

11  reported about his former business.  Now, they may find

12  it distasteful; the court might find it distasteful; but

13  it, in fact, is protected by the First Amendment.  And in

14  fact, the speaker is DISF that's not a party before this

06:51AM 15  court involving information owned by a party also not

16  before this court.  Get to that in a second.

17       But if the court would indulge me, just a few

18  statements of background.  You said you were new to the

19  case; you said you read the briefs.  But I think it's

06:52AM 20  important to emphasize a few points that make this motion

21  particularly rich to be heard.

22       My clients, they're lawyers from Tennessee;

23  and they uncovered years ago in the diamond industry this

24  massive fraud, this overgrading of diamonds.  Not just

06:52AM 25  the Diamond Doctor but other jewelers around the country

Tonya B. Jackson, RPR-CRR
409.654.2833

12

1  would sell diamonds overgraded at inflated prices

2  to consumers.  They began to advertise these claims,

3  get clients, and bring effectively DTPA-type claims

4  around the country.  They discovered the Diamond

06:52AM  5  Doctor was engaged in this same type of fraud and

6  started advertising back in -- I guess it's October,

7  2015.

8          These folks filed this as an emergency motion;

9  but, your Honor, this type of speech in advertising has

06:53AM  10  been around for more than 2 years.  Yet, they're bringing

11  this motion 60 days before trial.

12          What was the Diamond Doctor's response to that

13  initial set of advertising?  Well, hired lawyers, decided

14  that the best defense was a good offense; and he did a

06:53AM  15  number of things.

16          First, he sued these folks, my clients, in

17  state court.  Judge Ginsburg threw that out.

18          He then brought a suit in the Eastern District

19  of Texas, brought another suit in the Northern District

06:53AM  20  of Texas.  He sued three times in three different venues.

21  Got consolidated.  That's why we're here today in the

22  Eastern District.

23          The Diamond Doctor filed numerous bar

24  complaints against these folks.  But what's more

06:53AM  25  significant, he hired a public relations firm to put as

Motion Hearing 7-12-2017

13

much information in the public domain as possible.  There
was a front-page ad -- I mean, I'm sorry, not ad --
article in the *Dallas Morning News* I guess it was about a
year ago in the Sunday edition where his public relations

06:54AM 5  firm engineered to get as much of this in the public as
possible.  The court might -- we have a copy of the
article, and I'm happy to show it when we get to that
point.  There's e-mails that show his public relations
firm wanted to discredit Manookian, and part of that

06:54AM 10  strategy involved -- and we didn't hear Mr. Johnston say
anything about this -- but part of his strategy was to
create and author his own attack websites directed at my
clients.

14          So, what did he do?  He opened a number of

06:54AM 15  websites, wrote the content, called my client a "crooked
law firm," called it a "criminal enterprise."  He even
went so far as to forge an engagement agreement and post
that on the website suggesting to the public that they
had an attorney-client relationship.  This is what the

06:54AM 20  plaintiffs have done in this case.  And those websites,
until just recently, a few weeks ago, were still online
where potential jury members and potential witnesses
could *Google* them and find it just the same.

24          Now --

06:55AM 25          THE COURT:  I'm going to interrupt you.  I

Motion Hearing 7-12-2017

14

06:55AM

1  don't -- I mean, that may all be; but the issues here

2  today are different.  I mean, No. 1, plaintiffs are

3  saying there's customer proprietary information on the

4  websites.  No. 2, they've made allegations -- and I

5  believe your clients have admitted to -- to contacting

6  witnesses in this case and directing them to websites.

7  And that conduct is different than what you just spoke

8  of.

9           MR. SCHWEGMANN:  It is.  My point in giving

06:55AM

10  you the background, your Honor, is really to say this is

11  not an emergency.  None of this is new.  And what's

12  different here today in part is this involves the DISF,

13  which you'll hear, if we hear evidence, is a separate,

14  independent entity that published these websites.  That

06:55AM

15  entity is not a party here.  The information that's

16  published on those websites is owned by an entity,

17  Diamonds Direct, that is also not a party here.

18           So, what they're effectively seeking, although

19  they don't style it this way -- what they're effectively

06:56AM

20  seeking is an injunction, a prior restraint, something to

21  make my client take off the Internet something he doesn't

22  have direct control of.  And it involves an entity not

23  even within this court's jurisdiction involving

24  information no longer within this court's jurisdiction.

06:56AM

25  If what they want is a prior restraint on the website,

they know where to find the representative.  They served

DISF.  They can depose DISF, and they can go seek their

injunction in the appropriate jurisdiction involving the

appropriate party.

06:56AM          THE COURT:  I think they tried to do that, and

you filed a motion to quash that's now pending.  So --

                MR. SCHWEGMANN:  It is pending in Tennessee,

and we have said that we will help -- well, we don't

represent DISF.  And you can hear from Mr. Manookian but

06:56AM  he is DISF's lawyer and my understanding is that he will

make available a corporate representative to testify

regarding all the facts they want to hear about.  But

what they're asking for -- and candidly, I'm not sure

what they're asking for in terms of relief today.  They

06:57AM  don't specify in their motion.  But sounds like what they

want is some sort of prior restraint without having to

brief any of the First Amendment issues, without having

to join any of the proper parties, and without having to

step through any of those issues.

06:57AM          And what's interesting, your Honor, is there's

a Fifth Circuit case that candidly none of the parties

cited but that's directly on point.  And I'm going to at

least provide the court with the cite.  It's *Marceaux*

*versus Lafayette City*; it's 731 F.3d 488.  It involves a

06:57AM  situation very similar to this one where the plaintiff

16

06:58AM

was a group of police officers and were suing the police department in Lafayette, Louisiana; and the plaintiffs put on an attack website that attacked the police department, attacked the sheriff.  By the way, this is a 2013 opinion.  And the police department said, "No, you got to take down the website.  It's poisoning the jury pool."  And the lower court did exactly that, entered an order telling the plaintiff policemen to take it down. They appealed, and the Fifth Circuit reversed and said no.  And they analyzed it under the prior restraint doctrine.

Now, that case, at a least all the proper parties were within the court's jurisdiction involving information within the court's jurisdiction.  This case involves DISF, not a party, involving information owned by someone else.  And again, that cite is 731 F.3d 488.

But, your Honor, let me address the specific allegations.  What you'll see attached to their motion really is no evidence.  There's no affidavit or declaration from anyone who says they have been intimidated or threatened.  There's -- they withdrew the allegation concerning the plaintiff's mother.  But just so the record is clear, if Mr. Manookian testifies, he'll say he never called her.  There's no evidence that any -- other than the existence of the websites, there's no

Motion Hearing 7-12-2017

17

06:59AM

evidence that any potential juror ever even looked at

that.  There's no *Google* analytics or anything that would

suggest that anyone from the Eastern District of Texas

looked at it, anyone other than the Diamond Doctor's

customers who incidentally wouldn't be impaneled on the

jury anyway because of their relationship with the

plaintiff.  There's just no evidence at all to cause this

court to enter any relief.

06:59AM

The fact of the matter is they can take the

deposition of DISF once they step through the appropriate

hoops and they're going to get to take the deposition of

my clients and we've offered dates to take their

depositions on numerous occasions.  So, you know, I'm

happy to walk through all of these issues if the court

06:59AM

has questions but, frankly, there's no evidence to

justify any relief here and it's questionable whether the

court even has the power to order DISF, a nonparty, to do

anything.

Let me say one word about the serious

07:00AM

protective order issues raised by the plaintiffs.  Your

Honor, my clients have sought in discovery to get

customer lists repeatedly and consistently since the

start.  And the reason they want a customer list was so

that they could determine whether Mr. Blank was truthful

07:00AM

when he said that he disclosed that some of these

Motion Hearing 7-12-2017

18

1   diamonds came from a disreputable grading lab.  They

2   studiously and repeatedly avoided providing us that

3   information.  In fact, we had to go to Judge Mazzant

4   twice to get that information from them; and even then

07:00AM 5   they only gave us 100 customer names from which we were

6   allowed to send subpoenas to 40.  It's unfathomable to

7   think that DISF -- well, first of all, Mr. Manookian

8   submitted a declaration where he says as far as he knows

9   nothing that the DISF published came from discovery in

07:01AM 10   this case; and we certainly didn't give it to them.  We

11   abided by the protective order.

12          The fact is they're saying we have it

13   and that -- the only way it's a violation of the

14   protective order is if it's defined as discovery

07:01AM 15   information.  The protective order says discovery

16   information is information provided by them to us.  We

17   didn't have it.  They wouldn't give it to us.  We had to

18   go to court to get it, and we only got it a couple of

19   weeks ago.  The information they're complaining about was

07:01AM 20   up long before that.  It, by definition, can't be a

21   violation of the protective order.

22          What's more, they don't have standing to argue

23   about it.  You just heard the plaintiffs say they sold

24   that information to someone else.  That someone else is a

07:01AM 25   client of Cummings Manookian today.  Your Honor, there's

Motion Hearing 7-12-2017

19

1   not even evidence that there was any violation of the

2   protective order.

3          I'm happy to address any of the court's

4   questions; but for all those reasons, your Honor, we

07:02AM   5   don't feel they've made a threshold holding.  They

6   haven't filed a motion with sufficient evidence to even

7   justify an evidentiary hearing or anything of the sort.

8   We think instead they should take the deposition of DISF,

9   if they feel it's appropriate; and if appropriate, they

07:02AM   10   can seek injunctive relief against the right party in the

11   right forum.  Thank you.

12          THE COURT:  Mr. Johnston.

13          MR. JOHNSTON:  I was in a trial one time when

14   I had a lawyer stand up and try to give a rebuttal

07:02AM   15   opening, but I know of no procedure for that.  So, I will

16   call our first witness, Bruce Steckler.

17          MR. SCHWEGMANN:  Your Honor, we'd like to --

18   I'm not sure the procedural mechanism that we're

19   operating in; but in any event, I'd like to invoke the

07:02AM   20   Rule.

21          THE COURT:  Okay.  If there are any other

22   witnesses that intend to take the stand in the courtroom,

23   if you'll please step outside the courtroom.

24          (Oath administered.)

25

20

1        DIRECT EXAMINATION OF BRUCE STECKLER

2          CALLED ON BEHALF OF THE PLAINTIFFS

3    BY MR. JOHNSTON:

4    Q.    Mr. Steckler, I'm going to go kind of quickly

07:03AM  5    through just background stuff.

6              You're one of the attorneys for the plaintiff

7    in this case, correct?

8    A.    Yes.

9              And by the way, Bruce Steckler, counsel for

07:03AM  10   the plaintiffs.

11   Q.    I'm sorry.  I didn't get the reference.

12             But let me direct you to this motion today and

13   just ask you for the background of this motion in

14   connection with your service as an attorney for the

07:03AM  15   plaintiff in this case.

16   A.    Well, it's certainly not something I've ever filed

17   before in my career.  It was something that took a lot of

18   consideration and research on before we filed it.  In

19   fact, we discovered this information only in May of 2017.

07:04AM  20   That's when we first learned that Facebook posts were

21   being sent to people in the Dallas area in which the --

22   they were advertising a Diamond Integrity Standards

23   Foundation and a website *www.ddvictimfund.com*.

24   Q.    Now, did that website have customer information on

07:04AM  25   it?

Motion Hearing 7-12-2017

21

A.      Yes, it did.

Q.      And Mr. Schwegmann referred to the earlier
websites and you waiting 60 days before trial to file
this.  Did the earlier websites have customer information
07:04AM  on them?

A.      No, not that we're aware of.  At least when we --
this is the first website that we learned that full
customer names were being disclosed, purchase prices were
being disclosed.

07:05AM  Q.      And with regard to your efforts to not disclose
that customer information, let's lay that out a little
more clearly, too.

        You did resist producing customer information,
correct?

07:05AM  A.      Yes, and --

Q.      And let me take it a step at a time.

        And they filed a motion to compel, correct?

A.      They did.

Q.      And what did Judge Mazzant rule?

07:05AM  A.      Judge Mazzant --

        MR. SCHWEGMANN:  Your Honor, objection.  I
mean, his rulings are part of the record in the case; and
I don't know that it's appropriate for him to have
plaintiffs' counsel interpret it for you.

07:05AM          THE COURT:  I'm going to let him answer.

22

1  A.     There's a minute entry just recently, at the end

2  of June, by Judge Mazzant which basically allowed only a

3  snapshot, I believe, of 40 customer names be produced for

4  Attorneys' Eyes Only; and he even cautioned in there in

07:06AM  5  his minute entry order about the utilization of the names

6  by the parties.

7  BY MR. JOHNSTON:

8  Q.     And was there also a prior protective order

9  entered allowing the designation of Attorneys' Eyes Only

07:06AM  10  back in October of 2016?

11  A.     Yes.  The court entered a protective order

12  designating things confidential, highly confidential, and

13  Attorneys' Eyes Only.

14  Q.     And my memory may be inaccurate, but my memory is

07:06AM  15  he ordered you to produce 100 customers' names but they

16  got to subpoena 40 of the 100.  Does that sound right?

17  A.     That's exactly correct.  We provided a list of 100

18  names; and then of the 100, 40 could then be subpoenaed

19  whereby additional information would be gathered,

07:06AM  20  including the depositions.

21  Q.     So, when Mr. Schwegmann complains about you only

22  producing 100 names, that's what the court required,

23  correct?

24  A.     That's correct.  And in fact, for clarification,

07:07AM  25  we produced thousands of customer invoices and records in

23

1    the case.  We had just redacted customer names,

2    addresses, and phone numbers in the production that we

3    did in response to discovery.

4    Q.    Let's move now to -- well, has there been any

07:07AM    5    doubt about Mr. Blank's access to these documents in

6    connection with the plaintiffs' repeated demands that he

7    produce them?

8    A.    Not at all.  In fact, we did produce the 100 names

9    because we do have access to them; and we did consult

07:07AM   10    with the new owner of the company, Diamonds Direct,

11    before we produced them, explained to them we were

12    subject to court order, even though there is an asset

13    purchase agreement asking us to maintain the

14    confidentiality.  Moreover, we received letters and we've

07:07AM   15    had conversations with Diamonds Direct indicating they

16    wanted to maintain --

17            MR. SCHWEGMANN:  Objection, your Honor,

18    hearsay.  He's talking about conversations with others

19    that aren't going to be here as witnesses today.

07:08AM   20            MR. JOHNSTON:  Your Honor, I'll --

21            THE COURT:  Sustained.

22    BY MR. JOHNSTON:

23    Q.    Let me ask you, Mr. Schwegmann -- I'm sorry --

24    Mr. Steckler -- and I'll probably make that mistake more

07:08AM   25    than once.

Motion Hearing 7-12-2017

24

1  A.     I won't take offense.

2  Q.     Do you recall the date in May of this year when

3  you learned about the first Diamond Integrity Standards

4  Foundation website?

07:08AM  5  A.     Yes.  It was on or about May 10th of this year.

6  Q.     And I said in my opening that the websites have

7  been changed at various times.  Would you describe for

8  the court what you have discovered in connection with

9  these websites since May of this year?

07:09AM  10  A.     Personally and as counsel in the case, we have

11  been keeping track of the websites.  The initial website

12  that we saw in May of 2017 had customer names, and it had

13  information about the purchase price.  In addition, it

14  had a petition that you could file a lawsuit.  In

07:09AM  15  essence, you could click on it and prepare a lawsuit; and

16  it provided a request for a declaration.  I think you

17  have the website in front of you up online that we saw.

18  That's the first one.  Now, there are times that on this

19  website, it's gone down.  I believe right now you can't

07:09AM  20  access it.  At other times we've either middle initial --

21  you know, first names redacted or just initials; but it's

22  been ever-changing.  But the sum and substance of the

23  text seems to have remained the same.

24  Q.     And with regard to what you're seeing on the

07:10AM  25  screen, the capture of that website, did you verify that

Motion Hearing 7-12-2017

25

1  these are in fact customers with the dollar amounts of

2  their purchases?

3  A.    Yes.  When we first discovered this, that's one of

4  the first things we did was to -- first of all, we needed

07:10AM  5  to find out the source of the information.

6  Q.    Well, let me just stay with that for a minute.

7          When you verified that there were customers'

8  names on the website, who did you contact?

9  A.    Well, my first conversation, I -- let me see.  I'm

07:10AM  10  not sure who we first contacted.  I can tell you who we

11  did contact.

12  Q.    Tell me who you did contact, then.

13  A.    We first reached out to Diamonds Direct who was

14  part of the asset purchase agreement on November 1st.

07:11AM  15  Q.    And why?

16  A.    We wanted to see if they had produced or disclosed

17  that information to Mr. Manookian.

18  Q.    And were you able to satisfy your concerns about

19  the source of the documents with a phone call to Diamonds

07:11AM  20  Direct?

21  A.    I received not only a phone call from Diamonds

22  Direct but a letter and an e-mail confirming that no --

23          MR. SCHWEGMANN:  Objection, your Honor,

24  hearsay.

07:11AM  25  A.    I confirmed that it was not --

Motion Hearing 7-12-2017

26

1             THE COURT:  Sustained.

2    BY MR. JOHNSTON:

3    Q.    By Diamonds Direct.

4             MR. SCHWEGMANN:  Objection, hearsay.

07:11AM  5    BY MR. JOHNSTON:

6    Q.    So, then, what did you do after you found out that

7    Diamonds Direct did not produce the customer information

8    contained on the victims' fund website?

9             MR. SCHWEGMANN:  Your Honor, I'm sorry to

07:11AM 10    interrupt; and I understand this is a bench hearing.  At

11    the same time, if you'll indulge my objections, I need to

12    protect the record.

13             Among other things, I don't believe I see a

14    representative from Diamonds Direct here to testify and

07:11AM 15    he's just gotten in two hearsay statements about that and

16    we'd ask the court, again for record purposes, just to

17    strike that from the record.

18             THE COURT:  What question are you referring

19    to?  I don't have the transcript up.

07:12AM 20             MR. SCHWEGMANN:  I apologize for leaning.  I

21    believe I'm not being loud enough.

22             Mr. Johnston asked Mr. Steckler twice about

23    conversations he had with the attorneys for Diamonds

24    Direct about the information that's at issue here.

07:12AM 25    Unless I'm incorrect, I don't see an attorney or anyone

Motion Hearing 7-12-2017

27

1   from Diamonds Direct who owns the information who can

2   testify about that at all.  So, we're left with taking

3   Mr. Steckler's hearsay as truth; and we don't believe

4   that's appropriate for this type of hearing.  So, we

07:12AM   5   object on the basis of hearsay for the last two questions

6   and answers.

7            THE COURT:  All right.  I'm going to sustain

8   the objections.  If y'all will give me a chance to make a

9   ruling on any objections made before the witness answers,

07:12AM   10  that will be helpful.

11           Okay.

12  BY MR. JOHNSTON:

13  Q.    Did you contact counsel for the defendants in this

14  case, sir?

07:13AM   15  A.    Yes, I did.

16  Q.    And what was their response?

17  A.    When first confronted with it, Mr. Schwegmann was

18  unaware of it, over a telephone call.  Subsequently, I

19  asked him why we hadn't gotten any of this information in

07:13AM   20  the course of discovery and told him a little bit about

21  the work that we did once we found out about this

22  website.

23  Q.    And did you ever get a satisfactory explanation

24  from them as to how -- well, what did you do to

07:13AM   25  investigate the origin of DISF?

28

A.     The first thing we did is we went onto the

Tennessee Secretary of State's website and discovered

that this Diamond Integrity Standards Foundation was

incorporated by Brian Manookian and he and his law firm

07:14AM   was the registered agent.  I did that before I called

Mr. Schwegmann.  Obviously because the situation was so

serious, I wanted to make sure I knew who I was talking

about.

The second thing I did and -- but one of the

07:14AM   things we did, which I'm surprised today, is counsel for

the defendant was on e-mails with Diamonds Direct about

the production of these customer names and repeatedly

insisted that they didn't want them produced in e-mails,

in which both parties were on them because Diamonds

07:14AM   Direct has a stake in this.  So, I wanted to include them

in my e-mails with counsel for defendants.

Q.     Did counsel for defendant receive e-mails from

Diamonds Direct with regard to their position on this

customer list?

07:15AM   A.     Yes.  They were copied on I know one for certain,

because I was with Mr. Correa, in which counsel for

Diamonds Direct, Mickey Aberman, had sent to me and was

pretty unequivocal about their --

MR. SCHWEGMANN:  Objection, hearsay again.

07:15AM   THE COURT:  Sustained.

Tonya B. Jackson, RPR-CRR
409.654.2833

Motion Hearing 7-12-2017

29

```
 1  BY MR. JOHNSTON:

 2  Q.     With regard to the -- well, was -- did there come

 3  a time when the victims' fund lawsuit was taken down?

 4  A.     Yes -- well --

 5  Q.     And by the way --

 6         MR. JOHNSTON:  Let me go back to the very

 7  front of the website, Coyt, please.

 8  BY MR. JOHNSTON:

 9  Q.     It refers to a Diamond Doctor Victims' Fund

10  administered by DISF and invites people to enroll or

11  contact them for assistance before it's too late,

12  correct?

13  A.     Correct.

14  Q.     Do you know of the source of any fund that's ever

15  been established for victims of Diamond Doctor?

16  A.     I am unaware of any such fund.

17  Q.     Is there any class action or settlement anywhere

18  where there has been a fund set aside to pay victims of

19  Diamond Doctor?

20  A.     I am completely unaware of such a thing.

21  Q.     And if you look at -- under the section "Defrauded

22  by Diamond Doctor" -- let me get over here where I can

23  read it -- where it says "If you received an invitation

24  to enroll in the Diamond Doctor Victim Fund, you are

25  likely one of the thousands of individuals defrauded by
```

07:15AM (line 5)
07:15AM (line 10)
07:16AM (line 15)
07:16AM (line 20)
07:16AM (line 25)

Motion Hearing 7-12-2017

30

1  Diamond Doctor through the sale of EGL-International and

2  in-house certified diamonds."

3          And then the second paragraph, "Following the

4  exposure of its fraudulent sale practices, Diamond Doctor

07:16AM  5  shut down its business."

6          Do you see that language?

7  A.    I do.

8  Q.    And then let me direct your attention in those two

9  paragraphs to the words in red.

07:17AM  10  A.    The hyperlinks?

11  Q.    Correct.

12  A.    Yeah, those are hyperlinks, I believe; and those

13  click you to the Cummings Manookian website.

14  Q.    Well, what happens if you click on those?  Do you

07:17AM  15  know?

16  A.    Yes.  You go to a Cummings Manookian sponsored

17  website.  It's I think *diamondlawsuit.com*.

18  Q.    So, the Victim Fund lawsuit established by DISF,

19  incorporated by Mr. Manookian, has a hyperlink that takes

07:17AM  20  you to his law firm's website?

