IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

DIAMOND CONSORTIUM, INC. d/b/a §
THE DIAMOND DOCTOR and §
DAVID BLANK, §
§
  Plaintiffs, §
§
v. §    Case No. 4:16CV94-ALM
§
BRIAN MANOOKIAN, CUMMINGS §
MANOOKIAN, PLC, and BRIAN §
CUMMINGS, §
§
  Defendants. §

## OPINION AND ORDER REGARDING SANCTIONS

Pending before the Court is Plaintiffs' Emergency Motion for Order to Show Cause

(Potential Contempt of Court and Sanctions) (the "Emergency Motion") (Dkt. 269), the motion

having been referred to the undersigned pursuant to 28 U.S.C. § 636 (*see* Dkt. 288). Having

considered the motion, as well as the responsive briefing thereto, and the evidence adduced

during the Show Cause Hearing held on July 12, 2017, the Court is of the opinion that Plaintiffs'

Emergency Motion (Dkt. 269), as supplemented by their additional briefings (Dkts. 306 and

310), should be **GRANTED** in part and **DENIED** in part.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs filed their Emergency Motion on June 27, 2017, stating they became aware of a

Facebook advertisement sponsored by the Diamond Integrity Standards Foundation (the

"DISF"), three (3) websites administered by the DISF, the proactive publication of said websites

to witnesses and the press, and "robo-calls" targeting certain customers of Plaintiff Diamond

Consortium, Inc. d/b/a The Diamond Doctor's ("Diamond Doctor"). Records obtained by

Plaintiffs from the Tennessee Secretary of State show the DISF was incorporated by Defendant Brian Manookian ("Manookian") on May 4, 2017, and its registered agent is Defendant Cummings Manookian ("Cummings Manookian"). *See* Dkt. 271-2 (Sealed). It has also been established that the DISF's business address is the same as Cummings Manookian's address. *See* Dkt. 307, July 12, 2017, Hearing Transcript ("Hrg. Tr.") at 115:16-24.

In addition to asserting that the DISF is nothing more than an "alter ego" or "shell entity" controlled by Defendants (*see* Dkt. 310 at 1, 5), Plaintiffs allege Defendants have proactively publicized the DISF websites in an attempt to influence witnesses and improperly prejudice the jury pool against Plaintiff David Blank ("Blank").[1] *See* Dkt. 269.

Also at issue is how the DISF obtained Diamond Doctor's proprietary customer information—information which is arguably subject to the Court's Protective Order (*see* Dkt. 128). Diamond Doctor customer information, including customer names, contact information, and detailed purchase information, was published on the DISF websites and was also used to send solicitation emails and "robo-calls" to targeted Diamond Doctor customers. In addition, the DISF, or someone acting on its behalf, sent emails to the media and others, including Plaintiff Blank himself, alerting them to the DISF websites.

The primary issue before the Court, as articulated in Plaintiffs' Emergency Motion and clarified and/or amplified by the subsequent briefings, is whether the actions and activities attributed to the DISF were, in fact, orchestrated by Defendants to improperly influence witnesses and/or prejudice potential jurors, and whether the Court should impose sanctions for such actions.

---

[1]     Trial is set for August 15, 2017, and District Judge Amos Mazzant has explicitly stated the trial date will not be continued.

Plaintiffs' current pleading requests relief "in addition to the relief already requested" in their Emergency Motion, "including the award of reasonable and necessary attorney's fees." *See* Dkt. 310 at 8. However, the only relief specifically requested in the Emergency Motion is that the Court conduct a show cause hearing, which it has done. Plaintiffs did not specifically request attorney's fees in the Emergency Motion but have requested attorney's fees and expenses in their subsequent pleadings. *See* Dkts. 306 and 310. Thus, the Court will focus on the relief requested in Plaintiffs' current pleading (*see* Dkt. 310).

Plaintiffs ask the Court to impose sanctions against Defendants, pursuant to Rule 37(b)(2)(A)(i), (ii), and (vii), as follows:

(a) finding that the actions of DISF are the actions of Defendants for purposes of this lawsuit; (b) holding that Defendants are prohibited from calling as witnesses any former customers of Diamond Doctor; (c) holding that Defendants are prohibited from offering a substantial truth defense to Plaintiffs' defamation, libel and business disparagement claims; (d) sanctioning Defendants for Plaintiffs' costs and fees incurred in pursuing the Emergency Motion and related discovery; and (e) Defendants be fined for every day they fail to disclose how they obtained the Diamond Doctor customer lists and which customers received "ringless voicemails" or were otherwise contacted by the DISF.

Dkt. 310 at 2.

Plaintiffs also seek a finding that Defendant Manookian is in contempt of court by failing to comply with the Court's July 13, 2017, and July 14, 2017, Orders (Dkts. 300 and 305).

## A. THE DISF WEBSITES

### 1. The DD Victim Fund Website

On or about May 10, 2017, Plaintiffs became aware of a Facebook advertisement sponsored by the DISF with a reference to the DD Victim Fund Website, http://ddvictimfund.com/. *See* Dkt. 269. According to Plaintiffs, the site states the "Victim Fund" is administered by the DISF. The site invites visitors to "claim your award" and also provides a

long list of Diamond Doctor customer names, dates of purchase, purchase prices, and detailed information about their diamonds.[2] It then links to a form for a *"Pro Se* Petition" against Diamond Doctor. The site invites customers to submit a "Declaration," so a representative of the "Victim Fund" can contact them. Plaintiffs allege the site contains links to the Cummings Manookian website: www.diamondlawsuit.com/diamonddoctor/. Plaintiffs assert that although the DD Victim Fund Website has been down at times, it "reappears whenever strategically advantageous to Defendants in this lawsuit." *See* Dkt 269 at 2.

### 2. The DD Sales Tax Fraud Website

According to Plaintiffs, on June 19, 2017, Defendants' counsel, Andres Correa ("Correa"), sent Plaintiffs' counsel, Bruce Steckler ("Steckler"), an email stating Defendants had uncovered that Diamond Doctor had not paid sales taxes on certain in-state diamond sales. Subsequently, Steckler was made aware of the DD Sales Tax Fraud Website, www.ddtaxfraud.com. The site plays the Chris Isaak song, "Baby Did a Bad, Bad Thing" and displays an animated caricature of Plaintiff Blank behind prison bars, holding diamonds in one hand and dollar bills in the other. The website proclaims "IT'S TIME TO PUT NOTORIOUS FRAUDSTER DAVID BLANK BEHIND BARS," and alleges, "We now know that he was also perpetrating a massive tax fraud on the State of Texas and the citizens of Dallas."

