## IN THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS, SHERMAN DIVISION

| | | |
|---|---|---|
| **MARK HAMMERVOLD** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | **No. 20-165** |
| **v.** | § | |
| | § | |
| **DIAMONDS DIRECT USA OF** | § | |
| **DALLAS, LLC;** | § | |
| | § | |
| **DAVID BLANK;** | § | |
| | § | |
| **DIAMOND CONSORTIUM, INC.** | § | |
| **d/b/a THE DIAMOND DOCTOR; and** | § | |
| | § | |
| **JEWELERS MUTUAL INSURANCE** | § | |
| **COMPANY** | § | |

## COMPLAINT

The Plaintiff, Mark Hammervold – in support of his causes of action against the Defendants – states as follows to the Court and Jury:

## VENUE, JURISDICTION, AND PARTIES

1.      The Plaintiff, Mark Hammervold ("Hammervold"), is an attorney and an adult resident of Illinois.

2.      Defendant Diamonds Direct USA Dallas, LLC is a Texas Limited Liability Corporation. Diamonds Direct may be served through its registered agent, Diamonds Direct USA of Austin, LLC at 11104 Domain Dr., Austin, TX 78758.

3.      The only manager of Diamonds Direct USA Dallas, LLC is Diamonds Direct USA, Inc., a North Carolina corporation. For the purposes of diversity jurisdiction Diamonds Direct USA Dallas, LLC is a citizen of the state of North Carolina.

1

4.      Defendant David Blank ("Blank") is an adult resident, citizen, and domicile of Texas. He may be found and served at 6338 Norway Rd., Dallas, TX 75230.

5.      Defendant Diamond Consortium, Inc. d/b/a The Diamond Doctor ("Diamond Doctor"), is a Texas Corporation. The Diamond Doctor may be served through its registered agent, David Blank, who may be found and served at 6338 Norway Rd., Dallas, TX 75230.

6.      Defendant Jewelers Mutual Insurance Company ("Jewelers Mutual") is a Wisconsin insurance company doing business in Texas, with its main office in Neenah, Wisconsin. For the purposes of diversity jurisdiction, Jewelers Mutual is a citizen of Wisconsin.

7.      The Diamond Doctor was a retail jewelry business located in Dallas, Texas. Diamond Doctor was owned and operated by David Blank.

8.      Diamonds Direct is a diamond retail chain based in Charlotte, North Carolina. It owns a series of diamond retail stores located across the county.

9.      There is complete diversity among the Parties.

10.     The amount in controversy in this action exceeds $75,000.

11.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

## STATEMENT OF FACTS

12.      "European Gemological Laboratory," or "EGL," is a trademark and brand that can be licensed outside of the United Stated by entrepreneurs, without adopting industry-accepted standards for grading diamonds. As described by one diamond industry publication: "new EGLs pop up like mushrooms, some of which have outrageous standards or even no standards at all."[1]

13.     EGL International (EGL-I) was one of the most egregious abusers of the EGL trademark. EGL-I was a for-profit "EGL" licensee that operated out of Ramat Gan, Israel until late

---

[1] Rapaport Magazine Special Feature, "Honest Grading," attached hereto as **Exhibit 1**.

Case 4:20-cv-00165-ALM Document 1 Filed 02/27/20 Page 3 of 39 PageID #: 3

2014. Before it was ultimately forced to close-down due to its fraudulent over-grading practices, EGL-I was widely-known in the diamond industry to issue bogus certificates grossly overstating the color and clarity of diamonds well beyond any honest margin of disagreement among gemologists.

14.     EGL-I's reputation for issuing bogus certificates egregiously overgrading diamonds had become so pronounced and well-known that by 2004, EGL-I was sued by other licensees of the "EGL" trademark for its "flagrant practices of unfair competition and inflated grading."

15.     Because EGL-I grades were known by industry professionals to be exaggerated and unreliable, reputable jewelers refused to accept or deal in diamonds accompanied by EGL-International certifications.

16.     During the same period of time, certain unscrupulous jewelers, including Diamonds Direct and The Diamond Doctor, not only carried EGL-I certified diamonds, but made their sale central to their business models.  These jewelers would pass off inferior quality EGL-International diamonds to consumers as equivalent or comparable to GIA-certified by diamonds by using the industry-standard color and clarity grading terminology that EGL-I diamonds do not remotely meet.

17.     In doing so, retailers like Diamonds Direct and The Diamond Doctor could then claim to offer diamonds at "wholesale" or "direct importer" pricing when, in reality, they were simply selling an overgraded stone acquired at a steep discount to a comparable GIA diamond. This practice allowed those retailers to not only reap a profit margin that would not be possible selling legitimately-graded GIA diamonds, but also claim to have undercut their competitors' price.

18.    The Diamond Doctor held itself out as "a true Diamond Wholesaler." Diamond Doctor claimed to "purchase stones directly from the best diamond mines in the world." Diamond Doctor maintained that "our diamonds are offered to our customers at a fraction of the price you would pay either online or at another diamond retailer."  Diamond Doctor further proclaimed that "Diamond Doctor only sells GIA certified diamonds that are hand selected to maximize beauty and value."

19.    From at least 2013 to 2015, The Diamond Doctor sold a large volume of diamonds that had been overgraded and fraudulently certified by disreputable international diamond grading operating under the EGL trademark, including EGL-I.

20.    David Blank and The Diamond Doctor knew that EGL diamonds were consistently overgraded by 2-3 grades compared to the industry standard.

21.    The Diamond Doctor was aware that selling EGL diamonds to consumers was misleading. In 2012, The Diamond Doctor's website claimed that The Diamond Doctor did not sell any EGL diamonds because "the EGL consistently gives higher grades for the same stones and would therefore make our sales price here at Diamond Doctor.com seem more attractive [than it is]."

22.    When selling overgraded, fraudliently certified EGL-I Diamonds, The Diamond Doctor's employees and sales staff would falsely claim that the only difference between diamonds certified by the two laboratories is "the price."  By doing so, The Diamond Doctor was able to claim it offered diamonds at "wholesale" or "direct importer" pricing when, in reality, it was simply selling an overgraded stone that it acquired at a steep discount to a comparable GIA diamond.  This practice allowed Diamond Doctor to simultaneously reap a profit margin that

would not be possible selling legitimately-graded GIA diamonds, while falsely claiming they have saved the customer money.

23.     Finally, at the time of a sale of a diamond, Diamond Doctor completed its sequence of fraud by bogusly appraising the diamond at or near the price of an equivalently graded GIA stone.  Diamond Doctor did so fully knowing that the inferior diamond was significantly overgraded; that it is not a GIA stone; and that it does not have the qualities necessary to support such a valuation.  Diamond Doctor issued these bogus appraisals to further dupe customers into accepting the fraudulent, inflated value for which Diamond Doctor sold the diamond.

### The EGL-I Scam is Exposed by Industry Insiders and Trial Lawyers

24.     By 2011, EGL-I's well-deserved reputation for fraudulent over-grading had become a major topic of discussion within the diamond industry.

25.     In June 2011, the annual Rapaport Conference hosted dedicated panels to address the growing industry concern about diamond overgrading.  At the 2011 conference, panelists feared the industry was "in a race to the bottom."  One speaker put it succinctly.  "We are cheating the consumer when you tell them the diamond is one or two-color grades better than it is.  If this was 18 karat gold and it was stamped 14 karat, everyone would be screaming bloody murder."

26.     Reporting on the 2011 certification conference, Rob Bates of JCK wrote "every day, people are sold diamonds 'upgraded' by two to three grades, because a respectable-looking piece of paper says it so... today, some labs have basically turned bribery into a business model." Referring to EGL-International certificates, the article concluded "its reports are basically worth nothing."

27.     As the EGL scam became subject to increasing scrutiny within the diamond industry, various industry publications began discussing the significant legal and business risks

facing those who had trafficked in EGL diamonds. On June 11, 2013, JCK reported that one "oft-mentioned-solution" to the EGL scam "is a class action lawsuit." "Simply sue the worst offenders out of business, and the rest of the trade will pay attention."