21  A.    Yes, and back to DISF if you want it as well.

22  Q.    Well, let's -- so, just so we're clear, this is

23  the DISF website directing you to Mr. Manookian's law

24  firm, correct?  The website with the customer names

07:18AM  25  directs you to Mr. Manookian.

31

A.      Correct.

Q.      Let's look at it now going the other way.  Let's

go to the Diamond Doctor -- the *diamondlawsuit.com* slash

Diamond Doctor website.  Who established that website?

07:18AM  A.      That is a Cummings Manookian website, as you can

see from the left-hand corner.

Q.      That is in fact one of the websites that started

this lawsuit, correct?

A.      Correct.

07:18AM  Q.      So, if you click up there -- by the way, let's

just go through it.

        It talks about was I sold an overgraded

diamond; it talks about how to contact them to file a

lawsuit and contact -- I mean, and assert a claim against

07:18AM  Mr. Blank and the Diamond Doctor, correct?

A.      Correct.

Q.      On this theory of the EGL diamond is fraudulent.

A.      That's their theory.

Q.      All right.  Let me direct your attention to the

07:19AM  upper left-hand corner where the name of the law firm is.

And because the fund has been taken down, we have this on

a video as opposed to an actual presentation live at this

time.  But let me direct your attention to what happens

if you click on the name of the Cummings Manookian law

07:19AM  firm up at the top.

Motion Hearing 7-12-2017

32

1          (Video presentation.)

2   BY MR. JOHNSTON:

3   Q.     So, what does that direct you to?

4   A.     As I said, it -- the Cummings Manookian sponsored

07:19AM  5   website takes you to the Diamond Integrity Standards

6   Foundation website, www --

7   Q.     Which contains what?

8   A.     Diamond Victim Fund, which is this DISF website

9   that contains Diamond Doctor customer names and purchase

07:20AM  10   prices.

11   Q.     So, wholly apart from DISF revealing the

12   customer's name, is it accurate to say that the law firm

13   is revealing them by directing people from their website

14   to the Victim Fund website?

07:20AM  15   A.     Correct.

16   Q.     Was that one of the concerns that you had that

17   caused the filing of this motion?

18   A.     Absolutely.  We have a protective order in place

19   and we've been fighting over the production of names and

07:20AM  20   prices and, yet, here they are in the possession and

21   control, it appears to us, of Mr. Manookian and his law

22   firm.

23   Q.     Well, let's talk about the protective order just

24   for a minute.  It is Document No. 128 entered

07:20AM  25   October 25th, 2016.  Is there an "Attorneys' Eyes Only"

33

1  section?

2          MR. JOHNSTON:  And I have a copy, your Honor,

3  if you'd like one, as opposed to pulling it up.

4          THE COURT:  I think I may.  Is it the

07:21AM  5  protective order entered October 25th, 2016?

6          MR. JOHNSTON:  That's correct, your Honor.

7          THE COURT:  Okay.  I've got a copy.  Thank

8  you.

9          Mr. Johnston, what -- is this -- is the

07:21AM  10  website that is currently on the screen, is that the law

11  firm's?

12          MR. JOHNSTON:  That's the Victim Fund website.

13  The law firm website directed you to the Victim Fund

14  website, and the Victim Fund website had the customers'

07:21AM  15  names.

16  BY MR. JOHNSTON:

17  Q.    Is there an Attorneys' Eyes Only provision that

18  you negotiated with opposing counsel in this case?

19  A.    We had negotiated a protective order that contains

07:21AM  20  an Attorneys' Eyes Only provision, yes.

21  Q.    What was the purpose, in your mind, of needing an

22  Attorneys' Eyes Only provision?

23  A.    Based upon our research, defendants had, in other

24  litigation, disclosed privileged and protected

07:22AM  25  information.  We were extremely concerned with giving

Motion Hearing 7-12-2017

34

1  defendants access to this information because it would be

2  extrajudicially used and impact other people.  So, we

3  wanted Attorneys' Eyes Only so it would remain in the

4  case and he could not use them adversely against clients

07:22AM  5  or some of the things that candidly we've ended up facing

6  in this situation.

7  Q.    And when you refer to Mr. Manookian having

8  disclosed confidential information previously, are you

9  referring to the *Chase* case out of the Circuit Court of

07:22AM  10  Williamson County, Tennessee?

11          MR. SCHWEGMANN:  Objection, your Honor.  Lacks

12  foundation.  No personal knowledge of that.

13          MR. JOHNSTON:  I asked if that's what he was

14  referring to.  I think he has personal knowledge of what

07:22AM  15  he was referring to.

16          THE COURT:  Overruled.

17  A.    Yes, we found the court order online in which the

18  court found him in contempt of court and having

19  violated --

07:23AM  20          MR. SCHWEGMANN:  Objection, your Honor.  The

21  document speaks for itself.  He's interpreting again an

22  order of the court.

23          THE COURT:  Overruled.

24          MR. JOHNSTON:  We'll submit the order, your

07:23AM  25  Honor.  We'll solve that problem that way, and I'll move

35

1  on.

2  BY MR. JOHNSTON:

3  Q.     Now, did the issue of the propriety and the

4  sensitivity of this customer list come up again with

07:23AM  5  Judge Mazzant within the last few weeks?

6  A.     Absolutely.

7  Q.     Specifically June 27th when he held a telephonic

8  hearing?

9  A.     Yes.

07:23AM  10  Q.     And did -- have you seen the minute entry of Judge

11  Mazzant in which he -- as on -- at 11:02 a.m. on that

12  date in which he says, "The court noted that it is

13  subject to protective order and cautioned the parties"?

14  A.     Yes.

07:23AM  15  Q.     What did Judge Mazzant caution the parties?

16  A.     He cautioned against the adverse use of these

17  customer names and the prices and utilizing them for any

18  other purpose than the limited purpose he ordered for the

19  40 people that could be subpoenaed.  And, in fact, it

07:24AM  20  limited even to certain number of questions basically

21  that would be asked during these subpoenaed depos.

22  Q.     Were the 100 names that were ordered produced by

23  Judge Mazzant designated Attorneys' Eyes Only or just

24  confidential?

07:24AM  25  A.     I believe it was Attorneys' Eyes Only.

Motion Hearing 7-12-2017

36

```
 1  Q.    Let me direct your attention now to July the 7th.
 2           THE COURT:  Counsel, I've got a quick
 3  question --
 4           MR. JOHNSTON:  Yes, your Honor.
 5           THE COURT:  -- that this witness may be able
 6  to answer or you may be able to.
 7           The names that are on the website, are those
 8  the 100 names that were -- the plaintiff disclosed to
 9  defendant?
10           MR. JOHNSTON:  My knowledge is they are not,
11  your Honor; but let me ask the witness to be sure.
12           THE WITNESS:  There are thousands of customer
13  names on the ddvictimfund.com website.  Some of those
14  names also include the 100 names and the 40 names
15  selected.  I can't tell you offhand the crossover.  But
16  this is a -- this appears to be a customer list of those
17  people between 2010 and 2016.
18  BY MR. JOHNSTON:
19  Q.    So, when we're looking at this customer list up
20  here, I gather it's way longer than what we're
21  demonstrating on the screen here in court today.
22  A.    I don't know what a gigabyte is or all those --
23  you know, I don't understand all that stuff; but it's a
24  lot of gigabytes.  I was told it took a long time to
25  download all of this information.  And it's not just the
```

07:24AM (line 5)
07:25AM (line 10)
07:25AM (line 15)
07:25AM (line 20)
07:26AM (line 25)

Tonya B. Jackson, RPR-CRR
409.654.2833

37

1  names but the icons on the right as well.

2  Q.    Now, if you look at the website there where it

3  says "Enroll, complete your declaration," did you secure

4  a copy of the declaration that the DISF website was

07:26AM 5  asking customers to complete for them?

6  A.    I did.

7         MR. JOHNSTON:  May I approach, your Honor?

8         THE COURT:  Yes.

9         MR. JOHNSTON:  I will mark as Exhibit 1 for

07:27AM 10  this hearing a document that says "Declaration of Matan

11  Abehasira."  And I am grateful this person is not in the

12  room to explain to me how I mispronounced their name.

13  BY MR. JOHNSTON:

14  Q.    Where did you secure this document?

07:27AM 15  A.    From the website.  If you go to the entry of her

16  name and to the right of it if you click -- and I'm

17  sorry.  This is not a very good screen.  That says

18  "declaration"; and if you click on that, this is what

19  appears, this witness statement here.

07:27AM 20  Q.    Do you know whether or not -- well, let me ask you

21  this:  When you looked through the website, did you see

22  anything in there that explained to people the import of

23  signing an affidavit under penalties of perjury?

24  A.    No.

07:28AM 25  Q.    Were you able to see how many people completed

38

```
        1  this form for the foundation?

        2  A.     No.

        3  Q.     Did you see any explanation of what would be done

        4  with the form?

07:28AM  5  A.     No.

        6  Q.     Now let's move to July 7, 2017, and the appearance

        7  of the next website.  It's what I have referred to as

        8  shorthand as the "Tax Code website."

        9         Tell us what the Tax Code website is about.

07:29AM 10  A.     Let me see if I have a copy.  It's hard to read on

       11  here.  But in essence --

       12  Q.     And just so we're clear, this is -- this was

       13  discovered by your office when?

       14  A.     Well, on the same date I got an e-mail from --

07:29AM 15  Q.     Oh, I said July 7.  I'm told it's June 19, is the

       16  date.  So, I may have confused you with that.

       17  A.     Yeah.  I kind of tried to write all this in some

       18  chronological order to --

       19  Q.     Well, I apologize.  Let me just lead you for a

07:29AM 20  moment.

       21         Did you discover this website on or about

       22  June 19 of this year?

       23  A.     Yes.

       24  Q.     All right.  And what was your concern on behalf of

07:29AM 25  your client with regard to this website opened by the
```

39

```
 1  DISF?
 2  A.    Well, No. 1 -- and it's not even playing -- it was
 3  mocking my client.
 4  Q.    If it were played live -- let me ask it to be
 5  played live.
 6              (Video presentation.)
 7  BY MR. JOHNSTON:
 8  Q.    So, what's the song that's playing while
 9  Mr. Blank's head is bobbling there?
10  A.    "Baby Did a Bad, Bad Thing."
11  Q.    And in his right hand he appears to have what?
12  A.    A stack of cash.
13  Q.    And then in the left hand?
14  A.    A handful of diamonds.
15  Q.    Now, when Mr. Blank sold his company to Diamonds
16  Direct, did they do a sales tax audit investigation to
17  ensure that they were not buying any liability?
18  A.    Of course.
19  Q.    What does this website accuse Mr. Blank of?
20  A.    It makes allegations of tax fraud.
21  Q.    And specifically sales tax fraud?
22  A.    Correct.
23  Q.    And just under --
24              MR. JOHNSTON:  If we can scroll up on it a
25  little.
```

07:30AM (line 5)
07:30AM (line 10)
07:31AM (line 15)
07:31AM (line 20)
07:31AM (line 25)

Motion Hearing 7-12-2017

40

1    And, your Honor, we have hard copies of these

2 we can mark and introduce for the court; but for now it's

3 on the -- online, I believe.

4 BY MR. JOHNSTON:

07:32AM 5 Q.    Under the "Tax Code Felonies," there is a list --

6 well, let's go up a little further so we have the...

7    There's a reference to $150,000 I believe --

8 or maybe it's even more than that and I'm not reading

9 right -- a failure to pay taxes to the state of Texas,

07:32AM 10 correct?

11 A.    There's some allegation like that.  Let me see

12 where you're pointing to exactly.  I mean, the thing

13 speaks for itself.

14 Q.    There, right under "Tax Code Felonies" there's

07:32AM 15 "failure to pay taxes."

16 A.    It's -- it looks like it's a section of a code, of

17 a tax code that was violated.

18 Q.    You're correct.

19 A.    In the --

07:33AM 20 Q.    The section sign looks like a dollar sign to older

21 eyes.

22 A.    And the second paragraph is where you're seeing

23 some of those allegations.

24 Q.    And then underneath the allegations there's a

07:33AM 25 sentence that says, "Scroll through our database of sales

Motion Hearing 7-12-2017

41

1  tax fraud to see the transaction."  And then what do you

2  find there?

3  A.    Again these are the customer names and purchase

4  prices that were redacted in the course of our litigation

07:33AM  5  and in which we have an obligation to maintain as

6  confidential under the asset purchase agreement with

7  Diamonds Direct.

8  Q.    And do you know how many customers' names are

9  listed here?

07:33AM  10  A.    It's the answer "lots."

11  Q.    Okay.

12  A.    I didn't count --

13  Q.    And in addition to the name, we've got the

14  customer's phone number and the price of their diamond,

07:34AM  15  correct?

16  A.    Correct.  Some of the phone number of course is

17  redacted out but it's got the purchase price and then it

18  has a click on for view of more information.

19            THE COURT:  What is the additional information

07:34AM  20  under "view"?  Is it the same for each customer?

21            MR. JOHNSTON:  It's not -- well, the

22  additional information is the same.  It has a section on

23  the date, the customer, their phone number, the price of

24  their purchase, and then sales tax paid; and then there

07:34AM  25  is a -- again a link to details that you can click on for

42

1    more details on that customer and the purchase.

2                And I have marked a hard copy of the printout

3    of the pages of the website as Exhibit 2 and would offer

4    it.

07:35AM    5                And if I haven't offered Exhibit 1, I would

6    offer it also.

7                THE COURT:  Are there any objections to 1 or

8    2?

9                MR. SCHWEGMANN:  No.

07:35AM   10                THE COURT:  All right.  They're both admitted.

11   BY MR. JOHNSTON:

12   Q.    Now, have you studied through this website?

13   A.    I have.

14   Q.    Did you see anything in there where Mr. Manookian

07:35AM   15   found -- well, where the foundation advised these

16   customers that they are the ones responsible for the

17   payment of sales tax?

18   A.    No.

19   Q.    And how long -- do you know how long this website

07:35AM   20   was up?

21   A.    I believe it may still be up.  It goes up and

22   down, but I believe it's still up.

23   Q.    Okay.  And let me direct your attention now to

24   July the 7th, just a matter of days ago and after the

07:36AM   25   filing of this motion.  Did you come to learn of yet a

Motion Hearing 7-12-2017

43

 1 │ third website?

 2 │ A.     Yes, I did.

 3 │ Q.     And what was the name of that website?

 4 │ A.     *Suedavidblank.com.*

07:36AM  5 │        MR. JOHNSTON:  And I'll ask Mr. Johnston to

 6 │ bring that up.  But let me also inform the court I have

 7 │ marked as Exhibit 3 a hard copy of a printout of that as

 8 │ well, and I'll tender it.

 9 │ BY MR. JOHNSTON:

07:36AM 10 │ Q.     So, tell me about *suedavidblank.com.*

11 │ A.     It's more of the same.  It's very similar to the

12 │ Cummings Manookian law firm website and very similar to

13 │ the DISF website.  In other words, you can see the same

14 │ images; the text is very similar and consistent

07:37AM 15 │ throughout.  There's a pattern in the text and the font

16 │ and the list --

17 │ Q.     Stop and let me just...

18 │        (Video presentation.)

19 │ BY MR. JOHNSTON:

07:37AM 20 │ Q.     Now, so, did you also look into the link on these

21 │ websites on what is called the "admin," or the

22 │ administrator of these websites?

23 │ A.     Yes.

24 │ Q.     And what do you learn when you follow that lead?

07:38AM 25 │ A.     It goes to Cummings Manookian.

Motion Hearing 7-12-2017

44

1  Q.    Do you see any similarity between the format, the

2  colors, the template used on these three websites and the

3  website that Mr. Manookian used for his own law firm?

4  A.    Absolutely.

07:38AM  5  Q.    Let me talk to you for a minute now about the

6  robo-calls.

7         By the way -- and I'm not sure which one it

8  is -- did you see on one of these websites -- I believe

9  it's *suedavidblank.com*, but did you see on one of these

07:38AM 10 foundation websites a place where it says "Click here if

11 you want to hear David Blank admit to the fraud in his

12 own words," or something to that effect?

13 A.    Yes.

14 Q.    Have you ever seen that link before?

07:39AM 15 A.    Absolutely.

16 Q.    Where did you see it before?

17 A.    One of the Cummings Manookian websites.

18 Q.    And when you clicked on that Cummings Manookian

19 link that says listen to David Blank in his own words,

07:39AM 20 what recording did you hear?

21 A.    It was a recording that Mr. Manookian has been

22 posting between himself and David Blank on his website.

23 Q.    And was this a recording in which they --

24 Mr. Blank and Mr. Manookian are discussing the

07:39AM 25 formulation of an attorney-client relationship?

45

1          MR. SCHWEGMANN:  Objection, your Honor.

2    A.    Yes.

3          THE COURT:  What's the objection?

4          MR. SCHWEGMANN:  Calls for a legal conclusion.

07:39AM   5    Whether the attorney-client relationship was formed or

6    not is the subject of this lawsuit in fact.

7          THE COURT:  Overruled.

8          What was your answer?

9          THE WITNESS:  Yes.

07:39AM   10   BY MR. JOHNSTON:

11   Q.    Do you know of any way the foundation could have

12   received a tape recording that Mr. Manookian made as an

13   attorney when he was speaking to Mr. Blank about the

14   possible formation of an attorney-client relationship?

07:40AM   15   A.    Two ways.  One, he got it from Mr. Manookian or,

16   two, they somehow got it off of Mr. Manookian's website

17   and put it on this website.

18   Q.    Let me talk to you a little bit now about what has

19   been done with some of the customer information that the

07:40AM   20   foundation has -- well, let me ask this:  Have you ever

21   been able to discover where this customer information

22   came from, how it came into the hands of the foundation

23   incorporated by Mr. Manookian?

24   A.    No.

07:40AM   25   Q.    Let's talk about robo-calls now.

Tonya B. Jackson, RPR-CRR
409.654.2833

46

1           When did you discover --

2 A.     That's not for a lack of effort.

3 Q.     I accept that.

4           When did you discover that robo-calls were

07:40AM 5 being made to these customers?

6 A.     It was sometime in June, around June 9th.

7 Q.     Now, Mr. Manookian's --

8           (Audio presentation.)

9 BY MR. JOHNSTON:

07:41AM 10 Q.     Is that a recording of one of the robo-calls that

11 was received by one of these customers?

12           MR. SCHWEGMANN:  Objection, your Honor.  I'd

13 ask for some more foundation of how he --

14           MR. JOHNSTON:  That's fair.  Let me do that,

07:42AM 15 your Honor.

16 BY MR. JOHNSTON:

17 Q.     How did you come into possession of this

18 recording, sir?

19 A.     People sent them to me.  People that were aware

07:42AM 20 that I was handling the case sent them to me.  I don't

21 recall as I sit here who sent me a call.

22 Q.     Let me ask you this:  Have you seen

23 Mr. Manookian's affidavit or declaration filed in

24 opposition to this motion today?

07:42AM 25 A.     Yes.

Motion Hearing 7-12-2017

47

1  Q.     And in that does he admit that robo -- that DISF

2  made 175 robo-calls to customers of the Diamond Doctor?

3  A.     I know that he made one hundred seventy -- he

4  claims to have made 175 calls.  I --

07:42AM   5              MR. SCHWEGMANN:  Your Honor --

6  A.     I don't know whether he calls them robo-calls

7  like --

8              MR. SCHWEGMANN:  I think, in fairness, if

9  Mr. Steckler looks at the affidavit, it says that DISF

07:43AM  10  made the calls, not Mr. Manookian sitting at this table.

11              MR. JOHNSTON:  I think that was my question.

12              MR. SCHWEGMANN:  Well, the answer said that I

13  think "he," meaning Mr. Manookian, made these calls.

14              THE COURT:  I'll make this easy.  I've got the

07:43AM  15  declaration in front of me and I'm looking at it so...

16              MR. JOHNSTON:  Thank you, your Honor.

17  A.     Paragraph 7, I believe.

18  BY MR. JOHNSTON:

19  Q.     Is that -- did you receive complaints and concerns

07:43AM  20  from customers who received these robo-calls?

21  A.     Diamond Doctor employees did, and that was --

22              MR. SCHWEGMANN:  Your Honor, objection.  Again

23  it's hearsay.  None of these folks are here to testify,

24  and none of it has been disclosed to us before today.

07:44AM  25              THE WITNESS:  That's not true.  We produced

1    this actual -- this audio has been produced to you.  In

2    fact, pretty close to the time that we received it, we

3    brought it to your attention.  We also, I believe,

4    attached it to what we filed in the case and it's been in

07:44AM  5    your possession and that's part of the basis of your

6    response.  I'm just trying to be clear.

7            MR. SCHWEGMANN:  Fair enough.  But, your

8    Honor, the question that I'm objecting to is "has anyone

9    complained" and he started giving a list providing

07:44AM  10   hearsay information about what those complaints are when

11   we haven't had a witness -- I mean, simple due process

12   requires we know the allegations against us particularly

13   on a show cause for sanctions hearing.

14           THE COURT:  All right.  I'm going to sustain

07:44AM  15   the objection.

16           However, you are allowed to answer, if you

17   know who has complained, but just who that is and not the

18   subject of the complaints.

19           THE WITNESS:  Me.  I complained to you when I

07:45AM  20   told you that customers of Diamond Doctor are getting

21   these calls and it was concerning me because I didn't

22   think it was appropriate.  That's who complained.

23   BY MR. JOHNSTON:

24   Q.    Have you also discovered that there have been

07:45AM  25   e-mails sent to the media announcing and directing them

49

1    to these three websites?

2    A.    Yes.

3    Q.    Who sent those e-mails?

4    A.    Received an e-mail from Rob Bates who is a jewelry

07:45AM  5    industry reporter, whose name was brought up in the

6    deposition that we recently took, indicating that he had

7    gotten e-mails from this *info@disf.com* website.

8    Q.    And with regard to Mr. Bates, how did his name

9    come up?

07:46AM  10   A.    We took the deposition of a Mr. Hershovitz, and in

11   the deposition testimony his name was mentioned as

12   someone who had been threatened by Mr. Manookian.

13              MR. JOHNSTON:  May I approach, your Honor?

14              THE COURT:  Yes.

07:46AM  15   BY MR. JOHNSTON:

16   Q.    Let me show you what I would mark as Exhibits 4

17   and 5.

18              Are those the e-mails related to Mr. Bates and

19   directing him to the three websites?

07:47AM  20             MR. SCHWEGMANN:  Can we have copies, please?

21             MR. JOHNSTON:  I'm getting them as fast as I

22   can, sir.

23   A.    Yes.

24             MR. JOHNSTON:  Your Honor, we would offer

07:47AM  25   Exhibits 4 and 5.