The site lists partial names of Diamond Doctor's customers, along with purported purchase amounts, dates of purchase, and partial phone numbers. *See* Dkt. 269 at 4. Plaintiffs allege someone anonymously purchased the internet domain for the Sales Tax Fraud Website on June 10, 2017. *Id.* Plaintiffs further allege the Sales Tax Fraud Website is "copyrighted" by the DISF. *Id.*

---

[2]      By way of example, the Court notes the DD Sales Tax Fraud Website contains five thousand two hundred and forty-three (5,243) Diamond Doctor customer records.

### 3.  <u>The Sue David Blank Website</u>

On July 8, 2017, Plaintiffs filed a supplement to their Emergency Motion (the "Emergency Motion Supplement") (Dkt. 284), stating they became aware of another "harassing website." *Id*. Although the name of the website was redacted, the third website is believed be the "Sue David Blank Website," also controlled by the DISF.

### B.  PUBLICATION OF THE DISF WEBSITES

Plaintiffs allege that on or about May 22, 2017, Defendants (and/or the DISF and/or someone acting on Defendants' behalf) engaged in an "automated robo-calling" campaign with recorded messages to Diamond Doctor customers, accusing Plaintiffs of fraud and directing recipients to the DD Victim Fund Website for purported compensation. Defendant Manookian admits that the DISF used a process called "ring-less voice mail"[3] to leave messages for approximately one hundred seventy-five (175) "specifically identified" Diamond Doctor customers informing them "they may have been victims of Diamond Doctor's fraud" (*see* Dkt. 279-9 at 2).

Plaintiffs also allege Defendants—or persons acting on their behalf—have sent anonymous emails to selected individuals to ensure they are aware of the Sales Tax Fraud Website. *See* Dkt. 269 at 5. Specifically, Plaintiffs allege such emails were sent to Ronnie Mervis, a witness expected to testify at trial, Rob Bates, a diamond industry reporter, and Kendra Shapiro, an independent Dallas-area jeweler, alerting them to the website. *See id*. Plaintiffs also allege that since June 10, 2017, Manookian personally made calls to two additional Diamond Doctor customers. *Id*. According to Manookian, he contacted three Diamond Doctor customers as part of his "investigation of evidence of fraud by Diamond Doctor." *See* Dkt. 279-9 at 3.

---

[3]  *See* Dkt. 307, Hrg. Tr. at 143:24-144:1.

According to Plaintiffs, they became aware of the "Sue David Blank Website" when Plaintiff Blank received an email, threatening a Federal raid and containing links to all three DISF-controlled websites. Around the same time, Robert Bates, the same jewelry industry reporter who had received an email alerting him to the Sales Tax Fraud Website, received an email from the DISF to "spread the word to defrauded consumers" and containing links to the same three DISF-controlled websites. Dkt. 284 at 2.

### C. THE PARTIES' BRIEFINGS AND THE SHOW CAUSE HEARING

The briefings related to the Emergency Motion have been extensive, consisting of the following documents:

1. Plaintiffs' Sealed Appendix in support of the Emergency Motion (Dkt. 271);

2. Defendants' Response to the Emergency Motion (Dkt. 279) with exhibits thereto;

3. Plaintiffs' Reply to Defendants' Response (Dkt. 280);

4. Plaintiffs' Supplement in support of the Emergency Motion (Dkt. 284); and

5. Plaintiffs' Sealed Appendix in support of their Supplement (Dkt. 285).

After the Show Cause Hearing on July 12, 2017, the Court determined it needed additional briefing and discovery, and issued the following Orders:

1. Plaintiffs were ordered to file a brief explaining in further detail their requested relief and the rationale for said relief by July 17, 2017, at 5:00 p.m. Defendants' response, if any, was due by July 19, 2017, at 5:00 p.m.

2. Defendant Manookian was ordered to submit to Plaintiffs the name of a DISF corporate representative whom Plaintiffs could depose, as well as proposed deposition dates no later than July 26, 2017, by July 17, 2017, at 5:00 p.m.

3. Defendant Manookian was ordered to submit to Plaintiffs the names of the one hundred seventy-five (175) Diamond Doctor customers who received "ring-less voicemails" from the DISF, as well as the names of any other Diamond Doctor customers who received similar voicemails from the DISF or anyone acting on the DISF's behalf or at the DISF's direction, by July 17, 2017, at 5:00 p.m.

4. Finally, Defendant Manookian was ordered to submit to the Court by July 17, 2017, at 5:00 p.m., for *in camera* inspection, any and all documents related to his

association with the DISF. The Order specifically stated a non-exclusive list of documents to include the following: engagement/retainer agreement; copies of any payments received; correspondence to, from, or in any way related to the alleged client and/or client relationship; notes, emails, or other documents in any way related to conversations, communications, instructions, or advice sought or provided; and any other form of information, in whatever format (e.g. digital, hardcopy, etc) that bears on the identification of the client and the legal advice allegedly sought or received from Manookian.

Dkts. 300 and 305.

The following briefings were filed in response to the Court's Orders:

1. Plaintiffs' Brief in Support of Relief Requested Regarding their Emergency Motion to Show Cause (Dkt. 306) with exhibits thereto;

2. Defendants' Response to Plaintiffs' Brief in Support of Relief Requested Regarding Their Emergency Motion to Show Cause (Dkt. 308);

3. Plaintiffs' Notice of Defendants' Non-Compliance with the Court's July 13, 2017 and July 14, 2017 Orders and Supplemental Briefing Regarding Requested Remedies (Dkt. 310) with exhibits thereto;

4. Defendants' Response to Plaintiffs' Notice of Non-Compliance with the Court's July 13, 2017 and July 14, 2017 Orders and Supplemental Briefing Regarding Requested Remedies (Dkt. 313) with an exhibit thereto; and

5. Plaintiffs' Reply to Defendants' Response to Plaintiffs' Notice of Non-Compliance with the Court's July 13, 2017 and July 14, 2017 Orders and Supplemental Briefing Regarding Requested Remedies (Dkt. 314) with exhibits thereto.