28.     In July 2014, Brian Manookian began filing the first of a series of diamond overgrading lawsuits against Genesis Diamonds in Nashville. After that happened, David Blank learned of the lawsuits, including because he was forwarded a link to media coverage of that lawsuit from an industry friend, who proclaimed: "This is the beginning of the end of EGL as we know it. Prepare yourself."[2]

29.     On September 9, 2014, the world's largest diamond exchange, RapNet, announced that it was de-listing all EGL-I diamonds and banning their trade among wholesalers and retailers on its exchange. The basis for the decision was EGL-I's practice of fraudulently misrepresenting the qualities and characteristics of the diamonds it graded.

30.     Explaining the decision, Martin Rapaport, chairman of the Rapaport Group, stated, "The Rapaport Group is opposed to the misrepresentation of diamond quality. The over-grading of diamonds is an unfair practice that destroys consumer confidence and the legitimacy of the diamond industry. Retailers who sell over-graded diamonds using GIA terminology and non-GIA grading standards are at great risk. When consumers try to resell their diamonds or send them to the GIA for regrading and discover significant quality differences, there will be hell to pay."

31.     On September 17, 2014, Polygon, the world's largest online community and trading network of certified jewelers, followed suit – banning the trade of EGL-International diamonds on its site. A statement by Polygon's senior director acknowledged that, "the industry does not support the trade of these stones based on EGL International grading reports."

---

[2] Attached hereto as **Exhibit 2**.

32.     In November 2014, diamond industry publications began sounding the alarms of the existential legal exposure faced by unscrupulous retailers who had sold high volumes of overgraded EGL diamonds:

> What will happen when consumers find out about the massive overgrading situation? Will consumers say, "Oh, I knew that EGLI was using a different lower grading standard and I paid a fair price, so no problem?" Or will EGLIs become the new Yehuda fracture-filled diamonds of the twenty-first century? Will consumers who have been sold diamonds without fair disclosure line up waiting for appraisers to tell them the GIA quality of their diamonds? Will the eager beaver, class action lawyers smell opportunity? Will consumers and attorneys general demand refunds? If so, who will pay? We are not just talking about theoretical abstract reputational risk. No, we are talking about cold, hard cash. Something tangible that everyone in our trade understands. While I don't want to create panic, I do want to warn everyone about the serious risk we are facing. Well over a billion dollars of overgraded diamonds are out there and some of them will come back to retailers from consumers demanding a full retail refund. If retailers take back the diamonds and provide a full refund, things may not get too messy. However, if retailers do not take back the diamonds, they will be offered for resale on the open market and/or sent to the GIA for regrading. Consumers will find out that they have been taken for a ride. If a critical mass of consumers is made aware of the overgrading of their diamonds and they are unable to get their money back, things may get frighteningly interesting. We can expect a publicly driven social media blast against diamonds, the likes of which we have never seen or can barely imagine. …
>
> While there does not appear to be any imminent threat of consumers returning these diamonds en masse, a few lawsuits have already commenced. Failure by jewelers and the diamond trade to provide fair refunds to consumers seeking to return overgraded diamonds could encourage other consumers to question the quality of their diamonds. Should consumers find that a significant number of diamonds have been overgraded, a run of refund requests to jewelers is possible. If this occurs, it is unlikely that retailers will have the necessary funds to provide refunds. In any case, there would be significant damage to overall consumer confidence for all diamonds.[3]

33.     On December 3, 2014, having been exposed as a systemically fraudulent organization, EGL-I announced it was shutting down.

---

[3] Rapaport Special Report, "Honest Grading," November 2014. Attached as Exhibit 1 (emphasis added).

34. Even after EGL-I had been shuttered by the diamond industry and banned by several of the largest diamond markets, The Diamond Doctor continued selling overgraded diamonds fraudulently certified by EGL-I.

**Cummings Manookian's Solicitation of Verified Consumer Protection Claims Against Diamond Doctor for Unfair, Deceptive and Fraudulent Sales of Over-Graded EGL Diamonds**

35. From 2014 until at least 2017, Cummings Manookian maintained a general website that solicits consumers who have been victims of EGL-I diamond fraud at diamondlawsuit.com. Upon information and belief, through that site, Cummings Manookian began receiving information that The Diamond Doctor had long been flooding the Dallas market with over-graded EGL-I diamonds.

36. Upon information and belief, Cummings Manookian undertook an extensive investigation to confirm the wrongdoing. Upon information and belief, after interviewing industry sources, ex-employees, and scores of customers, Cummings Manookian learned that The Diamond Doctor had been, and continued to be, one of the worst offenders in the EGL-I certificate scam. Upon information and belief, Cummings Manookian further confirmed this fact when it secured *thousands* of the very EGL-I certificates Mr. Blank used to rip off his customers.

37. In October 2015, upon information and belief, Cummings Manookian began advertising directly to Mr. Blank's victims through a dedicated website, and simultaneously making media purchases, including through Google and Facebook, to get the message out to the widest possible audience of Diamond Doctor customers. Upon information and belief, the Cummings Manookian website dedicated to potential claims against Diamond Doctor went live on October 22, 2015.

38. Upon information and belief, Cummings Manookian's dedicated Diamond Doctor website provided entirely truthful information about diamond grading, EGL-I, and diamond over-

grading and served as a resource for consumers to learn whether they have verifiable diamond over-grading claims against The Diamond Doctor.

### Diamonds Direct's Engagement of Cummings Manookian

39.     In 2015, Diamonds Direct was one of the largest independent chain of jewelry retailers in the country, with locations in Charlotte, Raleigh, Burmingham, Richmond and Austin.

40.     Based on information and belief, Diamonds Direct – like the Diamond Doctor – had sold a large volume of EGL-I diamonds based on the inflated grades of EGL-I certificates it knew overgraded the diamonds. Diamond Direct did so without disclosing to its customers that the diamonds were overgraded by 2-3 grades or more.

41.     On April 17, 2015, Cummings Manokian announced through a press release that it would "begin filing a number of class action lawsuits centered on the dumping of billions of dollars of intentionally overgaded diamonds on hundreds of thousands of customers."[4] The press release indicated that the suits would name "nationally and regionally prominent retailers" as defendants and the first round of lawsuits were expected to be filed in early June.

42.     Upon information and belief, at or around the same time as the Cummings Manookian press release, Diamonds Direct was negotiating to be acquired by the Blackstone Group.

43.     Upon information and belief, Diamonds Direct became concerned about being named in a class action lawsuit filed by Cummings Manookian, and the negatively publicity that may be associated with same, because it could dramatically reduce its valuation or tank a potential acquisition deal with the Blackstone Group.

---

[4] Attached as **Exhibit 3**.

44. Upon information and belief, Diamonds Direct reached out to Cummings Manookian to engage Cummings Manookian on an ongoing basis to represent Diamonds Direct USA, including against claims from customers to whom it had sold EGL-I graded diamonds.

45. Based on information and belief, Diamonds Direct retained Cummings Manookian, prior to November 2015, primarily to "conflict-out" Cummings Manookian from soliciting or representing clients against Diamonds Direct in advance of its deal with Blackstone.

46. Upon information and belief, Diamonds Direct agreed to pay a monthly retainer to Cummings Manookian that far exceeded the market price for the legal services it would actually require from Cummings Manookian. However, Diamonds Direct USA did expect Cummings Manookian to provide legal representation and Cummings Manookian did so.

47. In November 2015, it was announced that Diamonds Direct had been acquired by Blackstone Group.

48. Taking a page from Diamond Direct's playbook, Soloman Brothers, a large independent jewelry chain based out of Atlanta, also retained Cummings Manookian in October 2015 to represent it on an ongoing basis. Soloman Brothers agreed to pay Cummings Manookian $20,000 a month for five (5) years to represent Soloman Brothers in a variety of matters, including customer claims against Soloman Brothers.

### *Blank and Diamond Doctor Respond by Intimidating and Attacking Cummings Manookian*

49. Upon information and belief, shortly after Cummings Manookian gave notice of forthcoming class actions and began alerting the public about the fraud perpetrated by The Diamond Doctor, Blank and The Diamond Doctor began taking every available bad-faith measure to intimidate, attack, and/or con Cummings Manookian out of pursuing potential claims on behalf of consumers against him and his fraudulent business.