Motion Hearing 7-12-2017

50

1        THE COURT:  Do you have a copy for the court?

2        MR. JOHNSTON:  I do.

3        MR. SCHWEGMANN:  And I'll object to

4  foundation, authenticity, and hearsay.  Foundation,

07:47AM  5  authenticity, and hearsay.

6        Your Honor, let me -- if I might, on

7  Exhibit 5, it looks to be an e-mail from

8  *info@diamondintegrity.org* to *info@diamondintegrity.org*

9  that Mr. Bates may have received.  He's obviously not

07:48AM  10  here to testify that he in fact received it.  There's

11  nothing on this page that indicates that it came from one

12  of my clients or any of the parties in this case.  I

13  think their allegation is it came from DISF; and if

14  that's the case, DISF, as this court knows because I've

07:48AM  15  said it a number of times, isn't a party and can't

16  authenticate it.  It also says:  Please (indiscernible)

17  to defrauded consumers about these websites.  This is

18  textbook hearsay involving nonparties, both the

19  recipients and the sender.

07:49AM  20        THE COURT:  Mr. Johnston, do you have a

21  response?

22        MR. JOHNSTON:  Your Honor, I think under the

23  circumstance of this case with regard to the behavior,

24  that the hearsay rule is a little different; and I think

07:49AM  25  they should be admitted to show, No. 1, the efforts of

1  Mr. Steckler to try to avoid this situation and, No. 2,

2  just what is going on out there in the Internet world

3  with regard to these websites.

4  MR. SCHWEGMANN:  Well, your Honor, the problem

07:49AM  5  I have with that is this is an emergency show cause

6  hearing where they're asking the court to impose contempt

7  sanctions and perhaps others.  And again, simple due

8  process requires that we have notice of what's being

9  alleged against us and us being the named defendants in

07:50AM  10  this case.  They've attached to their motion a bunch of

11  unauthenticated hearsay, and now they're having a witness

12  who didn't even receive the documents testify to the

13  court about that.

14  THE COURT:  All right.  Well, I'm just going

07:50AM  15  to tell you I don't think it's proper to continue to act

16  like DISF is this standalone third party that's clearly

17  associated with your client.  So, I'm going to sustain

18  the objection with regards to these two documents; but

19  I -- I don't think it's correct that DISF is a completely

07:50AM  20  unrelated, independent third party with regards to this

21  case.

22  MR. SCHWEGMANN:  Fair enough, your Honor,

23  although they haven't put on any evidence about the

24  structure of DISF other than it was incorporated -- well,

07:51AM  25  we'll get to that.  I'm sure they'll call Mr. Manookian

52

1    at some point.

2    BY MR. JOHNSTON:

3    Q.      And, Mr. Steckler, let me ask you also if you're

4    aware in the declaration of Mr. Manookian that he has, on

07:51AM  5    behalf of DISF, admitted that DISF sent notices by e-mail

6    by the websites to media outlets?

7    A.      Yes.

8    Q.      And do you know why -- do you know how

9    Mr. Manookian has the knowledge to speak on behalf of

07:51AM  10   DISF about these matters if in fact he is divorced from

11   it?

12   A.      That is the biggest concern.

13   Q.      Have you to this day learned how Mr. Manookian and

14   DISF came into possession of these customer lists?

07:52AM  15   A.      No.

16   Q.      Has the order of the court to treat these as -- to

17   treat the documents you produced involving customers as

18   Attorneys' Eyes Only ever been lifted?

19   A.      No.

07:52AM  20   Q.      Has the court's order -- or rather the court's

21   cautioning to the parties of how customer lists and

22   customer information is to be dealt with in this lawsuit

23   ever been altered?

24   A.      No.

07:52AM  25   Q.      Let me direct your attention now to the discovery

Motion Hearing 7-12-2017

53

1    process.

2             It is true, is it not, that the defendants

3    have made repeated demands upon your clients to produce

4    these discovery -- I'm sorry -- these customers lists?

07:52AM  5    A.    Yes.  They were the subject of a motion to compel.

6    Q.    And we've talked about that previously.

7             Let me talk about your discovery efforts to

8    the defendants.  Have you made discovery requests upon

9    the defendants that would encompass these customer

07:53AM  10   lists if they were in their possession, custody, or

11   control?

12   A.    Yes.  When we first discovered the website, the

13   first website that listed all the customer names, I

14   reached out to defendants' counsel and said, "We have

07:53AM  15   outstanding requests for production," listed for them

16   eventually the ones that were at issue and said, "Why has

17   this not been supplemented by your clients?"  Because

18   they clearly asked for any information they have or they

19   may have posted on the websites, et cetera.  I think we

07:53AM  20   listed maybe six active requests for production that we

21   thought this would be responsive to.

22   Q.    And what was their response?

23   A.    One, "We objected to it," of which I had

24   conversation saying there's continuing obligation; and

07:54AM  25   then two, "That's not us.  We're not DISF.  We can't

Motion Hearing 7-12-2017

54

1    produce that."

2    Q.    Has counsel for defendants at any time been

3    helpful to you in securing these customer lists in the

4    possession of DISF?

07:54AM  5    A.    No.

6    Q.    Have they been helpful to you in subpoenaing

7    Mr. Manookian to secure them from DISF?

8    A.    No.  In fact, that's --

9    Q.    Well, let me just ask you.  Describe for the court

07:54AM 10    the process of attempting to subpoena DISF in order to

11    get this information from them and find out how they got

12    it.

13    A.    Well, as in any discovery dispute in this court, I

14    contacted defense counsel, advised them of the situation,

07:54AM 15    what I had found with the relationship with

16    Mr. Manookian, Cummings Manookian, DISF.  I pointed out

17    the discovery issues.  They told me it's not them.  I

18    said, "Look, this is a little awkward because now you're

19    forcing me to reach out to your client who is the

07:55AM 20    registered agent and person that I would have to deal

21    with on this website.  I'd like to coordinate the process

22    with you for subpoena.  We can do them with the depos or

23    somehow."

24            I was told, "We don't speak for DISF.  We will

07:55AM 25    not do anything for DISF.  That's not us.  You're just

Motion Hearing 7-12-2017

55

1  going to go through it I think the old-fashioned way or

2  standard way."  There are a number of e-mails with

3  respect to that.  And, so, I had to actually issue a

4  subpoena.

07:55AM   5  Q.    And with regard to any communications that you

6  were going to have with DISF who is not their client,

7  what was the position of defense counsel?

8  A.    They're not going to be involved in it, they're

9  not going to cooperate or help me in any way secure the

07:56AM  10  information with respect to DISF, especially when I

11  raised to them, look, there's some real concerns here

12  because we've got this protective order, this is your

13  client, he's the registered agent.  I provided them with

14  the information we had gathered.  "How is this going to

07:56AM  15  work?"

16          Their point was "It's not us.  We don't

17  represent them.  You're going to have to subpoena them."

18  So, we tried that.

19  Q.    And let me direct your attention to -- well, let

07:56AM  20  me --

21          MR. JOHNSTON:  May I approach again, your

22  Honor?

23          THE COURT:  Yes.

24  BY MR. JOHNSTON:

07:56AM  25  Q.    I gather these communications were primarily with

Motion Hearing 7-12-2017

56

 1  Mr. Correa?

 2  A.    Yes.  The initial phone call was to Chris, lead

 3  counsel, and me being lead counsel and it being a

 4  discovery dispute.  Subsequently it fell to Mr. Correa

07:57AM  5  after numerous discussions and issues were raised.

 6  Q.    And then on Exhibit 6 -- do you have that in front

 7  of you?

 8  A.    Yes.

 9  Q.    Is that a communication between you and defense

07:57AM  10  counsel on this subject?

 11  A.    Yes.

 12          MR. JOHNSTON:  Offer Exhibit 6.

 13          MR. SCHWEGMANN:  No objection.

 14          THE COURT:  All right.  It's admitted.

07:57AM  15  BY MR. JOHNSTON:

 16  Q.    In it Mr. Correa says to you, "Bruce, we do not

 17  represent DISF and I do not know who to serve."

 18          Did you receive that from him?

 19  A.    Yes.

07:57AM  20  Q.    And discuss it with him?

 21  A.    Absolutely.

 22  Q.    What was your response to Mr. Correa saying he

 23  does not know who to serve for DISF?

 24  A.    Astounded.  I mean, I told him, "Your client is

07:57AM  25  the incorporator.  His law firm who is also your client

Motion Hearing 7-12-2017

57

1    is the registered agent.  We've got discovery to do.  We

2    need to coordinate this, and it involves some serious

3    issues."

4              He was unable to tell me what to do.  We were

07:58AM  5    left with no choice but to try to figure out another way

6    to handle this without court intervention but to try to

7    subpoena the corporate rep of DISF.

8    Q.    What was your concern about contacting

9    Mr. Manookian directly as the registered agent?

07:58AM  10   A.    As the court is aware, Mr. Manookian tried to make

11   an appearance in the case as counsel on behalf of

12   himself.  We had just recently gotten a ruling from the

13   court that he could not be counsel in the case.  And part

14   of that also raised Attorneys' Eyes Only issues.

07:58AM  15            In addition, Mr. Manookian is represented by

16   counsel and now I'm put in that awkward situation -- as I

17   told Andres, "I'm now going to be communicating to

18   somebody who you represent in this case regarding these

19   issues."  It puts me in a very awkward position as an

07:59AM  20   attorney, not to mention the ethical concerns that that

21   also can raise.

22   Q.    Do you have in front of you Exhibit 7 now?

23   A.    I do.

24   Q.    And is that another communication between you and

07:59AM  25   Mr. Correa on this same subject?

58

```
 1  A.    Yes.
 2              MR. JOHNSTON:  Offer Exhibit 7.
 3              MR. SCHWEGMANN:  No objection.
 4              THE COURT:  It's admitted.
 5  BY MR. JOHNSTON:
 6  Q.    Did Mr. Correa ever at any point in time indicate
 7  that if there were any phone calls or communications with
 8  Mr. Manookian concerning DISF, that he insisted on being
 9  a party to those communications?
10  A.    No, he never made that statement.
11  Q.    Did you feel free to contact Mr. Manookian without
12  including Mr. Correa in the communication?
13  A.    No.
14  Q.    Do you now have Exhibit 8 in front of you, sir?
15  A.    I do.
16  Q.    Is this another communication in this ongoing
17  effort to secure the information from the foundation?
18  A.    Yes.
19              MR. JOHNSTON:  Offer Exhibit 8.
20              MR. SCHWEGMANN:  No objection.
21              THE COURT:  It's admitted.
22              MR. JOHNSTON:  Your Honor, it's been pointed
23  out to me also that I failed to offer Exhibit 3 which is
24  I think the *suedavidblank.com* website.  I would offer it
25  at this time.
```

07:59AM  5
08:00AM  10
08:00AM  15
08:01AM  20
08:01AM  25

59

1          MR. SCHWEGMANN:  No objection.

2          THE COURT:  It's admitted.

3    BY MR. JOHNSTON:

4    Q.    So, what did you finally do to try to secure the

08:01AM  5    information that defendants say you should secure from

6    DISF?

7    A.    Issue a subpoena, a unilateral subpoena.

8    Q.    And what was the response to the subpoena?

9    A.    We gave a courtesy copy to defense counsel the

08:01AM 10   date of issuance.  We had trouble serving Mr. Manookian,

11   and then we found out that their office was closed for

12   maintenance for eight or nine days during the week.

13   Q.    So, the law office of Mr. Manookian -- let me take

14   that chronologically.

08:02AM 15         First you issued a subpoena, correct?

16   A.    Yes.

17   Q.    And then you notified opposing counsel that you

18   had done so and would be serving their client

19   Mr. Manookian as the agent for the foundation, correct?

08:02AM 20   A.    Yes.

21   Q.    I have not placed in front of you, but I have

22   marked as Exhibit 9 a photocopy of a photograph of the --

23   do you have a copy of a photograph there?  Do you know

24   which one I'm looking at?

08:02AM 25   A.    Yes, I have it.

Motion Hearing 7-12-2017

60

1   Q.     Tell me what that is.

2   A.     The process server explained to us that he

3   couldn't serve them because their building was closed.  I

4   said -- for maintenance.  I said, "Well, I don't really

08:03AM  5   understand."  It's a freestanding -- it's not a -- my

6   understanding it's a freestanding home kind of like in

7   uptown where lawyers have offices.  I said, "I'm not sure

8   what maintenance closes down -- what do you mean?"

9          And he sent us a picture explaining what was

08:03AM  10  posted on the door.

11  Q.     So, he was unable to serve the subpoena on

12  Mr. Manookian because his office was closed for

13  maintenance for a week.

14  A.     Correct.

11:58AM  15  Q.     And, so, then did you attempt a second time?

16  A.     Yes.  We then had to do an amended subpoena, which

17  we tried to do as quickly as possible in light of the

18  holidays coming up and given where we were in the course

19  of the litigation.  So, we sent an amended subpoena,

11:58AM  20  trying to get it out as soon as possible because we had

21  dates of availability, et cetera.

22  Q.     And just so the court is aware, the case is set

23  for trial August I think 15th; is that correct?

24  A.     Correct.

11:58AM  25  Q.     And there are multiple depositions scheduled

61

1    between now and that date, correct?

2    A.    Certainly with respect to the customers; and we

3    are trying to coordinate other witnesses in the case,

4    yes.

11:59AM  5    Q.    And the judge has indicated that discovery can go

6    on late up to the time of trial but that that trial

7    setting is firm, correct?

8    A.    That's my understanding.

9    Q.    So, did you ultimately succeed in serving a

11:59AM  10   subpoena on Mr. Manookian as the registered agent for

11   DISF?

12   A.    Yes, he was served.

13   Q.    And what was the response of the subpoena you

14   served on him?

11:59AM  15   A.    Mr. Manookian, as counsel for DISF, filed a motion

16   to quash and sought sanctions against us in the Middle

17   District of Tennessee.

18   Q.    And what's the basis for seeking sanctions?

19   A.    I'll have to look at that.  I think it was the --

11:59AM  20   complaining that the amount of time he had to respond to

21   the subpoena, not -- and that had to do with apparently

22   the topics involved involved gathering a lot of

23   documents, I believe was something -- it was something to

24   that effect.  In other words, we had put on there a

12:00PM  25   number of topics and those topics required him gathering

voluminous documents and there was inadequate time and

therefore he quashed it.  I have it here in front of me,

to be more exact.

            THE COURT:  I've got -- I've seen --

            THE WITNESS:  Okay.

            THE COURT:  I've got a copy.

A.    That's just the best of my recollection.

            MR. JOHNSTON:  Your Honor, if you have a copy,

I would like to mark the third-party Diamond Integrity

Standards Foundation Motion to Quash Out of District

Subpoena as Exhibit 10 and offer it.

            MR. SCHWEGMANN:  No objection.

            THE COURT:  All right.  It's admitted.

BY MR. JOHNSTON:

Q.    Did you ever receive information from defense

counsel that indicated they had communicated with their

client about your request for these documents in this

subpoena?

A.    No, not that I'm aware of.

Q.    With regard to the motion today, can you tell the

court what your concern is as it relates to three things:

These three DISF websites brought within a couple of

months of the trial setting; the robo-calls and e-mails

and personal calls of Mr. Manookian, is the second; and

as the third, the issues you have encountered in

1    connection with trying to find out how confidential

2    customer information is being posted on the website of

3    the foundation?

4    A.     Let's start as counsel for Diamond Doctor.  My

5    No. 1 concern is for my client.  And this was more

6    guttural than anything else, but it's the absolute

7    mocking of my client that is truly disturbing.

8              Secondly what is disturbing is the court

9    process.  This case has a long history.  Mr. Blank has a

10   long history with this case.  We came to the court for

11   relief.  We trust the court, we trust the process, and we

12   have institutions and standards within this court system

13   and everything is turned on its head.  We have

14   confidential customer names of which we are obligated to

15   maintain as confidential, my client list which we have

16   access to and which another party has access to that

17   somehow has been disclosed.  We have customer names that

18   I've been told the customers, in repeated documents, are

19   important critical witnesses in this case; and they have

20   been called and contacted and poisoned with websites and

21   robo-calls and this information out there.  I don't know

22   where these e-mails have been and gone.  People in my

23   office get Facebook posts about this.  So, I don't know

24   the extent and breadth of it and how far it goes.

25   Witnesses in this case who are jewelers who also have

Motion Hearing 7-12-2017

64

1   similarly been victimized have gotten information about

2   these websites and who, you know, have been working with

3   us cooperatively and collaboratively, I don't know if

4   that's going to continue because of their fear as

12:04PM   5   witnesses.

6           MR. SCHWEGMANN:  Your Honor, objection.

7   A.    These are all --

8           MR. SCHWEGMANN:  Your Honor, I'm sorry to

9   interrupt.  It exceeds the scope of the question, No. 1;

12:04PM  10   but second, it's hearsay.

11          THE COURT:  Overruled.  He is testifying to

12   his own concerns.

13   A.    And, I mean, that's -- I mean, that's the

14   threshold.  Not to mention we have --

12:04PM  15   BY MR. JOHNSTON:

16   Q.    Well, let me just stop you and move you to another

17   subject because that's the concern you have expressed for

18   your client as an attorney and officer of this court.

19          Do you have concerns that go beyond just this

12:04PM  20   case and Mr. Blank and his company?

21   A.    Well, let me add one more thing, if you don't

22   mind.

23   Q.    Okay.

24   A.    Documents that have not been produced in this case

12:04PM  25   that we don't know where they came from that are

Motion Hearing 7-12-2017

65

1    confidential are being used in this case but not being

2    produced to us.

3    Q.    Tell me what you mean by that.

4    A.    For example, we've had two incidences of -- one,

12:05PM  5    this Tax Fraud website.  I'm getting an e-mail from

6    defense counsel "You need to be aware that" --

7    Q.    Who with defense counsel?

8    A.    Mr. Correa.

9          -- "that there are allegations of tax fraud

12:05PM  10   involved in this case."  And I'm kind of like this is out

11   of the blue.

12          And then we discover on the same day the

13   website indicating allegations of tax fraud that are then

14   confirmed through this declaration where Mr. Manookian is

12:05PM  15   investigating tax fraud through documents that have not

16   been produced and yet posting allegations online and

17   threatening in sanctions -- it's --

18   Q.    Let me stop you right there.

19   A.    Yeah.

12:06PM  20   Q.    (No audio.)

21   A.    Okay.

22   Q.    Okay.  Is Exhibit 11 the document that you were

23   talking about where Mr. Correa starts making allegations

24   that are from the foundation with related to this tax

12:06PM  25   fraud -- sales tax fraud situation?

Motion Hearing 7-12-2017

66

1   A.    Yes.

2   Q.    Are there any other examples where this division

3   between Mr. Manookian and his law firm and the foundation

4   appear to be not what they would tell you?

12:06PM   5   A.    There was an issue raised of some sort of

6   fabrication of documents that was addressed by this

7   court; and clearly it appeared to us that somehow the

8   documents that have been posted -- the information posted

9   online and the underlying documents are being used to

12:07PM   10   somehow create an allegation of fabrication of documents,

11   which is really more explained by how documents are

12   printed and produced versus what actually occurred.

13   Q.    And let me be sure because Judge Johnson wasn't

14   there for that hearing.

12:07PM   15         There was an allegation that the Diamond

16   Doctor had falsified or fabricated documents which was

17   presented to the court because the documents that were

18   produced to the defendants had language on them with

19   regard to diamond grading that in fact was not really on

12:07PM   20   the invoices that had been given to the customers,

21   correct?

22   A.    Correct.  It --

23   Q.    And the reason that Diamond Doctor came forward

24   with as to why the documents produced had language that

12:08PM   25   in fact the original document did not have was what?

A.    Well, it's like when you go to the supermarket and the receipt prints out for you.  They -- you know, on the back you might have coupons or some language on there; and that's what you contemporaneously print out.  The

12:08PM    supermarket --- or Tom Thumb for me is -- they don't keep a copy of the receipt.  It's in their system.  So, when you go back to Tom Thumb and you say, "I need you to print me a receipt," you know, you'll usually get it on an *Excel* spreadsheet where you'll get the most recent

12:08PM    coupon or information that they -- like "Have a Happy Easter" or "Have a Nice Day."  So, it's going to be different because they don't have a way to kind of go back in time and recreate things.

So, somehow somewhere they were aware -- and I

12:08PM    don't know.  They had gotten documents back in the day and then we printed them out as best we could today through this -- there's a system called -- I think it's *Jewel Mate* that prints things out that we had to have a full-blown hearing to sort of explain to the court why

12:09PM    there's such a disparity in the language on the receipts.

Q.    Now, what's the connection to that to the documents the foundation has, in your mind?

A.    Well, I don't know what the foundation has.  I know what I've seen on the website of what they have.

12:09PM    What concerns me and as a practitioner is, first of all,

68

1    the allegation -- I've never had allegations like that

2    made against myself or -- I don't know about this whole

3    group but where does this come from and why and if there

4    is a disparity, why wasn't it shown to me, brought forth

12:09PM    5    in a timely manner so that we could sort of compare it

6    and explain it before we start ending up with sanctions.

7    And had we been produced the information in the common

8    course of discovery, those are the type of things that

9    can at least be addressed more candidly.  Instead, you

12:10PM    10    feel like what else -- we don't know what else is out

11    there.  It's a significant concern.  I don't know what

12    else has been done with this information either for these

13    people.

14    Q.      Right.  And I interrupted you earlier.

12:10PM    15           Are there any other concerns that you have

16    that have caused the filing of this motion today, the

17    motion on which we are here today?

18    A.      And I don't want to -- I don't want to impugn

19    anything or anybody.  It's the process, the integrity of

12:10PM    20    the process.  That's what is most concerning to me, and

21    that is the understanding that we're all going to be

22    playing by the same rules without the sort of

23    gamesmanship or non -- I mean, the thought of creating a

24    nonprofit as some sort of straw man to intimidate and

12:11PM    25    harass somebody in a case involving harassment and

extortion and what that does and the fact that we have

reached professional agreements and we have a process in

place, it undermines the whole system and it concerns me.

It concerns me for my client, how it impacts jurors, how

12:11PM   it impacts witnesses and -- I mean, he's come here to get

his day in court.  It takes a lot for somebody to put

themselves out there in a case.  It's not something

someone takes lightly.  And whether he does it out of

fear or anything, he did it.  But this is not what

12:11PM   somebody expects, especially in the parameters of the

system that we have in my practice especially in this

particular district which is so collegial and

collaborative in how we handle matters.

MR. JOHNSTON:  Your Honor, I am told I did not

12:12PM   offer Exhibit 9 which was a photocopy of the photograph.

I would offer that.

MR. SCHWEGMANN:  No objection.

THE COURT:  It's admitted.

MR. JOHNSTON:  And I did not offer Exhibit 11,

12:12PM   one of the e-mails.  I offer that.