Plaintiffs filed their brief as ordered on July 17, 2017 (Dkt. 306), and Defendants timely filed a response on July 19, 2017 (Dkt. 308). In response to the Court's order for Manookian to provide Plaintiffs the name of the DISF corporate representative and the names of the one hundred seventy-five (175) Diamond Doctor customers receiving robo-calls—or any Diamond Doctor customers contacted by the DISF, Manookian, or someone on their behalf—Chris Schwegmann, counsel for Defendants, sent Plaintiffs an email on July 21, 2017, informing them that Manookian no longer represents the DISF and stating that:

1. the corporate representative of the DISF is Felipe Debase [sic], and Manookian cannot, himself, compel any testimony from Mr. DeMase;

2. [Manookian] does not have a list of the 175 names in his possession, custody, or control. They may be obtained from the DISF, which has already been subpoenaed in the Middle District of Tennessee; and

3. Apart from the names disclosed in his declaration, [Manookian] has no knowledge of any other Diamond Doctor customers who received similar voicemails from the DISF or anyone acting on its behalf.

Dkt. 310-1.

Plaintiffs also advised the Court that the DISF is no longer an active business entity in the State of Tennessee, having been "terminated" by the incorporators as of July 21, 2017. *See* Dkt. 310-2.

The only relevant documents Manookian submitted to the Court for *in camera* review was a copy of an "attorney-client agreement" purportedly signed by "DeMase" on June 7, 2017, and a copy of a letter from the Tennessee Secretary of State confirming the successful filing of the DISF registration documents, dated June 8, 2017. No other details about Manookian's attorney-client relationship with the DISF and DeMase were provided. Defendants also submitted a copy of Defendants' motion to quash Plaintiffs' subpoena filed in the Middle District of Tennessee,[4] but the relevance and purpose of that document as it relates to Manookian's compliance with this Court's Order is unclear since the Court advised the parties during the hearing that it was aware of and had reviewed the motion to quash.

## II. **LEGAL STANDARD**

### A. CONTEMPT

"A party may be held in contempt if he violates a definite and specific court order requiring him to perform or refrain from performing a particular act or acts with knowledge of

---

[4] Middle District of Tennessee Case No. 3:17-mc-00008, Dkt. 1.

that order." *Whitfield v. Pennington*, 832 F.2d 909, 913 (5th Cir. 1987). "The judicial contempt power is a potent weapon" that should not be used unless a specific aspect of the court's order has been "clearly violated." *Piggly Wiggly Clarksville, Inc. v. Mrs. Baird's Bakeries*, 177 F.3d 380, 383 (5th Cir. 1999). The purpose of a civil contempt order is: "(1) to coerce compliance with a court order; or (2) to compensate a party for losses sustained as a result of the contemnor's actions." *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 290-91 (5th Cir. 2002).

To show that civil contempt is warranted, a moving party must establish that: (1) a court order was in effect; (2) the order required certain conduct by the respondent; and (3) the respondent failed to comply with the court's order. *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992). Intent is not an element of civil contempt; the issue is whether the alleged contemnor has complied with the court's order. *See Whitfield*, 832 F.2d at 913. The standard of proof for civil contempt is clear and convincing evidence, which is "that weight of proof which produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, of the truth of the precise facts of the case." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (internal quotation marks omitted).

"After the movant has shown a *prima facie* case, the respondent can defend against it by showing a present inability to comply with the subpoena or order." *Petroleos Mexicanos v. Crawford Enters.*, 826 F.2d 392, 401 (5th Cir. 1987). "Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action. It is settled, however, that in raising this defense, the defendant has a burden of production." *United States v. Rylander*, 460 U.S. 752, 757 (1983). Additionally, "[t]he respondent may avoid a contempt finding by establishing that it has substantially complied with the order or has made reasonable efforts to comply." *In re Brown*, 511 B.R. 843, 849 (S.D. Tex. 2014) (citing *U.S.*

*Steel Corp. v. United Mine Workers of Am., Dist. 20*, 598 F.2d 363, 368 (5th Cir. 1979)). And, "[e]ven if liability is established, the respondent may demonstrate mitigating circumstances that might persuade the Court to withhold the exercise of its contempt power." *Id.* (citing *Whitfield*, 832 F.2d at 914).

"Upon a finding of civil contempt, the Court has broad discretion to impose judicial sanctions that would coerce compliance with its orders and compensate the moving party for any losses sustained." *Mary Kay Inc. v. Designs by Deanna, Inc.*, 2013 WL 6246484, at *4 (N.D. Tex. 2013) (citations omitted). The Court may impose a reasonable fine and/or a fixed term of imprisonment, with the condition that the contemnor be released if he or she complies with the court order. *Id.* The Court also may require the contemnors pay reasonable attorney's fees incurred by the movant in obtaining the contempt finding. *Id.*

### B. SANCTIONS

Rule 37(b)(2)(A) provides "[i]f a party . . . fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders." FED. R. CIV. P. 37(b)(2)(A). A district court has broad discretion to determine an appropriate sanction under Rule 37(b), *Pressey v. Patterson*, 898 F.2d 1018, 1021 (5th Cir. 1990), which may include an order directing that certain designated facts be taken as true, prohibiting the disobedient party from supporting or opposing designated claims or defenses, striking pleadings in whole or in part, dismissing the action in whole or in part, rendering a default judgment against the disobedient party, or treating the failure to obey the order as contempt of court. *See* FED. R. CIV. P. 37(b)(2)(A)(1).

The court must impose the least severe sanction that will achieve the deterrent value of Rule 37. *See United States v. Garrett*, 238 F.3d 293, 298 (5th Cir. 2000). A finding of bad faith

or willful misconduct is required to support severe sanctions such as an order striking pleadings or dismissing a case. *Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 73d 486, 488–89 (5th Cir. 2012) (citing *Pressey*, 898 F.2d at 1021). Lesser sanctions do not require a finding of willfulness. *Id.* Instead of, or in addition to, any sanction permitted by Rule 37(b), "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." FED. R. CIV. P. 37(b)(2)(C).

Additionally, the availability of other sanctioning mechanisms does not prevent the court from exercising its inherent power to grant the victim further relief if the ends of justice require it. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 50-51 (1991). "[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Id.* at 50.