50.     Upon information and belief, on the very day that Cummings Manookian's dedicated Diamond Doctor site went live, October 22, 2015, Diamond Doctor and its first set of attorneys began using all manner of threats and abuses of the legal process to prevent Cummings Manookian from soliciting clients for diamond overgrading claims against The Diamond Doctor.

51.     Upon information and belief, on October 26, 2015, then-counsel for The Diamond Doctor sent a cease and desist letter to Brian Manookian, alleging the kitchen sink: violation of The Diamond Doctor's trademark(s), defamation, misrepresentation, and violations of Tennessee State Bar Rules. Upon information and belief, The Diamond Doctor also sent the letter to the Tennessee Board of Professional Responsibility and the Texas State Bar.

52.     On October 30, 2015, The Diamond Doctor sued Brian Manookian in Texas State Court, petitioning for an injunction requiring him to take down the website. The same day, the court *sua sponte* denied the petition and ordered Diamond Doctor's lawyers to appear and show cause for why they should not be disciplined under Tex. Discpl. Rule 4.04(b)(1).[5] The Diamond Doctor thereafter dismissed its own case.

53.     Upon information and belief, after realizing that legal process could not be legitimately used to shut-down Cummings Manookian's client solicitation campaign, The Diamond Doctor and Mr. Blank came up with a scheme to buy and seal off Cummings Manookian by "retaining" them like Diamonds Direct and Soloman Brothers had done.

54.     On November 6, 2015, Blank approached Manookian about The Diamond Doctor "retaining" Cummings Manookian for a monthly retainer. Upon information and belief, Blank did not actually have interest in Manookian representing him as counsel – it was only sham to "conflict" Manookian out of soliciting or representing clients adverse to The Diamond Doctor.

---

[5] Tex. Discpl. Rule 4.04(b)(1) provides: "a lawyer shall not present, participate in presenting or threaten to present: … disciplinary charges solely to gain an advantage in a civil matter.

55.    Based on information and belief, Manookian entertained, but ultimately declined Blank's offer. Based on information and belief, Manookian and Blank terminated discussions of Manookian representing Blank sometime in November 2015 and did not re-open such discussions anytime thereafter.

56.    Upon information and belief, after Manookian declined Blank's offer, Blank began labeling Manookian an "extortionist," and repeatedly threatened that unless Cummings Manookian agreed to remove its Diamond Doctor website, Blank would seek to have Mr. Manookian criminally prosecuted and professionally sanctioned by the Board. Upon information and belief, Diamond Doctor additionally claimed that simply by propositioning Cummings Manookian to represent him, Diamond Doctor had succeeded in conflicting them out of all future cases.

57.    Upon information and belief, on December 11, 2015, David Blank sent another bar complaint to the Tennessee Board of Professional responsibility against Manookian that abandoned the prior line to attack (soliciting clients for "bogus" claims) and instead claimed that Blank's failed request to retain Cummings Manookian was an "extortion scheme" by Cummings Manookian. Upon information and belief, the letter further claimed that Cummings Manookian was not even a legitimate law practice, but rather a sophisticated, mafia-like, criminal enterprise.

58.    Upon information and belief, Blank admitted in his December 11, 2015 letter that his *express goal* in complaining to the Board, was that "the Cummings Manookian 'law practice' will be shuttered…"

59.    Upon information and belief, at the time Blank made these claims to the Board – for the express purpose of "shuttering" the law practice of Cummings Manookian – he knew his

accusations were false, including because he knew that it was *his* idea and proposal to retain Cummings Manookian.

**Mark Hammervold Starts Hammervold PLC and Files Overgrading Claims Against Mervis**

60. Mark Hammervold became a licensed attorney in 2012. From 2012 to August 2015, Hammervold worked as an associate attorney at the health care litigation law firm, Gideon, Cooper & Essary, PLC, in Nashville, TN.

61. In August 2015, Mark Hammervold formed his solo law practice, Hammervold PLC.

62. One of Mark Hammervold's first cases was joining Cummings Manookian as co-counsel in a diamond overgrading case against a local jeweler in Lebanon, Tennessee who had allegedly converted a precious gemstone from the Plaintiff and tricked her into accepting a massively overgraded diamond as a replacement (*Burgess v. The Jewelers, et al.*).

63. In late December 2015 / early January 2016, Brian Manookian referred two diamond overgrading cases against Mervis Diamond to Hammervold. In January 2016, Hammervold, along with local Maryland counsel, filed *Ramsey v. Mervis*, No. 414008-V and *McMullen v. Mervis,* No. 414009-V in Montgomery County, Maryland.

64. The gravamen of these claims was that Mervis had materially misrepresented the color and clarity grades of diamonds Mervis had sold to the plaintiffs, and that at the time of those sales, Mervis presented fraudulent EGL-I diamond grading certificates that it knew overstated the grades of those diamonds.

65. Plaintiff Ramsey alleged that Mervis had represented the diamond to be "F" color and "SI1" clarity, but the diamond was actually "H" color and "I1" clarity. This allegation was supported by an independent pre-suit evaluation performed by the GIA. During the Ramsey

lawsuit, Mervis' retained an expert gemologist ultimately *agreed* with Ramsey's allegations that the diamond was H/I1 – not F/SI1 as had been represented by Mervis at the point of sale. Mervis himself also agreed with his retained expert's conclusion that Ramsey's diamond was H/I1 – not F/SI1.

66.     In the McMullen case, the IGI and GIA both agreed that the diamond had been overgraded and Mervis ultimately accepted responsibility for selling McMullen an overgraded diamond:

> Mr. Hammervold:     Do you accept responsibility for selling Ms. McMullen a diamond that was overgraded?
>
> Mr. Mervis:     We accept responsibility, yes.

67.     Discovery in the Mervis cases conclusively demonstrated that Mervis was aware – prior to selling the diamonds at issue in that litigation – that the EGL-I certificates it had supplied both plaintiffs were known to overstate the color and clarity grades of diamonds.

68.     The most clear-cut evidence of Mervis' awareness of this issue came from internal emails produced by Mervis in discovery:

**Ronnie Mervis**

| | |
|---|---|
| **From:** | Ronnie Mervis |
| **Sent:** | Thursday, January 2, 2014 6:49 PM |
| **To:** | Brie Robbins |
| **Subject:** | Re: Thursday |

I guess our diamond is a Gia. You should knock egl grading. It's at least one color and clarity off.

Ronnie Mervis
Mervis Diamond Importers

69.     A slew of internal Mervis emails demonstrated that EGL-I's overgrading of diamond was common knowledge at Mervis and among its sales team, including the following examples:

- On July 24, 2012, Zed Mervis emailed Mervis employee Tina Cleary about 3 diamonds certified by the GIA as being "I" color. Zed Mervis comments to Ms. Cleary that "any of these can get F at EGL."

- In an email sent on June 14, 2013, Zed Mervis tells Mervis employee Nancy Choi "if it's a nice diamond, nobody will bother to get an EGL certificate."

70.     At the outset of the case, Mervis moved to dismiss the complaint based on arguments that it was not responsible for the grading reflected in the EGL-I diamond certificates, and that diamond grading is entirely subjective, and so it cannot be misrepresented. The plaintiffs' response demonstrated these arguments had been rejected by every court known to address these issues and were also inconsistent with diamond industry norms and even Mervis' own representations.[6] The court agreed with the plaintiffs and denied Mervis' motion to dismiss.[7]

71.     The Mervis lawsuits were clearly meritorious and represented a significant threat to other jewelers who had sold a large volume of overgraded EGL diamonds, including Diamonds Direct and The Diamond Doctor, particularly after those lawsuits survived the pleading stage.