MR. SCHWEGMANN:  No objection.

THE COURT:  It's admitted.

MR. JOHNSTON:  Pass the witness.

70

<u>CROSS-EXAMINATION OF BRUCE STECKLER</u>

BY MR. SCHWEGMANN:

Q.     Good afternoon Mr. Steckler.

A.     Hi, Chris.

Q.     Let's see.  I believe you testified you're familiar with the protective order in this case, correct?

A.     I am familiar with it.

Q.     And that's Document No. 128 in the court's file?

A.     Get a copy, and I'll confirm -- I trust your representation, but I didn't have it right here.

Q.     And I believe Mr. Johnston asked you some questions about the provision related to Attorneys' Eyes Only.  I instead want to direct your attention to the third sentence of the first paragraph.  I assume you're also familiar with that sentence?

A.     Which one is it?

Q.     The one that says:  This protective order shall govern all documents, interrogatory response, responses to request for admission, et cetera, and all other material and information produced, given, filed, or used in the course of this action.

        Do you see that, sir?

A.     I do.

Q.     Fair to say that you understand the protective -- well, I should say that collection of information is

Motion Hearing 7-12-2017

71

1   referred to as "discovery material," capital D capital M.

2   Do you see that?

3   A.      I'm sorry.  Can you show me what you're looking

4   at?

12:13PM  5   Q.      Sure.  Same sentence.

6           THE COURT:  Where are you looking in the

7   protective order?

8   BY MR. SCHWEGMANN:

9   Q.      If you have Document 128 and you go to the second

12:14PM  10  page, it's -- in the paragraph set "Purpose and Scope."

11          Fair to say the protective order defines

12  discovery material as information produced, given, filed,

13  or otherwise used in the course of this action?  Correct?

14  A.      That is correct.

12:14PM  15  Q.      All right.  Now, I believe I heard you say that we

16  had a hearing in Judge Mazzant's court -- I guess it was

17  June 27th -- concerning the production of what we've I

18  guess generally referred to as "customer information."

19  Do you recall that?

12:14PM  20  A.      Yes.

21  Q.      And it's also fair to say that before June 27th of

22  this year your clients didn't produce any customer names

23  or other customer information during the course of this

24  litigation, fair?

12:14PM  25  A.      No.

Motion Hearing 7-12-2017

72

1  Q.     You didn't produce customer names, correct?

2  A.     That's true.

3  Q.     And you didn't produce other customer identifying

4  information prior to June 27th, correct?

12:15PM  5  A.     No -- yes, no customer identifying information.

6  Q.     Okay.  And you also testified that with respect to

7  all the websites that you're complaining about here

8  today, you discovered customer -- what you're calling

9  "customer information" on those websites prior to

12:15PM  10  June 27th, fair?

11  A.     Yes, I did.

12  Q.     Okay.  Now, after June 27th you produced -- I

13  believe it was -- 100 customer -- or information

14  concerning 100 customers; is that correct?

12:15PM  15  A.     After -- I'm trying to decide whether we

16  produced -- yeah, I think after -- wait.  I don't know

17  whether it was before or after, but at some point he

18  ordered 40 could be deposed.  I think we might have

19  produced the 100 earlier unredacted and asked that they

12:16PM  20  be maintained Attorneys' Eyes Only and then afterwards we

21  had a minute entry hearing in which the issue had to deal

22  with subpoenas or something, but I could be wrong.  I

23  just --

24  Q.     Sure.  And I'm not trying to trick you.  Just

12:16PM  25  to -- we had to fight to get the customer identifying

Motion Hearing 7-12-2017

73

1  information.  The reason we had to fight for it was

2  because your client, for whatever reason, didn't produce

3  it to us, fair?  And didn't produce it to us in any form

4  or fashion before June 27th, right?

12:16PM  5  A.    Well, I explained in all of our pleadings exactly

6  why we did not produce the --

7  Q.    Sure.  You had reasons you didn't want to produce

8  it; and Judge Mazzant ultimately said you've got to

9  produce some of it, right?

12:16PM  10  A.    He asked -- he allowed a snapshot of customer

11  names to be produced, yes.

12  Q.    And Judge Mazzant didn't make that order until

13  June 27th of this year, right?

14  A.    That's correct.

12:16PM  15  Q.    And you discovered customer identifying

16  information on these websites that you're complaining

17  about well before June 27th, in fact as early as May and

18  in some cases even earlier, correct?

19  A.    No.  I discovered the names being listed on the

12:17PM  20  website on May 10th.  I then had to figure out who DISF

21  was, and then we had to figure out whether this was

22  somehow related to Diamonds Direct who has access to

23  them.  Then I brought it to your attention, and then we

24  raised it in -- before Judge Mazzant in a hearing.

12:17PM  25  Q.    Okay.

Motion Hearing 7-12-2017

74

A.      Then we filed this motion down the road once it

continued.

Q.      Right.

                THE COURT:  I'm going to short-circuit this

12:17PM  because I think I'm already where you're trying to go --

                MR. SCHWEGMANN:  You got that point.

                THE COURT:  -- that you -- somehow your client

had customer information.

                MR. SCHWEGMANN:  Well, no, your Honor.  I

12:18PM  don't think --

                THE COURT:  Your client had customer

information other than what has been provided by

plaintiff in this case.

                MR. SCHWEGMANN:  I'm not ready to concede that

12:18PM  Mr. Manookian had customer information at all, that was

in his possession, custody, and control.  I will say that

these folks didn't produce to us customer information

until Judge Mazzant ordered him to do it and even then

only 100 names.  So, to the extent this issue is a

12:18PM  protective order violation, we can't have violated a

protective order because --

                THE COURT:  I don't agree with that because

the protective order specifically says "or otherwise used

in the course of this action."  So, I understand the

12:18PM  point you're trying to make, that it may not have been --

1  that information may not have been necessarily given to

2  your client or to whomever by plaintiff.  However, it

3  clearly has been somehow used in the course of this

4  action.

12:19PM 5          MR. SCHWEGMANN:  It has not, your Honor.  It

6  has not.  It has not -- none of that information, as far

7  as I know, has been marked as an exhibit in this matter

8  until today.  As far as I know, it hasn't.  And this is

9  against -- this is in a backdrop where DISF and Cummings

12:19PM 10 Manookian have their own investigations going on trying

11 to solicit clients to bring claims against this, their

12 own *Word* files.  This, by the way, is information that

13 Judge Mazzant has already held is privileged that needed

14 to be disclosed.

12:19PM 15         But if what we're here arguing about today is

16 a protective order violation, then that's a Rule 37

17 motion or some other motion.  But this is part of the

18 problem I have, your Honor, is I'm not sure -- I want to

19 hit the ball in front of me; but based on the motion that

12:19PM 20 is filed, I'm not sure what that ball is.  And so, you

21 know, if what they're saying is, look, we violated the

22 protective order, right, the best defensive I have is no,

23 you never gave us that information and studiously avoided

24 giving us that information.

12:20PM 25         THE COURT:  Well, what I see is both of you

1    are swinging and missing because there's no balls to hit

2    because you're playing games.  I mean, there is

3    clearly -- they've got questions of how was this

4    information obtained and information specifically about

12:20PM    5    DISF that so far your clients have avoided answering.

6            MR. SCHWEGMANN:  Your Honor, they -- if I -- I

7    know we have a witness on the stand and if you'll indulge

8    me, because I have no great desire to cross-examine

9    Mr. Steckler and I think I can answer just some of the

12:20PM    10    questions directly to you if we'll agree to that.

11            I guess let me -- let me start by saying this.

12    We -- if you go to Exhibit 6, which was admitted over no

13    objection, that was an e-mail dated May 23rd between my

14    partner Mr. Correa and Mr. Steckler.  And on May 23rd

12:21PM    15    Mr. Correa very clearly said, "We don't represent" -- "my

16    law firm doesn't represent DISF."  I can't change that

17    fact.  I don't have authority to accept service of

18    subpoena that I -- for an entity that I don't represent.

19    But the key is -- and the court may have its feelings

12:21PM    20    about that, but I'm bound by my own professional duties

21    and what I have authority to do and what I don't have

22    authority to do.  But in any event, that representation

23    was made on May 23rd.

24            And if the court looks down, this is the first

12:21PM    25    time that the plaintiffs say, "Wait a second.  It looks

1  like there's customer information out there."  If it's

2  within the possession, custody, and control of my

3  clients, it should be produced.  Mr. Correa says, "It's

4  not in our possession, custody, and control and since we

12:22PM  5  don't represent DISF."

6            And my point, your Honor, is they didn't file

7  a motion to compel in May seeking that information where

8  we would know we're looking at Rule 37 and we can look at

9  the actual document request and we can look at the

12:22PM 10  objections and we can do this in a way that's proscribed

11  by the Federal Rules of Civil Procedure.  They don't do

12  that.  Instead -- and they knew on May 23rd.

13            If you go to Exhibit 8, June 16th, this is

14  another e-mail from my partner Mr. Correa saying, "Look,

12:22PM 15  we don't have authority to accept service of the

16  subpoena."  But between May 23rd and June 16th, they

17  don't file a motion to compel nor do they serve -- make

18  any attempt to serve the subpoena.  And we heard today

19  that Mr. Steckler knew exactly who the registered agent

12:22PM 20  for service of process was, Mr. Manookian.

21            If you look at Exhibit 7, this is a -- now

22  we're at June 27th.  Another e-mail from Mr. Correa

23  saying as clear as possible, "Look, I told you before I

24  don't represent DISF.  I told you before the information

12:23PM 25  is not within the possession, custody, and control of my

Motion Hearing 7-12-2017

78

1    clients."

2            Again, between May 23rd and now we're in

3    June 27th, no motion to compel to get this information,

4    no motion -- no service of a subpoena on what they knew

12:23PM  5    was the registered agent.

6            Now, I want to be as cooperative as possible

7    as well; but it doesn't change the fact that I don't have

8    authority.  I don't represent DISF, and I have been told

9    I can't accept service of that subpoena.  They can do it

12:23PM  10   themselves.

11           Now let's get to the actual subpoena.  When he

12   serves -- first of all, Mr. Manookian called the process

13   server once he learned about its issuance and accepted

14   service.  He wasn't even tagged.  He called him and said,

12:23PM  15   "I'll accept service."  The problem was it set the

16   deposition for -- I think it was 72 hours after the date

17   he accepted service.  And I think we'll all agree here

18   today that -- is it -- can I agree that we'll organize a

19   deposition or at least facilitate, however I can, of

12:24PM  20   DISF?

21           I think the problem is this motion is just

22   frankly procedurally improper.  It doesn't specify any

23   relief.  And what's more, every solution here can be

24   solved by discovery.  We'll facilitate a -- to the best

12:24PM  25   that I can -- again, I still don't represent DISF; but I

1  will do my best to facilitate a deposition date for that.

2  I think we can get Mr. Manookian to stand and say the

3  same thing.  He actually represents DISF and presumably

4  has authority to say that.

12:24PM  5          And with respect to these protective order

6  issues, to the extent there's any meat to them, we've

7  offered deposition dates for both Mr. Manookian and

8  Mr. Cummings.  And I guess from my perspective, your

9  Honor, because I don't know what ball I'm hitting, which

12:24PM  10  I think just simple due process requires, it seems like

11  we ought to at least do that and if necessary we can

12  re-tee this up somewhere down the road if that's what's

13  required.  But I honestly don't know how the court can

14  fashion an opinion.  I don't even know what we're doing.

12:25PM  15          THE COURT:  No, and I will be candid with you

16  that before this hearing started, my thought is what

17  needs to happen before any definitive rulings in terms of

18  relief on sanctions can be made is some discovery --

19  expedited discovery needs to happen; and if everyone can

12:25PM  20  leave here today in agreement that that's going to

21  happen.  I do think there needs to be some agreement on

22  the part of Mr. Manookian in the interim at least while

23  this discovery is conducted there's not going to be any

24  additional contacts of witnesses made like what has been

12:25PM  25  happening and what is the subject of this motion.

80

1          MR. SCHWEGMANN:  Well, I guess, your Honor, we

2    haven't heard the name of any particular witness that has

3    been contacted.  A witness list --

4          THE COURT:  He admitted to contacting 175

12:26PM  5    witnesses in this case.

6          MR. SCHWEGMANN:  He didn't.  DISF contacted

7    175 witnesses for its own purposes.  And your Honor rolls

8    its eyes, but you have to understand they're not the same

9    entity.  And we filed, your Honor, our witness list this

12:26PM  10   morning; and there's -- for the trial that starts on

11   October 14th.  And that's what we're going to be bound

12   by, and there's no proof that any of those witnesses on

13   that witness list that we're going to be bound by have

14   been contacted and certainly not by these gentlemen.

12:26PM  15          And, so, it -- and, your Honor, even -- I

16   guess two other points.  Even if the court feels they

17   were contacted, there's no proof they were intimidated,

18   that they were threatened, that they were persuaded not

19   to testify.  There's no proof of any of that.  And what's

12:27PM  20   more, in Texas, as this court likely knows, the parties

21   have an absolute right to contact witnesses and --

22          THE COURT:  They have a right to contact

23   witnesses and investigate, but what was stated on the

24   calls is not -- was not a neutral investigation type of

12:27PM  25   question.

81

1        MR. SCHWEGMANN:  Well, if it was the call that

2  you're referring to here, it was "You may have been

3  defrauded by the Diamond Doctor.  Call if you want more

4  information."  That wasn't -- it was a one-way call.

5  There wasn't any sort of -- you've heard it yourself.

6  There was no sort of intimidation or threatening.  It was

7  you, a customer of the Diamond Doctor, may have been

8  defrauded.  Call me.  And there's no proof any of them in

9  fact did that.  Instead, it sounds like what they did was

10  contact Bruce Steckler so that he could complain about it

11  here today.

12        In any event, there's no evidence that that

13  was intimidating.  It's certainly not witness

14  intimidation within the meaning of any of the cases that

15  are cited.  So, with respect that -- I can't see any

16  basis of relief on that front.

17        With respect to the websites themselves, first

18  of all, as I said at the outset, I'm not sure the court

19  even has jurisdiction over the DISF websites; but what's

20  more, there's this Fifth Circuit case right on point that

21  says they might not like the websites, this court might

22  find the websites distasteful, just like the lower court

23  did in the *Marceaux* case.  But the Fifth Circuit says too

24  bad.  The Fifth Circuit says that's what the First

25  Amendment protects in that there's a -- that if the court

82

is going to analyze that issue, it's got to be done under

the prior restraint doctrine which neither party briefed,

which gets back to my original point.  I don't know the

ball I'm trying to hit here today.  And again, I think

12:28PM    simple due process requires it.  And I'm perfectly happy

to facilitate the best I can; and if the court wants to

hear from Mr. Manookian, that's fine.

But in terms of me defending these defendants

in this action right now, I think I should be told what

12:29PM    I'm fighting about.  If it's a motion for sanctions under

Rule 37 because I didn't produce some documents, let's

brief that and I'll respond to that.  If it's take the

websites down that I don't control, then I want to have

my right to say they're protected by the First Amendment

12:29PM    and see what evidence they have that any jurors even saw

any of these websites.  And I certainly want to argue

that Mr. Blank put up his own attack websites that were

out there for at least as long and only recently came

down and I suspect only because they wanted to make this

12:29PM    argument to this court today.

How does the court wish to proceed?

THE COURT:  If you want to finish -- if you've

got any other questions that you want to ask of this

witness, why don't you go ahead and do that while he's up

12:29PM    on the stand.  If you don't, then that's fine.

83

1    MR. SCHWEGMANN:  You know what?  I'll pass the

2  witness.

3    THE COURT:  All right.  Mr. Johnston, do you

4  have any other questions?

12:30PM  5    MR. JOHNSTON:  If I may briefly, your Honor.

6    <u>REDIRECT EXAMINATION OF BRUCE STECKLER</u>

7  BY MR. JOHNSTON:

8  Q.    With regard to the allegation that Mr. Blank's

9  attack website was only taken down recently, is that a

12:30PM 10  true statement?

11  A.    No, it's not.

12  Q.    How long ago was his attack website taken down?

13  If I may use that phrase.

14  A.    Probably when I got involved in the case.

12:30PM 15  Q.    When did you get involved?

16  A.    I don't know exactly.  It was definitely -- I

17  believe it was last summer.  I don't even remember.  It's

18  been a roller coaster.

19  Q.    Let me ask you just a series of questions that I

12:31PM 20  may take a moment to formulate related to Mr. Manookian's

21  legal ethics and the roles he's playing.

22    He's a defendant in this lawsuit, correct?

23  A.    Yes.

24  Q.    And as a defendant in this lawsuit is subject to

12:31PM 25  Judge Mazzant's rulings with regard to the cautious

Motion Hearing 7-12-2017

84

1   treatment of customer information, correct?

2   A.    Correct.

3   Q.    And he's an attorney for a foundation that has

4   published widely the customer information that Judge

12:31PM  5   Mazzant told him as a party he could not --

6            MR. SCHWEGMANN:  Objection, your Honor.

7   That's not what Judge Mazzant held.  I mean, he's

8   mischaracterizing the court's order.

9   BY MR. JOHNSTON:

12:31PM  10  Q.    And third --

11           THE COURT:  Hold on just a second.

12           MR. JOHNSTON:  I'm sorry, your Honor.

13           THE COURT:  What is the mischaracterization?

14           MR. SCHWEGMANN:  The mischaracterization is

12:32PM  15  this idea that Judge Mazzant ordered my client to protect

16  customer information generally when in fact he said --

17  and I'm looking for the order now -- it's certainly part

18  of the court's record, but what Judge Mazzant said is the

19  information that's being produced by you to us is subject

12:32PM  20  to this protective order.

21           MR. JOHNSTON:  Well, so that I am clear, your

22  Honor, I am referring to the minute entry of June 27,

23  2017, by Judge Mazzant in response to the telephone

24  conference where he says he warned the parties or

12:32PM  25  cautioned the parties about this information.

Tonya B. Jackson, RPR-CRR
409.654.2833

1          MR. SCHWEGMANN:  Right.  The information that

2   is "this information" is the information that Judge

3   Mazzant ordered them to produce to us, specifically the

4   hundred customer names.  He wasn't saying, "Look, I think

12:32PM  5   any sort of customer information, however obtained, is --

6   falls within the scope of this protective order."  That

7   wasn't briefed.  That wasn't before him.

8          What he was saying was "I'm going to grant

9   this motion.  I think customer information is relevant

12:33PM  10   and it should be produced."  And that's what he did.  And

11   in doing so, he said, "Listen, I'm going to watch it

12   because I think this is -- this specific hundred names

13   being produced is confidential."  And, your Honor, if you

14   think about it in context, these guys have been

12:33PM  15   soliciting clients for years, since October, 2015; and

16   they themselves give their own customer information to

17   these folks.

18          THE COURT:  Okay.  I'm with you.  The

19   objection is sustained.

12:33PM  20          Mr. Johnston, please rephrase your question.

21          MR. JOHNSTON:  Thank you.

22   BY MR. JOHNSTON:

23   Q.    So, in term of the hat that Mr. Manookian is

24   wearing, he's a party in this lawsuit bound by Judge

12:33PM  25   Mazzant's cautionary words with regard to the use of

86

1  customer names that he ordered you to produce, correct?

2  A.    Correct.

3  Q.    And in response to a request that you produce

4  thousands of customer names, Judge Mazzant said, "No, I'm

12:34PM  5  only going to allow you access to 100 of them," correct?

6  A.    Correct.

7  Q.    And even that 100 he said he wanted treated

8  cautiously, correct?

9  A.    Correct.

12:34PM  10  Q.    And then the second hat he wears is he's an

11  attorney for a foundation that apparently has this

12  customer list and has on three occasions posted it on the

13  website with accusatory accusations against Mr. Blank,

14  correct?

12:34PM  15  A.    Correct.

16  Q.    And then thirdly, he is the attorney for Diamonds

17  Direct which presumably owns the list and doesn't want it

18  produced, correct?

19         MR. SCHWEGMANN:  Objection, your Honor.

12:34PM  20  That's the same hearsay statement he tried to get in

21  earlier about what Diamonds Direct wants or doesn't want.

22  They're not here to testify about that.

23         THE COURT:  Sustained.

24         MR. JOHNSTON:  Pass the witness.

12:34PM  25         THE COURT:  Do you have any questions?

87

<u>RECROSS-EXAMINATION OF BRUCE STECKLER</u>

BY MR. SCHWEGMANN:

Q.    Just so we have a -- I think this is established, but just so that it's clear on the record.  It's fair to say that the Diamond Doctor doesn't own any of this customer information sitting here today, fair?

        MR. JOHNSTON:  Objection, asked and answered.

        THE COURT:  I know what the answer is; but if you want to answer again, you can.

A.    The assets which is the customer information were sold.  The Diamond Doctor's obligation and his access to the information is to protect it.

BY MR. SCHWEGMANN:

Q.    And Diamonds Direct owns that customer information today, correct?

A.    That's correct.

Q.    And Diamonds Direct isn't here today as -- participating in today's hearing, correct?

A.    That is correct.

Q.    Thank you.

        THE COURT:  All right.  You may step down, sir.  Thank you.

        Mr. Johnston, do you have any other witnesses?

        MR. JOHNSTON:  May I have a moment to confer, please?

Motion Hearing 7-12-2017

88

1          THE COURT:  Yes.

2          MR. SCHWEGMANN:  While they are conferring, to

3    further complicate matters, your Honor, my client is

4    getting married this week on Saturday.  His rehearsal

12:36PM  5    dinner is on Friday, and I think they've got events

6    tomorrow.  The reason I say that is he's got to leave

7    tonight or I think he'll be in big trouble with his

8    fiancée and I -- we can talk about how this needs to

9    continue, but I need to at least say they've got to leave

12:36PM 10    at 5:00, with the court's permission, of course.

11          THE COURT:  Are you asking, or are you

12    telling?

13          MR. SCHWEGMANN:  I'm certainly asking.

14          THE COURT:  All right.  I think we can be done

12:36PM 15    by 5:00.

16          MR. STECKLER:  Your Honor, Bruce Steckler for

17    the plaintiffs.  We would like to call Mr. Manookian to

18    the stand, please.

19          (Oath administered.)

12:37PM 20          DIRECT EXAMINATION OF BRIAN MANOOKIAN

21          CALLED ON BEHALF OF THE PLAINTIFFS

22    BY MR. STECKLER:

23    Q.    Can you please state your name for the record?

24    A.    Brian Manookian, B-R-I-A-N M-A-N-O-O-K-I-A-N.

12:37PM 25    Q.    You're a partner in the law firm of Cummings

Motion Hearing 7-12-2017

89

1  Manookian in Nashville, Tennessee, correct?

2  A.     Yes.

3  Q.     And you and your law firm are defendants in the

4  lawsuit in which you are giving testimony today, correct?