In order to exercise its inherent authority, the court must find the accused party engaged in bad faith conduct that resulted in prejudice to the judicial process. *See Chambers*, 501 U.S. at 45–46. These inherent powers "ought to be exercised with great caution," *id.* at 43 (internal quotation marks omitted), and are reserved for "conduct which abuses the judicial process." *Id.* at 44–45. "The threshold for the use of the inherent power sanction is high." *Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir. 1996). A court's inherent powers to sanction "may be exercised only if essential to preserve the authority of the court," *id.*, and only when the court "finds that 'fraud has been practiced upon it, or that the very temple of justice has been defiled.'" *Boland Marine & Mfg. Co. v. Rihner*, 41 F.3d 997, 1005

(5th Cir. 1995) (quoting *Chambers*, 501 U.S. at 46). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44.

### III. <u>ANALYSIS</u>

To reiterate, Plaintiffs' seek the imposition of sanctions against Defendants pursuant to Rule 37(b)(2)(A)(i), (ii), and (vii) and a finding that Defendant Manookian is in contempt of court by failing to comply with the Court's July 13, 2017, and July 14, 2017, Orders (Dkts. 300 and 305).

### A. CONTEMPT

Although prior pleadings, as well as argument presented at the Show Cause Hearing, suggest that Plaintiffs seek a finding of contempt based on Defendants' alleged publication of Diamond Doctor customer information on the DISF websites, a putative violation of the Court's Protective Order, Plaintiffs appear to have abandoned that request, in favor of a contempt finding based on Defendant Manookian's failure to comply with the Court's July 13, 2017, and July 14, 2017, Orders.[5] *See* Dkt. 310.

Under 28 U.S.C. § 636(e), the magistrate judge's authority is to certify the facts, not issue an order of contempt. 28 U.S.C. § 636(e)(6)(B)(iii). The magistrate judge's role is "to determine whether the moving party can adduce sufficient evidence to establish a *prima facie* case of contempt." *Church v. Steller*, 35 F. Supp. 2d 215, 217 (N.D.N.Y. 1999) (citing *Proctor v. State Gov't of N.C.*, 830 F.2d 514, 521 (4th Cir. 1987)). Based on the record before it, the Court does not find sufficient evidence to establish that Defendant Manookian violated the Court's Orders.

Furthermore, even if Plaintiffs could establish a *prima facie* case, Defendants argue that Manookian has substantially complied with the Order. "[A] respondent may avoid a contempt

---

[5] Although Plaintiffs ask the Court to make a finding that Defendants willfully participated in disclosing personal information of Diamond Doctor customers in violation of this Court's Protective Order, (*see* Dkt. 310 at 9), they do not argue for a contempt finding on this basis. *See* Dkt. 310.

finding by establishing that it has substantially complied with the order or has made reasonable efforts to comply." *In re Brown*, 511 B.R. 843, 849 (S.D. Tex. 2014) (citing *U.S. Steel*, 598 F.2d at 368). Defendants argue that because Manookian supplied documents for *in camera* review, supplied the name of a DISF representative, and disclosed the names of the three Diamond Doctor customers he personally called he was in substantial compliance. *See* Dkt. 313 at 5-6.

In addition to a showing of substantial compliance, a respondent can defend against a movant's *prima facie* case by showing an inability to comply with the subpoena or order. *Petroleos Mexicanos*, 826 F.2d at 401. Defendants argue Manookian could not "disclose the 175 persons contacted by DISF, or force a DISF representative to appear at a deposition" because "that information does not belong to [Manookian], and even advising the DISF to provide it is a violation of the fiduciary duty he owes to DISF to act at all times in its best interest." *See* Dkt. 313 at 5-6. Thus, Defendants argue Manookian supplied the information he could in light of his obligation to protect the DISF's privileged information. *Id*.

As will be discussed further below, although the Court is not persuaded that Defendants' explanations are entirely credible, the Court declines to recommend a finding of contempt against Defendant Manookian at this time. Accordingly, Plaintiffs' request for a finding, pursuant to Rule 37(b)(2)(A)(vii), that Defendant Manookian is in contempt of Court by failing to comply with this Court's July 13, 2017, and July 14, 2017, Orders is **DENIED**.

### B. SANCTIONS

Plaintiffs ask the Court to issue sanctions and award reasonable and necessary attorney's fees pursuant to Rule 37(b)(2)(A)(i) and (ii).[6] Specifically, under Rule 37(b)(2)(A)(i), Plaintiffs request the Court to designate that facts at issue regarding the DISF and its relationship to Defendants be taken as established and make a finding for the purposes of this action that:

---

[6]    Plaintiffs' Rule 37(b)(2)(A)(vii) request for a finding of contempt of court was addressed above.

1. Defendant Manookian was totally lacking in credibility in his testimony before this Court;

2. DISF is the alter-ego and/or an instrument of Defendants, controlled and used by Defendants to advance their personal interests and to avoid compliance with the rules of discovery and this Court's Protective Order;

3. Defendants have willfully and in bad faith failed to comply with the July 13 and July 14 Orders;

4. Defendants have willfully obstructed the Court's efforts to determine how DISF obtained the Diamond Doctor customer information;

5. Defendants have willfully obstructed the Court's efforts to determine which Diamond Doctor customers received voicemails from DISF;

6. Defendants have willfully participated in contacting—and disclosing personal information of—Diamond Doctor customers in violation of this Court's Protective Order;

7. Defendants have willfully failed to comply with legitimate discovery requests of Plaintiffs; and

8. Defendants have willfully attempted to tamper with potential witnesses and influence potential members of the jury panel in this case.

Dkt. 310 at 8-9.

In addition to arguing there is no evidence of misconduct by Manookian, Defendants argue "Plaintiffs violated, blatantly and hypocritically, the Protective Order they [now] ask this Court to enforce" (Dkt. 313 at 5), an allegation which, unsurprisingly, Plaintiffs deny. As explained above, although the Court is concerned that the Diamond Doctor customer information somehow got into the hands of "DeMase" in violation of the Court's Protective Order, because the Court's opinion herein is not based on a violation of the Protective Order, Defendants' allegation that Plaintiffs also violated the Protective Order is irrelevant.