***Other Jewelers' Awareness of and Response to Hammervold's Mervis Lawsuits***

72.     In response to the Mervis lawsuits, another diamond retailer who had sold a large volume of EGL diamonds – International Diamond Center ("IDC") – ordered a memo to be prepared by Sara Brady, a public relations firm.[8] The memo identified a need for IDC to "Have a Crisis Response Plan in place should another lawsuit be filed against IDC with similar allegations [to those in Hammervold's lawsuits against Mervis]." The memo also suggested IDC and other

---

[6] **Exhibit 4**.
[7] **Exhibit 5**.
[8] Attached hereto as **Exhibit 6**.

jewelers who sold large volumes of EGL diamonds adopt a "bold" "proactive" collective "plan of action" to "invalidate Manookian and his cohorts," including demand letters, countersuits, media campaigns, and bar complaints. This memo used the term "cohorts" to include Hammervold.

73.     On January 22, 2016, this memo was forwarded to Blank in an email with the subject line "Plan of Attack." The email stated: "Collectively we need to work together on this issue."[9] On January 25, 2016, Diamond Doctor COO Nicole Becker responded to an email forwarding her the "Plan of Attack" email, commenting as follows: "This is exactly what we were talking about Friday. Let's fight!!!!!!!!!!!!!! Get them all together and let's get that united front. We also need to set forth plan B."[10]

74.     On January 25, 2016, Mr. Blank emailed Ronnie Mervis regarding the "plan of attack." He relayed: "I am instructing my lawyers to sue the guy in Federal court and <u>have him start spending money</u>. I would very much like for you and others to join me, he is not going away!!!! They believe they can severly [sic] limit the discovery. <u>It would also help your local case</u>."[11] The "local case" to which Blank was referring was the consumer lawsuit Hammervold had filed against Mervis three weeks earlier. Blank expressly communicated his belief that suing Manookian/Hammervold in federal court would help collaterally defend the consumer overgrading cases Hammervold was prosecuting in Maryland state court.

75.     Based on information and belief, Diamonds Direct was also apprised of this "plan of attack" and agreed and conspired to help Diamond Doctor execute a concerted plan of attack against Hammervold and others willing to represent consumers pursue diamond overgrading claims against those who had sold large volumes of overgraded EGL-I diamonds.

---

[9] *See* Exhibit 6.
[10] Attached as **Exhibit 7**.
[11] Attached as **Exhibit 8** (emphasis added).

*Diamond Doctor's Bogus "Extortion" Claim and Lawsuit Against Manookian*

76.     On February 3, 2016, The Diamond Doctor filed a federal RICO lawsuit against Manookian, alleging that Manookian had <u>extorted</u> him by demanding $3 million dollars to stop a "smear campaign."

77.     The original lawsuit alleged that "Manookian told Blank that he would take down the website and cease attacks on Facebook if The Diamond Doctor 'engaged' Cummings Manookian as its outside legal counsel" and "Manookian proposed that The Diamond Doctor pay Cummings Manookian $25,000 a month over a 10-year period for an aggregate fee of $3,000,000." The Complaint misleadingly excerpted portions of conversations between Blank and Manookian to make it appear as though Manookian had demanded Blank retain Cummings Manookian.

78.     The Diamond Doctor's lawsuit claiming "extortion" by the Manookian Defendants was an entirely contrived effort to intimidate and to achieve a hush agreement with the Manookian Defendants requiring the Manookian Defendants to be silent about Diamond Doctor's deceptive trade practices after Diamond Doctor failed to effectively achieve this by retaining and "conflicting out" Cummings Manookian.

79.     Based on information and belief, Blank and The Diamond Doctor engaged in settlement discussions with Cummings Manookian after filing the lawsuit, wherein Blank and The Diamond Doctor offered to make a large payment to Cummings Manookian for a "global" release. Blank and The Diamond Doctor's lawsuit and settlement offers were a continued attempt to achieve the same objective as their prior attempts to "retain" Cummings Manookian in November 2015.

80.     In Blank and Diamond Doctor's original complaint, they did not name Hammervold as defendants, nor did they identify Hammervold as playing any role in the so-called "extortion scheme."

### *Blank Begins Negotiating the Acquisition of Diamond Doctor by Diamonds Direct*

81.     In early 2016, Diamonds Direct was flush with capital from the Blackstone acquisition and was looking to purchase other independent jewelry stores, like The Diamond Doctor, as part of an effort to expand Diamonds Direct.

82.     Between February and May 2016, David Blank began having discussions with Diamonds Direct about Diamonds Direct acquiring the The Diamond Doctor.

83.     In mid-March 2016, Hammervold sent Texas Deceptive Trade Practices Act ("DTPA") notices[12] on behalf of four consumers who had retained Hammervold to pursue DTPA claims against Blank and The Diamond Doctor. Ultimately, nine clients retained Hammervold to represent them in such claims against Blank and The Diamond Doctor.

84.     Based on information and belief, Diamonds Direct was very interested in purchasing The Diamond Doctor, but was concerned about the threatened litigation by claimants represented by Hammervold, and the potential for Hammervold to file a class action lawsuit, or to represent additional claimants against Diamonds Direct in future lawsuits. Based on information and belief, Blank and Diamonds Direct discussed ways that Blank could seal-off Hammervold from representing claimants in future suits in order to address this concern.

### *Hammervold Represents Claimants Against Diamond Doctor, Becomes a Target*

85.     Blank and Diamond Doctor used the federal lawsuit they filed against Cummings Manookian as a way to shape the public narrative, and to attempt to *re-initiate* negotiations to buy-

---

[12] Such notices *must* be sent prior to a DTPA lawsuit per Tex. Bus. & Comm. Code § 17.505.

off Manookian, and now Hammervold, from soliciting or prosecuting any consumer claims against the Plaintiffs.

86.     On May 22, 2016, Mr. Blank gave an interview to the Dallas Morning News about his allegations that Manookian had extorted him.[13] Mr. Blank characterized the deal *he actually proposed* to Manookian as "hush money" and claimed he did not go through with it on principle: "I decided I couldn't sleep knowing that someone out there has a 10-year contract of me paying him hush money."[14] Randy Johnston, who ultimately became Diamond Doctor's attorney in the federal lawsuit, opined in the article that the deal discussed between Blank and Manookian was "fraud" and "unethical" regardless of who proposed it:

> "You can't go into an agreement that says, 'If you pay me a million dollars, I'll never sue you again,'" said Johnston, who is not involved in this controversy. "So what lawyers try to do is say: 'I can't do that but you can hire me and conflict me out. Just pay me a million dollars for me to sit on my butt and do nothing.' The ABA has said: 'That's a fraud. You're coming in the back door when you can't get through the front door. And you can't do that.'"[15]

87.     On May 27, 2016 – while the federal case was pending – as an ostensible "settlement," Blank and Diamond Doctor offered to pay Manookian $2.4 million over 10 years, in exchange for Manookian's agreement to:

   a.   Cease all media campaigns and take down all internet activity;
   b.   Make a public statement in favor of The Diamond Doctor;
   c.   Agree not to bring or be part of any claims against The Diamond Doctor in the future; and
   d.   For any potential client who contacts your clients about The Diamond Doctor, your clients would have to say something along lines of, "Diamond Doctor did no wrong when we checked claims against them, but they will exchange your diamond for you"; and

---

[13] Attached as **Exhibit 9**.
[14] *See* Exhibit 9.
[15] *See* Exhibit 9.

  e. To settle all of Hammervold's client's overgrading claims for $200,000.[16] [17]

88. Incredibly, this settlement offer proposed by Plaintiffs and Plaintiffs' Counsel in this case was virtually the same terms that Blank and Manookian discussed in November 2015 that Plaintiffs and their Counsel were actively alleging were "fraud," unlawful, and unethical in this case.

89. Based on information and belief, Jewelers Mutual Insurance Company participated in these negotiations and had agreed to provide at least part of the money that was to be paid to Manookian if a hush agreement could be reached.

90. Negotiations of this settlement between Plaintiffs' and Manookian's Counsel apparently hit a snag when the Plaintiffs had been assuming that Hammervold would be subject to the agreement, but Manookian's lawyers indicated that they did not represent Hammervold, so Hammervold would have to be dealt with separately.

91. On May 31, 2016, Plaintiffs' Counsel emailed Hammervold to determine whether Hammervold and his client's claims were part of Manookian's settlement demands. Hammervold responded that *he* was <u>not</u> part of any settlement demand (only his clients), and his clients' demands were entirely independent of any agreements Plaintiffs might reach with Manookian.