12:37PM  5  A.     Yes.

6  Q.     And you're an attorney that's licensed in the

7  state of Tennessee; is that right?

8  A.     Yes.

9  Q.     I take it you're familiar with the disciplinary

12:37PM  10  rules of professional responsibility in Tennessee, right?

11  A.     Generally, yes.

12  Q.     And you have read plaintiffs' latest complaint in

13  this case, and I take it you're familiar with our

14  allegations; isn't that true?

12:37PM  15  A.     I've read all of the complaints that have been

16  filed in all the different districts and different courts

17  and different forums through amendments.  So, yes, I'm

18  positive I've read the latest one at some point and I'm

19  generally aware of the allegations in them.

12:38PM  20  Q.     You're aware that the allegations in the case here

21  today involve you and your law firm's conduct towards

22  other jewelers.  You're aware of that, right?

23  A.     I'm aware that there are allegations about

24  interactions with other jewelers.  There are no claims by

12:38PM  25  other jewelers.

90

1   Q.      You're aware that we've made allegations against

2   you that you and your law firm put up negative ads,

3   negative websites, untruthful websites in an effort to

4   extort jewelers.  You're aware of that, correct?

12:39PM  5   A.      Yes.  Yes, I'm aware that those are the

6   allegations that have been made.

7   Q.      And, in fact, you and your law firm own websites

8   such as www.solomonbrotherslawsuit.com, correct?

9   A.      No.

12:39PM  10   Q.      You don't own that anymore?

11   A.      I've never owned that.

12   Q.      You've never owned that.

13   A.      Yes.

14   Q.      And you've never owned www.mervislawsuit.com.  Is

12:39PM  15   that your testimony, too?

16   A.      That is my testimony.  You asked if I or my law

17   firm owned it.  I'm testifying on behalf of Brian

18   Manookian right now, and I don't own any of those.  If

19   you're asking about my law firm, I don't know if the

12:39PM  20   domain is owned by the law firm.

21   Q.      I understand.  Did you or your law firm ever own

22   the websites www.solomonbrotherslawsuit.com or

23   www.mervislawsuit.com at any point in time?

24   A.      I know that we've owned mervislawsuit.com at some

12:39PM  25   point in time.  I'm not sure about Solomon Brothers.

Tonya B. Jackson, RPR-CRR
409.654.2833

Motion Hearing 7-12-2017

91

1   Q.     You didn't put up a negative lawsuit *[sic]* against

2   Solomon Brothers, sir?  Is that your testimony?

3           You or your law firm never put up a negative

4   website against them?  Is that your testimony?

12:40PM   5   A.    Is the question a negative lawsuit or a negative

6   website?

7   Q.    Negative website.

8   A.    My recollection is that we put up a website

9   soliciting consumers to bring claims against Solomon

12:40PM   10   Brothers at some point, yes.

11   Q.    And you're aware that they felt forced -- are you

12   aware that they felt forced to hire you to stop those

13   negative lawsuits?  Are you aware of that?

14           MR. SCHWEGMANN:  Your Honor, relevance.  He's

12:40PM   15   trying the case during today's hearing.

16           MR. STECKLER:  No, I'm trying to lay a

17   foundation of the allegations --

18           THE COURT:  Overruled.

19   A.    No, I'm not aware of that.

12:40PM   20   BY MR. STECKLER:

21   Q.    No one has told you that?

22   A.    No.

23   Q.    Okay.  You have your own website, the Cummings

24   Manookian law firm website, correct?

12:40PM   25   A.    We have a firm website at *cmtriallawyers.com*, yes.

Motion Hearing 7-12-2017

92

Q.    And on that website you say, "If you are like most
Americans, you treat people right and play by the rules."
It's in bold and all caps.  Isn't that on your website?

A.    Yes, sir.

12:41PM  Q.    Do you believe in that?

A.    Yes, I do.

Q.    And you're familiar with the protective order in
this case?

A.    Yes.

12:41PM  Q.    Okay.  And the protective order has a Section 1
that talks about "Purpose and Scope."  Are you familiar
with that at all, or do I need to show it to you?

A.    I'd like to see it if we're going to discuss it.

        MR. STECKLER:  May I approach?

12:41PM        THE COURT:  Yes.

BY MR. STECKLER:

Q.    If you'd turn under the "Purpose and Scope," which
is the second page.

        If you read the third line, it says, "This
12:42PM protective order shall govern all documents."

        Do you see that?

        Do you see that where it says that in the
third line?

A.    No.  I see the sentence in its entirety that says,
12:42PM "This protective order shall govern all documents,

93

1   whether in writing, in electronically readable form, or

2   otherwise, interrogatory responses, responses to requests

3   for admission, responses to requests for production,

4   deposition testimony, and all other material and

12:42PM   5   information produced, given, filed, or otherwise used in

6   the course of this action or required by court order,

7   local rules, or the Federal Rules of Civil Procedure,

8   collectively 'discovery material.'"

9   Q.      Thank you.  Do you see the "or otherwise used in

12:43PM  10   the course of this action"?  Do you see that?

11   A.      I do.

12   Q.      Okay.  Is it your testimony that the customer

13   information contained in the DISF website was never used

14   in the course of this action?

12:43PM  15   A.      No, it's not been used in the course of this

16   action.  It's not been filed.  It's not been made an

17   exhibit.  It's never been produced.  If you turn to the

18   first page of the protective order under where "The court

19   hereby orders and adjudges as follows," what's ordered

12:43PM  20   and what's governed are the production and exchange of

21   all documents, testimony, interrogatories, and other

22   information produced, given, or exchanged by and among

23   the parties.

24          No, that customer information has never been

12:43PM  25   produced in this action or used in this action.

94

1  Q.     So, my question to you was:  Has it been used in

2  this action at all?

3  A.     And I guess I'd ask you to be more specific.

4  Q.     No, I --

12:44PM  5  A.     Are you asking about all of the customer names

6  that encompass all of the things that have been posted by

7  DISF?

8  Q.     I'm asking whether any of the information on the

9  DISF voluminous websites that you've put up or have -- or

12:44PM 10  DISF has put up, has that information ever been used in

11  this lawsuit?

12  A.     Not that I'm aware of.

13  Q.     Okay.  Can you take a look at the e-mail that was

14  offered into evidence by Mr. Correa?

12:44PM 15         Let me see what the date of that is.  I

16  apologize.

17         It's dated June 19th, 2017.  It's Exhibit 11.

18         Can you read the second paragraph?

19         MR. SCHWEGMANN:  I don't know if he has a

12:45PM 20  copy, Bruce.

21         MR. STECKLER:  Oh, I'm sorry.  I thought we

22  left them up there.

23         THE COURT:  Yes.  Yes, I do.

24  BY MR. STECKLER:

12:45PM 25  Q.     Can you read the second paragraph out loud,

1 please, from your lawyer Mr. Correa?

2 A.    "As I explained, our client has identified

3 approximately $57 million in in-state sales by Diamond

4 Doctor with respect to which no sales tax were paid.  I

12:46PM 5 explained that we may need to raise this issue in this

6 case likely in connection with our dispute over the

7 production of customer names (it seems to explain Diamond

8 Doctor's persistent objections to disclosure of any

9 customers), and also because it may constitute evidence

12:46PM 10 of fraud by Diamond Doctor (thus supporting defendants'

11 truth defense to Diamond Doctor's defamation claims).  We

12 may also need to raise this issue in connection our

13 request for sanctions as it may help explain why Diamond

14 Doctor may have had, but ultimately destroyed, original

12:46PM 15 invoices for its diamond sale transactions."

16 Q.    Let me stop you right there.

17          How did you discover $57 million in in-state

18 sales by Diamond Doctor in which no sales taxes were

19 paid?  How were you able to do that with redacted

12:46PM 20 information that was produced in the course of this

21 litigation as Attorneys' Eyes Only?  How did you do this?

22 A.    This information is all available on

23 *ddtaxfraud.com*.

24 Q.    So, you got -- the information that you found

12:47PM 25 about the tax fraud you got from *ddtaxfraud.com*'s

96

website, right?

A.     I got it from the DISF.  That's where we learned

that Diamond Doctor over a multiyear period was

committing a massive, systemic sales tax fraud where

12:47PM   customers would come in in-state and rather than charge

them sales tax, they would create phony shipping charges

and claim that items were sent out of state to in-state

customers so that no sales tax was collected, charged, or

remitted to the state.

12:47PM   Q.     And, so, you got that information from your client

DISF's website in which you are the administrator; is

that right?

A.     I'm not the administrator of that site, no.  So --

I can answer that compound question if you break it down.

12:48PM   Q.     Let's break it down because I think that's really

important.

         So, you got information about this sales tax

fraud from DISF, correct?

A.     In part.  We also got it from the customers that

12:48PM   have contacted us in the last year and a half that we

have been soliciting for clients against Diamond Doctor.

It was fairly consistent that what he would do in order

to undercut competition and essentially offer an illegal

discount, he would ask people "What is your budget for an

12:48PM   engagement ring?"  And if they said $10,000, he would

Motion Hearing 7-12-2017

97

1    allow them to put the entire $10,000 towards a ring and

2    not charge sales tax, thereby giving them essentially

3    8 and a half percent more purchasing power at the expense

4    of the state and something that he could put in his

12:49PM  5    pocket as well.  So, that's something that we saw pretty

6    quickly and --

7    Q.    Who is "we"?  Who is "we"?

8    A.    Myself and Cummings Manookian.

9    Q.    Okay.  And "we" is doing this investigation with

12:49PM  10   information that we got from DISF; is that right?  Yes or

11   no?

12   A.    In part.

13   Q.    Okay.

14   A.    We were aware of --

12:49PM  15   Q.    Let me stop you.  In part.  I appreciate that.

16         And the other part of information you got was

17   contacting customers of Diamond Doctor, correct?

18   A.    No, sir.  Customers of Diamond Doctor would

19   contact us --

12:49PM  20   Q.    Well, hold on.  Hold on.

21         You in your declaration indicated that you

22   left voice messages for 175 people, or is that DISF?

23   A.    I did not leave voice mails for 175 people.

24   Q.    Who did?  Who did?

12:49PM  25   A.    DISF.

Motion Hearing 7-12-2017

98

1  Q.    Okay.  You just contacted three customers,

2  correct?

3  A.    Correct, before --

4  Q.    Okay.  Hold on.  I'm going to ask the questions.

12:49PM  5  You can explain yourself when your attorney asks you.

6          And the customers you contacted also happened

7  to be witnesses in this case, correct?

8  A.    Happen to be witnesses in this case?

9  Q.    Yes.

12:50PM  10  A.    I don't believe they have been identified as

11  witnesses in this case by anyone.

12  Q.    All right.  Well, let me hand you the motion to

13  compel.

14          Have you seen the motion to compel in this

12:50PM  15  case?

16  A.    I try to read most of the pleadings in this case,

17  but if you have a copy of it --

18  Q.    I'm just asking you if you've read it.

19  A.    I don't recall if I've read it or not --

12:50PM  20  Q.    Okay.

21  A.    -- Mr. Steckler.

22          MR. STECKLER:  Your Honor, do you need a copy?

23          THE COURT:  I have a copy.  Thank you.

24          MR. STECKLER:  Okay.  May I approach?

12:50PM  25          THE COURT:  Yes.

99

BY MR. STECKLER:

Q.     Please turn to page 10.  I would like you to read the last sentence of -- under No. 3.  Just read that last sentence.  On page 10.

12:51PM

A.     "Diamond Doctor customers are therefore the only witnesses who can provide what is unquestionably relevant information."

Q.     Okay.  And you contacted three customers, right?

       Did you contact three customers?  Yes or no?

12:51PM

       MR. SCHWEGMANN:  The next question is --

       MR. STECKLER:  Excuse me.  I'm asking the questions.

BY MR. STECKLER:

Q.     Did you contact three customers, sir; or did

12:51PM

you --

A.     I contacted --

Q.     Answer.  Answer the question.

       THE COURT:  Okay.  One at a time, please.

       MR. STECKLER:  Thank you.

12:51PM

       THE COURT:  Please answer the question.

A.     I contacted three customers who had purchased --

BY MR. STECKLER:

Q.     Thank you.

A.     -- GIA diamonds --

12:51PM

Q.     Thank you.  I'm asking you -- excuse me.  I asked

100

1  you one question.

2           THE COURT:  Sir, you need to answer the

3  question; and if you need to explain something else

4  further, your counsel, when he gets to ask you questions,

12:52PM  5  will allow you to do that.

6           THE WITNESS:  Thank you.

7  BY MR. STECKLER:

8  Q.    So, you contacted three customers who, according

9  to this motion filed by your counsel, would be witnesses,

12:52PM  10  correct?  Is that correct?  Yes or no?

11  A.    That is not correct.  I --

12  Q.    Okay.  Thank you.  That's your opinion.  I

13  appreciate it.

14  A.    I contacted customers who had purchased --

12:52PM  15  Q.    Your Honor --

16           THE COURT:  Sir, you need to answer the

17  question and that's it.

18  BY MR. STECKLER:

19  Q.    Did you or your law firm at any point in time ever

12:52PM  20  own the website *www.diamondsdirectlawsuit.com*?

21  A.    Not that I recall.

22  Q.    Okay.  You're aware you're under oath?

23  A.    Yes, sir.

24  Q.    Okay.  And you're aware that Diamonds Direct,

12:53PM  25  through an asset purchase agreement, purchased Diamond

Motion Hearing 7-12-2017

101

1  Doctor?  Are you aware of that?

2  A.    Yes.  Well, it purchased the assets of Diamond

3  Doctor and the intellectual property.  I don't -- it

4  didn't --

12:53PM   5  Q.    Are you aware of the asset purchase agreement of

6  November 1st, 2016, sir?

7  A.    I'm aware that there is one.  It's been designated

8  Attorneys' Eyes Only.  So, I've never seen it.

9  Q.    Correct.  I'm asking about the fact.  I'm not

12:53PM  10  asking about the contents of it.

11  A.    Yes, I'm aware that there is one.

12  Q.    Okay.  And are you currently representing Diamonds

13  Direct?

14  A.    Yes, I represent Diamonds Direct.

12:54PM  15  Q.    You have an engagement agreement with them; is

16  that right?

17  A.    Correct.

18  Q.    And they pay you a monthly fee, correct?

19  A.    Yes.

12:54PM  20  Q.    Right.  Whether you do work or not, they pay you a

21  monthly fee; is that right?

22  A.    They pay us a monthly retainer and some months we

23  do --

24  Q.    That's not my --

12:54PM  25  A.    -- lots of work and there have been months where

102

1    we don't do any work.

2    Q.    And that's my point.  You get paid a monthly

3    retainer whether you do work or not, correct?

4    A.    Yes.

12:54PM  5    Q.    Okay.  And you represent DISF; is that right?

6    A.    Yes.

7    Q.    And DISF has this website, right?  It's

8    www.ddtaxfraud.com, right?

9    A.    Yes.

12:54PM  10    Q.    DISF has a website www.suedavidblank.com, correct?

11    A.    Yes.

12    Q.    DISF also has a website www.ddvictimsfund, right?

13    A.    Yes.

14    Q.    All right.  And on these websites that your client

12:55PM  15    DISF owns, you have posted customer names, correct?

16                MR. SCHWEGMANN:  Objection, your Honor.

17    BY MR. STECKLER:

18    Q.    Excuse me.  DISF has posted customer names,

19    correct?

12:55PM  20                THE COURT:  Did you make an objection?

21                MR. SCHWEGMANN:  I did.  He clarified it.

22    Thank you.

23    BY MR. STECKLER:

24    Q.    DISF posted customer names, right?

12:55PM  25    A.    Yes, they posted names of customers who purchased

Motion Hearing 7-12-2017

103

```
          1  things from Diamond Doctor.
          2  Q.    And the amount they purchased, right?
          3  A.    Yeah.  It shows the purchase price.
          4  Q.    And all of that is listed on this website,
12:55PM   5  correct?
          6  A.    The customer name, the certification, the price,
          7  and the date, yes.
          8  Q.    Yeah.  All right.  And did you talk to Diamonds
          9  Direct about the fact that you represented DISF that was
12:56PM  10  posting these names on their website?  Did you speak to
         11  them?
         12          MR. SCHWEGMANN:  I think you can -- well...
         13  BY MR. STECKLER:
         14  Q.    Did you speak to them is the question.
12:56PM  15  A.    Yes.
         16  Q.    Okay.  Did you do a conflict check or waiver with
         17  respect to your representation of these two clients?
         18          MR. SCHWEGMANN:  Your Honor, objection,
         19  relevance.
12:56PM  20          THE COURT:  Overruled.
         21  A.    Yes.
         22  BY MR. STECKLER:
         23  Q.    And did Diamonds Direct at any point in time
         24  object or instruct you not to represent DISF?
12:56PM  25  A.    I don't want to get into a situation where I'm
```

Motion Hearing 7-12-2017

1  arguably waiving privilege between conversations between

2  me and Diamonds Direct.  I want to be responsive to your

3  question.  And I guess I'm asking if I can answer that

4  question without waiving a privilege that would belong to

12:57PM  5  my client Diamonds Direct as to other information.

6  BY MR. STECKLER:

7  Q.    Well, did you see any of the information on the

8  DISF websites before it was published?

9  A.    Did I see it?

12:57PM 10  Q.    Yes.

11  A.    Prior to it being published on the websites?

12  Q.    Yes.

13  A.    (No audible response.)

14  Q.    So, you were aware that the information being

12:57PM 15  published on these websites could potentially be harmful

16  to another client, correct?

17  A.    No.

18        MR. SCHWEGMANN:  Your Honor, it's not my

19  privilege; but I feel I have to stand.  Neither of the

12:58PM 20  two entities are in the room.

21        THE COURT:  Well --

22        MR. STECKLER:  He's the attorney for both

23  entities, and I'm asking him whether he thinks it would

24  be harmful.  I'm not asking what was said.

12:58PM 25        THE COURT:  Right.  And I don't want you to

Motion Hearing 7-12-2017

105

1   talk about -- and I think you have not thus far talked

2   about -- the substance of the communications.

3         I think the questions that have been asked so

4   far he can properly answer without waiving any kind of

12:58PM  5   privilege.

6         MR. SCHWEGMANN:  My concern is the parties

7   that need to protect their own privilege aren't here; and

8   as a result, they don't have -- they can't stand up to

9   protect the privilege themselves.  But I'll be careful

12:58PM 10   and listen to the questions before I stand up again.

11   A.    I think I can answer that.  It asks for my mental

12   impression, but again --

13   BY MR. STECKLER:

14   Q.    No, I'm asking you:  In your opinion, do you think

12:58PM 15   that the posting of Diamond Direct's customer information

16   that they purchased on this website of DISF could be

17   harmful to them?

18   A.    No.

19   Q.    Why not?

12:59PM 20   A.    Not initially.

21   Q.    Why not?

22   A.    These were customers of Diamond Doctor; and in the

23   asset purchase, Diamonds Direct, as my understanding --

24   and it's clear when you drive by their storefront -- was

12:59PM 25   going to do business on a go-forward basis as Diamonds

1  Direct.

2         One of the things that concerned me later

3  on -- and it frankly wasn't something that I appreciated

4  when DISF initially published this -- was would these

12:59PM  5  customers associate this website with Diamonds Direct.

6  Would they say, hey, I bought this at Diamond Doctor; but

7  Diamonds Direct is the store there now; is Diamonds

8  Direct putting out information?

9         One thing that never even occurred to me is

01:00PM  10 that sometimes these individuals buy jewelry for people

11 who aren't their wife, for example, and they don't want

12 that information there and they might call Diamonds

13 Direct and say, "Hey, why is this here?"  Because there

14 isn't a Diamond Doctor to call anymore.  So, that's a

01:00PM  15 long way to answer your question.

16 Q.    So --

17 A.    Initially no, I did not see that there would be a

18 nexus between the two.

19 Q.    So, why would Diamonds Direct -- part of the asset

01:00PM  20 purchase, why would they be purchasing names and

21 information about customers if that's not important to

22 them or it may not hurt them by putting this out on the

23 website?

24         MR. SCHWEGMANN:  Foundation, speculation.

01:00PM  25 A.    Well -- right.  It's not my testimony that --

Motion Hearing 7-12-2017

107

1      THE COURT:  Hold on just a second.

2      I'm going to sustain the objection.

3      MR. STECKLER:  Yes, I understand.

4  BY MR. STECKLER:

01:01PM   5  Q.    You understand where the asset purchase agreement

6  may involve -- first of all, you haven't seen the asset

7  purchase agreement, right?

8  A.    No, sir.

9  Q.    Diamonds Direct never provided it to you, did

01:01PM  10  they?

11  A.    No.  I have not seen it.

12  Q.    No.  They never provided it to you, did they?

13  A.    Right.  It hasn't been provided to me by anyone.

14  Q.    And you don't know what they purchased, do you?

01:01PM  15  You don't know what was purchased in this agreement

16  between Diamond Doctor and Diamonds Direct, right?

17  A.    I have a sense of it for --

18  Q.    Well, hold on.  You haven't seen it.

19  A.    Mr. Steckler, I could know from what they tell me

01:01PM  20  generally.  I have a knowledge of it just because David

21  Blank has made statements about it.  There are news

22  stories about it.  So, I don't have any personal

23  knowledge in the sense that I didn't negotiate the

24  transaction and I haven't read the asset purchase

01:01PM  25  agreement, but I can't tell you no, I don't know what

Motion Hearing 7-12-2017

108

1    they purchased.  I know that they got inventory.  I know

2    that they got the intellectual property because we have a

3    lawsuit with Diamond Doctor in federal court in Arizona

4    about intellectual property.  So, there are other ways

01:02PM    5    that what Diamonds Direct bought came to my attention

6    that wasn't through reading the actual purchase --

7    Q.    So, do you know whether or not -- from the

8    information you've gleaned through your own intuitive

9    nature, whether or not one of the assets purchased was

01:02PM    10    customer name and pricing of diamonds?  Do you know that

11    for a fact?  Yes or no?

12    A.    I know it for a fact as I sit here now because you

13    testified to it.

14    Q.    No, I'm not -- I'm asking you:  Did you know that

01:02PM    15    at any point?

16    A.    I wasn't -- if you're asking me from a personal

17    knowledge standpoint, I didn't negotiate the transaction.

18    Q.    That is my point.  You didn't know whether

19    customer names and purchase prices were an asset

01:02PM    20    purchased by Diamonds Direct, your client.