Relying on Rule 37(b)(2)(A)(ii), Plaintiffs request that Defendants be prohibited from supporting or offering any evidence in support of their substantial truth defense to Plaintiffs'

defamation, libel, and business disparagement allegations.[7] *See* Dkt. 310 at 9. Plaintiffs argue that Defendants' willful failure to comply with the Court's July 13, 2017, and July 14, 2017, Orders regarding discovery of the source of Diamond Doctor customer information in the DISF's possession warrants the striking of that defense and the introduction of any testimony from any former Diamond Doctor customers. *Id.*

Defendants argue Plaintiffs are not entitled to any relief because: (1) there is no evidence of any misconduct by either Manookian or Cummings Manookian; (2) Manookian's professional duties prohibit him from disclosing the information the Court ordered him to disclose; and (3) the requested sanctions do not meet the Fifth Circuit's justice and relevance requirements because they have no connection to the alleged misconduct.

### 1. Rule 37(b)(2) Sanctions

Under Rule 37(b)(2)(A), sanctions may be sought for failure to obey a discovery order:

> If a party or a party's officer, director, or managing agent)—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders.

FED. R. CIV. P. 37(b)(2)(A). The court may issue orders:

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims, and

> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence.

FED. R. CIV. P. 37(b)(2)(A)(i) (ii).

Rule 34 requires that a responding party produce responsive documents that are within their "possession, custody or control." Documents are deemed to be within the "possession,

---

[7]     According to Plaintiffs, Defendants have consistently taken the position that all Diamond Doctor customers are potential witnesses who can establish the truth of Defendants' fraud and "overgrading" allegations against Plaintiffs and, therefore, support their defense of truth or substantial truth. *See* Dkt. 310 at 9.

custody or control" of a responding party if that party either has "actual possession, custody or control" of the documents or if that party "has the legal right to obtain the documents on demand or has the practical ability to obtain the documents from a non-party to the action." *Estate of Monroe v. Bottle Rock Power Corp.*, 2004 WL 737463, at *10 (E.D. La. 2004).

"Rule 34 is broadly construed and documents within a party's control are subject to discovery, even if owned by a nonparty." *Id.* (citing *Commerce and Indus. Ins. Co. v. Grinnell Corp.*, 2001 WL 96337, at *3 (E.D. La. 2001)). The burden, however, is on the party seeking discovery to make a showing that the other party has control over the documents sought. *Id.* Typically, what must be shown to establish control over documents in the possession of a non-party is that there is "a relationship, either because of some affiliation, employment or statute, such that a party is able to command release of certain documents by the non-party person or entity in actual possession." *Id.*; *see also Shell Global Solutions (US) Inc. v. RMS Eng'g, Inc.*, 2011 WL 3418396, at *2 (S.D. Tex. 2011) ("Among the factors used by courts to determine whether one corporation may be deemed under control of another corporation are: (a) commonality of ownership, (b) exchange or intermingling of directors, officers or employees of the two corporations, (c) exchange of documents between the corporations in the ordinary course of business, (d) any benefit or involvement of the nonparty corporation in the transaction, and (e) involvement of the non-party corporation in the litigation."). Courts have ordered corporate parties to produce documents in the possession of corporate relatives—such as parent, sibling, or subsidiary corporations. *See Steel Software Sys. Corp. v. DataQuick Info. Sys., Inc.*, 237 F.R.D. 561, 564 (D. Md. 2006).

The Court has already concluded that Manookian complied with the letter, though not the spirit and intent, of the Court's July 13, and July 14, Orders. And even broadly construing Rule

34, the Court is not satisfied there is sufficient evidence to establish that Manookian had control over the customer information allegedly in the possession of the DISF. Thus, the Court finds there is insufficient bases to impose sanctions under Rule 37. However, Defendant Manookian's behavior in the context of the actions he attributes to the DISF demonstrates the necessity for the Court to draw on its inherent power to address Manookian's pattern of obfuscation regarding the DISF, his offering of inconsistent information about his relationship to, and representation of, the DISF, and his failure to provide credible explanations about how the DISF obtained Diamond Doctor customer information.

### 2.  **The Court's Specific Finding of Bad Faith**

As explained above, the Court has inherent power to sanction parties that engage in conduct that constitutes fraud on the court or an abuse of the judicial process. *Chambers*, 501 U.S. at 44-45; *Crowe v. Smith*, 261 F.3d 558, 563 (5th Cir. 2001). The Court must make a specific finding that the sanctioned party acted in bad faith, and any sanctions imposed should be the least severe sanctions adequate to accomplish the purpose for which the sanction was imposed. *See Topalian v. Ehrman*, 3 F.3d 931, 938 (5th Cir. 2001). Furthermore, the Court's inherent power is not displaced by any rule or statute. *Chambers*, 501 U.S. at 46.

The Court finds the following actions and conduct by Defendant Manookian constitute bad faith: (1) his representation of the DISF and the mysterious Felipe DeMase; (2) his knowledge, involvement, and/or facilitation of the DISF's procurement of  Diamond Doctor customer information; (3) his involvement in the establishment of the DISF websites which look identical to, and contain links to, Cummings Manookian websites; (4) the publication of Diamond Doctor customer information on the DISF websites; (5) his knowledge, involvement, and/or facilitation of targeting  the Diamond Doctor customers who received ring-less voicemails

from the DISF; and (6) the sudden termination of his representation of the DISF and the deactivation of the DISF as a business entity on the very day Manookian was to provide Plaintiffs with the name of a corporate representative to answer the subpoena in the Middle District of Tennessee.

It has been established that the DISF has in its possession thousands of customer names and has used ring-less voice mail to contact at least one hundred seventy-five (175) of those customers. Further, Manookian testified he relied upon the DISF customer databases to investigate potential sales tax fraud claims against Plaintiffs. Manookian's representations that the DISF is a nonparty entity separate and distinct from Manookian and Cummings Manookian, and that neither Manookian nor Cummings Manookian have possession, custody, or control of any Diamond Doctor customer information, lack credibility.