92. On June 2, 2016, then-Counsel for Diamond Doctor, Don Godwin, communicated to Hammervold that Blank and Diamond Doctor were willing to settle all of Hammervold's clients' DTPA claims, but *only if* Hammervold and his then local counsel, Bill Dipple, agreed to never represent any other claimants against Diamond Doctor:

- "I believe that the only way Mark, my client would be willing to try to reach a resolution with you is to know that there would be no more cases you would present."

---

[16] Hammervold had previously communicated to both sides in this case that his clients would settle their cases for amounts totaling $200,000.
[17] Attached as **Exhibit 10**.

- "How can he have assurance that you wouldn't be coming up with additional claimants? That's what I'm trying to accomplish."
- "Let me couch it this way, my client would like to have closure with you and your clients, if and when a settlement is reached. And we want to know, can we have closure so that other claims won't be brought by you?"
- "And so what I recommend you do is speak to Bill about it. And you know, just say, 'Don mentioned to me if we can reach a resolution they'd like to have closure. They don't want to see the Bill and Mark show come running through town again and they want to do that and not just settle the seven cases, but they want closure on it and can that be done?'"
- "I've heard of other lawyers that are representing David Blank and Diamond Doctors say to me, 'Well sure it can be done.' And I've said, 'Tell me how?' Well to this date nobody has told me how." [18]

93.     After Hammervold refused to voluntarily agree to a "global" pre-suit settlement of his clients claims, which imposed an unethical restriction on Hammervold's ability to represent other claimants, Blank, The Diamond Doctor, Diamonds Direct, and Jeweler's Mutual Insurance Company, continued to look for another way to achieve this unlawful end.

### *Jewelers' Mutual Insurance Company and Hammervold*

94.     Based on information and belief, The Diamond Doctor – like many other retail jewelers across the country – had been insured by Jewelers Mutual Insurance Company from at least 2012 to 2016, when Diamond Doctor had sold thousands of overgraded EGL-I diamonds.

95.     Hammervold's interest and pursuit of diamond overgrading claims against Diamond Doctor and other retailer jewelers presented significant financial exposure to Jewelers Mutual Insurance Company. Each sale of an EGL-I diamond by Diamond Doctor, or another one of its insureds, represented a potential legal claim for which Jewelers Mutual Insurance Company would ultimately be responsible for paying defense costs and/or indemnification.

96.     By August 2016, Hammervold was pursuing diamond overgrading claims against Jewelers Mutual insureds in multiple states. Jewelers Mutual understood that it had exposure for

---

[18] Full transcript attached hereto as **Exhibit 11**.

these claims, as evidenced by indemnification payments ultimately authorized and paid by Jewelers Mutual to one or more clients of Hammervold.

97.    On July 11, 2016, Jewelers Mutual Insurance Company retained Thomas W. Fee and Howard Klatsky of the law firm Fee, Smith Sharp & Vitullo to take over the representation of Blank and the Diamond Doctor against the diamond overgrading claims for which Diamond Doctor had received pre-suit notice from claimants represented by Hammervold.

98.    On July 12, 2016, Mr. Klatsky communicated to Hammervold that Jewelers Mutual Insurance Company had communicated it was interested in an "amicable global settlement," but Mr. Klatsky needed to get up to speed in the case.

99.    On August 17, 2016, Fee and Klatsky also entered appearances in the federal lawsuit Blank and Diamond Doctor had filed against Manookian, which Blank and Diamond Doctor had been using as a vehicle to continue negotiating with Cummings Manookian for an illicit deal to pay-off Cummings Manookian to stop soliciting claimants against Diamond Doctor.

### Blank and Diamond Doctor File Suit Against Hammervold

100.    After the attorneys that Jewelers Mutual retained to defend Blank and Diamond Doctor against the consumer cases became involved in the federal lawsuit, Blank and Diamond Doctor amended their Complaint to add Hammervold as a defendant to the federal lawsuit on September 14, 2016. The allegations against Hammervold were sparse and generic. The Defendants' complaint against Hammervold only sought monetary damages.

101.    Blank and Diamond Doctor's complaint did not seek – *and could not have lawfully sought* – to enjoin Hammervold from soliciting and/or accepting representation of clients pursuing claims against Blank, The Diamond Doctor and/or Diamonds Direct.

102.    On August 11, 2016, Hammervold, in association with local Texas counsel, filed the first of a series of consumer claims against Diamond Doctor in Texas state court, alleging violation of the DTPA, fraud, and breach of warranty ("consumer claims").

103.    Diamond Doctor and/or Diamonds Direct made a claim to Jewelers Mutual in connection with the consumer claims. Jewelers Mutual assigned those claims internal claim number "45-002624," and the internal title: "Diamonds Direct." Based on information and belief, Diamonds Direct assumed control and/or indirectly controlled the manner in which the consumer claims were litigated.

104.    In 2016, Hammervold maintained a limited $100,000 liability insurance that diminished dollar for dollar with defense costs. After Defendants learned of same, they intentionally conducted the litigation against Hammervold in a way that diminished his policy. On at least one occasion, attorney Bruce Steckler – an agent for Defendants Blank and Diamond Doctor – openly joked that Hammervold's insurance policy was being "chomped, chomped, chomped" away. This was consistent with David Blank's comments earlier in 2016 that the case was filed to get Manookian to start paying money.

105.    Sometime in October or November 2016, Blank and Diamonds Direct finalized Diamonds Direct's acquisition of The Diamond Doctor. Based on information and belief, in connection with that acquisition, Diamonds Direct and Diamond Doctor agreed and conspired to use the federal lawsuit as leverage to intimidate Hammervold into agreeing not to solicit or pursue any future claims against either Diamonds Direct and Diamond Doctor. This relief could not be lawfully requested or granted in that federal lawsuit, but the specter of the lawsuit and the manner in which Blank and The Diamond Doctor conducted themselves therein would be used to attempt to force Hammervold to unlawfully agree not to solicit or pursue any future claims against either

Diamonds Direct and Diamond Doctor. Based on information and belief, Blank agreed that he would protect and/or indemnify Diamonds Direct from future claims by Hammervold and/or his clients. Based on information and belief, Diamonds Direct required this provision and/or paid a premium to Blank for it.

106.    In November 2016, Diamonds Direct began operating a new Dallas location of Diamonds Direct at 8127 Preston, Rd., Dallas, TX 75225. Amit Berger, a senior Vice President of Diamonds Direct, moved to Dallas to oversee the operations of the store. Blank continued to work with Amit Berger at the Dallas location of Diamonds Direct.

107.    Based on information and belief, Diamonds Direct acquired the Diamond Doctor's customer transaction information, and expressly and/or constructively assumed the warranties Diamond Doctor had made to consumers regarding those transactions.

108.    Based on information and belief, at the time of the acquisition of The Diamond Doctor, and thereafter, Diamonds Direct, including Amit Berger, remained informed, and were actively involved in, The Diamond Doctor's lawsuit in federal court against Manookian and Hammervold, as well as the consumer claims Hammervold was pursuing against The Diamond Doctor in Texas state court.

### *Defendants' Abuses of Process During the Ongoing Case*

109.    The Defendants conspired to abuse process in the federal case and in the consumer cases to attempt to achieve unlawful objectives, including to pressure and incent Hammervold to provide false inculpatory testimony against Manookian, to use the filed lawsuit as a basis to disqualify Hammervold in the pending consumer cases against Blank and The Diamond Doctor, and to obtain Hammervold's agreement that he would not solicit or pursue any claims against Blank, Diamond  Doctor and/or Diamonds Direct.

110.     On May 24, 2017 – on the eve of the date that the Defendants had scheduled for the deposition of Mark Hammervold – Counsel for Blank and The Diamond Doctor, Randy Johnston, spoke with Mark Hammervold, and his attorney Varant Yegparian on the phone. During the phone call, Mr. Johnston stated that his job in the case was to "ensure that Mr. Manookian was disbarred." In the next sentence, Mr. Johnston stated that if Hammervold remained a defendant in the case, he would face "career-altering, life-lasting consequences." Hammervold understood this threat from Mr. Johnston to imply that that if Hammervold did not go along with the Defendants' demands, Defendants would make it their goal to use the proceedings to try to get Hammervold disbarred.