21    A.    I was told that.

22    Q.    When?

23    A.    At some point by Diamonds Direct but --

24    Q.    So, despite --

01:02PM    25    A.    You told my attorneys that --

Motion Hearing 7-12-2017

109

```
 1  Q.     So, despite that, you think it's okay to put
 2  customer names and the price they paid on the websites
 3  that are controlled by your client DISF, right?
 4              MR. SCHWEGMANN:  Objection, your Honor.  The
 5  question is vague with respect to "you," and it also
 6  calls for some either legal or ethical opinion.  I'm not
 7  sure again the relevance of any of this.
 8              MR. STECKLER:  Well --
 9              THE COURT:  If you want to direct the use of
10  "you" to DISF, do that; but otherwise, the objection is
11  overruled.  Or I'll make the correction for you.
12              MR. STECKLER:  Please.
13              THE COURT:  Substitute "DISF" in place of
14  "you," and then you can answer the question.
15  A.     Can you ask the question again?
16  BY MR. STECKLER:
17  Q.     I was afraid you were going to say that.
18  A.     I know.  I...
19  Q.     So, you didn't know whether customer names and
20  pricing information were an asset purchased by Diamonds
21  Direct; and you didn't even learn it until recently,
22  correct?  Is that correct?
23  A.     Mr. Steckler, I'm trying to pinpoint --
24  Q.     I understand.  I'm asking you whether you knew it
25  or not because you must have had to have known it before
```

01:03PM  (lines 4-7)
01:03PM  (lines 9-11)
01:03PM  (line 15)
01:03PM  (lines 19-22)
01:04PM  (line 25)

1  you represent DISF and they're putting it online.

2  A.    I can't say for certainty that I knew it before,

3  but I knew it very soon thereafter if I didn't know it

4  before.

01:04PM  5  Q.    So, you could see where if they're purchasing

6  customer names and prices and DISF, your other client, is

7  putting them online, that could be a problem, couldn't

8  it?

9  A.    Yeah, it could in some sense; but the thing --

01:04PM  10  Q.    Thank you.  That's my question.

11  A.    We also had the customer information ourselves.

12          MR. STECKLER:  May I approach, your Honor?

13          THE COURT:  Yes.

14          Sir, we -- if you'll not talk until you get to

01:04PM  15  the microphone.

16          MR. STECKLER:  Let me see if I have it here.

17          Here, I have it.

18  A.    This would appear to be hearsay.

19          MR. SCHWEGMANN:  He didn't ask you a question

01:05PM  20  yet.

21  BY MR. STECKLER:

22  Q.    Do you know who Adam Ross is?

23  A.    Yes.

24  Q.    Who is he?

01:05PM  25  A.    He is a lawyer in Charlotte, North Carolina.

Motion Hearing 7-12-2017

111

1    Q.    Does he also represent Diamonds Direct?

2    A.    Yes.

3    Q.    He's a trial lawyer for Diamonds Direct, isn't he?

4    A.    No.  I think he primarily does transactional work.

01:05PM    5    Q.    Okay.  Are you sure about that?

6    A.    I know he handles their transactional work and a

7    lot of real estate issues for them.  I -- I'll leave it

8    at that.

9    Q.    Regardless, they do represent Diamonds Direct,

01:06PM    10    correct?

11    A.    Adam Ross does, yes.

12    Q.    Right.  And his law firm, right?

13    A.    Yes.

14    Q.    James McElroy & Diehl, right?

01:06PM    15    A.    Correct.

16    Q.    And if you read the e-mail from me to Mr. Ross --

17         MR. SCHWEGMANN:  Your Honor --

18    BY MR. STECKLER:

19    Q.    -- at the bottom --

01:06PM    20         MR. STECKLER:  Hold on, please.  Let me ask

21    the question, and then you can object.

22         MR. SCHWEGMANN:  I'm sorry.

23    BY MR. STECKLER:

24    Q.    In this e-mail I'm asking him questions about

01:06PM    25    DISF's website.  Do you see that?  I'm just asking you if

Motion Hearing 7-12-2017

112

1  you see that in the e-mail.

2  A.    At the bottom, the original e-mail from you to

3  Mr. Ross?

4  Q.    Yes.

01:06PM  5  A.    I see a question.

6  Q.    Okay.  And it's -- and the question relates to

7  *ddvictimfund*; is that right?

8  A.    The one question is --

9  Q.    Okay.  Well, I mean, you can read it.  "It comes

01:07PM  10  to our attention" -- they put -- I made some statements.

11  And I'm not seeking to add hearsay.  I'm just saying I'm

12  raising DISF website in this e-mail, aren't I?

13        MR. SCHWEGMANN:  Your Honor, I object to both

14  the question and the document itself are hearsay.

01:07PM  15        MR. STECKLER:  I am asking about the document,

16  and I'm trying to lay the foundation.

17  BY MR. STECKLER:

18  Q.    The e-mail asks about *ddvictimfund* website,

19  correct?

01:07PM  20  A.    I don't have any personal knowledge of this --

21  Q.    I understand that.  I'm asking you if the e-mail

22  asks about *ddvictimfund* website.

23        MR. SCHWEGMANN:  Objection, hearsay.

24  BY MR. STECKLER:

01:07PM  25  Q.    I'm asking if that's what's in the e-mail.  I'm

113

1    asking you as a foundation.

2             MR. STECKLER:  If the court will indulge me.

3             THE COURT:  Mr. Steckler, you're asking

4    foundation questions for a document that isn't

01:07PM  5    admissible.

6             MR. STECKLER:  I understand.  Let me see if I

7    can try this another way.

8             THE COURT:  But there's really no way you can

9    make this document admissible.

01:07PM  10             MR. STECKLER:  I'm not seeking to admit it.  I

11   have not offered it for admission.  I'd like to ask some

12   questions about the e-mail.  In other words, I'd like to

13   have him read what is written here, if the court will

14   indulge me, and ask him if he had those conversations

01:08PM  15   with his client just like Mr. Ross has told me.  I want

16   to know if he had similar conversations as what's laid

17   forth here.

18             MR. SCHWEGMANN:  Well, then my objection would

19   be not only hearsay but privilege if he had certain

01:08PM  20   conversations with his client Diamonds Direct about this.

21   So, in either event it's inadmissible.

22             MR. STECKLER:  May I try?

23             THE COURT:  Well, what's your response to the

24   privileged objection?

01:08PM  25             MR. STECKLER:  Well, I'm wondering whether --

1   well, my foundation is whether he gleaned information --

2   whether he was told -- that's all --

3              THE COURT:  Yeah.

4              MR. STECKLER:  You're right.  I think you're

01:08PM   5   right, and I hate to say it.

6              THE COURT:  I think it's sustained.

7              MR. STECKLER:  Yeah.  Thank you.  I apologize.

8              Your Honor, we don't intend to offer that as

9   an exhibit in the record.

01:08PM  10   BY MR. STECKLER:

11   Q.    Let me ask you a few questions about the websites

12   that have been put up, Diamond Doctor Victim Fund real

13   quick.

14              You are the incorporator, correct?

01:09PM  15   A.    Of DISF, yes.

16   Q.    Right.  We did some research on the incorporation,

17   and I don't know if that's been offered into evidence yet

18   or not.  Let me go ahead and offer that into evidence

19   real quick, and I've got a quick question.

01:09PM  20              MR. STECKLER:  Your Honor, I don't think you

21   have the --

22              THE COURT:  Yeah, I don't think that I do.

23              Thank you.

24              MR. STECKLER:  We're going to call this

01:09PM  25   Exhibit 12.

BY MR. STECKLER:

Q.    Under -- I guess on the -- on the second page --
this is labeled "Charter Nonprofit Corporation."  Do you
see that?

01:10PM  A.    Yes, sir.

Q.    Okay.  Under No. 4, it says, "The name and
complete address of its initial registered agent and
office located in the state of Tennessee is."  Do you see
that?

01:10PM  A.    Yes, sir.

Q.    Who is listed?

A.    Cummings Manookian PLC and then the addresses --
the office address for Cummings Manookian in Nashville.

Q.    Okay.  And if you look at No. 9, down there.

01:10PM  A.    Yes, sir.

Q.    It says, "The complete address of its principal
office is"; and this has to do with the principal office
of the Diamonds Integrity Standards Foundation, right?

A.    Correct.

01:10PM  Q.    What is listed?

A.    The same address:  45 Music Square West,
Nashville, Tennessee.

Q.    That's your law firm address, right?

A.    Correct.

01:10PM  Q.    And if we go to the last page, under No. 11 it

Motion Hearing 7-12-2017

116

1  says, "Incorporator," correct?

2  A.     Yes, sir.

3  Q.     And it lists you as the incorporator, correct?

4  A.     Yes, sir.

01:11PM  5  Q.     And again your business address, right?

6  A.     That's correct.

7  Q.     And at the bottom the date is May 4, 2017,

8  correct?

9  A.     Correct.

01:11PM  10  Q.     Okay.  Who is on the board of DISF?

11  A.     I know who the director is.  I don't know who the

12  board is, if there is a board.

13  Q.     Who is the director of DISF?

14  A.     I believe Felipe De Mase.

01:11PM  15  Q.     Who is that?

16         Can you spell that?

17  A.     Felipe, F-E-L-I-P-E, De, D-E, Mase, M-A-S-E.

18  Q.     Who is he?

19  A.     He's the director of the DISF.  He's an

01:11PM  20  individual.

21  Q.     Tell me about him.

22  A.     He is a dual citizen of Italy and Argentina.

23  Q.     Yes.  What does he do for a living?

24  A.     He's retired.

01:12PM  25  Q.     How do you know him?

Tonya B. Jackson, RPR-CRR
409.654.2833

Motion Hearing 7-12-2017

117

```
           1   A.      He found us through our web page.

           2   Q.      Which web page?

           3   A.      diamondlawsuit.com.

           4   Q.      And where does he live?

01:12PM    5   A.      I believe he's in Italy currently.

           6   Q.      How long is he going to be in Italy?

           7   A.      I don't know the answer to that.

           8   Q.      As the incorporator, did you set up the articles

           9   of incorporation?

01:12PM   10   A.      I set up the charter, yes, and the articles of

          11   incorporation.

          12   Q.      And did you put together the bylaws?

          13   A.      Yes.

          14   Q.      And did you set up a board of directors?

01:12PM   15   A.      No.   There is a director that I am aware of.

          16   Q.      And who is the one director?   It's Felipe?

          17   A.      Felipe De Mase.

          18   Q.      Felipe De Mase.   And do you have his home address?

          19   A.      Yes.

01:13PM   20   Q.      And it's -- his home address is in Italy?

          21   A.      He has an address in Italy and one in Argentina.

          22   Q.      I see.   And is English his first language?

          23   A.      No.

          24   Q.      Why is -- do you know why he is interested in

01:13PM   25   putting up a Diamond Integrity Standards Foundation
```

Motion Hearing 7-12-2017

118

1  website?

2  A.      I do.

3  Q.      Yeah.   Why?

4  A.      That's attorney-client privileged and information

01:13PM  5  that he shared with me as an attorney.

6  Q.      Was he a customer of Diamond Doctor?

7  A.      I don't know the answer to that.

8  Q.      Has he ever been to Dallas?

9  A.      I don't know the answer to that.

01:13PM  10  Q.      Has he ever purchased an item from Diamond Doctor

11  that you're aware of as you sit here today?

12  A.      I do not know if he has or has not.

13  Q.      Is he a lawyer?

14  A.      No.

01:14PM  15  Q.      Is he familiar with the -- have intimate

16  familiarity with the tax code, that you know of?

17  A.      No, not that I know of.

18  Q.      Are you his lawyer?

19  A.      Yes.

01:14PM  20  Q.      Individually and as DISF?

21  A.      I represent him, and I represent the organization

22  DISF.

23  Q.      Okay.

24          MR. STECKLER:  Let's go to the

01:14PM  25  *ddvictimfund.com* website.   We're going to put it up

Motion Hearing 7-12-2017

119

1    online.

2              Have we introduced any of that as evidence?

3    Let's go ahead and, if I may, just mark them as exhibits

4    for the court's consideration.

01:14PM    5              THE COURT:  Did you intend to offer Exhibit

6    No. 12?

7              MR. STECKLER:  That would be the -- that would

8    have been -- yes, I did.  I apologize.  Yes.

9              THE COURT:  All right.  Do you have any

01:14PM   10   objection?

11             MR. SCHWEGMANN:  No, your Honor.

12             THE COURT:  All right.  Exhibit 12 is

13   admitted.

14             MR. STECKLER:  May I approach?

01:15PM   15             THE COURT:  Yes.

16             MR. STECKLER:  This will be Exhibit 13.

17   BY MR. STECKLER:

18   Q.    Now, for convenience of the court, Mr. Manookian,

19   I'd like you to look up at the screen.  It might be

01:15PM   20   helpful for all of us so we can be on the same page.

21             Is there a Victim Fund?

22   A.    Yes.

23   Q.    How much is in the Victim Fund?

24   A.    I do not know the answer to that.

01:15PM   25   Q.    Who set up the Victim Fund?

120

A.     The DISF.

Q.     Did you set up the fund?

A.     No.

Q.     Okay.  Did you advise Mr. Felipe De Mase that you
were being sued by Diamond Doctor?

       MR. SCHWEGMANN:  Objection, your Honor.
Again, it's not my privilege but --

       MR. STECKLER:  Your Honor, I understand.  I
understand.  Forget it.

       THE COURT:  Sustained.

BY MR. STECKLER:

Q.     This Victim Fund maintains a master database of
customers.  Do you see that?

A.     Yes.

Q.     And you've relied upon that database of customers,
correct?

A.     I have relied upon it?

Q.     Yes.

A.     In what respect?

Q.     You've used them for your own investigations,
correct?

A.     I called the three individuals regarding sales tax
not from this database but from the *ddsalestax.com*
database.

Q.     I understand, and it's used -- is there a

difference between *ddtaxfraud.com* database and

*ddvictimfund*?

A.     Yes, absolutely.

Q.     Tell me the difference between the two.

01:17PM  A.     Okay.  So, the Victim Fund identifies individuals

who bought EGL-Israel or in-house graded diamonds.  Those

were the two categories of diamonds that were

systemically and massively overgraded.

Q.     Hold on real quick.  And I apologize to interrupt.

01:17PM  A.     The distinction between the two --

Q.     You know what?  Let me let you finish.  I

apologize.  Go ahead.

A.     Okay.  So, the Victim Fund exists for individuals

who bought EGL-I diamonds or in-house graded diamonds.

01:18PM  One of the biggest problems is these consumers have no

clue that their diamond is overgraded for years and years

and years and, so, what often happens is there will be a

divorce, a death in the family, sometimes there's a

financial catastrophe and, so, they take their diamond to

01:18PM  have it sold and then they find out that, hey, this was

supposed to be an F grade and it's really a J.  But when

they take it around in the Dallas area, generally it's

just to an appraiser.  You'll see oftentimes they'll take

it to Robbins Brothers, Bachendorf's --

01:18PM  Q.     I'm sorry.  I hate to interrupt.  I asked you if

there's a difference between the two databases, not your

theory.

            THE COURT:  But, sir, I'm actually going to --

if you will just simply state the differences because of

01:18PM   our time constraint.

A.    The Victim Fund is limited to people who bought

EGL-I in assisting them in getting them graded

objectively by the GIA and paying for it.  The *ddtaxfraud*

database -- and this is my knowledge -- lists people who

01:19PM   purchased items from Diamond Doctor in-state and who are

in-state residents where no sales tax was charged,

collected, or remitted.  So, the universe of their

transactions is not limited to EGL-I diamonds.

BY MR. STECKLER:

01:19PM   Q.    What's the basis of your knowledge about these two

websites and what's contained in them?

A.    My knowledge about the websites?

Q.    Yeah.

A.    What's publicly available on here.

01:19PM   Q.    No, no.  But what's your knowledge about how

they're two different ones?

A.    It says right here that this one is EGL-I and you

can see it's EGL-I and in-house and the tax fraud site is

not limited to EGL-I.

01:19PM   Q.    I see.

Motion Hearing 7-12-2017

123

A.      It's all transactions where sales tax wasn't

collected but it was an in-state qualifying transaction.

Q.      How did your client get those documents?  How did

Felipe De Mase get these documents?

01:20PM A.      That's attorney-client privileged as well.  You'd

have to ask him.

                MR. STECKLER:  Your Honor, I would argue that

there are very limited options of how he got them, and

one of them would involve a crime fraud exception to any

01:20PM privilege that's being asserted here.

                MR. SCHWEGMANN:  Your Honor, except that none

of -- as Mr. Steckler himself testified, none of the

information -- they haven't established that any of the

information on either of these websites came from them.

01:20PM I mean, it's -- and --

                THE COURT:  Okay.  Hold on just a second.

                Let me just ask you, sir.

                THE WITNESS:  Yes, your Honor.

                THE COURT:  Do you know how the client

01:20PM information that is on the websites labeled Exhibits 2,

3, and 13 got on these websites?  Do you know that?

                THE WITNESS:  I know how it got on the

websites, yes.

                THE COURT:  All right.  Do you know where --

01:21PM the customer information on these three websites, do you

 1  know how -- where the customer information was obtained

 2  from?

 3              THE WITNESS:  Yes.  I know that the DISF

 4  obtained it from Felipe De Mase.  I do not know from

01:21PM  5  there.

 6              THE COURT:  So, it's your testimony that you

 7  do not know how this Felipe De Mase acquired the customer

 8  information that is on these three websites.

 9              THE WITNESS:  Correct.

01:21PM 10              THE COURT:  Okay.  All right.

11              Do you have any additional questions?

12              MR. STECKLER:  I do have a few.

13  BY MR. STECKLER:

14  Q.    On this *ddvictimfund* website, if you'd go to the

01:21PM 15  very last page.  Can you read what it says there?

16  A.    "The DISF provides access to independent

17  attorneys, law firms, and self-assisted legal services at

18  your specific direction.  The DISF is not a law firm or

19  substitute for an attorney or law firm.  The DISF itself

01:22PM 20  does not provide advice, explanation, opinion, or

21  recommendation about legal rights, remedies, defenses,

22  options, selection of forums or strategies.  Your access

23  to this website is subject to these terms."

24  Q.    Okay.  And I noticed on the *ddvictimfund* website,

01:22PM 25  if you click on -- it says "Complaint."  Are you aware

1    that a lawsuit comes up?

2    A.    Yes.  It's a template original petition; and to my

3    understanding, it includes the specific sale details for

4    the customer that it's tailored for.

01:23PM  5    Q.    Okay.

6              MR. STECKLER:  Your Honor, may I approach and

7    offer this into evidence real quick?  This would be

8    Exhibit No. 14.

9    BY MR. STECKLER:

01:23PM  10   Q.    So, this is an example of one of the original

11   petitions that pops up on *ddvictimfund* website.  How did

12   Mr. Felipe De Mase create this petition?  Do you know?

13   A.    Well, I'm not sure that this is what pops up.

14   This -- the typeface in this is different throughout.

01:23PM  15   Q.    Well, why don't we just take a look at it online

16   up here and we can see what pops up.  I'm sorry.  It's

17   Matan Abehasira.  I think we talked about her

18   declaration, or his.  I don't know.

19             This right here, if you click on that, that's

01:24PM  20   what shows up, right?

21   A.    Right.  And just to be clear, what you're clicking

22   on is a local file that somebody has saved somewhere.

23   That doesn't appear to be anything that's online.

24   Q.    That's correct.  It was downloaded from this

01:24PM  25   website to capture it so we could ask questions about it

126

1  in the course of this lawsuit.

2  A.    Okay.  And I don't know that to be the case; and

3  with all the documents that have been --

4  Q.    I understand that --

01:24PM  5  A.    -- fabricated by this side, I don't want to

6  testify that this is what you purport it is because I

7  don't know.

8  Q.    I understand.  So, let me ask you this question.

9  Tell me, based upon your knowledge as a party in this

01:24PM  10  case, what court has ruled there's fabricated documents.

11  A.    What court has ruled there's fabricated documents?

12  Q.    Yes.  Yeah.  What court?

13  A.    I believe it was stipulated that the receipts,

14  appraisals, and invoices all had bogus disclaimers on

01:25PM  15  them; and as a result, the plaintiff in this case is

16  required -- can't say that there were disclosures on any

17  of this.

18  Q.    So, it's your testimony this court has ruled that

19  defendants fabricated documents.  Is that your

01:25PM  20  understanding the court ordered that -- plaintiffs, I

21  mean.  Excuse me.  Let me rephrase.  Let me withdraw the

22  question.

23        So, it's your understanding this court has

24  ruled that plaintiffs fabricated documents?  Is that

01:25PM  25  your understanding?

Motion Hearing 7-12-2017

127

A.     The plaintiffs produced fabricated documents that

were not reflective of original --

            MR. STECKLER:  Objection.

BY MR. STECKLER:

01:25PM  Q.     Counsel, if I may, please listen to my question.

            Has a court in this case ruled that defendants

fabricated documents -- that plaintiffs -- excuse me.  I

keep mixing my -- let me withdraw the question.  It's

very simple.

01:26PM            MR. SCHWEGMANN:  May I short-circuit it just

by saying that the court, Mazzant, made a written ruling

on this issue that your Honor can peruse on PACER at your

leisure?  I'm not sure what his understanding is relevant

to when the court can just read the court's opinion on

01:26PM  the issue.

            MR. STECKLER:  Well, he seems to --

A.     I'll defer to the order.

BY MR. STECKLER:

Q.     Thank you.  Because you seem to have a

01:26PM  misimpression that the court's ruled there's a

fabrication, and I suggest that you take a look at the

public documents.

            But regardless, you're aware that if you click

on the DISF website, a sample petition comes up, correct?

01:26PM  Do you know that as their lawyer?

Motion Hearing 7-12-2017

128

A.    When you say "the DISF website," you've referred

to multiple different --

Q.    I'm referring to the one that we just looked at

right here that's sitting right in front of you, sir.

01:26PM  A.    Okay.  And again, to be clear, this is a local

file on --

Q.    I'm asking you a question --

A.    -- not a website --

       MR. STECKLER:  Your Honor?

01:26PM        THE COURT:  Sir, he's no longer asking you

about the exhibit, what's been marked as Exhibit 14.  I

think the question generally is now just about the

website.

A.    I'm generally aware that on Diamond Doctor Victim

01:27PM  Fund, for each listed customer that bought one of the

suspect diamonds, they could click, just like on

LegalZoom, and have a tailored petition specific to their

transaction available for download.

BY MR. STECKLER:

01:27PM  Q.    Did you draft the petition?

A.    No.  My understanding is that these are based on

the nine lawsuits that have been filed against Diamond

Doctor by other consumers.

Q.    Well, hold on.  The nine lawsuits, they're being

01:27PM  represented by your co-conspirator Mark Hammervold,

Motion Hearing 7-12-2017

129

 1  aren't they?

 2           MR. SCHWEGMANN:  Objection, your Honor.

 3  Co-conspirator Mark Hammervold -- I guess I'll say it

 4  assumes facts not in evidence.

01:28PM   5           THE COURT:  Overruled.