Defendants' primary argument in opposition to Plaintiffs' request for sanctions is the lack of evidence of any misconduct by Manookian or Cummings Manookian. However, the Court is persuaded there is sufficient evidence of bad faith conduct that interferes with the judicial process. Based on the record before the Court, it appears likely that, for all intents and purposes, Manookian and/or Cummings Manookian, are one and the same as the DISF. At the very least, Manookian orchestrated the circumstances allowing for the creation of the DISF and the publication of the DISF websites containing Diamond Doctor customer information, either by using DeMase as a "straw man" or by concocting a fake identity for Demase, the purported "Director" of the DISF, and its only known corporate representative. Manookian testified that DeMase, allegedly a dual citizen of Italy and Argentina, contacted Manookian through the Cummings Manookian website, and that it was DeMase who provided the Diamond Doctor customer information to the DISF. *See* Dkt, 307, Hrg. Tr. at 116:11-117:3.

Manookian further testified he does not know if DeMase was ever a Diamond Doctor customer (*id*. at 117:10-12). When questioned about whether he knew the reason DeMase was interested in setting up the DISF, Manookian replied he did know but asserted the information is privileged. *See id*. at 117:24-188:5. Manookian maintains the DISF has established a "Victim Fund," but he does not know how much is in the Fund. *See id*. at 119:121-120:1. Although Manookian testified he did not know how DeMase obtained the Diamond Doctor customer information (*id*. at 123:19-124:5, 124:6-9), he admitted to knowing how the customer information was published on the DISF websites (*id*. at 123:22-23). Manookian also asserted attorney-client privilege when questioned about how the one hundred seventy-five (175) customers who received ring-less voice mail messages from the DISF were selected (*id* at 143:21:23), but admitted he provided the parameters used to select the targeted customers. *See id*. at 152:15-153:8.

The timing of the creation of the DISF websites and the proactive publication of the sites to potential witnesses and the press is even more troubling in light of the fact the trial in this case is set to begin on August 15, 2017. The Court has an obligation to protect the integrity of the judicial process and, in particular, the integrity of a jury trial; and there is strong evidence here that Defendants' efforts to publicize the existence of these websites are a deliberate attempt to disrupt that process by improperly influencing witnesses and/or prejudicing the jury pool. Defendants' assertion that there is no proof that any jury *venire* members were contacted (*see* Dkt. 279 at 11) is irrelevant, given that potential and actual jurors may be tempted to use the Internet to search for information about the litigants—in spite of being warned by the court not to do so. Accordingly, the Court finds the timing and publication of these websites—with

Manookian's help and/or approval—further support a finding of Manookian's bad faith conduct in abuse of the judicial process.

Aside from the implausibility of Manookian's explanations regarding the identity of DeMase and why DeMase would be motivated to incorporate, operate, and fund the DISF, and to publish Diamond Doctor customer information on its websites, Manookian's actions in response to the Court's Orders of July 13, and July 14, 2017, further warrant a finding that Manookian acted in bad faith.

The Court's July 13, 2017, Order directed Manookian to submit for *in camera* review documents to establish his representation of the DISF and to support his assertions of attorney-client privilege regarding the customer information in the DISF's possession, as well as to establish that the asserted privilege is not subject to the crime-fraud exception. *See* Dkt. 300 at 6. Thus, the Court's Order was specifically tailored to achieve this objective. *Id*. Manookian submitted an "attorney-client agreement" allegedly signed by "DeMase" on June 7, 2017 (the "Client Agreement"). The Court first notes the Client Agreement is nothing more than a generic engagement letter. None of the requested additional details about Manookian's relationship with the DISF and DeMase were provided. Furthermore, the date of the Client Agreement is suspicious. In addition to the Client Agreement, Manookian also submitted a copy of a letter from the Tennessee Secretary of State, dated June 8, 2017, confirming the successful filing of the DISF registration documents. Thus, the Agreement is dated one day prior to the State of Tennessee's approval of the DISF's incorporation. However, the record shows that Manookian filed the DISF's incorporation application on May 4, 2017 (*see* Dkt. 298-10 at 3), more than a month prior to the date DeMase purportedly signed the Client Agreement.

Furthermore, Plaintiffs first became aware of the DISF websites on or about May 10, 2017, and the ring-less voice mail calls occurred on or about May 22, 2017. Thus, the Court reaches the inescapable conclusion that the documents provided to the Court for *in camera* review do not accurately reflect the sequence of events relating to Manookian's representation of the DISF. Moreover, the nexus of the June 7, 2017, date the Client Agreement was purportedly executed by DeMase and the June 8, 2017, date the DISF's incorporation was approved by the State of Tennessee leads the Court to conclude the Client Agreement was created after the fact, in specific response to the Court's Order. The Court thus finds Manookian's conduct constitutes fraud and an abuse of the judicial process. *See Chambers*, 501 U.S. at 44-45.

In response to the Court's Orders to provide Plaintiffs with the name of the DISF corporate representative whom Plaintiffs could depose in response to their subpoena, Manookian now advises he suddenly no longer represents the DISF (*see* Dkt. 310-1), that he cannot compel any testimony from DeMase (*id.*), and the DISF's status as a registered entity in the State of Tennessee has been terminated (*see* Dkt. 310-2), coincidentally on July 21, 2017, the very date Manookian was due to comply with the Court's Orders. These events further support the Court's finding of bad faith.

Defendants assert "it became impossible for Manookian to comply in full with this Court's Order and also comply in full with his fiduciary duties to his client" and, therefore, "Manookian did the only thing he could do: provide to Plaintiffs any information he actually could provide, and immediately terminate his attorney-client relationship with [the] DISF." *See* Dkt. 313 at 3. Defendants completely mischaracterize the Court's Orders. It was Manookian who assured the Court he would "promptly and expeditiously" ensure the availability of a DISF corporate representative for Plaintiffs to depose. *See* Dkt. 307, Hrg. Tr. at 139:17-19. The

Court's review of information about Manookian's representation of the DISF was to be done *in camera*, so Defendants' arguments in that regard are disingenuous.

The only Order that could have possibly raised an issue as to Manookian's obligations to his client was the Order to provide the names of the one hundred seventy-five (175) Diamond Doctor customers who received ring-less voice mail messages. However, rather than explaining their inability to comply or seeking further relief from the Court regarding this issue, Defendants simply "tossed out the baby with the bathwater" and refused to take any good faith steps toward compliance. Thus, Defendants' actions appear to be deliberately calculated to conceal information from the Court.