111.     Mr. Johnston communicated to Hammervold that he should seriously consider settlement, and that Blank and Diamond Doctor would be willing to dismiss their case against Hammervold, withdraw their objections to Hammervold appearing *pro hac vice* in the consumer claims (where Hammervold was opposing counsel), and settle those cases. But the extent to which Blank and Diamond Doctor would be willing to do those things depended directly upon Hammervold's willingness to provide testimony adverse against Manookian in that case and to agree not to accept any more diamond cases (against Diamond Doctor and Diamonds Direct). Hammervold would also have to agree to disassociate himself with Manookian and not be involved in any more cases against the Diamond Doctor.

112.     Hammervold understood Mr. Johnston's demand that Hammervold provide testimony "adverse against Brian Manookian" in that case to mean false testimony, because Blank/Diamond Doctor and their attorneys already had the right to elicit any relevant, non-privileged truthful testimony from Hammervold during his next-day deposition (without a settlement).

113.    On June 27, 2017 the Blank and Diamond Doctor's claims against Hammervold were severed from the Defendants' claims against Manookian and the other co-Defendants.

114.    On the eve of trial (August 16, 2017), Blank and Diamond Doctor reached a "global" settlement with Manookian. Based on information and belief, Amit Berger and Diamonds Direct were informed of and provided input in the negotiations of settlement between Manookian and Blank and Diamond Doctor.

115.    Shortly after the settlement was finalized, Blank and Diamond Doctor's attorneys made several statements to the media, characterizing the settlement as a "complete vindicat[ion]" and "major win" for Blank and Diamond Doctor. Attorney Randy Johnston – on behalf of Blank and Diamond Doctor "said under the deal, the Blank family did not have to pay any money to Tennessee lawyer Brian Manookian or his law firm Cummins [sic] Manookian."[19] However, an attorney for Blank and Diamond Doctor, Howard Klatsky, later admitted that the settlement between Blank / Diamond Doctor and Manookian provided for a circuitous payment to Manookian that was structured as one of Blank and Diamond Doctor's  attorney's purchasing internet sites from Manookian:

| | |
|---|---|
| Judge Clement: | What's the status of your case against Mr. Manookian? |
| Howard Klatsky: | Your Honor, there was a compromise, a confidential settlement agreement entered into that resulted in the entry of a, an agreed permanent injunction. So the claims against Mr. Manookian and his firm have been resolved. |
| Judge Clement: | So, does the confidentiality prevent you from saying whether money was paid? |
| Howard Klatsky: | Um, whether money was paid? As part of the settlement? Your Honor, I believe that it does. If you were to order me to answer your question, I would, would certainly, uh, do so. |
| Judge Clement: | Okay. <u>Was the money paid?</u> |

---

[19] Diamond Doctor case ends with both sides agreeing to halt war of words. 8/21/17. **Exhibit 12**.

| Howard Klatsky: | As I understand things ... I'm not trying to be cute. The answer is yes and no. Technically no, under the terms of the agreement. However, my recollection of things, and I was one of a handful of lawyers involved, is that one of the law firms who was representing my client agreed to purchase certain internet sites that Mr. Manookian had allegedly posted. |
| Judge Clement: | Like the Facebook ads and all that? |
| Howard Klatsky: | Yes, Your Honor. And that was the way it was ultimately resolved, to the best of my understanding.[20] [21] |

116.     Based on information and belief, during the negotiation of settlement between Blank / Diamond Doctor and Manookian, the attorneys for Blank / Diamond Doctor requested that Manookian agree and/or facilitate Hammervold releasing all claims against Blank and Diamond Doctor and agreeing to the terms of an Agreed Permanent Injunction.

117.     In connection with the settlement Blank / Diamond Doctor and Manookian submitted an "Agreed Permanent Injunction," which "enjoined from any harassing conduct or disparaging or defaming the services, business, integrity, veracity or personal or professional reputations of [a party by] the other in either a personal or professional manner at any time and through any medium or intermediary."

118.     By its terms, this Agreed Permanent Injunction not only applied to the Parties who agreed to its entry, but also "those persons in active concert or participation with [the Parties] who receive actual notice of this order by personal service or otherwise."

119.     Throughout the pendency of the lawsuit, Blank and Diamond Doctor continued to demand – as part of any settlement – that Hammervold unlawfully agree not to solicit any future claims against Blank, Diamond Doctor or Diamonds Direct.

---

[20] This is an unofficial transcript of an audio excerpt from the Fifth Circuit's official audio recording of the oral argument that took place before the Fifth Circuit on February 7, 2018.
[21] After Mr. Klatsky publicly made this admission during recorded argument before the Fifth Circuit, Blank and Diamond Doctor asked the Fifth Circuit to "seal" that portion of the transcript. That request was meritless and denied.

120.     Because of Blank and Diamond Doctor's settlement posture, Hammervold filed a motion on April 27, 2016, requesting guidance from the court as to whether he could agree to restrict his practice in connection with a settlement that might be reached during the court-ordered mediation that was scheduled to occur on May 12, 2017 and May 15, 2017.

121.     On May 9, 2017, Blank and Diamond Doctor responded by accusing Hammervold of asking the court to "essentially bless a violation of an ethical rule." This response further characterized Hammervold's request for guidance on the issue as "shock[ing] the conscience and surpass[ing] reason."

122.     Despite acknowledging that asking Hammervold to restrict his practice would be a "shocking" "violation of an ethical rule," attorneys for Blank and Diamond Doctor continue to make this demand of Hammervold as a condition of settlement of the case.

123.     On January 31, 2018, Counsel for Blank / Diamond Doctor sent a written settlement communication to Hammervold, demanding – as the primary consideration for dismissal of the suit – that Hammervold agree ***not to solicit any claims*** against Blank, Diamond Doctor or Diamonds Direct:

> That Mark Hammervold and Hammervold, P.L.C. agree that they will not actively solicit any individual who has not previously retained Hammervold, P.L.C. to pursue affirmative claims for relief against The Diamond Consortium, Inc. and Diamond Consortium, LLC, and/or David Blank to retain Mark Hammervold, Hammervold, P.L.C., or any other attorney or law firm to assert/pursue claims relating to the alleged overgrading and sale of diamonds first shown or sold (whichever date occurred first) to customers on or before November 1, 2016 against, or to file suit against, David Blank, his spouse, his children, his parents, The Diamond Consortium, Inc., Diamond Consortium, LLC, any other privately-held entity that David Blank has a direct or indirect ownership interest in, any employees or former employees of The Diamonds Consortium, Inc., Diamond Consortium, LLC, or Diamonds Direct in the future;[22]

---

[22] Settlement Communication of January 31, 2018. **Exhibit 13**.

124.    At the time this demand was communicated, the attorneys representing Blank and Diamond Doctor knew that it was wrongful.

125.    Rule 5.06 of most states' ethical rules applicable to lawyers provides that "A lawyer shall not participate in offering or making … an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a suit or controversy."

### Conclusion of the Case Against Hammervold in Hammervold's Favor

126.    After Diamond Doctor settled its dispute with Manookian on the eve of trial – by making a substantial payment to Manookian – the case against Hammervold resumed at the trial court level in August 2018 after the conclusion of two interlocutory appeals.

127.    Based on information and belief, Jewelers Mutual Insurance Company continued to pay for the Blank and Diamond Doctor's attorneys fees' and expenses in prosecuting the federal lawsuit against Hammervold, even though there were no remaining affirmative claims against Blank or Diamond Doctor. Jewelers Mutual Insurance Company continued to fund and participate in the lawsuit against Hammervold as a way to intimidate and seal-off Hammervold from accepting consumer claims against Diamond Doctor and/or other Jewelers Mutual Insureds.

128.    On August 8, 2018, Hammervold filed a renewed motion to proceed *pro se*. Hammervold was forced to do so because he had exhausted his professional liability policy limit and could no longer afford to pay a retained attorney.