 6  A.    Those individuals are represented by an attorney

 7  that is not me and is not with my law firm.

 8  BY MR. STECKLER:

 9  Q.    Those individuals are represented by Mark

01:28PM  10  Hammervold, correct?

11  A.    And I believe another --

12  Q.    Is that correct?

13  A.    -- Texas lawyer --

14  Q.    Is that correct?

01:28PM  15  A.    Yes, and another Texas lawyer --

16  Q.    Excuse me.  I asked you a --

17           THE COURT:  Sir, just answer the questions.

18  BY MR. STECKLER:

19  Q.    Are they represented by Mark Hammervold?

01:28PM  20  A.    To my knowledge.

21  Q.    You worked with Mark Hammervold at a law firm in

22  Tennessee, correct?

23  A.    Yes.

24  Q.    You sent clients to Mark Hammervold, correct?

01:28PM  25  A.    Frequently, yes.

Motion Hearing 7-12-2017

130

1   Q.    You sent nine clients to Mark Hammervold to sue

2   Diamond Doctor, correct?

3   A.    No.

4   Q.    You've never sent clients to Mark Hammervold

01:28PM  5   against Diamond Doctor -- to sue Diamond Doctor, correct?

6   A.    That wasn't my testimony.

7   Q.    Well, what is your testimony?  Did you send

8   clients to Mark Hammervold to file suits against Diamond

9   Doctor or not?

01:28PM  10  A.    We've referred clients to Mark Hammervold.

11  Q.    To sue Diamond Doctor, sir?

12  A.    We refer clients --

13  Q.    Excuse me.  If --

14  A.    If you'll let me finish.

01:29PM  15        MR. SCHWEGMANN:  You have to let him answer.

16        MR. STECKLER:  I understand.  The question is

17  simple.  It's a yes or no.

18  BY MR. STECKLER:

19  Q.    Did you refer clients to Mark Hammervold to sue

01:29PM  20  Diamond Doctor or not?

21  A.    Sir, we refer clients who have potential cases

22  against Diamond Doctor.  It's not -- we don't elect

23  whether to file the suits.  Sometimes Mark Hammervold

24  chooses to based on the facts and his investigation, and

01:29PM  25  sometimes he doesn't.

Q.    So, the answer is yes, you have referred clients

to Mark Hammervold for cases against the Diamond Doctor,

correct?

A.    For which he has filed suit, yes.

01:29PM  Q.    Right.  And, in fact, if we -- let me hand you --

            MR. STECKLER:  Did we offer 14?

            THE COURT:  Well, 14 was not offered; but

something has been marked as 14.

            MR. STECKLER:  Your Honor, for a little

01:29PM  housecleaning, I would like to offer -- I don't know if

I've offered any of the other ones there.  I did not

offer the e-mail.

            MR. SCHWEGMANN:  Correct.  And I object to 14

because he never laid a proper foundation for it.

01:30PM            THE COURT:  Well, now, hold on.  13 was the

web -- the Victim Fund website.  That's admitted.

            MR. SCHWEGMANN:  No objection.

            THE COURT:  12 was the e-mail that --

            MR. STECKLER:  We never offered.

01:30PM            THE COURT:  -- is not going to be admitted.

            13 is the petition which is not going to be

admitted -- no, 14 is the petition which is not going to

be admitted.  So, you're on 15 now.

            MR. STECKLER:  Okay.

01:30PM            MR. SCHWEGMANN:  He hasn't seen 15 yet, as far

Motion Hearing 7-12-2017

132

```
              1  as I know.

              2             MR. STECKLER:  He hasn't seen 15.

              3             THE COURT:  Right.

              4  BY MR. STECKLER:

01:30PM       5  Q.    Let me ask you a question about 14.  Does that

              6  appear to be similar to the petitions that were on the

              7  DISF website?

              8  A.    Yes, it appears to be similar.

              9  Q.    Okay.

01:30PM      10  A.    I don't know if --

             11  Q.    Anything in there that appears to be different to

             12  you?

             13  A.    The typeface is different throughout.  And again,

             14  I'm not familiar personally with each of these petitions.

01:31PM      15  I doubt -- I know that I've never read this before.

             16  Q.    It's a pro se petition; is that right?

             17             If you'll go to the last page.  It will clear

             18  things up quickly if you look at the last page.

             19  A.    It's drafted as a pro se petition.  I mean, I

01:31PM      20  assume Matan Abehasira is not a lawyer; but the person is

             21  listed as both the plaintiff and who is signing it.

             22  Q.    Well, on that website that clicked into petitions,

             23  it doesn't say whether they're lawyers or not, right?  It

             24  doesn't say "esquire" after names, does it?

01:31PM      25  A.    No, not that I've seen.
```

133

```
 1   Q.    But you're aware that this website that your
 2   client who lives in Italy set up against Diamond Doctor
 3   does have a link to click on to petitions, right?
 4   A.    Yes.  Individuals can click on -- it says
 5   "Complaint."
 6   Q.    Well, if you look, it says, "Downloading and
 7   filing a custom complaint generated specifically for
 8   you."  It's bolded right on our computer screen, right?
 9   A.    Sure.  Yes, I see that.
10   Q.    And that's what you're aware was going on, right?
11   A.    Yes.  You could also represent yourself by
12   downloading and filing the custom complaint generated
13   specifically for you and your purchase.
14            MR. STECKLER:  May I approach again?
15            THE COURT:  Yes.
16            MR. STECKLER:  This will be number --
17            THE COURT:  15.
18            MR. STECKLER:  -- 15.  I am the worst at
19   numbers, and I apologize.
20            MR. SCHWEGMANN:  I'm sorry.  What was the
21   question?
22            MR. STECKLER:  Any objection to that?  It's a
23   file stamped copy of the Kelly Dane --
24            MR. SCHWEGMANN:  No objection.
25            MR. STECKLER:  Okay.  We would like to offer
```

01:32PM  5
01:32PM 10
01:32PM 15
01:32PM 20
01:33PM 25

Tonya B. Jackson, RPR-CRR
409.654.2833

134

1    this as an exhibit, your Honor.

2              MR. SCHWEGMANN:  No objection, your Honor.

3              THE COURT:  All right.  It's admitted as

4    Exhibit 15.

01:33PM  5    BY MR. STECKLER:

6    Q.    If you look at the petition in front of you, this

7    Kelly Dane petition, at the bottom it's submitted -- the

8    name is Mark Hammervold, correct, as well as --

9    A.    I see a William C. Dippel.

01:33PM  10   Q.    Look below that.

11   A.    Yes.

12   Q.    Yeah.

13   A.    Mark Hammervold, with a PHV admission forthcoming.

14   Q.    Was Kelly Dane one of the people that you referred

01:33PM  15   to Mr. Hammervold?  Do you know?

16   A.    Yes, he was.

17   Q.    Okay.  And Mr. Hammervold worked with you in

18   Tennessee at a law firm?

19   A.    Worked with -- I interviewed him at Vanderbilt,

01:34PM  20   hired him at that law firm; and then we were co-counsel

21   on a lot of health care litigation and medical

22   malpractice cases.  So, not just worked.  We continue to

23   work together in a number of cases.

24   Q.    You refer him all your diamond cases?

01:34PM  25   A.    Not all of them.

135

1  Q.    So, which diamond cases are you actively filing

2  right now?

3  A.    We've probably accepted a dozen.

4  Q.    No, no, that you're counsel of record.  How many

01:34PM  5  do you have on file right now that you're counsel of

6  record?

7  A.    I don't know the answer to that specifically.  The

8  vast majority of them never get filed.  So, if you're

9  asking about diamonds matters --

01:34PM  10  Q.    No.  I'm asking:  How many cases are you counsel

11  of record on filed in the United States?

12  A.    I don't recall if --

13  Q.    Greater than zero?

14  A.    Yes, I believe so.

01:34PM  15  Q.    Less than five?

16  A.    I believe it's less than five currently filed, but

17  I would have to check.  I know at least one settled

18  recently.

19  Q.    Okay.  Will you tell me, other than the name of

01:35PM  20  the plaintiff in the plaintiff's original petition, the

21  difference between your co-defendant, Mr. Hammervold's

22  original compliant with Kelly Dane and the one that you

23  click on the DISF website?  Can you just tell me where

24  the two are different --

01:35PM  25  A.    It's --

136

1  Q.      -- other than the plaintiff's names?

2  A.      -- different defendants.  Leslie Greco is a

3  defendant in this one with Kelly Dane.

4  Q.    Right.  I'm sorry.  I didn't mean -- in the body

01:35PM  5  of it, yeah.  Go ahead.

6          Well, let's go to -- discovery control plan

7  appears to be the exact same language on No. 1, correct?

8  A.    If you want me to read the whole thing, I'm happy

9  to do it; but you're going to have to give me the time.

01:36PM  10          MR. SCHWEGMANN:  Your Honor, I'll just object

11  for the record.  Relevance.

12          THE COURT:  I think your time might be better

13  spent --

14          MR. STECKLER:  Yes, I think that's probably

01:36PM  15  correct.

16  BY MR. STECKLER:

17  Q.    When was the last time you spoke to Felipe De Mase

18  or whatever?  I apologize for butchering the name.

19  A.      Within the last week.

01:36PM  20  Q.    And how do you communicate?

21  A.      Generally by phone.

22  Q.    Do you also communicate with him by e-mail?

23  A.      I have.

24  Q.    And is he the one that controls the three websites

01:36PM  25  *suedavidblank.com*, *ddvictimfund.com*, and *ddtaxfraud.com*?

Motion Hearing 7-12-2017

137

A.      No.

Q.      Who does?

A.      The DISF.

Q.      Well, if he is in Italy, how is that decision

01:36PM  made?

A.      How is what decision made?

Q.      As to what to put up, what not to put up, and when

to put it up?  Who does that for him?  He does it from

Italy?

01:37PM  A.      You would have to ask him or the DISF.

Q.      I see.

         MR. STECKLER:  Your Honor, is there a

possibility we could have the communications between

Mr. Manookian and Felipe De Mase reviewed *in camera*?

01:37PM          MR. SCHWEGMANN:  Your Honor, again I'm

hamstrung because I'm standing here protecting a

privilege not between myself and my client Mr. Manookian

but the privilege between Mr. Manookian and a party not

in the courtroom or even a party to this case.  I mean,

01:37PM  the fact of the matter is if he wants that, there's a

proper --

         THE WITNESS:  I can speak to it as the

attorney --

         THE COURT:  Let me just say it seems to me

01:37PM  that somehow the court is going to get to the bottom of

01:38PM

 1  where this information is coming from and how it's being

 2  used, and you can't take the positions that no one can

 3  answer the questions.  That's not sufficient.  So, if you

 4  want to answer the questions now, you can.  I mean, is

 5  that what you're willing to do?

 6                  THE WITNESS:  I can't waive privilege for my

 7  client.  I've already accepted a subpoena on their

 8  behalf.  When they came to the office and the process

 9  server called me, I called him back right away and said,

10  "Come meet me back there.  I'll get it."  And, so, my

11  understanding of how this is supposed to work is -- DISF

12  is in Tennessee.  They've served the subpoena in

13  Tennessee.  We moved to quash based on the fact that it

14  called for a deposition three days later with a huge

15  number of topics.  It just wasn't possible.

16                  And, so, DISF is subject to subpoena in

17  Tennessee; and these questions directly posed to

18  Mr. De Mase or a corporate representative are not going

19  to be covered by privilege.  So, the -- that's what we've

20  said all along, is you need to ask them the questions.

21  There's not an effort to shield it or hide it, but I'm

22  not the one to answer it.

23                  MR. STECKLER:  Who --

24                  THE COURT:  Who is "them"?

25                  THE WITNESS:  The DISF or Felipe De Mase,

whoever they choose as the corporate rep.  For example,
of the 26 topics, some of them are highly technical
things about a website that I suspect Mr. De Mase is not
the representative to testify to.  So, because they chose

01:39PM    so many specific and very broad, as they can, topics,
there may be different individuals to testify to each of
them.  But the process is by subpoenaing them there.
That's why I'm the registered agent.  I accepted the
subpoena and will produce them, and they will give the

01:39PM    testimony.

THE COURT:  All right.  Well, instead of
filing a motion to quash, as you know, you could have
reached out to counsel and tried to reach an agreeable
date.  You didn't do that.  By what date could you have a

01:40PM    representative available to answer the questions on the
topics that they have set forth?

THE WITNESS:  I can't tell you that from this
stand.  I can agree to do it promptly and expeditiously
with the client.  I'm getting married on Saturday and

01:40PM    then I'll be off for a little bit, but I can arrange for
another attorney to represent them in a deposition, if
that speeds it along.  But there's no effort to either
hide it or delay it and we can do it quickly, but I can't
give an answer that they'll be available on July 20th as

01:40PM    I sit here right now.  But I'll agree to work with

Motion Hearing 7-12-2017

140

 1  Mr. Steckler to identify that date.

 2  BY MR. STECKLER:

 3  Q.    Who other than Mr. De Mase is affiliated with

 4  DISF?

01:40PM  5  A.    I don't know.  And I don't know what you mean by

 6  "affiliated."

 7  Q.    Who other than Mr. De Mase that you're aware of as

 8  you sit here today has a relationship or any sort of

 9  position within the nonprofit that you set up as their

01:41PM 10  lawyer?

11  A.    I'm not aware of anyone else that has a seat on

12  the board of directors or an official position.

13  Q.    So, the only one you're aware of -- there's you

14  that's the lawyer for DISF and Felipe De Mase is the only

01:41PM 15  other person that you're aware of that has any sort of

16  position, title, relationship with DISF?

17  A.    I don't know about relationship.  That's the only

18  person that I know that speaks for the DISF.

19  Q.    I understand.  But in your capacity as the lawyer,

01:41PM 20  do you know of any other employees of DISF?

21  A.    No.  It's a nonprofit.  I'm not aware that it has

22  any employees.

23  Q.    Do you know anybody that works for DISF?

24  A.    No.

01:42PM 25  Q.    Do you know anyone on the board of directors of

Motion Hearing 7-12-2017

141

1   DISF?

2   A.     I only know the director.

3   Q.     Do you know any representatives of DISF, someone

4   that represents them in other matters?

01:42PM   5   A.     I represent them as their attorney.

6   Q.     Other than you, anybody else?

7   A.     No, sir.

8   Q.     Okay.  And let me ask you this:  Do you know who

9   funds the DISF?

01:42PM   10   A.     Felipe De Mase.

11   Q.     Okay.  He personally funds it?

12   A.     That's my knowledge, yes.

13   Q.     Okay.  Are there any other relationships between

14   DISF and the Cummings Manookian law firm?

01:42PM   15   A.     Registered agent and then I'm representing them

16   with respect to the subpoena that you sent.

17   Q.     Yeah.  And I take it you had no problem with the

18   DISF website having links to your website on their

19   website.

01:42PM   20   A.     No, not at all.

21   Q.     And --

22   A.     I mean, there's a link on there to I think the

23   article that quotes Mr. Blank extensively about shutting

24   down his business.  I mean, the --

01:43PM   25   Q.     No, no.  I'm just asking you about your law firm.

Motion Hearing 7-12-2017

142

1  There's a link on DISF's website to your law firm.  You

2  have no problem with that?

3  A.     No, no problem.

4  Q.     Okay.  And your law firm website has a link to

01:43PM  5  DISF; isn't that right?

6  A.     I don't believe that's true.  I'm not --

7  Q.     Well, let's just play it again from --

8  A.     Again, I see you playing a video.  I don't know

9  that to be correct.

01:43PM  10  Q.     Well, let's just look at it again.  I'm going to

11  show it.

12  A.     I know that that site is live.  You could go to

13  the site right now and just check it.

14  Q.     How do you know it's live?

01:43PM  15  A.     My site?  The Cummings Manookian site?

16  Q.     No.

17  A.     You're clicking on the Cummings Manookian site to

18  go to the DISF site.  So, I --

19  Q.     No.  I understand.  This was captured at a time --

01:44PM  20  we tried to recreate this before the hearing today, and

21  for some reason it just didn't work today.  Do you know

22  why?

23  A.     Well, for some reason it just did work on that

24  video.  I don't know the answer to that either,

01:44PM  25  Mr. Steckler.

Motion Hearing 7-12-2017

143

1  Q.     You have no problem, though, with your website

2  linking to DISF website?

3  A.     It doesn't link to the DISF website.

4  Q.     Did it at any point in time that you --

01:44PM  5  A.     No, not that I'm aware of.  That's the first that

6  I have ever seen of that.

7  Q.     Okay.  How were the 175 people contacted?  Voice

8  messages left, how did that happen?

9  A.     You mean in what manner?

01:44PM 10  Q.     Yeah.  I'm -- would you like your declaration?

11  A.     No.  I'm trying to determine if you're asking how

12  they were selected, which I believe would be something

13  you need to ask the DISF, versus functionally what

14  technical process was used to contact them, which I don't

01:45PM 15  think would be privileged.

16  Q.     Okay.  So, you don't know how the -- you know 175

17  people were contacted?

18  A.     Yes, I'm aware of that.

19  Q.     You just don't know how that happened?

01:45PM 20  A.     No, I do know how that happened.

21  Q.     How did it happen?  How were they selected?

22  A.     That's privileged, and you need to ask the DISF

23  that.

24         If you're asking me functionally how they were

01:45PM 25  contacted, I don't think that's privileged.  They were

Tonya B. Jackson, RPR-CRR
409.654.2833

contacted through a process called "ringless voice mail."
It's not a robo-call in the sense that somebody is dialed
and they pick up the phone.

Q.    Were you familiar with the ringless voice mail

01:45PM    sent to the 175 people?

A.    I researched for the DISF the process of ringless
voice mail to ensure that it didn't violate any FTC
issues.  And, so, I was aware of the process; and that's
how I had knowledge of it.

01:46PM  Q.    So, you were also aware that the ringless voice
mails were going to customers of Diamond Doctor, right?

A.    175, yes.

Q.    Okay.  And who created the content for the DISF
websites?

01:46PM  A.    Who created the content?

Q.    Yes.

A.    I don't know.

Q.    You don't know?

A.    The DISF.

01:46PM  Q.    Okay.  Do you know why the language in the DISF
websites appears to be so similar to the language in the
websites that the Cummings Manookian law firm has put up?

A.    A lot of it is they're towards the same purpose,
which is informing a group of people that were defrauded

01:46PM  by Diamond Doctor about the ongoing fraud and --

Motion Hearing 7-12-2017

145

```
 1  Q.     Is it just coincidence?

 2  A.     Absolutely it's not coincidence.  The DISF is very

 3  aware of our website.

 4  Q.     Of course they are because you're their lawyer,

 5  right?

 6              Who is in charge of editing DISF websites?

 7  A.     The DISF.

 8  Q.     Who?  Who at the DISF?  Name.  I need a name.

 9  A.     I don't know.

10  Q.     Okay.  Who edits the Cummings Manookian websites?

11  A.     There are a number of Cummings Manookian websites.

12  Q.     I know.  Who edits them?

13  A.     Well, Mr. Cummings and myself edited our firm's

14  websites.  He did his bio; I did mine.

15  Q.     Who else?

16  A.     For our firm's website?

17  Q.     Well, you've got websites.  You've got a Diamond

18  lawsuit website.  We looked at that because here -- here

19  we have this website, *diamonddoctorlawsuit*.  We have --

20  *www.diamonddoctorclassaction* website you have.  You have

21  websites against Mr. Mervis in Maryland, right?

22  A.     Yes.

23  Q.     So, who edits all of these websites that you-all

24  control?

25  A.     I write the vast majority of the content for our
```

01:47PM (line 5)
01:47PM (line 10)
01:47PM (line 15)
01:47PM (line 20)
01:48PM (line 25)

Motion Hearing 7-12-2017

146

1   websites.  We have a lot of websites.  We have websites

2   dedicated to medical malpractice --

3   Q.    I'm not asking about all the different websites.

4   A.    You need to be specific about the one you're

01:48PM   5   asking me about --

6   Q.    All of them.

7   A.    -- because the answer is different --

8   Q.    All of them.  Who are the people --

9   A.    It's not one person who edits all of them.  I do

01:48PM   10   some of them --

11   Q.    You're a two-man law firm, correct?

12   A.    Correct.

13   Q.    Okay.  So, you've named the two of you.  And I

14   would like to know:  Who is the web designer involved in

01:48PM   15   your websites?

16   A.    In --

17   Q.    Yes.

18   A.    They're different web designers.

19   Q.    Who are they?  I'd like the names of your

01:48PM   20   different web designers you use.

21   A.    So, I coded personally our home page

22   *cmtriallawyers*.

23   Q.    Okay.  Who else?

24   A.    Well, I mean --

01:49PM   25   Q.    You said you, Mr. Manookian.

Motion Hearing 7-12-2017

147

1          Sir, I just want the names of different people

2   or different companies you've used on your websites.

3   A.     WordPress is who I use for the back end on my

4   website.  The theme that I use, the company is Avada,

01:49PM  5   A-V-A-D-A.

6   Q.     What about Hilex SEO?  Do you use them?

7   A.     We've used them for search engine optimization.

8   Q.     Okay.  Do you use them for your web design or

9   websites?

01:49PM  10  A.     No.  I primarily do the actual design and coding.

11  Q.     Okay.  And did you ever do the design and coding

12  for any DISF website?

13  A.     No.

14  Q.     You did not.

01:49PM  15  A.     Did I do the design and coding for it?

16  Q.     Yes.

17  A.     No, I did not.

18  Q.     Do you know who did it?

19  A.     The DISF.

01:49PM  20  Q.     Who?  Is Mr. Felipe De Mase an expert in coding

21  and web design?

22  A.     You're going to need to ask him or the DISF that.

23  Q.     Okay.  Did you review the content as lawyer -- I'm

24  asking if you reviewed it.  I don't want to know your

01:50PM  25  conversations.  Did you review the content of the DISF

Motion Hearing 7-12-2017

148

1  websites with Mr. De Mase to determine whether they were

2  in compliance with the law, just like the robo-calls -- I

3  call them robo-calls.  You had some fancy name.  Do you

4  do that?

01:50PM  5  A.    Are you asking me what legal work I did on behalf

6  of Mr. De Mase?

7  Q.    Yes.

8  A.    I've reviewed the websites, yes.

9  Q.    And do you review the content for --

01:50PM  10  A.    Yes --

11  Q.    -- for him?

12  A.    -- I review the content on the websites.

13  Q.    And give him legal opinions on it?

14  A.    Yes, I've rendered legal opinions on it.

01:50PM  15  Q.    Do you edit and modify them for him?

16  A.    No.

17  Q.    You've never done that?

18  A.    No.

19  Q.    Okay.  And you're aware, though, that he's linking

01:50PM  20  to your websites, though, correct?