There is also significant evidence before the Court that Manookian and/or Cummings Manookian controlled the DISF websites. The websites have almost identical content, color, patterns, layout, etc. Defendant Manookian testified he reviewed the content of the DISF websites, provided certain information to be published on the DISF websites,[8] and approved the use of links to the Cummings Manookian website. *See* Dkt. 307, Hrg. Tr. at 148:9-12; 148:19-149:21, Finally, the Court finds it curious that the only websites the DISF has ever posted are the three websites aimed at Plaintiffs. Thus, it seems the DISF had no other reason to exist but to publicize negative information about Plaintiffs very close to the start of trial.

Whatever damage has been done by the DISF websites (which the Court notes remain active as of the date of this Opinion), the publication of Diamond Doctor customer information on the DISF websites, the ring-less voice mails by the DISF, and the emails and other communications (known and unknown) to customers, potential witnesses, members of the press, and others cannot be undone. In all likelihood, the names of the Diamond Doctor customers

---

[8] However, Manookian denes providing the Diamond Doctor customer information published on the websites. *See* Dkt. 307, Hrg. Tr. at 150:3-4.

contacted will remain unknown, and how the DISF obtained the Diamond Doctor customer information published will also remain unknown.

Finally, as a licensed and practicing attorney, Manookian is an officer of the Court. Despite his role as a party, he is still bound by ethical duties, such as the duty of candor toward a tribunal,[9] and the duty to not engage in conduct constituting obstruction of justice.[10] *See Cohn v. Commission for Lawyer Discipline*, 979 S.W.2d 694, 697 (Tex. App.—Houston [14th Dist.] 1998, no pet.) ("[a] lawyer shall not . . . violate these rules . . . whether or not such violation occurred in the course of a client-lawyer relationship"). Throughout these proceedings, Manookian has feigned adherence to ethical rules, while seemingly using those same ethical rules as a pretense to thwart the Court's efforts to make a thorough and informed inquiry. Manookian's conduct regarding the information he provided to the Court concerning his representation of the DISF is particularly troubling—and even further justifies the Court's finding of bad faith.

### 3.  Determination of Appropriate Sanctions

After finding that Manookian acted in bad faith and disrupted the litigation process, the Court must determine an appropriate sanction for Manookian's behavior. In *Thomas v. Capital Security Services*, 836 F.2d 866 (5th Cir. 1988) (en banc), the Fifth Circuit outlined the procedures and standards for imposing sanctions under Rule 11. In *Topalian v. Ehrman*, 3 F.3d 931, 936 n.5, the Fifth Circuit refined the *Thomas* principles and determined they should "apply across-the-board to all of the district court's sanction powers." In *Thomas*, the Fifth Circuit set forth the over-arching principle that sanctions should be tailored to fit the particular wrong. *Thomas*, 836 F.2d at 877. Accordingly, "the district court should carefully choose sanctions that

---

[9]     *See, e.g.*, ABA Model Rule 3.03(a).
[10]    *See, e.g.*, ABA Model Rule 8.4.

foster the appropriate purpose of the rule [namely, the source of sanctioning power], depending upon the parties, the violation, and the nature of the case." *Id*.

Sanctions pursuant to a court's inherent authority serve the "dual purpose of vindicat[ing] judicial authority without resort to the more drastic sanctions available for contempt of court and mak[ing] the prevailing party whole for expenses caused by his opponent's obstinacy." *Carroll v. Jaques*, 926 F. Supp. 1282 (E.D. Tex. 1996), *aff'd sub nom. Carroll v. Jaques Admiralty Law Firm, P.C.*, 110 F.3d 290 (5th Cir. 1997) (citing *Chambers*, 501 U.S. at 46 (internal quotation marks omitted)). In this context, "vindicating judicial authority" relates back to the purpose of inherent power:

> For nearly as long as the federal courts have existed, it has been understood that certain implied powers must necessarily result to our courts of justice from the nature of their institution, powers which cannot be dispensed with in a court because they are necessary to the exercise of all others. The inherent powers of the federal courts are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.

*Natural Gas Pipeline*, 2 F.3d at 1406. (internal quotation marks and citations omitted). "The ultimate touchstone of inherent power is necessity." *Id*. at 1412.

The court in *Topalian* set forth four factors the district court must use in determining the appropriate sanction. *See Topalian*, 3 F.3d at 936–37; *see also Collie v. Kendall*, 1999 WL 462327, at *4–5 (N.D. Tex. July 6, 1999); *Taylor v. Cnty. of Copiah*, 937 F.Supp. 580, 584 (S.D. Miss. 1995). First, the court "must announce the sanctionable conduct giving rise to its order." *Topalian*, 3 F.3d at 937. As discussed above, Defendants, and in particular, Defendant Manookian, engaged in a pattern of obfuscation regarding the DISF, Manookian's relationship to, and representation of, the DISF, and Manookian's failure to provide credible explanations about how the DISF obtained Diamond Doctor customer information. The Court also found that

Defendants controlled the DISF websites and either provided or facilitated the publication of Diamond Doctor customer information on those websites. Further, the websites came into existence of the heels of the upcoming trial in this case.

Second, the court must address the connection between the sanctions the court imposes and the sanctionable conduct. *Topalian*, 3 F.3d at 937. As stated above, Defendants orchestrated or facilitated the publication of Diamond Doctor customer information on the DISF websites, as well as other inappropriate communications with Diamond Doctor customers who are potential witnesses at trial, creating the need for Plaintiffs' Emergency Motion for a show cause hearing, thus incurring attorney's fees for Plaintiffs, as well as expending judicial resources. Furthermore, Defendants' behavior after the Show Cause Hearing essentially amounted to a flouting of the Court's Orders. Not only did Manookian renege on his commitment to provide the name of a DISF corporate representative whom Plaintiffs could depose, he terminated his representation of the DISF, terminated the DISF as a registered business entity, and provided untrustworthy information to the Court regarding his representation of the DISF, incurring further attorney's fees for Plaintiffs and further expending judicial resources.