129.    On January 15, 2019, the trial court granted Hammervold's motion and allowed Hammervold to represent himself and his solo law practice *pro se*.

130.    On January 29, 2019, Hammervold filed a motion for leave to file a concise motion for summary judgment. Hammervold filed that motion after being given access to critical discovery materials, including David Blank's deposition, for the first time on January 24, 2019.

Hammervold requested the opportunity to submit a concise motion for summary judgment because testimonial admissions from Blank's deposition demonstrated that the plaintiffs never had any evidentiary basis for their claims as against Hammervold. Hammervold argued that the court should permit him the opportunity to file a concise Motion for Summary Judgment "rather than delay resolution the issue until the directed verdict stage – because a jury should not be empaneled and Hammervold should not be subjected to trial for Plaintiffs' claims, when those claims have no evidentiary basis."

131.    The Plaintiffs' Response in opposition to the motion objected to the filing of the motion for summary judgment almost entirely on procedural grounds. The section of the Plaintiffs' response to that motion arguing that a motion for summary judgment by Hammervold would be "futile" demonstrated the abject weakness of the Plaintiffs' substantive case against Hammervold.

132.    On February 4, 2019, Hammervold filed his motions in limine. Hammervold's motions in limine #1, #3, #4 – in the context of the Plaintiffs' claims against him – were effectively dispositive motions, and were likely to be granted.

133.    On February 19, 2019, the court denied Hammervold's motion for leave to file a motion for summary judgment on procedural grounds, without addressing the Plaintiffs' argument that a motion for summary judgment would be futile or the merits of the motion for summary judgment Hammervold sought leave to file.

134.    As a result of the court's order of February 19, 2019, the court never addressed whether the Plaintiffs had any threshold evidence supportive of their allegations as against Hammervold and the court never addressed Hammervold's contention that Blank's testimonial admissions demonstrated that Hammervold was entitled to judgment as a matter of law.

135.    On February 25, 2019, Hammervold met with Braden Wayne, an attorney for Blank and Diamond Doctor, in person, at the Loews Hotel in Chicago. The ostensible purpose of the meeting was for Hammervold and Wayne to meet and confer regarding motions in limine, jury instructions, and other pre-trial issues in advance of the pre-trial conference. However, Wayne was largely unprepared to do so. During the meeting, Wayne acknowledged that it would be virtually impossible for the Plaintiffs to proceed with their case if Hammervold's motion in limine #1 was granted. During the meeting Hammervold communicated to Wayne that since the court had only denied the motion to leave to file a motion for summary judgment, he would be filing the motion as a motion for directed verdict at trial.

136.    After the meeting, Wayne invited Hammervold to have drinks at the Loews hotel bar, and brought up settlement. Wayne communicated that the Plaintiffs' attorneys "liked" Hammervold and were sorry that Hammervold had to get wrapped up in the suit against Manookian and that the Plaintiffs were not looking for any money from Hammervold (the only relief Plaintiffs were seeking in their Complaint) and only wanted "peace" with Hammervold. Hammervold reiterated that he could not agree to limit his practice, as he had said before.

137.    The Plaintiffs' claims against Hammervold were set to be tried before a jury in April 2019. The pre-trial conference was set to occur on March 1, 2019.

138.    On February 28, 2019, the day before the pre-trial conference, Braden Wayne texted Hammervold at 9:08 am to ask if Hammervold was available for a five (5) minute call to "confer on a motion we're preparing to file earlier today." Hammervold responded that he would not be available to discuss by phone until 2:00 pm because he was in a meeting, but asked Wayne to send a draft of the proposed motion by email for consideration.

139.     At 9:23 am, Braden Wayne indicated by email that Plaintiffs had prepared a Rule 41 Motion to Dismiss. Wayne communicated: "We're willing to file the Rule 41 Motion with prejudice, provided that you and your PLC agree to a mutual release of any and all claims between the parties."

140.     Hammervold did not agree to release the Plaintiffs and the Plaintiffs moved to voluntarily dismiss their own case on February 28, 2019.

141.     The Plaintiffs claimed that they were dismissing their case due to concerns about collecting against Hammervold, but this was false. Throughout the case, the Plaintiffs' filing of th lawsuit was never about collecting money, but about creating a mechanism to "settle" with the defendants for unlawful non-monetary terms that could not be ordered by the Court. This is evidenced by the Plaintiffs offering to pay millions of dollars to the Manookian defendants right out of the gate after initially filing their lawsuit, the Plaintiffs agreeing to pay the Manookian defendants money to settle on the eve of the trial against those defendants, and the nature of the Plaintiffs' previous settlement demands to Hammervold.

142.     The Plaintiffs dismissed their own lawsuit on February 28, 2019 because they knew that effectively-dispositive pending motions in limine were likely to be granted on March 30, 2019, and in any event, that Hammervold was likely to obtain a directed verdict in his favor after the court declined to allow Hammervold to file a motion for summary judgment based on Blank's deposition testimony.

143.     Even though the Plaintiffs settled with Manookian by making a payment to Manookian and voluntarily dismissed their lawsuit as against Hammervold, the filing and the prosecution of the lawsuit has still caused Hammervold to incur significant expense, to expend a significant amount of professional time without remuneration, and has significantly damaged

Hammervold's reputation. Prior to the Defendants' filing of the lawsuit, Hammervold's Google results primarily reflected his various accolades. Now, Hammervold will forever be associated with the Defendants' patently false allegations that he participated in a criminal conspiracy to "shakedown" or "extort" The Diamond Doctor.

### Count I – Conspiracy / Abuse of Process (All Defendants)

144. The Defendants had an ulterior motive when using and abusing process in *Diamond Consortium v. Manookian, et al.* and *Diamond Consortium v. Hammervold, et al.* Specifically, the Defendants conspired to abuse process in these cases, as part of a broader "plan of attack" to collaterally defend and/or to seal-off Manookian and Hammervold from soliciting or pursuing meritorious diamond overgrading grading claims against Blank, Diamond Consortium, and Diamonds Direct, and/or to embarrass, intimidate, invalidate, and/or discredit Hammervold.

145. The only form of relief sought by Defendants in the Complaint against Hammervold was monetary damages. The law would not support a request by Defendants for an injunction precluding Hammervold from soliciting or representing claimants against Defendants. Yet, in their settlement demands throughout the case, Defendants insisted on an agreement from Hammervold that would effectively seal Hammervold off from representing consumers pursuing diamond overgrading claims against the Defendants.[23]

146. Defendants abused process and/or conspired to abuse process, including in the following ways:

  a. Demanding that Hammervold agree not to solicit for and/or accept any other diamond cases against Defendants;

---

[23] Defendants' often demanded monetary payment as well, but it was typically nominal.

b. Pursued *Diamond Consortium v. Hammervold* in a way aimed to drain Hammervold's insurance policy and financial resources, so he would have no other option but to agree to the illegal terms Defendants sought from him;

c. Threatened Hammervold and alternatively offered to settle with Hammervold if he would provide adverse, false testimony against Brian Manookian in *Diamond Consortium v. Manookian*;

d. Used the filing of the *Diamond Consortium v. Manookian* lawsuit to attempt to disqualify Hammervold from representing claimants in consumer cases against Blank and Diamond Doctor;

e. Obtaining an agreed injunction that arguably applied as against Hammervold – as a party they alleged was in "active concert" with Manookian, when Hammervold would not agree to same;

f. Obtaining an Agreed Permanent Injunction to silence Brian Manookian, a critical witness for Hammervold's defense against Blank and the Diamond Consortium's bogus claims against Hammervold.

147.    Jewelers Mutual Insurance Company and Diamonds Direct conspired with Blank and Diamond Doctor to abuse process against Hammervold in the federal case and in the state law consumer cases, in order to coerce Hammervold into entering into an illegal settlement agreement, in which Hammervold agreed to never solicit or pursue claims against The Diamond Doctor, Blank and Diamonds Direct, or alternatively, to intimidate, embarrass, discredit and/or invalidate Hammervold if Hammervold was unwilling to agree to same.