21  A.    I'm aware of --

22  Q.    Who implements your --

23        THE COURT:  Wait, wait.  Let him answer.

24        MR. STECKLER:  I'm sorry.  I thought he

01:51PM  25  finished.

149

A.      I'm aware of the link on the *ddvictimfund.com*

website.  I don't know of a link on *ddtaxfraud.com*; and

I'm not familiar with the content on the third website,

as to whether there's a link or not.  There either is or

01:51PM  there isn't, and I'll defer to what's on there.

THE COURT:  I have a couple of questions

that -- I'm going to interrupt Mr. Steckler just because

of time.  The question that Mr. Steckler asked you was

are you aware of the link on the Victim Fund website.

01:51PM  My question is:  Did you give permission to

Mr. De Mase for the link to your law firm website to be

on the Victim Fund website?

THE WITNESS:  I don't know if we talked about

it ahead of time but I definitely approved of it and I

01:51PM  would have ratified it.  I thought that -- I think our

website does a really good job of explaining what is

diamond overgrading.  There's, you know, videos and

things like that.  So, I thought that's a good way to

encapsulate this.  So, I don't recall if I gave him

01:52PM  permission ahead of time but I definitely approved of it

and I approve of it.

THE COURT:  Did you -- I know Mr. Steckler

asked you a question about whether you reviewed

information on these three websites that are at issue

01:52PM  today.  My question is a little bit different.  Did you

150

1    provide any of the information on any of these three

2    websites?

3              THE WITNESS:  Not the content about customers,

4    prices, or things like that.  There are parts of the

01:53PM  5    third site that are almost identical to our site.  So, in

6    that sense, you know, I would have been the original

7    author when I wrote that a year and a half -- or back in

8    October of 2015.

9              THE COURT:  What about the websites that

01:53PM 10    contain the -- where you can click on both the

11    "declaration" tab as well as the "petition" tab?  I think

12    you testified earlier that Mr. De Mase is not a lawyer.

13    So, I -- I think Mr. Steckler may have asked the

14    question.  I'm not clear on who provided that

01:53PM 15    information.

16              THE WITNESS:  So, this is my understanding.

17    The lawsuits that Mark Hammervold and Bill Dippel filed,

18    the nine lawsuits on behalf of the consumers, largely

19    used the same template.  And, so, for the boilerplate

01:54PM 20    allegations and the background allegations, my

21    understanding is the petitions on the website plug in

22    those customers' specific information into template

23    petitions that were already filed in Dallas County.

24              THE COURT:  But who drafted the templates of

01:54PM 25    the declaration and the petition that are on the website?

1          THE WITNESS:  I mean, in a literal sense it

2  would have been William Kenneth Dippel and Mark

3  Hammervold.

4          THE COURT:  And how is it that their templates

01:54PM  5  are on DISF websites?

6          THE WITNESS:  They selected those because it's

7  the exact same causes of action and series of background

8  facts to which the transactional facts fit in.  It's

9  almost like a template will or sales contract on

01:55PM  10  LegalZoom.

11          THE COURT:  Are you the one that gave the

12  approval to Mr. Hammervold to allow him to put his

13  templates for the declaration and petition on the DISF

14  websites?

01:55PM  15          THE WITNESS:  Did I approve -- give

16  Mr. Hammervold approval?

17          THE COURT:  I haven't heard any association

18  that you've testified about between Mr. Hammervold and

19  DISF.  So, I'm trying to figure out how it is that his

01:55PM  20  templates --

21          THE WITNESS:  I understand.  His complaints

22  are publicly filed.  They're posted on a number of places

23  on the Internet.  They were covered by National

24  Jeweler --

01:55PM  25          THE COURT:  But there is a template for every

1    single customer that's listed on the website.

2              THE WITNESS:  Exact same petition every single

3    time, but it fills in a different --

4              THE COURT:  I understand.

01:55PM    5              THE WITNESS:  It's like a mail merge document.

6              THE COURT:  I understand.  Who made the

7    decision -- who had the authority to put that template

8    onto this website?  If you know.

9              THE WITNESS:  The DISF.  I don't know that

01:56PM   10    Mark Hammervold had any --

11              THE COURT:  But the DISF -- you keep saying

12    that.  Someone had to make the decision on behalf of

13    DISF.  Who made the decision?

14              THE WITNESS:  Felipe De Mase.

01:56PM   15              THE COURT:  All right.  And my last question

16    is:  Were you involved in the selection of the 175

17    customers that were contacted?

18              THE WITNESS:  I gave parameters that I thought

19    would be people who should be contacted, but I didn't

01:56PM   20    select individuals.  So, I said things like, "Don't

21    contact" -- "it's pointless to contact anyone who bought

22    a GIA diamond.  They wouldn't be subject to the fraud

23    issue.  You need to look for people who bought EGL-I and

24    generally look for people who bought of a certain --

01:57PM   25    higher than a certain carat weight and in a certain color

Motion Hearing 7-12-2017

153

1   range."  So, I helped tailor parameters for it.  I didn't

2   pick individual customers.

3              THE COURT:  And you gave those parameters to

4   Mr. De Mase?

01:57PM   5              THE WITNESS:  Correct.

6              THE COURT:  And what was the purpose of

7   contacting these 175 customers?

8              THE WITNESS:  Well, it's the same thing as on

9   the Victim Fund site.  It's -- the vast majority of these

01:57PM  10   people still have no clue that their diamond isn't what

11   it was represented to be.  And, so, the first step when

12   they find that out -- when you tell somebody "That

13   diamond is not a G," they generally -- they want some

14   type of third-party authority on it; and that is the GIA.

01:58PM  15   That's the Bible of diamond grading.  And rather than

16   send them to an appraiser in Dallas who might have a

17   competitive motive to talk badly about Diamond Doctor or

18   David Blank or Bachendorf's who might have years of

19   animus towards David Blank or Diamond Doctor, it's -- you

01:58PM  20   send it to the GIA.  It's a nonprofit, and they grade it

21   objectively.  So, it's to call them and offer to have the

22   diamond objectively graded by the GIA at cost to the

23   Victim Fund.

24              THE COURT:  Let me ask you this.  I note that

01:58PM  25   DISF was incorporated in May of 2017; so, fairly

1  recently.  And there's been three websites all that are

2  directed specifically at customers of Diamond Doctor.

3  Are there any other websites that are directed at other

4  companies like Diamond Doctor?

01:59PM  5          THE WITNESS:  Not that I'm aware of.

6          THE COURT:  All right.

7          MR. STECKLER:  You just asked my last

8  question, your Honor.

9  BY MR. STECKLER:

01:59PM  10  Q.    Are you a defendant in any other lawsuit as you

11  sit here today?

12  A.    No.

13  Q.    Okay.

14          CROSS-EXAMINATION OF BRIAN MANOOKIAN

01:59PM  15  BY MR. SCHWEGMANN:

16  Q.    I don't have much time, and maybe I can cut to the

17  chase and just ask a few simple questions.

18          Mr. Manookian -- if you'll indulge me in

19  leading just briefly.  Is it fair to say, Mr. Manookian,

01:59PM  20  that my law firm has never provided you with any

21  discovery materials marked Attorneys' Eyes Only?

22  A.    That's correct.

23  Q.    Is it fair to say that you have never provided the

24  DISF with any information in this lawsuit marked

02:00PM  25  Attorneys' Eyes Only?

```
 1   A.     Correct.

 2   Q.     Is it fair to say that Mr. Manookian has never --

 3   I'm sorry -- Mr. Cummings, sitting over there, has never

 4   provided the DISF or anyone else with any information

 5   marked Attorneys' Eyes Only in this lawsuit?

 6   A.     Correct.

 7   Q.     Is it fair to say that you've never provided

 8   discovery materials to the DISF?

 9   A.     Correct.

10   Q.     And as far as you know, is it fair to say that

11   Mr. Cummings has never provided discovery materials, as

12   that term is used in the protective order, to the DISF?

13   A.     Correct.

14   Q.     Quickly, you've testified that you spoke with

15   three individuals:  Lance Crosby, Jerry Myers, and

16   Michael Powell.  Do you recall --

17   A.     Michelle Powell.

18   Q.     I'm sorry.  Michelle Powell.

19          What was your purpose in contacting those

20   individuals?

21   A.     I wanted to know for a fact the basis for the

22   sales tax fraud allegations.  Lance Crosby bought an

23   850,000-dollar diamond and didn't pay a cent of sales

24   tax.

25          Jerry Myers had millions of dollars worth of
```

02:00PM (line 5)
02:00PM (line 10)
02:00PM (line 15)
02:00PM (line 20)
02:01PM (line 25)

156

transactions where it appeared Diamond Doctor would issue

an invoice with sales tax on it and then immediately

refund it so that he could have an invoice showing that

he paid sales tax and then he would buy it again without

02:01PM  it.  So, before that stuff went up on the Internet with

very serious allegations, I wanted to call these

individuals and ask them what they knew.

I've also been sued for defamation for calling

a fraud a fraud; and I want to investigate it the exact

02:01PM  same way these guys have called my former employers,

subpoenaed my college, my law school.  I want to ask the

questions and investigate it as well.

Q.    And during those communications with those

individuals, did you make any attempt at all to threaten

02:01PM  them?

A.    Absolutely not.  Jerry Myers told me he was out of

the country and his wife was sick and could he call me

back at a later date, and I could not have been nicer or

more polite.  The same thing happened with Michelle

02:02PM  Powell.  She asked me if I could call her back, and I

did -- or I did not call her back.  We just got off the

phone.  And Lance Crosby, I just left a voice mail for

him.

Q.    Did you make any attempt to intimidate them?

02:02PM  A.    No.

1  Q.    Do you know whether any of these three individuals

2  are on the witness list filed by the plaintiff today?

3  A.    I don't think that they are, including because I

4  believe all three of them made GIA purchases and not

02:02PM  5  EGL-I purchases.

6  Q.    All right.  Thank you.

7            MR. SCHWEGMANN:  I'll reserve the rest of my

8  questions depending on how this -- how we decide to do

9  this hearing.

02:02PM  10           THE COURT:  All right.

11           MR. STECKLER:  Your Honor, if I can, I don't

12  believe we offered the recording of the voice mail.  We

13  will provide you with a copy of that and mark that as

14  Exhibit 16 and offer it at this time.

02:02PM  15           THE COURT:  Any objection?

16           MR. SCHWEGMANN:  No objection.

17           THE COURT:  All right.  You may step down.

18           What's your hard stop time now for him?

19           Mr. Manookian, if you need to go, you can.

02:03PM  20           I want to ask counsel, before we conclude

21  today, to articulate what specific relief they are

22  requesting from the court because I will enter an order;

23  and, so, I'd like to hear from each of you specifically

24  what relief you are requesting at this time.

02:03PM  25           MR. SCHWEGMANN:  Your Honor, may they be

158

1    excused, my clients?

2              THE COURT:  Yes.

3              MR. SCHWEGMANN:  Thank you, your Honor.

4              MR. JOHNSTON:  Your Honor, I am sensitive to

02:03PM  5    the court's dilemma with regard to the relief.  This is

6    an area where candidly the law has not kept up with the

7    technology; and if this is permitted, it's the new norm.

8    Every -- and I have a lot of respect for plaintiff

9    lawyers.  That's my group of people.  But every

02:04PM 10    plaintiff's lawyer with five and $10,000 on a big case

11    will be doing stuff like this.

12              We don't believe that the court can simply

13    enter an order striking pleadings right now.  Wish we

14    could.  I am inclined to simply request a monetary relief

02:04PM 15    for all of the expense of tracing through this, with then

16    an appendage to that that if it's not paid by a certain

17    date, the affirmative pleadings would be stricken.

18              I am still struggling with what to do with

19    this DISF stuff because we're never going to get any

02:05PM 20    discovery on that.  That's clear to me.  We have

21    Mr. Manookian who, by his testimony, knows nothing and

22    can name no one except a mystery man who doesn't speak

23    English, who isn't in this country, and may or may not be

24    in Italy or Argentina; and we're going to trial on

02:05PM 25    August 15th.  So, I am open to a creative solution by

159

this court as to what we do there with regard to

restrictions on evidence or the striking of evidence or

pleadings.

             But at a minimum, we think there is a

02:05PM  significant monetary penalty that is appropriate with

attorneys' fees and then a customized restriction and --

and if I may, I'll be happy to provide the court with

more detail of that customized idea tomorrow because

today is the first time I reached the conclusion that I'm

02:06PM  never going to know where that list came from.  It's --

everyone we talk to has a different story, and it's very

disturbing.

             THE COURT:  All right.  Counsel?

             MR. SCHWEGMANN:  Yes, your Honor.  My story

02:06PM  has been consistent.  My law firm and no one at my firm

has ever provided these clients with any Attorneys' Eyes

Only information ever.  And they've conceded that they

didn't even produce them to us until the 28th; and at

that, it was 100 names.

02:06PM              Look, your Honor, if what we're here about is

a discovery dispute, there's a way to do that.  It's

Rule 37.  They file a motion.  They say, "They didn't

answer this discovery"; and the court rules on the

objection.

02:06PM              If it's an injunction to take down some

Motion Hearing 7-12-2017

160

1    websites, there's a way to do that.  It's Rule 65 and we

2    have an injunction hearing and I raise a First Amendment

3    defense to the extent that it's appropriate and relates

4    to my client.

02:06PM    5          If it's a relief against DISF, there's a way

6    to do that; and that's in Tennessee, a court with the

7    proper jurisdiction and the proper party.

8          But what they've done is they've filed this

9    vague and amorphous brief that says, "We're unhappy about

02:07PM    10   what's happening and we just want some vague and

11   amorphous relief."  That's not how it works, your Honor.

12   We're going to trial on August 15th.  We've offered

13   deposition dates for Mr. Manookian and Mr. Cummings and

14   they can take that deposition and if based on what they

02:07PM    15   learn in that deposition --

16          THE COURT:  Well, whose deposition do you

17   propose that they take to get the information regarding

18   DISF?

19          MR. SCHWEGMANN:  We were in the -- I

02:07PM    20   personally don't know.

21          THE COURT:  I mean, you heard the testimony.

22   Whose deposition do you propose they take?

23          MR. SCHWEGMANN:  I don't know, but I sat here

24   and --

02:07PM    25          THE COURT:  I don't know either.

1        MR. SCHWEGMANN:  I looked at Mr. Manookian

2  while we were all present and here and said, "Can you

3  facilitate this?"  And he nodded in the affirmative.  I

4  mean, I think the court ought to hold him to that.

02:07PM  5        But I guess what I'm saying is I'm here not

6  defending the DISF which we made clear on May 23rd, again

7  on June 16th, and again on June 27th; and all this time

8  has elapsed since then before this was filed.

9        And I guess my point is, your Honor, I'm

02:08PM  10  trying to get ready for trial to defend the two

11  individuals in the law firm.  None of this stuff, as far

12  as I know, is being used as evidence in this case for

13  this trial.  I mean, if there's relief to be had against

14  the DISF, I think that can be done in Tennessee under

02:08PM  15  some kind of injunctive relief or a demand to take the

16  deposition.  Certainly it's a Tennessee entity and can be

17  subject to the jurisdiction there.  But I think this here

18  is a sideshow.  It's a distraction from what we're trying

19  to get to, this trial, where it will all be over at that

02:08PM  20  point.

21        THE COURT:  All right.  Well, I'm going to

22  disagree with you that it's a sideshow.  I have concerns

23  about the customer information.  I -- it's a mystery how

24  that information has been obtained apparently to

02:09PM  25  everyone, but I have concerns that it's up on these

162

1   websites that links to your clients' websites.  I think

2   that's a problem, and I think that's potentially a

3   violation of the protective order.

4           So, I also -- while I think it is permissible

02:09PM  5   for -- to contact customers for investigation purposes, I

6   think you have to be carful in terms of the language that

7   is used when you are making those contacts; and at least

8   what has been alleged I think is close to or crossing the

9   line.  So, I don't agree with you that this is a

02:09PM  10   sideshow.  But it's always my preference if parties can

11   work things out themselves, that they should do that; and

12   if they can't, then I will enter an order.

13           So, because I do agree with you,

14   Mr. Schwegmann, that at least at this point the relief

02:10PM  15   sought by plaintiffs is a bit vague -- and I think that's

16   in part because of the lack of information, and I think

17   some information was at least obtained today in the

18   hearing -- I'm going to -- let's see.  Today is the 12th.

19           Your client is getting married this weekend.

02:10PM  20   How long is he out?  Do you know?

21           MR. SCHWEGMANN:  Do you know, Mr. Correa?

22           I believe it's a week, your Honor.

23           THE COURT:  All right.  Well, I'm going to

24   give you until Friday to confer with each other, try to

02:10PM  25   reach an agreement on a deposition for someone in the

163

1  very near future that is satisfactory to plaintiffs on

2  behalf of DISF; and if no agreement is reached by the end

3  of the week, then plaintiffs can file additional briefing

4  and -- on what specific relief that are requesting.

02:11PM  5          I think -- assuming that a timely deposition

6  for DISF occurs, then I would withhold ruling on customer

7  information and other issues in this case until after

8  that deposition, as I would anticipate additional filings

9  on this issue from plaintiffs.

02:12PM  10          MR. SCHWEGMANN:  Your Honor, Mr. Johnston has

11  raised this issue of counsel for plaintiffs potentially

12  violating disciplinary rules by contacting Mr. Manookian

13  directly because he represents the DISF.  Could I give

14  them that permission or -- so there's no concern?

02:13PM  15          As I said before, I don't have authority for

16  the DISF.  I don't represent them.  I'm not sure I can

17  confer for them.  You heard today that Mr. Manookian is

18  their lawyer, their counsel.  He even said on the stand

19  that if he is on his honeymoon, that he would facilitate

02:13PM  20  that deposition via a different lawyer.  Can I give them

21  some comfort that they can reach out to Mr. Manookian on

22  this directly for that purpose, that conference?

23          THE COURT:  You can, although you certainly

24  can talk to your client as -- I realize that you don't

02:13PM  25  represent DISF, but certainly there are issues that cross

164

1   over into this case wherein you do represent him.

2              MR. SCHWEGMANN:  I have no earthly idea how to

3   reach Mr. De Mase.  I don't know -- I've never spoken to

4   the man.  I don't represent him.  Manookian clearly has.

02:14PM   5   He's offered to --

6              THE COURT:  Right, I understand that.

7              MR. SCHWEGMANN:  My only point is I will make

8   someone from my office available to attend that

9   deposition on whatever date it's held.  All I want to do

02:14PM   10  is give them some comfort that I'm not going to raise any

11  disciplinary violation by them coordinating that

12  deposition with Mr. Manookian directly, who does speak

13  with him and who said on the stand he would facilitate

14  and coordinate that even if he's out.

02:14PM   15             THE COURT:  Mr. Johnston, do you want to say

16  anything?

17             MR. JOHNSTON:  I'm -- you know, I'm fine with

18  being relieved of the threat of an ethical violation for

19  contacting Mr. Manookian directly.  I still don't know

02:14PM   20  how that can be done, quite candidly, when we're talking

21  about that in the context of a ruling in this court and

22  adverse consequences if we can't make an appropriate

23  arrangement that will affect his client on which he is

24  entitled to participate.  But I'll do it without him if

02:15PM   25  that's what he's suggesting.

1              MR. SCHWEGMANN:  I am very careful; and the

2    last thing I want to do for myself, for Mr. Correa, or

3    for my law firm is violate an order of this court.  And I

4    guess I'm doing my best to say that if there's a

02:15PM  5    conference requirement, I will of course participate; and

6    I will, as I said, make an attorney appear at whatever

7    day that deposition occurs.

8              My only concern is I'm between a rock and a

9    hard place.  We've said as early and as often as we can I

02:15PM  10    don't have authority for DISF.  It's putting us in a very

11    difficult position; and as a result, all I'm trying to

12    say is you guys coordinate with the lawyer for that

13    entity to get that deposition set.  We'll be there.

14              MR. JOHNSTON:  It sounds an awful lot like

02:15PM  15    shoving over responsibility onto me.

16              MR. SCHWEGMANN:  Look, I'll help facilitate

17    the conference.

18              THE COURT:  I think, with that said, it's

19    probably better that the court just issue an order.

02:16PM  20              MR. JOHNSTON:  I will suggest, your Honor, as

21    one of the possible -- and this may be before -- without

22    or after a deposition of DISF, which I candidly confess

23    to have zero confidence in the value of.  But one

24    possibility of relief is to prevent the defendants from

02:16PM  25    calling any customers as witnesses in the case because of

Motion Hearing 7-12-2017

166

02:17PM

their having polluted the customer base and the things
that they have done.  That, with the monetary sanction, I
suggest might be the appropriate remedy.  And as I said,
I'm happy to spend the night thinking about it and
provide the court with something in the morning, if you
would like, as well.

            THE COURT:  Well, I think there does need to
be, depending on what specific relief is sought by
plaintiffs, additional briefing on what is permitted by
courts.  For example, if the court were to order that
these other websites are -- you know, they're protected
by the First Amendment in terms of free speech, however,
the customer information shouldn't be on the websites and
needs to be taken down, I need briefing from the parties
on is that permissible, have other courts done that
before, because that to me seems like a reasonable remedy
in this case.  And, so, it would be helpful if you could
spend some time thinking about that, they could have a
chance to respond, and then the court can fashion an
order after that.

            MR. JOHNSTON:  I will, your Honor.  And I'll
set this out in the briefing as well, but let me be
clear.  Nowhere in our motion, contrary to
Mr. Schwegmann's understanding -- and I don't accept
blame for his misunderstanding this -- nowhere in our

Motion Hearing 7-12-2017

167

1    motion have we suggested anything approaching a prior

2    restraint and the striking of their ability to speak.

3    There is a First Amendment right, but there is a

4    consequence when you say certain things.  We have

02:18PM   5    defamation and libel and contempt of court.  So, we're

6    not asking for those to be taken down.  We'll live with

7    them.  We don't like them.  They're there.  We'll live

8    with them.  But there is a consequence to having violated

9    the discovery order, the protective order, the

02:18PM   10    interference, et cetera.  And that's what my response to

11    you, my additional briefing, will address.

12              THE COURT:  Okay.  All right.  I'm going to

13    issue an order regarding an expedited briefing schedule

14    for this issue, and I'll get that out by tomorrow.

02:19PM   15              MR. JOHNSTON:  Thank you, your Honor.

16              THE COURT:  Anything else before we adjourn?

17              MR. SCHWEGMANN:  No, your Honor.  Thank you

18    for your time.

19              THE COURT:  All right.  We'll stand in recess.

02:19PM   20              (Proceedings adjourned, 5:26 p.m.)

21                    **CERTIFICATION**

22        I certify that on this date, July 17, 2017, the
      foregoing is a correct transcript from the electronic
23    sound recording of the proceedings in the above-entitled
      matter.

24

25    _____
                   TONYA JACKSON, RPR-CRR