Third, the court must review whether the costs or expenses were "reasonable," as opposed to self-imposed, mitigable, or the result of delay in seeking court intervention. *Topalian*, 3 F.3d at 937. In this case, Plaintiffs filed their subpoena to the DISF on June 23, 2017, and their Emergency Motion on June 27, 2017. Plaintiffs assert they became aware of the DISF Facebook advertisement with a reference to the DD Victim Fund Website on or about May 10, 2017. *See* Dkt. 289 at 2. Plaintiffs became aware of the ring-less voice mail calls on or about May 22, 2017, and they were notified of the DD Sales Tax Fraud Website on June 19, 2017. *See* Dkt. 289. They became aware of the Sue David Blank Website or about July 7, 2017. *See* Dkt. 284. Thus, it

appears the DISF-initiated actions were multi-pronged and staged periodically over the course of a few weeks. Defendants argue that Plaintiffs *could have* more timely issued their subpoena to the DISF and/or *could have* served discovery on Defendants rather than filing a motion for a show cause hearing. *See* Dkt. 308 at 2 (emphasis added). However, the record before the Court indicates Plaintiffs conducted due diligence to determine the origins of the offending websites before filing their Emergency Motion. They explored the websites and tested their various links; they contacted Defendants' counsel to find out what they knew about the disclosure of Diamond Doctor customer information on the websistes; and they contacted the Tennessee Secretary of State to determine the identity of the DISF. Based on the foregoing, the Court finds that Plaintiffs acted reasonably under the circumstances.

Finally, the court must consider whether the sanction imposed is the least severe sanction adequate to achieve its intended purpose, deter similar conduct, both specifically and generally, and preserve the integrity of the Court. *See Topalian*, 3 F.3d at 937. Inherent power sanctions are essentially punitive, designed to penalize bad faith abuses of the litigation process. *Carroll*, 926 F.Supp at 1291. While they may be used to compensate the opposing party for fees that should never have been incurred, their compensatory aspect is only incidental, and it is within the discretion of the court to determine the appropriate sanction. *Id.* Among the types of inherent power sanctions that the court, in its discretion, may choose to impose are:

(1) a fine;

(2) an award of reasonable attorneys' fees and expenses;

(3) disqualification of counsel;

(4) preclusion of claims or defenses or evidence;

(5) dismissal of the action;

(6) entry of a default judgment;

(7) suspension of counsel from practice before the court or disbarment;

(8) vacatur of a judgment for fraud;

(9) injunctive relief limiting a person's future access to the courts;

(10) a contempt citation; and

(11) permitting adverse inference from document destruction.

*Id.* (citing GREGORY P. JOSEPH, SANCTIONS: THE FEDERAL LAW OF LITIGATION ABUSE 440–41 (2d ed. 1994) (internal citations omitted).

Based on the record before the Court, it is more likely than not that the DISF is an alter ego controlled by Defendants, and Felipe DeMase is a fictitious individual. At the very least, Defendants have deliberately obstructed the Court's efforts to determine how the DISF came into possession of the Diamond Doctor customer information, and Defendant Manookian has offered disingenuous testimony and untrustworthy documents in response to the Court's efforts to establish the nature and scope of his alleged representation of the DISF and Felipe DeMase. Furthermore, the creation and publication of the DISF websites appears to have been deliberately timed to interfere with or improperly influence potential jurors and witnesses. Accordingly, the Court finds Defendants' bad faith behavior constitutes an abuse of the judicial process that warrants the imposition of sanctions under the Court's inherent powers.

Accordingly, the Court finds that an award of Plaintiffs' attorneys' fees is appropriate. The Court further finds that Defendants should be precluded from calling as witnesses any Diamond Doctor customers obtained through the DISF websites and other communications at issue herein. Finally, the Court finds that Defendants must remove the Diamond Doctor customer information from the DISF websites, or else be assessed a fine for their failure to do so. Having considered the available sanctions in light of the *Topalian* factors and other relevant authority, the Court determines these are the least severe sanctions, in light of Defendants' bad faith

conduct, to deter similar conduct and preserve the integrity of the Court. *See Topalian*, 3 F.3d at 937. While the Court is mindful of the "balance between the necessity of avoiding a tainted jury pool" and the right of the DISF and Manookian to investigate potential claims, inform relevant communities, and contact potential witnesses (*see* Dkt. 279 at 11), the Court finds there is adequate bases here to order the removal of the Diamond Doctor customer information from the DISF websites. *See Marceaux v. Lafayette City-Par. Consol. Gov't*, 731 F.3d 488 (5th Cir. 2013).

## IV. <u>CONCLUSION</u>

Based on the foregoing, Plaintiffs' Emergency Motion for Order to Show Cause (Potential Contempt of Court and Sanctions) (Dkt. 269), is **GRANTED** in part and **DENIED** in part. After careful consideration, the Court concludes the following sanctions are appropriate and are the least severe sanctions adequate to achieve the intended purpose, deter similar conduct, and preserve the integrity of the Court. *See Topalian*, 3 F.3d at 937.

**IT IS THEREFORE ORDERED** that Defendants shall pay Plaintiffs' reasonable attorneys' fees and expenses associated with filing the Emergency Motion, as well as court appearances and the subsequent briefings thereto. Evidence of reasonable attorneys' fees and expenses shall be submitted to the Court no later than August 9. 2017. Defendants may file a response no later than August 11, 2017.

**IT IS FURTHER ORDERED** that Defendants are prohibited from calling as witnesses any former customers of Diamond Doctor, unless Defendants can establish said witnesses were not obtained through the DISF websites, the ring-less voice mails, or other communications initiated by or on behalf of the DISF.[11] However, Defendants are not prohibited from offering a

---

[11] For example, Defendants assert there are nine customers who have diamond "overgrading" claims pending in court against Diamond Doctor, and who should not be excluded as potential witnesses. The Court agrees, but only

substantial truth defense to Plaintiffs' defamation, libel, and business disparagement claims (as Plaintiffs request), provided they do not call any witnesses prohibited by this Order.

**IT IS FURTHER ORDERED** that from the date of this Order until the conclusion of trial, Defendants shall ensure that no Diamond Doctor customer information is displayed on **any** DISF website. Defendants shall be fined Five Hundred Dollars ($500.00) per day per website for each day Diamond Doctor customer information appears on any DISF website. The Court is confident that Defendant Manookian has sufficient administrative control over the websites to comply with this Order.

It is **SO ORDERED.**

**SIGNED this 3rd day of August, 2017.**

KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE

---

to the extent those customers were not identified through the DISF. This should be an easy factual matter to establish given that the DISF was only in existence for a defined period of time.