148.    Jewelers Mutual committed overt acts in furtherance of the conspiracy, including signing off on settlement demands communicated to Hammervold that would unlawfully seal

Hammervold off from soliciting future claimants against Blank, Diamond Doctor, and/or Diamonds Direct.

149.    Diamonds Direct committed overt acts in furtherance of the conspiracy, including coordinating meetings with Manookian and Blank to attempt to reach a settlement that would seal off Manookian and Hammervold.

150.    As a direct and proximate result of Defendants' conspiracy to abuse process, and the abuses of process that resulted, Hammervold was damaged in excess of $500,000.

151.    Since Defendants intended to damage the Plaintiff and/or were reckless as to whether their abuses of process would damage the Plaintiff, the Plaintiff is entitled to an award of at least $1,500,000 in punitive damages.

152.    The Defendants' conspiracy to abuse process was ongoing and remained continuous until Blank and the Diamond Doctor dismissed their lawsuit against Hammervold on February 28, 2019. Therefore, Hammervold has timely filed this claim.

### Count II – Conspiracy / Malicious Prosecution
### (Blank, Diamond Doctor and Jewelers Mutual Only)

153.    Defendants Blank and Diamond Doctor instituted and continued a civil lawsuit against Hammervold.

154.    Defendants Jewelers Mutual Insurance Company insisted that Hammervold be named as a defendant in *Diamond Consortium, et. al. v. Manookian, et al.* and aided, abetted, encouraged, and supported the prosecution of Hammervold by paying attorneys to affirmatively prosecute those claims, even though their insurance agreement with the Plaintiffs would not and should not have covered Jewelers Mutual pursuing claims against the attorney of a consumer claimant.

155.     Defendants lacked probable cause for suing Hammervold in *Diamond Consortium, et. al. v. Manookian, et al.*, and for continuing to prosecute the case, even as it became clear that there was no probable cause.

156.     Defendants acted with malice in adding Hammervold as a defendant to their lawsuit against Manookian and in continuing to prosecute that lawsuit against Hammervold.

157.     *Diamond Consortium v. Hammervold* terminated in Hammervold's favor for the purpose of this malicious prosecution claim, including for the following reasons:

    a.   Illinois law applies to this element under applicable choice of law principles, and Illinois recognizes that an action terminates in a defendant's favor when the plaintiff abandons a claim,[24] as Blank and the Diamond Doctor did on February 28, 2019;

    b.   Alternatively, even under Texas law, the circumstances surrounding Blank and The Diamond Doctor's voluntary dismissal of Hammervold demonstrate that said dismissal was a favorable termination for Hammervold,[25] including because:

        i.   Discovery confirmed that Blank and Diamond Doctor had no evidence or information to support their claims against Hammervold and decided

---

[24] *Cult Awareness Network v. Church of Scientology Int'l*, 177 Ill. 2d 267, 276-280 (Ill. 1997) (adopting Restatement (Second) of Torts § 674, Comment j).

[25] Texas courts have recognized that "voluntary non-suits ... might satisfy the favorable-termination element depending upon the circumstances attending the non-suits." *McCall v. Tana Oil & Gas Corp.*, 82 S.W.3d 337, 350, 2001 Tex. App. LEXIS 4969, *28 (Tex. App. 3rd 2001) (noting that the Texas Supreme Court adopted comment j to Restatement (Second) of Torts § 674 in Texas Beef Cattle Co. v. Green, 921 S.W.2d 203, 208 (Tex. 1996) with respect to the issue of favorable termination); *see Duzich v. Advantage Fin. Corp.,* 424 F.Supp. 910, (S.D.Tex. 2003) ("The Court is inclined to follow the state court rule that voluntary dismissal may in some cases qualify as a favorable determination for the defendant. But the Parties do not provide any indication why the Trustee voluntarily dismissed the claims in the Underlying Litigation"); *Duzich v. Advantage Fin*., 395 F.3d 527 (5th Cir. 2004) ("…we agree with the district court. The record in this case provides nothing from which to infer that the voluntary dismissal of the bankruptcy proceeding by the Trustee was a favorable termination for Duzich on the merits.").

to voluntarily dismiss their claims against Hammervold on the eve of the pre-trial conference, on February 28, 2019, only because Hammervold refused to agree to the non-monetary demands Plaintiffs were seeking from Hammervold all along and to avoid inevitable negative ruling(s) in favor of Hammervold on (1) Hammervold's effectively-dispositive motions in limine on March 1, 2018, (2) Hammervold's forthcoming motion for a directed verdict in April 2018, and/or (3) a jury verdict in favor of Hammervold in April 2018.

ii. The dismissal was only "without prejudice" because Hammervold refused to agree to a mutual release with Blank and Diamond Doctor.

158. Hammervold suffered a special injury and/or special damages due to the malicious prosecution, including for the following reasons:

a. Illinois law applies to this element under applicable choice of law principles;

b. The Defendants' malicious prosecution of Hammervold created potential a conflict of interest between Hammervold and prospective claimants that limited Hammervold's ability to accept additional representation of claimants against Blank and The Diamond Doctor;

c. The Defendants' malicious prosecution of Hammervold damaged Hammervold's professional reputation in a manner that harmed his future job prospects;[26] and

d. The Defendants conspired to use litigation "not to resolve any legal dispute between the parties, but to keep plaintiff from engaging in its business."[27]

---

[26] *See* Rothman v. City of Chicago, 2003 U.S. Dist. LEXIS 8376, *17-18, (N.D. Ill. May 14, 2003).
[27] *See Cult Awareness Network*, 177 Ill. 2d at 284-285.

Specifically, the Defendants sought to use the civil lawsuit to prevent

Hammervold from soliciting and prosecuting consumer claims against Blank,

The Diamond Doctor, Diamonds Direct, and/or other Jewelers Mutual insureds.

159.    As a direct and proximate result of Defendants' abuses of process, Hammervold

was damaged in excess of $500,000.

160.    Defendants acted with malice and in a willful and wanton manner. Accordingly,

Plaintiff is entitled to an award of at least $1,500,000 in punitive damages.

161.    Hammervold has timely filed this claim within one year of the underlying lawsuit

terminating in his favor.

### DEMAND FOR JURY TRIAL

162.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff requests a trial by

jury.

WHEREFORE, the Plaintiff, Mark Hammervold, requests that this Court enter judgment

in his favor and against Defendants David Blank, The Diamond Consortium, Inc., Diamonds

Direct USA of Dallas and Jewelers Mutual Insurance Company as follows:

(A) Award Plaintiff actual damages in excess of $10,000,000;

(B) Award Plaintiff punitive damages in an amount in excess of $30,000,000;

(C) Award costs;

(D) Any further relief this Court deems just.

**RESPECTFULLY SUBMITTED,**

**s/Mark Hammervold**[28]
Mark Hammervold, IL #6320744
155 S. Lawndale Ave.
Elmhurst, IL 60126
(T) 405.509.0372
(F) 615.928.2264
mark@hammervoldlaw.com

---

[28] Mark Hammervold is admitted to practice in this district, but is representing himself *pro se* in this case.

AO 399 (01/09) Waiver of the Service of Summons

# UNITED STATES DISTRICT COURT

for the

Eastern District of Texas

| | |
|---|---|
| Mark Hammervold | ) |
| *Plaintiff* | ) |
| v. | ) |
| Diamonds Direct of Dallas, LLC et al. | ) |
| *Defendant* | ) |

Civil Action No. 4:20-cv-00165-ALM

## WAIVER OF THE SERVICE OF SUMMONS

To: Mark Hammervold

*(Name of the plaintiff's attorney or unrepresented plaintiff)*

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from _____03/03/2020_____, the date when this request was sent (or 90 days if it was sent outside the United States).  If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date: _____03/04/2020_____

*Signature of the attorney or unrepresented party*

David Blank and Diamond Consortium, Inc.

*Printed name of party waiving service of summons*

Braden M. Wayne

*Printed name*

12720 Hillcrest Road, Suite 1045
Dallas, Texas 75230

*Address*

braden@sgc.law

*E-mail address*

(972) 387-4040

*Telephone number*

---

**Duty to Avoid Unnecessary Expenses of Serving a Summons**

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint.  A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court.  By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.